## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Capital Area Immigrants' Rights Coalition,**
1612 K Street NW, #204
Washington, DC 20006;

**Refugee and Immigrant Center for Education
and Legal Services, Inc.,**
1305 North Flores Street
San Antonio, TX 78212;

        Plaintiffs,

      v.

**Donald J. Trump,** in his official capacity as **President
of the United States,**
1600 Pennsylvania Avenue NW
Washington, DC 20500;

**William Barr,** in his official capacity as **Attorney
General of the United States,**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530;

**Kevin McAleenan,** in his official capacity as **Acting
Secretary of Homeland Security,**
25 Murray Lane SW
Washington, DC 20528;

**Kenneth Cuccinelli,** in his official capacity as **Acting
Director of U.S. Citizenship and Immigration
Services,**
20 Massachusetts Avenue NW
Room 4210, MS: 2120
Washington, DC 20529;

**John P. Sanders,** in his official capacity as **Acting
Commissioner of U.S. Customs and Border
Protection,**
1300 Pennsylvania Avenue NW
MS: 1345
Washington, DC 20229;

Civil Action No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**Matthew Albence**, in his official capacity as **Acting Director of Immigration and Customs Enforcement**,
500 12th Street SW
Washington, DC 20536;

**James McHenry**, in his official capacity as **Director of the Executive Office for Immigration Review**,
U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041;

**U.S. Department of Justice,**
950 Pennsylvania Avenue NW
Washington, DC 20530;

**U.S. Department of Homeland Security,**
245 Murray Lane SW
Mailstop 0485
Washington, DC 20528;

**U.S. Citizenship and Immigration Services,**
20 Massachusetts Avenue NW
Washington, DC 20529;

**U.S. Customs and Border Protection,**
1300 Pennsylvania Avenue NW
Washington, DC 20229;

**U.S. Immigration and Customs Enforcement**,
500 12th Street SW
Washington, DC 20536;

**Executive Office for Immigration Review**;
U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041;

Defendants.

## INTRODUCTION

1.      Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and

Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") (together,

"Plaintiffs") bring this lawsuit to challenge the Government's bar on asylum eligibility for individuals and families entering the United States across the southern border without first applying for protection from persecution or torture while in third countries through which they transited en route to the United States.

2.      Our immigration laws, consistent with the United States' international legal obligations, reflect Congress's commitment to aid persons fleeing persecution who are "physically present in the United States or who arrive[] in the United States * * * irrespective of such alien's status." 8 U.S.C. § 1158(a)(1).

3.      The Immigration and Nationality Act ("INA") provides two exceptions under which individuals can be prevented from seeking asylum in the United States based on their connection with a third country: (1) where the United States has a bilateral or multilateral agreement with a "[s]afe third country" in which the alien would have access to "a full and fair procedure" for determining her eligibility for asylum or equivalent protections, *id.* § 1158(a)(2)(A), or (2) the alien was "firmly resettled" in another country before arriving in the United States, *id.* § 1158(b)(2)(A)(vi).  The only country with which the United States has a "safe third party" agreement is Canada.

4.      On July 16, 2019, without using the notice and comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, the U.S. Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ"), U.S. Citizenship and Immigration Services ("USCIS"), and Department of Homeland Security ("DHS") issued an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (the "Rule") that radically rewrites this statutory scheme.

5.     The Rule creates a new third country-related exception to the INA's presumption of asylum eligibility for those in the United States.  Under its amendments to 8 C.F.R. §§ 208.13, 1208.13, an individual who "enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside of the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum," unless she can show that she falls within one of three limited exceptions: (1) that she applied for protection from persecution or torture in at least one third country and received a final judgment of denial, (2) that she satisfies the definition of a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11, or (3) that the only third countries through which she transited to the United States were, at the time, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment ("CAT").  84 Fed. Reg. 33,843.

6.     The Rule's amendments to 8 C.F.R. § 208.30(e)(5)(ii) subject individuals to a higher burden to avoid removal: "If the alien is found to be an alien described in § 208.13(c), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum," and proceed to place the individual into full removal proceedings under Section 240 of the INA for consideration of her claims for withholding of removal under Section 241(b)(3) of the INA or for protection under the CAT.  84 Fed. Reg. 33,843-33,844.  Either form of relief requires the individual to establish a "reasonable fear of persecution or torture," rather than a credible fear, subject to limited review under the same

"reasonable fear" standard by an immigration judge.  84 Fed. Reg. 33,843-33,844 (amending 8 C.F.R. § 208.30(e)(5)(ii)).

7.      The Rule intentionally operates to strip asylum eligibility from many of those who need it most: migrants fleeing persecution and violence across the southern border of the United States.  Such asylum seekers are disproportionately comprised of women, children, LGBT individuals, and other vulnerable populations at risk of violence in their home countries.

8.      Plaintiffs respectfully ask the Court to issue an order declaring that the Rule violates the INA, the APA, and the Constitution, and enjoining its enforcement and implementation across the United States.

9.      Because Plaintiffs CAIR Coalition and RAICES also will suffer irreparable harm absent an injunction against the Rule, Plaintiffs have moved for a temporary restraining order and a preliminary injunction.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, the INA, the APA, and other federal statutes.

11.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. § 706; the Mandamus and Venue Act, 28 U.S.C. § 1361; Rules 23, 57, and 65 of the Federal Rules of Civil Procedure ("Federal Rules"); and the Court's inherent equitable powers.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1).  Upon information and belief, a substantial part of the events giving rise to this claim occurred in this District, including the decision to implement the policy changes challenged in this action.

13.    Each individual Defendant also is an officer of the United States sued in his or her official capacity, and the majority of Defendants reside in this District.

## PARTIES

### *CAIR Coalition*

14.    Plaintiff CAIR Coalition is a 501(c)(3) nonprofit legal services and advocacy organization with its principal place of business in the District of Columbia.  CAIR Coalition provides direct legal services to migrant men, women, and children at risk of detention and deportation in the Washington, DC metropolitan area and beyond, including with respect to credible fear interviews in the course of removal procedures, asylum applications, and adversarial proceedings in immigration courts.  The organization also engages in impact and advocacy work related to immigration and trains and supervises pro bono attorneys.

### *RAICES*

15.    Plaintiff RAICES is a 501(c)(3) nonprofit legal services and advocacy organization with offices in San Antonio, Austin, Corpus Christi, Dallas, Fort Worth, and Houston, Texas.  Founded in 1986 as the Refugee Aid Project, RAICES has grown to become the largest immigration legal services provider in Texas.   The organization provides consultations and direct legal services to immigrants and refugees in Texas, as well as to clients after they leave the state.  In 2017 alone, RAICES closed 51,000 cases at no cost to its clients.

*Defendants*

16.     Defendant Donald J. Trump is the President of the United States.  In that capacity, he directs and oversees the activities of the executive agencies that have promulgated and seek to implement the Rule.  He is sued in his official capacity.

17.     Defendant William Barr is sued in his official capacity as Attorney General of the United States.  The Attorney General is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103, and has the authority to grant noncitizens asylum and other relief. He also directs each of the component agencies within DOJ.  Defendant Barr was Attorney General when DOJ issued the Rule challenged in this action, and approved it in the form in which it was published in the Federal Register.

18.     Defendant Kevin McAleenan is sued in his official capacity as the Acting Secretary of Homeland Security.  In that capacity, he is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103, has the authority to grant noncitizens asylum and other relief, and approved the Rule challenged in this action.  He also directs each of the component agencies within Defendant DHS.  Defendant McAleenan held this position at the time Defendant DHS issued the Rule challenged in this action.

19.     Defendant Kenneth Cuccinelli is sued in his official capacity as the Acting Director of USCIS.  In that capacity, he is responsible for overseeing asylum officers who adjudicate applicants' asylum claims, including by conducting "credible fear" interviews pursuant to 8 U.S.C. § 1225(b)(1)(B).  Defendant Cuccinelli held this position at the time Defendant USCIS issued the Rule challenged in this action.

20.     Defendant John P. Sanders is sued in his official capacity as the Acting Commissioner of U.S. Customs and Border Protection ("CBP").  In that capacity, he oversees the

agency responsible for securing U.S. borders with respect to trade, immigration, and agricultural protection.  Defendant Sanders held this position at the time the Rule challenged in this action was issued.

21.     Defendant Mathew Albence is sued in his official capacity as the Acting Director of U.S. Immigration and Customs Enforcement ("ICE").  In that capacity, he is responsible for civil and criminal enforcement of federal laws governing border control, customs, trade, and immigration.  Defendant Albence held this position at the time the Rule challenged in this action was issued.

22.     Defendant James McHenry is sued in his official capacity as the Director of EOIR.  In that capacity, he is responsible for the sub-agency of DOJ that conducts limited review of negative credible fear determinations made pursuant to 8 U.S.C. § 1225(b)(1)(B).  Defendant McHenry held this position at the time Defendant EOIR issued the Rule challenged in this action.

23.     Defendant DOJ is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States.  It issued the Rule challenged in this case.

24.     Defendant DHS is a cabinet-level department of the federal government responsible for enforcing the immigration laws of the United States.  Its component sub-agencies include Defendants USCIS, CBP, and ICE.  It issued the Rule challenged in this case.

25.     Defendant USCIS is the sub-agency of DHS responsible for conducting interviews of asylum applicants through its asylum officers.  It issued the Rule challenged in this case.

26.     Defendant CBP is the sub-agency of DHS responsible for the initial processing and detention of noncitizens who are apprehended at or near U.S. borders.  In that capacity, it will implement the Rule challenged in this case.

27.     Defendant ICE is the sub-agency of DHS responsible for carrying out removal orders and overseeing immigration detention in the United States.  In that capacity, it will implement the Rule challenged in this case.

28.     Defendant EOIR is a sub-agency of DOJ.  *See* 28 C.F.R. § 0.115.  It is responsible for conducting limited review of negative credible fear determinations made pursuant to 8 U.S.C. § 1225(b)(1)(B).  It also issued the Rule challenged in this case.

## BACKGROUND

### Asylum Protections under International and Domestic Law

29.     Under existing federal law, and consistent with the United States' international legal obligations, individuals fleeing persecution and violence are entitled to pursue several forms of legal protection in the United States.

30.     These forms of protection include (1) asylum, 8 U.S.C. § 1158; (2) withholding of removal, 8 U.S.C. § 1231(b)(3); and (3) protection under the CAT, *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

31.     Modern asylum procedures initially were established in the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which revised the INA's procedures for admission of refugees and announced that "it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible," *id.* § 101(a) (codified as Note to 8 U.S.C. § 1521).

32.     In creating the asylum provisions, Congress sought to bring the United States into compliance with its international obligations under the 1967 United Nations Protocol Relating to the Status of Refugees and the 1951 Convention Relating to the Status of Refugees.   These and other international treaties reflect the United States' obligations to permit refugees to seek asylum in its borders, to impose no penalties on asylum seekers based on their unlawful status, and to prevent the return (or "refoulement") of individuals to countries where they would face persecution or torture.

33.     It is a widely accepted principle of international refugee law that "asylum should not be refused solely on the ground that it could be sought from another State."   UNHCR Exec. Comm., Refugees Without an Asylum Country, Conclusion No. 15(h)(iv) (XXX) Oct. 16, 1979).[1]   The U.N. High Commissioner on Refugees has stated that before transferring asylum-seekers to another country, a state "needs to guarantee that each asylum-seeker" will receive basic protections, including "access to fair and efficient procedures for the determination of refugee status," "protect[ion] against *refoulement*," and an "individual[ized] assesss[ment] as to the appropriateness of the transfer."   UNHCR, Guidance Note on bilateral and/or multilateral transfer arrangements of asylum seekers ¶ 3(vi) (May 2013) (emphasis added).

34.     "Congress imbued these international commitments with the force of law when it enacted the Refugee Act of 1980," and when it subsequently passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, "which refashioned the above principles into their current form" in the INA.   *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017).   This "refashioning" in the INA included the modern prohibition on withholding of removal as to individuals threatened on account of race, religion, nationality,

---

[1] *Available at* https://www.unhcr.org/en-us/excom/exconc/3ae68c960/refugees-asylum-country.html.

social group membership, or political opinion, 8 U.S.C. § 1231(b)(3)(A), 8 C.F.R. § 1208.16, and the guarantee that all noncitizens may apply for asylum on the same grounds, 8 U.S.C. § 1158(a)(1). *See R-S-C*, 869 F.3d at 1178.

35.     As set forth above, 8 U.S.C. § 1158(a)(1) provides that "[a]ny alien who is physically present in the United States or who arrives in the United States * * * irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

36.     Asylum may be granted to an individual who has a "well-founded fear of persecution" on the same five grounds enumerated in our international agreements: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42)(A).

37.     An applicant's testimony is sufficient to sustain her burden to prove such well-founded fear without corroboration if it "is credible, is persuasive, and refers to specific facts" sufficient to demonstrate that asylum may be warranted. *Id.* § 1158(b)(1)(B)(ii).  A ten percent chance of harm is sufficient to establish a "well-founded fear." *Cardoza-Fonseca*, 480 U.S. at 440; *see, e.g., Bartolome v. Sessions*, 904 F.3d 803, 809 (9th Cir. 2018).

38.     There are three principal ways in which individuals may seek asylum:

        a.      First, where a noncitizen is not in any kind of removal proceedings, her application is "affirmative." *See* 8 C.F.R. § 208.2(a).  She files an application with Defendant USCIS and has an interview with an asylum officer. *Id.* §§ 208.3, 208.4, 208.9.

        b.      Second, a noncitizen in ordinary removal proceedings under INA § 240, 8 U.S.C. § 1229a, may file a "defensive" application in order to prevent her removal, 8 C.F.R. § 208.2(b).

c.      Third, a noncitizen in "expedited removal" proceedings under INA § 235, 8 U.S.C. § 1225—which apply to certain noncitizens who arrive at ports of entry or are apprehended after entering without inspection, *see id.* § 1225(b)(1)[2]—also may seek asylum to prevent her removal.  If the individual indicates an intention to apply for asylum or a fear of persecution during the expedited removal process, she is entitled to a "credible fear" screening interview with an asylum officer.  *Id.* § 1225(b)(1)(B).  If the officer finds she has a "credible fear of persecution," defined as a "significant possibility" that the alien could establish eligibility for asylum, she is then placed in ordinary removal proceedings under INA § 240 and permitted to apply for asylum as part of that process.  *Id.*; 8 C.F.R. § 208.30(f).  If the officer finds that the individual does not have a credible fear, the officer must provide her with a written notice of decision for review by an immigration judge.  8 C.F.R. § 208.30(g).

39.      Withholding of removal separately offers protection to individuals facing persecution on the same five grounds for which asylum is available (race, religion, nationality, membership in a particular social group, or political opinion), 8 U.S.C. § 1231(b)(3)(A), and the domestic implementing legislation for the CAT offers individuals protection against return to countries where they are likely to be tortured,[3] *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, § 2242(b) (requiring implementation of CAT); 8 C.F.R. § 208.18.

40.      Noncitizens may obtain withholding of removal and CAT relief in different ways, each of which is defensive:

---

[2] *See also Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) (expedited removal applies to those who entered without inspection and are apprehended within 14 days of entry and 100 miles of the border).
[3] The Government has recognized that "[f]ewer than 1,000 aliens per year, of any nationality, receive CAT protection."  83 Fed. Reg. 55,947.

a.     Noncitizens can raise withholding of removal and CAT relief as defenses to ordinary removal proceedings. *See* 8 U.S.C. § 1231(b)(3).  The applicant must demonstrate that it "is more likely than not that he would be subject to persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014).  Similarly, to obtain CAT relief, an applicant must demonstrate that it is "more likely than not that he or she would be would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

b.     Alternatively, Defendant DHS has provided by regulation that aliens who are ordered removed because they committed aggravated felonies, 8 U.S.C. § 1228, or whose removals are reinstated because they entered unlawfully after a valid removal order, 8 U.S.C. § 1231, may avoid removal by showing a "reasonable fear" of persecution.   8 C.F.R. §§ 208.31(b), 1280.31(b).  To establish such a "reasonable fear" an individual must establish "a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* §§ 208.31(c), 1208.31(c).[4]  Individuals who show such a reasonable fear are referred to an immigration judge for full consideration of withholding of removal. *Id.* §§ 208.31(e), 1208.31(e).[5]

---

[4]  "'[T]he standard for showing entitlement to these forms of protection (a probability of persecution or torture)'" thus "'is significantly higher than the standard for asylum (a well-founded fear of persecution).'"  83 Fed. Reg. 55,942 (quoting Regulations Concerning the CAT, 64 Fed. Reg. 8,485); *see also id.* ("'This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard.'").

[5]  If an asylum officer concludes that the individual does not present a reasonable fear and requests further review, an immigration judge performs a brief *de novo* review of the asylum officer's decision.  8 C.F.R. §§ 208.31(g), 1208.31(g); Immigration Court Practice Manual, ch. 7.4(e)(iv)(E).  If the immigration judge concurs with the asylum officer, the case is returned to DHS for the individual's removal without further administrative appeal.  8 C.F.R. §§ 208.31(g)(1), 1208.31(g)(1).   If the immigration judge disagrees, an application for withholding of removal and CAT relief is permitted. *Id.* §§ 208.31(g)(2), 1208.31(g)(2).

41.     There is no "reasonable fear" screening process for noncitizens subject to expedited removal.  Such noncitizens only need to show a "credible fear" of persecution or torture to advance to proceedings under INA § 240, in which they may raise claims for asylum, withholding of removal, or CAT relief.

42.     The INA imposes eligibility restrictions on asylum that it does not impose on withholding of removal and CAT relief.  *See* 8 U.S.C. § 1158(b)(1)(A).

43.     Congress made a number of benefits available to those who obtain asylum, including a path to U.S. citizenship, *id.* § 1427(a), and status adjustment from asylee to legal permanent resident, *id.* § 1159(b).

44.     The spouse and children of a person eligible for asylum likewise are derivatively eligible for asylum.  *Id.* § 1158(b)(3)(A).

45.     Asylees also are exempt from removal, *id.* § 1158(c)(1)(A), may obtain employment authorization in the United States, *id.* § 1158(c)(1)(B), may travel abroad without the Government's advance consent, *id.* § 1158(c)(1)(C), and may obtain public benefits, *id.* § 1613(b)(1).

46.     These status adjustment and family eligibility benefits are not available in connection with other forms of relief for those fleeing persecution and violence, such as withholding of removal and CAT protection.

**Individuals and Families Seeking Asylum at the Southern Border**

47.     Those who arrive at the southern border seeking asylum in the United States often are fleeing some of the most dangerous countries in the world.  Many hail from El Salvador, Guatemala, and Honduras, often referred to collectively as the "Northern Triangle."

48.     According to the Government's own findings in the Rule, 60% of the alien population crossing the border, and an "overwhelming majority" of those claiming fear of return to their home countries, are non-Mexican. 84 Fed. Reg. 33,838.

49.     In FY2000, public statistics indicate that 98% of individuals apprehended at the southern border were Mexican. By FY2018, 52% of apprehensions were of individuals from the Northern Triangle.[6]

50.     Between January 2018 and July 15, 2019, 60% of CAIR Coalition's intakes of adults were for individuals from the Northern Triangle. Fewer than 15% of individuals were from Mexico. Almost 94% of the children for which CAIR Coalition conducted intakes during the same time period were from the Northern Triangle.

51.     According to a recent report from the United Nations High Commissioner for Refugees, the Northern Triangle countries are experiencing epidemic levels of violence at the hands of "well-connected, armed, and dangerous criminal groups in the region," which have utterly "surpassed the governments' capacity to respond."[7]

52.     In particular, violence against women by armed groups has escalated dramatically throughout Central America in recent years, and those governments have failed to provide effective protection.[8]

---

[6] Jill H. Wilson, R45489 *Recent Migration to the United States from Central America: Frequently Asked Questions*, Cong. Res. Serv. 2 (Jan. 29, 2019), https://crsreports.congress.gov/product/pdf/R/R45489.

[7] *See Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* at 58, UNHCR (Oct. 2015), https://goo.gl/6hVsam; *see also Neither Security nor Justice: Sexual and Gender-based Violence and Gang Violence in El Salvador, Honduras, & Guatemala*, KIND (2017).

[8] *Anjali Fleury, Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women*, United Nations University (May 4, 2016), https://goo.gl/f8dspH.

53.     As of 2016, El Salvador, Guatemala, and Honduras ranked first, third, and seventh, respectively, for rates of female homicides.[9]

54.     In some instances, government actors have been charged with participating in such violence.  For example, following a March 2017 protest against sexual violence and physical abuse at a Guatemalan government-run children's shelter, 56 girls were locked inside the shelter and 41 died in a fire, for which state officials were charged.[10]

55.     Violence against children likewise is prevalent in the region.  As one example, Honduras is a particularly dangerous place for young people: In 2017, it was listed as the single most violent country for children under nineteen years old, with a homicide rate of more than thirty children per 100,000 inhabitants (about ten times the global average).[11]

56.     In particular, two rival gangs (MS-13 and Mara 18) fight for control over territory and recruit in urban and rural areas of Honduras.[12]  These gangs often target children as their weapons of war, because national anti-gang legislation carries less severe penalties for minors involved in gang activity than for adults.[13]  These young recruits are often forced to collect "taxes" or sell drugs, and those who refuse are often killed,[14] while law enforcement officers frequently regard them as potential criminals or gang members.[15]

---

[9] *Women on the Run* at 2, *supra*.

[10] Fatema Z. Sumar, *Violence Against Women in Central America is a Powerful Factor in the Migration Crisis (*Nov. 8, 2018); Andrew V. Pestano, *Guatemala charges officials over shelter fire that killed 41 girls*, UPI (Apr. 5, 2017), https://goo.gl/Zg1D86.

[11] Parker Asmann, *Ten Countries with Highest Child Homicide Rates All in LatAM:  Report*, InSight Crime (June 6, 2017), https://goo.gl/UC1Ea5.

[12] *See, generally*, *Gangs in Honduras*, InSight Crime (Apr. 21, 2016), https://goo.gl/oL6nFn.

[13] Honduras, Country Reports on Human Rights Practices for 2016 at 28, U.S. Dep't of State (2016), https://goo.gl/7MpCCM.

[14] *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions on his Mission to Honduras* at 6, U.N. Human Rights Council, A/HRC/35/23/Add.1 (June 2017).

[15] *Id.* at 14.

57.     Corruption among Honduran law enforcement also has been widely reported; some police officers themselves work with the gangs, compounding the dangers to citizens.[16]

58.     Reports of violence against lesbian, gay, bisexual, and transgender ("LGBT") individuals in the Northern Triangle countries also are overwhelming, and frequently ignored by state governments.[17]  The United Nations High Commissioner for Refugees found in the course of a study that 88% of LGBT asylum seekers and refugees from the Northern Triangle reported having suffered sexual and gender-based violence in their home countries.[18]

59.     According to the Honduran non-governmental organization Cattrachas, 264 LGBT individuals were killed in that country between 2009 and 2017; in most cases, those responsible were never brought to justice.[19]

60.     According to Amnesty International, the "high levels of impunity and corruption in [Northern Triangle] countries mean authorities are unlikely to punish those responsible for crimes against LGBT people, particularly when security forces are responsible for the attacks."[20]

61.     In sum, migrants fleeing to the United States, and particularly from the Northern Triangle countries, often are running from life-or-death situations, leaving behind all they have to make a dangerous journey.

62.     Many of these individuals have legitimate claims for asylum in the United States.  According to data published by the United Nations High Commissioner for Refugees, in

---

[16] Sarah Chayes, *When Corruption is the Operating System: The Case of Honduras* at 29, Carnegie Endowment for International Peace (May 2017), https://goo.gl/nUFicM ("Of greater concern are the reports we heard in interviews of collusion between police and the youth gangs whose depredations it is their job to curb.").

[17] *See Women on the Run* at 27-30, *supra*.

[18] *No Safe Place*, Amnesty Int'l at 7 (Nov. 2017), https://goo.gl/dNTUNm.

[19] *No Safe Place: LGBTI Salvadorans, Guatemalans and Hondurans Seeking Asylum in Mexico* (Nov. 27, 2017), https://goo.gl/79cG3H.

[20] *Id.*

Fiscal Year 2015 82% of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to credible fear screenings by asylum officers in the United States were found to have a significant possibility of establishing eligibility for asylum or protection under the CAT.[21]

63.     In a similar 2014 report, the United Nations High Commissioner for Refugees found that 58% of unaccompanied children interviewed from the Northern Triangle countries and Mexico were "forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection."[22]

## Safety Risks and Difficulties in Obtaining Asylum in Mexico

64.     The Rule posits that "[i]nstead of availing themselves of [Mexican asylum] protections, many aliens transiting through Central America and Mexico decide not to seek protection, likely based upon a preference for residing in the United States."

65.     That supposition ignores the reality that many asylum seekers are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms, *while in transit through third countries.* That many choose to endure that dangerous journey through third countries for an opportunity to seek asylum in the United States, without stopping to press their claims in the intervening countries, is a telling indicator of the extreme risks of persecution and violence faced by asylum seekers both at home and in transit.

66.     Migrant females are particularly vulnerable. Data published by Amnesty International estimates that 60% of women and girls are raped while migrating across Mexico, and the estimates of some service providers are higher.[23]

---

[21] *See Women on the Run* n.2, UNHCR, https://goo.gl/6hVsam.
[22] *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* at 6, UNHCR (2014), https://goo.gl/p3TGrW.
[23]  Alyson L. Dimmitt Gnam, *Mexico's Missed Opportunities to Protect Irregular Women Transmigrants: Applying a Gender Lens to Migration Law Reform*, 22 Pac. Rim L. & Pol. J.

67.     Rates of violence in Mexico also have been increasing, with more than 23,000 murder investigations opened in 2017 (the highest count on record).[24]

68.     Upon arrival at the southern border of the United States, entry is often delayed for many asylum-seekers.  Defendant CBP engages in a well-documented practice of "metering," in which "officers only allow the asylum-seeker to cross the [international] line if space is available" in the port of entry.[25]  "When the ports of entry are full, CBP guidance states that officers should inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them."[26]

69.     Advocates have documented substantial delay times and long lines at designated ports of entry such as Nogales, Arizona; El Paso and McAllen, Texas; and San Diego, California.[27]  Families may be camped out in heat exceeding 100 degrees.[28]

70.     Left stranded while waiting for backlogs at ports of entry to clear, asylum seekers are particularly vulnerable to kidnapping, extortion, and other violence by organized crime elements in northern Mexico.[29]  A study issued by Human Rights First reported that local

---

713, 722 (2013); *see also Invisible Victims: Migrants on the Move in Mexico* at 5, Amnesty International (2010),  https://goo.gl/Bvs1RM.

[24]  *Mexico murders hit record high, dealing blow to president*, Reuters (Dec. 23, 2017), https://goo.gl/524yFF.

[25]  *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84 at 6, U.S. Office of Inspector Gen. (Sept. 27, 2018).

[26]  *Id.*

[27]  Adam Isacson et al., *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports of Entry* at 2-3, Washington Office on Latin Am. (Aug. 2018), https://goo.gl/euGQyY.

[28]  *Id.* at 3.

[29]  Isaacson, *supra*, at 7; *see also Situation of Impunity and Violence in Mexico's Northern Border Region*, Washington Office on Latin America, Latin American Working Group, and Kino Border Initiative, March 2017, https://goo.gl/pYSySP (finding that "[v]iolence and crimes against migrants in Mexico's northern border states have long been documented to include cases of disappearances, kidnappings, rape, trafficking, extortion, executions, and sexual and labor exploitation by state and non-state actors," and that CBP's refusal to permit the entry of migrants at ports of entry exposes individuals, families, and children to "organized crime and smugglers as

lawyers and shelter staff found that "most—if not all—migrants they encounter who had been turned away from the [Hidalgo] port of entry have been kidnapped and held for ransom" by cartel members waiting outside the port in Mexico.[30]

71.    Even if seeking asylum in Mexico seemed desirable against this backdrop of safety risks, some migrants report that asylum claims have been more difficult to prove to Mexican authorities, that they did not have enough information about protections in Mexico, or that conditions in Mexico are sufficiently dangerous that seeking asylum there would not improve their safety.[31]

72.    Mexico's refugee agency, La Comision Mexicana de Ayuda a Refugiados ("COMAR"), lacks the resources and funding to adequately process asylum applications.  This year, Mexico is on track to receive double the number of asylum applications from 2018—an increase of 30,000 applications.[32]

73.    Despite this massive influx of applications, in 2019 COMAR received its lowest funding in seven years, with a budget of only $1.2 million.  The head of COMAR recently explained that the agency is "simply trying to survive."[33]

74.    Asylum seekers have resorted to bribes to receive interviews with members of COMAR's staff, which has around 50 members nationwide.  Lines at COMAR offices have

---

well as corrupt state authorities unable to protect them or investigate the crimes they have suffered").

[30] *Crossing the Line*, *supra*, at 16.

[31] *Fleury, Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women*, *supra*.

[32] Lizbeth Diaz & Delphine Schrank, *Mexico's refugee agency turns to U.N. amid asylum surge, funding cuts*, Reuters (May 21, 2019), https://www.reuters.com/article/us-usa-immigration-mexico/mexicos-refugee-agency-turns-to-u-n-amid-asylum-surge-funding-cuts-idUSKCN1SS06N.

[33] *Id.*

stretched for multiple blocks.[34]  As of today, COMAR's website lists only four offices, none of which are on the southern border with the U.S.[35]

75.     Asylum seekers in Mexico have only 30 days to apply for asylum.  Human rights organizations report that many refugees are barred from asylum because of this time limitation.[36]

76.     The time bar is particularly stringent given how little information migrants have about asylum in Mexico.  In one survey, three out of every four migrants who passed through a Mexican immigration detention center were not informed of their right to seek asylum.[37]

77.     Asylum seekers apprehended by Mexican immigration officers may only pursue asylum from detention.[38]  Mexican detention centers suffer from overcrowding and rampant abuse.  An 80-person detention center once held over 400 people.[39]  In one study, 94% of migrants in detention centers suffered abuse while detained.[40]

78.     Mexican immigration officials reportedly threaten to detain migrants in retaliation for applying for asylum.  The threat of detention deters asylum seekers from pursuing their claims.[41]

---

[34] *Id.*

[35] *Where is COMAR?*, COMAR,  https://www.gob.mx/comar/articulos/donde-esta-comar?idiom =es (last visited July 16, 2019).

[36] Human Rights First, *Dangerous Territory: Mexico Still Not Safe for Refugees* 7 (July 2017), https://www.humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf.

[37] Amnesty Int'l, *Overlooked, Under-Protected: Mexico's Deadly* Refoulement *of Central Americans Seeking Asylum* 5 (Jan 2018), https://www.amnestyusa.org/wp-content/uploads/2018/01/AMR4176022018-ENGLISH-05.pdf.

[38] Human Rights First, *supra*, at 8.

[39] James Fredrick, *Mexico Is Overwhelmed By Asylum Claims As It Ramps Up Immigration Enforcement*, N.P.R. (June 14, 2019), https://www.npr.org/2019/06/14/732485182/mexico-is-overwhelmed-by-asylum-claims-as-it-ramps-up-immigration-enforcement.

[40] Human Rights First, *supra*, at 8.

[41] *Id.*

79.     Even if migrants are able to apply for asylum in Mexico, they face difficulties receiving it.  Nonprofit organizations and attorneys in Mexico report that asylum adjudications are often unfair, inconsistent, and contrary to law.[42]

80.     Asylum seekers often navigate this complicated process without legal representation.  When they are detained, asylum seekers are at times prevented from conferring with counsel.[43]

81.     By Mexican law, COMAR must adjudicate asylum cases within 45 business days.  Yet with tens of thousands of asylum requests reportedly pending, COMAR had been forced to turn to other entities, including the United Nations, for assistance with additional funding and staffing.[44]

82.     Refugee organization statistics examining the "low rate of success on asylum applications in Mexico" indicate that in 2017, only 11% of asylum applicants from the Northern Triangle were granted immigration protection (either asylum or complementary protection).[45]

**The Government's Escalating Responses to Southern Border Migration**

83.     Notwithstanding the dire conditions in many Central American countries, the rate of illegal border crossings is substantially down from its peak.

---

[42] *Id.* at 7.

[43] *Id.*

[44] Rafael Carranza, *Mexico's tiny refugee office seeks help to process record number of asylum-seekers*, Arizona Republic (June 24, 2019), https://www.azcentral.com/story/news/politics/immigration/2019/06/24/united-nations-central-america-asylum-seekers-mexico-refugees-migrants/1549975001/; *see also Protection and Reintegration: Mexico Reforms Migration Agenda in an Increasingly Complex Era*, Migration Policy Institute, Fig. 2 (Mar. 7, 2019), https://www.migrationpolicy.org/article/protection-and-reintegration-mexico-reforms-migration-agenda.

[45] Women's Refugee Comm., *Mexico Does Not Qualify as a Safe Third Country* 3, https://www.womensrefugeecommission.org/images/zdocs/SafeThirdCountries.pdf (last visited July 16, 2019).

84.     The number of migrants arrested at the southern border for attempting to cross unlawfully is at its lowest level since 1971: For Fiscal Year 2017, Defendant CBP reported 310,531 such arrests, down from 1,676,438 in 2000.[46]   The 2017 figures represented a 25% decrease since 2016 alone.[47]

85.     The Rule itself similarly recognizes that the "overall number of apprehensions of illegal aliens was relatively higher two decades ago than it is today (around 1.6 million in 2000)."

86.     Nonetheless, Defendants have targeted southern border asylum seekers in recent months with exceptionally strict policies and unlawful regulations.

87.     In April 2018, the Administration announced a new "Zero Tolerance" policy on immigration, pursuant to which the Government began separating detained migrant parents and their children.[48]

88.     Following immense public opposition and political pressure, the "Zero Tolerance" family separation policy was withdrawn by Executive Order for an indefinite period on June 20, 2018.[49]

89.     On June 26, 2018, the U.S. District Court for the Southern District of California issued a preliminary injunction enjoining the Government from unlawfully detaining migrant

---

[46] John Burnett, *Arrests for Illegal Border Crossings Hit 46-Year Low*, NPR (Dec. 5, 2017) https://goo.gl/xqqjTo; *CBP Border Security Report, Fiscal Year 2017*, CBP (Dec. 5, 2017), https://goo.gl/k2wmia.
[47] *Id.*
[48] *Attorney Gen. Announces Zero-Tolerance Policy for Criminal Illegal Entry*, DOJ (Apr. 6, 2018), https://goo.gl/sdsvQP; *see also Attorney Gen. Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Admin.*, DOJ (May 7, 2018), https://goo.gl/ihRX79 ("If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law.").
[49] Exec. Order No. 13,841, *Affording Congress an Opportunity to Address Family Separation*, 83 Fed. Reg. 29,435 (June 25, 2018).

parents without and apart from their children, and ordered the Government to reunite separated families within thirty days, absent a determination of parental unfitness or danger to the child.[50]

90.     On November 15, 2018, following additional legal challenges, the Government entered a class Settlement Agreement, approved by the U.S. District Court for the Southern District of California, requiring Defendants to, *inter alia*, reconsider the asylum claims of classes of migrant parents and children who were unlawfully separated.[51]

91.     In late 2018, among other statements, President Trump tweeted that individuals would "have to apply for asylum in Mexico first, and if they fail to do that, the U.S. will turn them away."[52] On October 31, 2018, the President tweeted a video that contained inflammatory footage depicting an immigrant convicted of murdering police officers followed by a migrant "caravan" breaking past a wall.[53]

92.     On November 9, 2018, the Acting Attorney General and Secretary of Homeland Security promulgated a new asylum policy imposing a "new mandatory bar on eligibility for asylum" for "aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to § 212(f) of the INA, 8 U.S.C. § 1182(f), or § 215(a)(1) of the INA, 8 U.S.C. § 1185(a)(1), and who enter the United States in contravention of such a proclamation after the effective date of this rule." 83 Fed. Reg. 55,939.

---

[50] *Ms. L v. U.S. Immigration & Customs Enforcement ("ICE")*, 310 F. Supp. 2d 1133, 1149 (S.D. Cal. 2018).
[51] *Id.;* Dkt. 321, Case No. 18-cv-0428 DMS (MDD) (S.D. Cal.)  (Order Certifying Settlement Class and Granting Final Approval of Class Action Settlement) (Nov. 15, 2018); *id.* Dkt. 220-1 (Plan to address the asylum claims of class-member parents and children who are physically present in the United States) (Sept. 12, 2018).
[52] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 21, 2018, 12:11 PM EDT), https://goo.gl/6Hx5Eb.
[53] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2018, 1:18 PM EDT), https://goo.gl/cH9MD7.  The video was denounced by numerous Republican and other elected officials.

93.     On November 9, 2018, the day after that policy was first announced, President Trump issued a Proclamation pursuant to 8 U.S.C. §§ 1182(f), 1185(a).  The Proclamation immediately suspended "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico," applicable to aliens who enter the country after the date of the Proclamation and outside designated ports of entry.  Proc. §§ 1, 2(a)-(b).

94.     All noncitizens who entered the United States without inspection at the southern border were thus rendered immediately ineligible for asylum.

95.     That rule was promptly subject to challenge in several of federal courts.   On November 19, 2018, in a case brought by the American Civil Liberties Union ("ACLU"), the U.S. District Court for the Northern District of California issued a temporary restraining order enjoining the implementation of that policy nationwide.  *East Bay Sanctuary Covenant, et al. v. Trump, et al.*, Case No. 18-cv-06810, 2018 WL 6053140, at *21 (N.D. Cal. Nov. 19, 2018).  The court concluded that the plaintiffs were likely to succeed on the merits of their claims, *see id.* at *10-17, that the organizational plaintiffs "made a clear showing that it is likely that they and their clients will suffer irreparable harm absent a TRO," *id.* at *19, and that the public interest and balance of equities favor an injunction against the Rule, *id.* at *19-20.

96.     On December 7, 2018, the Ninth Circuit issued its opinion denying the Government's request for a stay of the district court's temporary restraining order pending appeal. *East Bay*, Case No. 18-17274, 2018 WL 6428204 (9th Cir. Dec. 7, 2018).

97.     On December 11, 2018, the Government filed an emergency application to the United States Supreme Court for a stay of the district court's injunction.  Application for Stay Pending Appeal, *Trump v. East Bay Sanctuary Covenant*, No. 18A615 (U.S. Dec. 11, 2018). The Supreme Court denied the request on December 21, 2018.

98.     On December 19, 2018, U.S. District Court for the Northern District of California issued a preliminary injunction as to the same policy.   Litigation in the district court is stayed pending the Ninth Circuit's resolution of the Government's interlocutory appeal of its temporary restraining order and subsequent preliminary injunction.

99.     Two related complaints were also filed in this Court.   The first, *O.A., et al. v. Trump, et al.*, No. 1:18-cv-02718 (D.D.C. Nov. 20, 2018), was brought on behalf of a set of individual plaintiffs who were subject to that policy.   The second, *S.M.S.R., et al. v. Trump, et al.*, No. 1:18-cv-02838 (D.D.C.   Dec. 3, 2018), was brought on behalf of CAIR Coalition, RAICES, and individual plaintiffs subject to the policy.   The *O.A.* and *S.M.S.R.* plaintiffs moved for temporary restraining orders and preliminary injunctions.   The two cases were consolidated, and the parties moved for class certification and summary judgment on behalf of a nationwide class consisting of all noncitizen asylum-seekers who have entered or will enter the United States through the southern border but outside ports of entry after November 9, 2018.

100.    A hearing on that motion was held on May 29, 2019, and a decision remains pending.

### The Rule

101.    On July 16, 2019, Defendants issued the Rule, entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829, without the thirty days' advance notice and opportunity for public comment required under the APA, 5 U.S.C. § 553(b)-(d).

102.    The Rule creates a new exception to the INA's presumption of asylum eligibility for those present or arriving in the United States after transiting through third countries.   Under the Rule's amendments to 8 C.F.R. §§ 208.13, 1208.13, an individual who "enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019,

after transiting through at least one country outside of the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum." 84 Fed. Reg. 33,843. The Rule applies unless an affected individual can show that she falls into one of three narrow exceptions: (1) she applied for protection from persecution or torture in at least one third country and received a final judgment of denial; she satisfies the definition of a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11; or the only third countries through which she transited to the United States were, at the time, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment ("CAT"). *Id.*

103.    The Rule's amendments to 8 C.F.R. § 208.30(e)(5)(ii) confirm that individuals subject to this revised policy will face a higher burden to avoid removal: "If the alien is found to be an alien described in § 208.13(c), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum," and proceed to place the individual into full removal proceedings under Section 240 of the INA for consideration of her claims for withholding of removal under Section 241(b)(3) of the INA or for protection under the CAT. 84 Fed. Reg. 33,843-33,844.

104.    Either alternative form of relief (withholding of removal or protection pursuant to the CAT) requires the individual to establish a more burdensome "reasonable fear of persecution or torture," rather than a credible fear, subject to limited review under the same "reasonable fear" standard by an immigration judge. 84 Fed. Reg. 33,843-33,844 (amending 8 C.F.R. § 208.30(e)(5)(ii)).

105.   A set of Guidelines Regarding New Regulations Governing Asylum and Protection Claims, issued on July 15, 2019 by Defendant McHenry and sent to "[a]ll of EOIR," summarizes the consequences of the Rule: "Aliens determined to be ineligible for asylum will still be screened, but in a manner that reflects that their only potentially viable claims would be for statutory withholding of removal or protection under the [CAT].   After determining the alien's ineligibility for asylum under the credible-fear standard, an asylum officer will apply the reasonable-fear standard to assess whether further proceedings on a statutory withholding or CAT protection claim are warranted.   If the asylum officer determines that the alien has not established a reasonable fear, the alien then can seek review of that decision from an immigration judge and will be subject to removal only if the immigration judge agrees with the negative reasonable-fear finding.   Conversely, if either the asylum officer or the immigration judge determines that the alien clears the reasonable-fear threshold, the alien will be placed in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum."[54]

106.   The rule does not provide for a categorical exemption for unaccompanied alien children ("UACs"), even though UACs are exempt from the safe third country bar.  UACs who transit through a country en route to the United States will therefore be barred from seeking asylum unless they seek and are denied asylum in a third country first.  84 Fed. Reg. at 33,839.

107.   The Rule's purpose statement asserts that the Rule is intended to "more efficiently identify[] aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture. Aliens who transited through another country where protection was available, and yet did not seek

---

[54] *Guidelines Regarding New Regulations Governing Asylum and Protection Claims*, EOIR (July 15, 2019), https://www.justice.gov/eoir/file/1183026/download (last visited July 16, 2019).

protection, may fall within that category." 84 Fed. Reg. 33,831. It claims that the Rule will "more efficiently identify[ ] aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture," and that "[a]liens who transited through another country where protection was available, and yet did not seek protection, may fall within that category." *Id.*

108.    The Rule invokes two exceptions—the "good cause exception" and the "foreign affairs exception"—as a basis for dispensing with notice-and-comment and a 30-day delay in the effective date under 5 U.S.C. § 553(d). It states that there is good cause to forgo notice and comment because a delay in implementation might encourage a surge in migration across the southern border. It states that the rule "directly implicates the foreign policy and national security interest of the United States" because it involves "[t]he flow of aliens across the southern border, unlawfully or without appropriate travel documents." 84 Feg. Reg. at 33,841.

109.    Written or electronic comments regarding the Rule must be submitted on or before August 15, 2019. 84 Fed. Reg. 33,830.

**Harms to Plaintiffs**

110.    Absent an injunction against the Rule, Plaintiffs CAIR Coalition and RAICES will be severely and irreparably harmed through diversion of their human and financial resources and injury to their abilities to serve their client populations consistent with their organizational missions.

111.    Both Plaintiffs are 501(c)(3) nonprofit organizations that provide assistance to asylum seekers in the United States, including individuals who crossed the southern border without applying for asylum in third countries.

112.    Plaintiff CAIR Coalition is a 501(c)(3) nonprofit organization dedicated to providing legal services to migrant men, women, and children who are detained by ICE or the Office of Refugee Resettlement ("ORR") in Virginia and Maryland.  CAIR Coalition assists clients with applications for asylum, preparing for credible fear interviews, and adversarial proceedings in immigration courts.   CAIR Coalition also trains and supervises legal professionals to provide similar assistance.

113.    Asylum applications are a critical component of CAIR Coalition's organizational mission.  Each year, CAIR Coalition serves hundreds of clients seeking asylum who entered the United States at the southern border.

114.    The Rule, if not enjoined, will irreparably frustrate CAIR Coalition's mission to serve as many migrants lawfully seeking asylum as possible.  Because Defendant DHS will summarily deport many asylum seekers before they reach the Washington, DC metropolitan area, CAIR Coalition will face a drastic reduction in its client base.

115.    The Rule also will substantially limit the overall number of clients CAIR Coalition can serve.   CAIR Coalition must create more complicated new resources and procedures to assist clients with their claims, in turn reducing how many clients the organization can reach.  The Rule puts CAIR Coalition in a difficult position: raise more funds to serve the same number of clients, or reduce the number of clients served to fit within its current budget.

116.    For example, CAIR Coalition will be forced to divert significant staff resources to analyzing and interpreting the Rule, overhauling its client information database, and preparing new informational and advocacy materials.

117.    CAIR Coalition also will need to develop new materials and procedures for jail visits specifically for asylum seekers subject to the Rule.  CAIR Coalition usually provides one orientation for all detainees, regardless of how they entered the country.   Under the Rule, however, CAIR Coalition must develop a separate orientation for affected asylum seekers to explain the different standard for their credible fear interview and the limited forms of relief available, double the number of staff to conduct two orientations, and spend more staff time on the longer, more complicated dual orientation.

118.    Under the Rule, CAIR Coalition also will expend more resources to prepare each affected asylum seeker for his or her credible fear interview.  During the approximately 1,500 intake sessions for detained adults that CAIR Coalition conducts each year, a CAIR Coalition staff member typically spends about five to ten minutes with each adult eligible for such interview preparing them for their credible fear interview.

119.    Under the Rule, affected asylum seekers effectively will need to meet the higher "reasonable fear" standard rather than the traditional "credible fear" standard to obtain relief.  To prevail in a reasonable fear interview, an individual must show effectively at least a 51% chance—i.e., that they "more likely than not"—will be persecuted or tortured in their home country.  In contrast, in a credible fear interview, an individual must show an approximately 10% chance—i.e., that they have a "well-founded fear"—of persecution or torture in their home country.   It is much more difficult for migrants to receive a positive determination in a reasonable fear interview.  During 2018, only 62% of reasonable fear interviews CAIR Coalition

was involved with received positive determinations, compared to 87% for credible fear interviews.

120.    As a result of the heightened "reasonable fear" standard, each preparation session for an affected asylum seeker will take roughly twice the amount of time, roughly ten to twenty minutes per client, whether to elicit and prepare more facts to satisfy the higher standard or related to follow-up interviews.  The Rule thus would cut in half the number of clients CAIR Coalition can prepare during each jail visit.  And with finite resources and permission to make jail visits only a few times per month, CAIR Coalition will be unable to compensate for this loss.

121.    CAIR Coalition will expend more resources during credible fear interviews for affected adult asylum seekers, too.  Prior to the Rule, CAIR Coalition had stopped sending staff and volunteers to credible fear interviews in person because the overwhelming majority of clients received positive results.  Instead, CAIR Coalition generally would review the transcripts from interviews with negative determinations.

122.    Because the Rule will increase the standard for the interviews, it will be necessary to send staff and volunteer attorneys to as many interviews as possible to increase the likelihood that each client will have a fair chance to present her case.  If CAIR Coalition staff members are busy attending these interviews, they will be unable to assist as many clients in trial proceedings under INA § 240.

123.    Given the increased burden of proof that will be required at interviews, CAIR Coalition also anticipates that it will not be able to staff interviews with legal assistants or law student volunteers, as it sometimes has in the past.

124.    CAIR Coalition also will need to recreate its now-defunct volunteer program for attending credible fear interviews as a result of the higher standard.  Because of the Rule, CAIR

Coalition already has discussed hiring another dedicated attorney or legal assistant to recruit and train volunteer lawyers to attend credible fear interviews.

125.    The increased need for volunteer lawyers has a ripple effect on the rest of CAIR Coalition's programs.  Attorneys volunteering to attend credible fear interviews will have less time—or perhaps no more time—available to volunteer in other cases.  This reduced volunteer capacity reduces the organization's overall capacity to represent as many clients as possible, especially in trial proceedings.

126.    Reduced volunteer capacity also will divert resources from other CAIR Coalition initiatives, such as providing translations or conducting country conditions research.

127.    The Rule also will force CAIR Coalition to spend more time and resources on each child client, because all child cases will be time- and resource-intensive trial cases. Because the Rule prevents affected asylum seekers, including children, from obtaining asylum, their cases bypass the normal Asylum Office process and move directly to trial at immigration court.

128.    CAIR Coalition's staff members will have to prepare for trial rather than an interview at the Asylum Office.  And staff members who work with detained children will have less time available to work on each case, as the detained docket moves much faster than the timeframe at the Asylum Office.

129.    Under the Rule, CAIR Coalition will have to spend more time and resources on cases for young mothers and their children as well.  Each year, CAIR Coalition serves about twenty to thirty mothers and their migrant children who live in shelters.  CAIR Coalition anticipates that, under the new Rule, it will have to significantly increase the total time that must

be spent on each family's case, because the mothers will be ineligible for asylum and their children unable to be counted as derivatives within a single application for relief.

130.    The Rule also will jeopardize CAIR Coalition's already tight budget.   CAIR Coalition depends on law firms for 12% of its annual budget; if the organization places fewer asylum cases with volunteers at law firms, it is likely to receive fewer of these much-needed donations.

131.    In addition, some of CAIR Coalition's funding is tied to the number of adult clients that it serves each year.  At the Caroline County, Virginia detention center, for example, CAIR Coalition receives funding to serve a targeted number of detained adults in trial proceedings each year.  Since January 1, 2018, CAIR Coalition conducted 4,477 intakes with children and adults that it encountered detained either in Virginia or Maryland.  The increased time it takes CAIR Coalition to serve each asylum seeker correspondingly reduces the overall numbers of people served.  As a result, it is uncertain whether CAIR Coalition will be able to comply with its existing funding conditions tied to numbers of trial representations.

132.    The Rule's lack of notice and comment procedures also irreparably compromised CAIR Coalition's ability to inform the Government of the substantial and irreparable harms— both to the organization and its clients—that the policy would create.  Commenting on rules and regulations is an important part of CAIR Coalition's mission to improve the lives of migrants in the Washington, D.C. area.  Had CAIR Coalition been given the opportunity to comment on the Rule, it would have done so.

133.    RAICES is a 501(c)(3) nonprofit organization headquartered in San Antonio, Texas.

134.    Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. RAICES is a 501(c)(3) nonprofit organization headquartered in San Antonio, Texas, with other offices in Austin, Corpus Christi, Dallas, Fort Worth, and Houston.  RAICES's mission is to promote justice by providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas.  In 2017, RAICES closed approximately 51,000 cases at no cost to the client.

135.    Absent an injunction, the Rule will irreparably harm RAICES in multiple ways, including by frustrating RAICES's mission to serve as many migrant clients as possible. RAICES will be unable to represent the same number of clients that it does currently, both because fewer clients will be eligible for relief and because RAICES will spend more resources on each individual case.  The Rule also will force RAICES to divert scarce resources away from other important programs to compensate for the additional time, procedures, and staff required to continue serving clients under the policy.

136.    The Rule will fundamentally reduce the capacity and divert the resources of RAICES's Family Detention Services program, which will need to devise entirely new intake procedures at each of the detention centers it serves.  Currently, the intake process is relatively short.  Under the Rule, however, RAICES staff will need to conduct more extensive and time-consuming intake questioning of each client.  In particular, RAICES would need to determine whether the client crossed the southern border after traveling through a third country, whether the client sought protection in that third country, whether a decision was made on that application prior to the client's arrival in the United States, and whether he or she is likely to meet the higher legal standards for alternative forms of relief.

137.    The Rule also will require Family Detention Services to create an entirely new process for assisting affected asylum seekers with their credible fear interviews.  For example, Family Detention Services currently assists most detainees at the detention facility in Karnes, Texas with their credible fear interviews.

138.    Pro bono attorneys and law students often attend these interviews telephonically so that staff can focus on difficult or emergency cases.

139.    Under the Rule, however, Family Detention Services will be forced to create a more time- and resource-intensive dual-track system to prepare clients for interviews: one for clients who entered before the effective date of the Rule or who meet its exceptions, and another entirely new system for affected asylum seekers who entered after the Rule's effective date and fall under its new asylum eligibility bar.

140.    Under the Rule, the shift from credible to reasonable fear interviews will be a significant one for Family Detention Services.  The reasonable fear standard is much more difficult to meet than the credible fear standard.

141.    The program's staff will spend double or triple the time interviewing and preparing each client to meet the higher reasonable fear standard.  Due to the higher stakes, more staff will need to attend interviews, rather than relying on volunteers.

142.    For the pro bono attorneys that still could attend, Family Detention Services will need to create new training resources on legal arguments that were rarely necessary during previous credible fear interviews.  And RAICES would be unable to rely on law students and non-lawyers to attend these interviews, drastically reducing the program's volunteer base.

143.    As a result of the Rule and the foregoing resource-shifting, Family Detention Services might not be able to provide any assistance at credible fear interviews for asylum seekers unaffected by the policy.

144.    Family Detention Services also will struggle under the weight of increased appeals under the Rule.  These appeals are time-consuming for staff, who must prepare the client to testify and research legal arguments for immigration court.  Family Detention Services will need to narrow its case acceptance criteria as the volume of appeals increases, further undermining the program's commitment to universal representation.

145.    Nor will Family Detention Services be able to rely on pro bono attorneys to represent clients in immigration court; unlike with telephonic credible fear interviews, few pro bono attorneys are available to represent clients in person at immigration court, especially in rural Texas.

146.    The Rule also creates new burdens for RAICES's Children's Program.  Under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), removal proceedings for unaccompanied minors applying for asylum occur at the Asylum Office in a non-adversarial context, rather than in immigration court, to protect these vulnerable children.

147.    Under the Rule, however, unaccompanied minors who fail to apply for asylum in a third country will no longer be eligible for asylum.  The Asylum Office will have no jurisdiction over the case; an Immigration Judge will hear the case for withholding of removal and protection under CAT.  What has been a non-adversarial process using minimal resources therefore will become a lengthy and costly process for the Children's Program.  Staff will have to prepare formal briefings and sophisticated legal arguments for an Immigration Judge, both of which are uncommon for Asylum Office proceedings.

148.    The adversarial process in immigration court is also a traumatic one for the children.  Under the Rule, Children's Program staff will expend tremendous time and resources preparing children not only for the contents of their testimony and cross-examination by a DHS attorney, but also for the emotional toll that testimony would take.

149.    The Rule will add new obstacles for RAICES's Community Immigration Services program as well, which provides legal services and representation to detained adults and non-detained adults and families.

150.    Under the Rule, Community Immigration Services will spend at least double the traditional time on each family's applications.  Because each individual will have to submit a separate application, rather than one application per family, it will take significantly more time and resources for Community Immigration Services lawyers to assist families with their applications than before the policy.  RAICES anticipates that, under the Rule, Community Immigration Services would need to assist with at least twice the current number of applications.

151.    Community Immigration Services staff also may have to shift roles into other RAICES programs.  If fewer clients are released from detention under the higher reasonable fear standard, Community Immigration Services lawyers will have a decreased population to serve. Family Detention Services and the Children's Program, conversely, will be understaffed due to the increased burdens created by the Rule.  RAICES will need to retrain Community Immigration Services staff to perform unfamiliar duties for other programs.

152.    The Rule's lack of notice and comment procedures also irreparably compromised RAICES's ability to inform the Government of the substantial harms—both to the organization and its clients—that the policy would create.  Commenting on rules and regulations is an important part of RAICES's mission to improve the lives of migrants in Texas.  In 2018,

RAICES commented on four proposed rules and regulations.  Had RAICES been given the opportunity to comment on the Rule, it would have done so.

## CAUSES OF ACTION

### COUNT I

### (Substantive Violation of INA, 8 U.S.C. § 1158, and APA, 5 U.S.C. § 706)

153.     Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

154.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(C).

155.     The INA guarantees "[a]ny alien who is physically present in the United States or who arrives in the United States * * * irrespective of such alien's status" the right to "apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).  The INA creates only two exceptions under which individuals can be prevented from seeking asylum in the United States because they passed through a third country: (1) where the United States has a bilateral or multilateral agreement with a "[s]afe third country" in which the alien would have access to "a full and fair procedure" for determining her eligibility for asylum or equivalent protections, *id.* § 1158(a)(2)(A), or (2) the alien was "firmly resettled" in another country before arriving in the United States, *id.* § 1158(b)(2)(A)(vi).

156.     The Rule contravenes this statutory treatment of circumstances in which travel through third countries may legally impact asylum eligibility.  In particular, under the Rule's

39

amendments to 8 C.F.R. §§ 208.13, 1208.13, an individual who "enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside of the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum," unless she can show that one of three narrow exceptions applies.

157.    In promulgating and implementing the Rule, Defendants have acted contrary to the INA.  By purporting to deny asylum eligibility to those specifically entitled to seek it, the Rule violates the INA.

158.    The Rule exceeds the Attorney General's scope of delegated authority to establish "consistent" limitations and conditions on asylum eligibility and consideration of applications under 8 U.S.C § 1158(b)(2)(C), (d)(5)(B).  In addition to contravening the plain terms of 8 U.S.C. § 1158(a)(1), the Rule introduces a limit on the availability of asylum that is dramatically different from the other restrictions on asylum specified in the statute itself.

159.    Through their actions described in this Complaint, Defendants have violated the substantive requirements of the INA and APA.  Defendants' violations inflict immediate and irreparable harm upon Plaintiffs and severely compromise the number of asylum-seekers that they may serve consistent with their organizational missions.

160.    Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT II

**(Violation of APA, 5 U.S.C. § 553, for Failure to Follow Notice and Comment Procedures)**

161.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

162.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

163.    The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See* 5 U.S.C. § 553(b), (c).  Defendants failed to provide notice and an opportunity for public comment on the Rule in any manner prior to its issuance on July 16, 2019.

164.    The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." *Id.* § 553(d).  Defendants failed to publish the Rule, which affects asylum seekers' substantive rights under the INA, as required by this provision.

165.    The APA's notice and comment exceptions related to "foreign affairs function[s] of the United States," *id.* § 553(a)(1), and "good cause," *id.* § 553(d)(3), are inapplicable.

166.    Had the Rule been the subject of advance publication and notice-and-comment rulemaking under the APA, CAIR Coalition and RAICES would have submitted comments opposing its adoption.

167.    Defendants' violations inflict immediate and irreparable harm upon Plaintiffs, which lack adequate remedies at law and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT III

### (Due Process, U.S. Const. amend. V)

168.   Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

169.   "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (internal quotation omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to . . . due process of law."). The Due Process Clause applies to Individual Plaintiffs and the other putative class members in the United States.

170.   Under the Rule, Defendants will deny asylum seekers access to the asylum procedures to which they are entitled under the INA. *See* 8 U.S.C. § 1158(a)(1).

171.   In addition, "an alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum and a statutory procedural due process right to a meaningful or fair evidentiary hearing." *Gutierrez-Rogue v. I.N.S.*, 954 F.2d 769, 772-73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332-33 (D.C. Cir. 1989)) (internal quotation marks and brackets omitted).

172.   As discussed above, migrants have been afforded no process or access to fair hearings through which to seek asylum under the Rule, due to the policy's categorical denial of eligibility for migrants who entered through the southern border outside designated ports of entry. Denying them any ability to be meaningfully heard on their asylum claims violates their Fifth Amendment rights to due process.

173.    In addition, because minor children are derivatively eligible to receive asylum where their parents obtain asylum, *see* 8 U.S.C. § 1158(b)(3)(A), Defendants' violations of the due process rights of adult asylum seekers violate the due process rights of derivatively eligible children in the putative class.

174.    Defendants' due process violations inflict immediate and irreparable harm upon asylum seekers by denying them the opportunity to seek asylum in the United States based on an asylum bar that is impermissible under the INA.  These violations of law also inflict immediate and irreparable harm on RAICES and CAIR Coalition by compromising the services they can provide to clients and forcing them to drastically divert or redesign their programs.

175.    Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT IV

### (Substantive Violation of Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1158(b)(3)(C), and APA, 5 U.S.C. § 706)

176.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

177.    As noted above, the TVPRA amended the INA to provide specific asylum protections for children.  *See* 8 U.S.C. §§ 1158(b)(3)(C), 1232.

178.    Pursuant to the TVPRA, unaccompanied children who enter the United States without inspection generally are not subject to expedited removal.  *Id.* § 1232(a)(5)(D)(i). Instead, unaccompanied minors are placed in regular removal proceedings before Immigration Judges without having to pass credible fear interviews.  *Id.*

179.    Prior to reaching an Immigration Judge, an unaccompanied child presents her application for asylum to an asylum officer, who has "initial jurisdiction over any asylum application filed by an unaccompanied alien child" and can accept the application even for an unaccompanied child in removal proceedings. *Id.* § 1158(b)(3)(C).  If the asylum officer denies the application, then the unaccompanied minor generally proceeds to present her application to the Immigration Judge, in addition to any other claims she may have for withholding of removal or CAT relief. *See id.* § 1232(a)(5)(D).

180.    As addressed above, this sequencing, which permits unaccompanied minors to present asylum claims to asylum officers in the first instance, is designed to further the TVPRA's fundamental objective of protecting children.  It ensures that when unaccompanied minors first recount the difficult and potentially traumatic facts underlying their asylum claims, they do so in a non-adversarial setting, rather than in the context of trial proceedings including cross-examination by DHS attorneys.

181.    The Rule is directly contrary to the TVPRA.  Asylum officers would be forced to issue negative findings on the asylum claims of unaccompanied children.  The Rule contravenes the specific process that Congress set up for unaccompanied children.

182.    Through their actions described in this Complaint, Defendants have violated the substantive requirements of the TVPRA and APA.  Defendants' violations inflict immediate and irreparable harm upon unaccompanied children by depriving them of the opportunity to seek asylum under the laws of the United States, especially the procedural protections created in the TVPRA, and by exposing them to the risk of forcible return to dangerous conditions in their home countries.  Defendants' violations also inflict immediate and irreparable harm on RAICES

and CAIR Coalition by compromising the services they can provide to unaccompanied minor clients and forcing them to drastically divert or redesign their children's services programs.

183.    Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT V

## (Mandamus, 28 U.S.C. § 1361)

184.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

185.    Federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

186.    A plaintiff may obtain a writ of mandamus where she has a clear right to the relief sought, the defendant has a duty to do the act in question, and no other adequate remedy is available. *Id.*

187.    Under the INA, "[a]ny alien who is physically present in the United States or who arrives in the United States * * * irrespective of such alien's status" has the right to "apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).  Statutory exceptions to this presumptive asylum eligibility exist with respect to third country travel only (1) where the United States has a bilateral or multilateral agreement with a "[s]afe third country" in which the alien would have access to "a full and fair procedure" for determining her eligibility for asylum or equivalent protections, *id.* § 1158(a)(2)(A), or (2) the alien was "firmly resettled" in another country before arriving in the

United States, *id.* § 1158(b)(2)(A)(vi).  The United States' only "safe third country" agreement is with Canada.

188.    Defendants have a clear, nondiscretionary duty to permit noncitizens to make asylum claims regardless of their decision not to apply for asylum in third countries, consistent with the foregoing statutory scheme.  The Rule contravenes Defendants' duty to permit such asylum claims in the United States based on impermissible extra-statutory criteria.

189.    Plaintiffs have exhausted all other avenues of relief and have no other adequate remedy.

190.    Defendants' violations inflict immediate and irreparable harm upon Plaintiffs.

191.    Plaintiffs have a clear right to carry out their organizational programs and missions in the context of the lawful administration of asylum procedures set forth in the INA, and Defendants have a non-discretionary duty to provide access to those procedures.  There is no adequate remedy to Defendants' violation, apart from ordering Defendants to carry out their duties to permit asylum claims consistent with the terms of the INA.  Plaintiffs accordingly are entitled to mandamus relief.

## COUNT VI

### (Declaratory Judgment)

192.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

193.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure 57, this Court is empowered to issue a declaratory judgment regarding the Rule's lawfulness under the Constitution, the INA, the APA, and other federal statutes.

194.    An "actual, ripe controversy" exists between the parties concerning Defendants'
authority to issue the Rule and to implement and enforce its terms nationwide consistent with
U.S. law.  *Committee on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 22 (D.D.C.
2013).  The Court has subject matter jurisdiction to adjudicate that dispute pursuant to 28 U.S.C.
§ 1331. *See id.*

195.    Plaintiffs seek a declaratory judgment from the Court that the Rule is inconsistent
with and unlawful under the Constitution and laws of the United States.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

a.    Declare that the Rule is unauthorized by, and contrary to, the Constitution
and laws of the United States;

b.    Issue a temporary restraining order, preliminary injunction, and permanent
injunction enjoining Defendants from implementing or enforcing the Rule
across the nation;

c.    Issue a writ of mandamus requiring Defendants' compliance with the
terms of the INA, including the requirement that they provide asylum
seekers with appropriate access to credible fear interviews to pursue their
asylum claims;

d.    Set an expedited hearing within fourteen days pursuant to Federal Rule
65(b)(2) to determine whether the temporary restraining order should be
extended and a preliminary injunction should be issued; and

e.    Award damages, attorneys' fees, and any such additional relief as the
interests of justice may require.

July 16, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

Justin W. Bernick

Manoj Govindaiah
RAICES, Inc.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-09642
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.org
*Pro hac vice application forthcoming*

*Counsel for Plaintiff Capital Area Immigrants' Rights Coalition*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com

Thomas P. Schmidt*
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* *Motion for admission and pro hac vice application pending admission forthcoming*

*Counsel for Plaintiffs*