**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. _____ |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Local Civil Rule 65.1 and Federal Rule of Civil Procedure 65, Plaintiffs hereby move the Court to issue a temporary restraining order, to be followed by a preliminary injunction, enjoining the implementation and enforcement of the interim final rule challenged in the Complaint, entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule").

Subject to limited exceptions, the Rule immediately and unlawfully renders ineligible for asylum all noncitizens who enter or attempt to enter the United States at the southern border on or after July 16, 2019 without first applying for protection from persecution or torture in a third country through which they transited en route to the United States. These asylum eligibility restrictions are contrary to the Immigration and Nationality Act, the Administrative Procedure Act ("APA"), the U.S. Constitution, and other federal laws. They also were issued without notice and an opportunity to comment pursuant to APA requirements, the "good cause" and "foreign relations" exceptions to which have no proper application here.

In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and accompanying declarations. A proposed temporary restraining order is attached. Oral argument is requested, as further set forth in Plaintiffs' concurrently-filed Motion for Expedited Hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

The accompany Certificate of Counsel Regarding Compliance with Local Rule 65.1 contains a description of the notice provided to Defendants regarding the instant motion and the parties' efforts to meet and confer regarding a proposed briefing schedule.

July 16, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

Justin W. Bernick

Manoj Govindaiah
RAICES, Inc.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-09642
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.org

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com

2

*Pro hac vice application forthcoming*

*Counsel for Plaintiff Capital Area Immigrants' Rights Coalition*

Thomas P. Schmidt*
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* *Motion for admission and pro hac vice application pending admission forthcoming*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAPITAL AREA IMMIGRANTS' RIGHTS
COALITION, *et al.*,

                Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Civil Action No. _____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

                                                       **Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

    A.     Factual Background ............................................................................ 3

    B.     Prior Asylum Policies ......................................................................... 4

    C.     The Challenged Rule........................................................................... 5

ARGUMENT ...................................................................................................... 6

I.     Plaintiffs' Claims Are Likely To Succeed On The Merits. ........................... 6

    A.     The Rule Violates Section 1158. ........................................................ 6

          1.     *Section 1158(b)(2)(C) does not permit the Attorney*
               *General to rewrite specific provisions of the INA* ......................... 7

          2.     *The Rule rewrites provisions governing asylum contained*
               *in Section 1158(a)(2)(A) and 1158(b)(2)(A)(vi)* ........................... 8

          3.     *The Rule is inconsistent with international law and the*
               *Charming Betsy canon*............................................................... 12

          4.     *Defendants have offered no valid defense of the Rule* ................ 14

    B.     The Rule Violates the TVPRA ......................................................... 16

    C.     The Rule Is Invalid Because It Went Into Effect Immediately And
          Did Not Go Through The Required Notice And Comment................... 17

          1.     *Good Cause Exception*............................................................... 17

          2.     *Foreign Affairs Exception*......................................................... 20

II.    The Other TRO And Preliminary Injunction Factors Are Readily Met.......... 23

    A.     The Rule Inflicts Irreparable Harm on Plaintiffs. ............................... 23

    B.     The Balance of Equities and the Public Interest Weigh in Favor of
          Injunctive Relief............................................................................ 26

# TABLE OF CONTENTS—Continued

Page(s)

III.   Nationwide Injunctive Relief Is Appropriate. ..................................................................27

CONCLUSION ...........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ................................................................................... 6

*Air All. Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) .......................................................................... 8, 9, 11

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block,*
    655 F.2d 1153 (D.C. Cir. 1981) ................................................................................. 18

*Aracely, R. v. Nielsen,*
    319 F. Supp. 3d 110 (2018) ........................................................................................ 27

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................................................... 29

*Azar v. Allina Health Servs.,*
    139 S. Ct. 1804 (2019) ................................................................................................ 12

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................................................... 28

*City of New York v. Permanent Mission of India to United Nations,*
    618 F.3d 172 (2d Cir. 2010) .................................................................................. 21, 22

*Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control,*
    71 F.3d 909 (D.C. Cir. 1995) ..................................................................................... 28

*Council of S. Mountains, Inc. v. Donovan,*
    653 F.2d 573 (D.C. Cir. 1981) ........................................................................ 17, 18, 20

*Cresote Council v. Johnson,*
    555 F.Supp.2d 36 (D.D.C. 2008) ............................................................................... 27

*Doe v. Trump,*
    288 F. Supp. 3d 1045 (W.D. Wash. 2017) ................................................................. 25

*East Bay Sanctuary Covenant v. Trump,*
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ....................................................................... 29

*East Bay Sanctuary Covenant v. Trump,*
    909 F.3d 1219 (9th Cir. 2018) ............................................................................. passim

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Exodus Refugee Immigration, Inc. v. Pence,*
    165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ...........................23

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
    542 U.S. 155 (2004).................................................................................................................14

*Freeman v. Quicken Loans, Inc.,*
    566 U.S. 624 (2012).................................................................................................................16

*Gonzalez v. Oregon,*
    546 U.S. 243 (2006)...................................................................................................................8

*Halverson v. Slater,*
    906 F.3d 180 (D.C. Cir. 2018) ...........................................................................................8, 9, 11

*Harmon v. Holder,*
    758 F.3d 728 (6th Cir. 2014) ...................................................................................................16

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989).................................................................................................28

*Hoctor v. United States Dep't of Agric.,*
    82 F.3d 165 (7th Cir. 1996) .....................................................................................................17

*Hou Ching Chow v. Att'y General,*
    362 F. Supp. 1288 (D.D.C. 1973).............................................................................................21

*Humane Soc'y of the U.S. v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017).................................................................................................29

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421 (1987)...........................................................................................................12, 14

*I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.,*
    502 U.S. 183 (1991).................................................................................................................28

*In re B-R-,*
    26 I&N Dec. 119 (BIA 2013) ...............................................................................................1, 15

*Int'l Bhd. of Teamsters v. Peña,*
    17 F.3d 1478 (D.C. Cir. 1994).................................................................................................21

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    407 F.3d 1250 (D.C. Cir. 2005)...............................................................................................17

## TABLE OF AUTHORITIES—Continued

Page(s)

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,*
  319 F. Supp. 3d 491 (D.D.C. 2018) ........................................................27, 28

*Jifry v. FAA,*
  370 F.3d 1174 (D.C.Cir.2004) ..............................................................18, 20

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................23, 24, 27

*Mack Trucks, Inc. v. EPA,*
  682 F.3d 87 (D.C. Cir. 2012) ................................................................18, 20

*Mobil Oil Corp. v. Dep't of Energy,*
  728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ...............................................20

*Morgan Stanley DW, Inc. v. Rothe,*
  150 F. Supp. 2d 67 (D.D.C. 2001) ..........................................................6, 25

*Murray v. The Schooner Charming Betsy,*
  6 U.S. (2 Cranch) 64 (1804) ......................................................................14

*N.J. Dep't of Envt'l Prot. v. EPA,*
  626 F.2d 1038 (D.C.Cir.1980) ...................................................................18

*N. Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................26, 27

*NAACP v. Trump,*
  298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ..................................................................28

*Nat'l Parks Conservation Ass'n. v. Semonite,*
  282 F. Supp. 3d 284 (D.D.C. 2017) ............................................................23

*Nat. Res. Def. Council v. EPA,*
  489 F.3d 1250 (D.C. Cir. 2007) ..................................................................29

*Nken v. Holder,*
  556 U.S. 418 (2009) ..................................................................................26

*North Carolina v. Covington,*
  137 S. Ct. 1624 (2017) ..............................................................................29

<u>TABLE OF AUTHORITIES—Continued</u>

Page(s)

*NRDC v. Reilly*,
976 F.2d 36 (D.C. Cir. 1992) ................................................................................. 8

*Open Communities All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................. 23, 27

*Port Auth. of N.Y. & N.J. v. Dep't of Transp.*,
479 F.3d 21 (D.C. Cir. 2007) ............................................................................... 14

*Rodriguez v. United States*,
480 U.S. 522 (1987) ....................................................................................... 15, 16

*Sall v. Gonzalez*,
437 F.3d 229 (2d Cir. 2006) ........................................................................... 11, 15

*Serono Labs., Inc. v. Shalala*,
158 F.3d 1313 (D.C. Cir. 1998) ........................................................................... 27

*Singh v. Illchert*,
63 F.3d 1501 (9th Cir. 1995) ............................................................................... 15

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) ....................................................................... 18, 19

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ......................................................................... 26, 29

*Sullivan v. Zebley*,
493 U.S. 521 (1990) ............................................................................................. 28

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2014), *aff'd by equally divided Court,* 136 S. Ct. 2271
(2016) .............................................................................................................. 28, 29

*Util. Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ....................................................................................... 10, 12

*WBEN, Inc. v. United States*,
396 F.2d 601 (2d Cir. 1968) ................................................................................ 21

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ............................................................................................. 16

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980) ............................................................................. 21

vi

# TABLE OF AUTHORITIES—Continued

Page(s)

CONSITTUTIONAL PROVISION:

U.S. Const. art. I, § 8, cl. 4................................................................................28

STATUTES:

5 U.S.C. § 553................................................................................17

5 U.S.C. § 553(a)(1)................................................................................20

5 U.S.C. § 553(b)................................................................................17

5 U.S.C. § 553(c)................................................................................17

5 U.S.C. § 706(2)................................................................................28

8 U.S.C. § 1101(a)(42)(A)................................................................................7

8 U.S.C. § 1158................................................................................*passim*

8 U.S.C. § 1158(a)................................................................................1, 9

8 U.S.C. § 1158(a)(1)................................................................................2, 7, 27

8 U.S.C. § 1158(a)(2)................................................................................1, 14

8 U.S.C. § 1158(a)(2)(A)................................................................................*passim*

8 U.S.C. § 1158(a)(2)(B)................................................................................10

8 U.S.C. § 1158(b)(1)................................................................................7

8 U.S.C. § 1158(b)(2)................................................................................1

8 U.S.C. § 1158(b)(2)(A)(vi)................................................................................*passim*

8 U.S.C. § 1158(b)(2)(C)................................................................................*passim*

8 U.S.C. § 1158(b)(3)................................................................................7

8 U.S.C. § 1158(c)(1)................................................................................7

8 U.S.C. § 1158(c)(2)(A)................................................................................15

8 U.S.C. § 1158(d)(5)(B)................................................................................7

# TABLE OF AUTHORITIES—Continued

**Page(s)**

8 U.S.C. § 1182(a)(2) .................................................................................................11

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1),
    100 Stat. 3359 .....................................................................................................28

**REGULATIONS:**

8 C.F.R. § 208.13 ........................................................................................................5

8 C.F.R. § 208.15 .......................................................................................................11

8 C.F.R. § 214.11 .........................................................................................................5

*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations;*
    *Procedures for Protection Claims,* 83 Fed. Reg. 55,934 (Nov. 9, 2018) ...........18, 19

*Asylum Eligibility and Procedural Modifications,* 84 Fed. Reg. 33,829 (July 16,
    2019) ....................................................................................................... *passim*

*Asylum Procedures,* 65 Fed. Reg. 76,121 (Dec. 6, 2000).........................................14

*Designating Aliens for Expedited Removal,* 69 Fed. Reg. 48,877 (Aug. 11, 2004) .....................20

*Eliminating Exception to Expedited Removal Authority for Cuban Nationals*
    *Arriving by Air,* 82 Fed. Reg. 4769 (Jan. 17, 2017)..............................................20

*Notice of Availability for Policy Guidance Related to Implementation of the*
    *Migrant Protection Protocols,* 84 Fed. Reg. 6811 (Feb. 28, 2019)........................19

*Visas: Documentation of Nonimmigrants Under the Immigration and Nationality*
    *Act, As Amended,* 81 Fed. Reg. 5906 (Feb. 4, 2016) .............................................20

**EXECUTIVE MATERIALS:**

Proclamation No. 9842 (Feb. 7, 2019)........................................................................19

Proclamation No. 9844 (Feb. 15, 2019)......................................................................19

Proclamation No. 9880 (May 8, 2019) ........................................................................19

**LEGISLATIVE MATERIALS:**

154 Cong. Rec. S10886-01 (daily ed. Dec. 10, 2008) .................................................16

S. Rep. No. 752, 79th Cong. 1st Sess. (1946).......................................................20, 21

## TABLE OF AUTHORITIES—Continued

**Page(s)**

OTHER AUTHORITIES:

Guy Goodwin-Gill & Jane McAdam, The Refugee in International Law (3d ed. 2007) ...................................................................................................................13

Oxford English Dictionary (online ed. 2019) ................................................................8

UNHCR, Guidance Note on bilateral and/or multilateral transfer arrangements of asylum seekers (May 2013) ..................................................................................13

UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status (1992).......................................................................................................................15

UNHCR, *UNHCR deeply concerned about new U.S. asylum restrictions* (July 15, 2019), *available at* https://www.unhcr.org/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html..............................................................14

UNHCR Exec. Comm, Conclusion on International Protection, Conclusion No. 85(aa) (XLIX) (Oct. 9, 1998), *available at* https://www.unhcr.org/en-us/excom/exconc/3ae68c6e30/conclusion-international-protection.html...............................13

UNHCR Exec. Comm., Refugees Without an Asylum Country, Conclusion No. 15(h)(iv) (Oct. 16, 1979), *available at* https://www.unhcr.org/en-us/excom/exconc/3ae68c960/refugees-asylum-country.html.................................12

U.S. Customs and Border Protection, Southwest Border Migration FY2019 (last modified July 10, 2019), *available at* https://www.cbp.gov/newsroom/stats/sw-border-migration...................................19

## INTRODUCTION

For the second time in less than a year, Defendants have enacted a sweeping ban on asylum that flagrantly violates the text of the Immigration and Nationality Act (INA), flouts the procedural protections of the Administrative Procedure Act (APA), and betrays our Nation's promise to serve as a place of refuge for the most vulnerable fleeing persecution.  That prior policy was rightly and swiftly enjoined.  This one should meet the same fate.

The INA broadly authorizes "[a]ny alien who is physically present in the United States" to "apply for asylum."  8 U.S.C. § 1158(a).  It also imposes several carefully drawn limits on that right.  *Id.* § 1158(a)(2), (b)(2).  Two of those restrictions concern an alien's relationship with a third country:  In Section 1158(a)(2)(A), Congress limited asylum eligibility for aliens who have an opportunity to apply for asylum in a third country, provided that the United States has a "bilateral or multilateral agreement" with that country, "the alien's life or freedom would not be threatened" there, and "the alien would have access to a full and fair procedure for determining a claim for asylum."  In Section 1158(b)(2)(A)(vi), Congress limited asylum for aliens who were previously present in a third country, so long as the alien "firmly resettled in [that] country prior to arriving in the United States."  As the Board of Immigration Appeals has explained, these provisions serve a common objective: "limit[ing] an alien's ability to claim asylum in the United States when other safe options are available." *In re B-R-*, 26 I&N Dec. 119, 122 (2013).

Today, the Attorney General promulgated a rule in the Federal Register that guts both of these carefully drawn restrictions. *See Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) ("the Rule").  That Rule forbids an alien from seeking asylum here if the alien had *any* opportunity to seek asylum in a third country—regardless of whether that country is party to a third-country agreement, threatens the alien's life and freedom, or has a full

1

and fair asylum process.  And it withholds asylum from an alien who merely *passed through* a third country—regardless of whether the alien "firmly resettled" there.  In short, the Rule purports to rewrite both of the statutory limitations Congress enacted, stripping out all of the qualifications Congress specifically imposed to ensure an alien's safety and replacing them with a wholesale ban on asylum for aliens who set foot in another country on the way to the United States.

Defendants do not have the power to rewrite the statute in this way—just as Defendants do not have the power to read out of the statute the right to apply for asylum "whether or not [an alien entered] at a designated port of arrival."  8 U.S.C. § 1158(a)(1); *see East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1249 (9th Cir. 2018).  Rather, Section 1158 authorizes the Attorney General "by regulation [to] establish *additional* limitations and conditions, *consistent with* this section, under which an alien shall be ineligible for asylum."  8 U.S.C. § 1158(b)(2)(C) (emphasis added).  The Attorney General plainly cannot use this supplementary, residual authority to enact regulations that override the statute's terms.

And that is just one of the Rule's many problems.  It violates the Trafficking Victims Protection Reauthorization Act.  It fails to comply with the most basic procedural requirements imposed by the APA.  And it inflicts immediate and irreparable harm on the Plaintiffs, which will be hobbled in their ability to serve their immigrant clients or fulfill their organizational missions if this illegal restriction on asylum goes into effect.  That is apart from the human toll inflicted upon migrants often in unimaginably desperate circumstances.  If this Rule were to be adopted, at a minimum it would have to be authorized by Congress first; it could not take effect simply by the stroke of two Executive Branch pens.

All of the prerequisites for emergency relief are satisfied.  A temporary restraining order

should be swiftly entered, and this cruel and unlawful Rule should be enjoined.

## BACKGROUND

### A.    Factual Background

Many individuals who arrive at the southern border of the United States are fleeing epidemic levels of violence.   Compl. ¶¶ 47-49.   In El Salvador, Guatemala, and Honduras— countries known collectively as the "Northern Triangle"—well-connected and well-armed criminal groups have "surpassed the governments' capacity to respond."   *Id.* ¶ 49.   Women in these countries face some of the highest rates of homicide and sexual violence in the world.   *Id.* ¶¶ 50-52.   Children are often forcibly recruited into gangs, forced to sell drugs, and employed as weapons of gang violence.   *Id.* ¶ 54.   Reports of violence against lesbian, gay, bisexual, and transgender ("LGBT") individuals are widespread, and frequently ignored by local governments. *Id.* ¶ 56.

Hundreds of thousands of individuals have fled these conditions, seeking freedom and safety.   Most seek refuge in the United States by transiting through Guatemala and then Mexico. In Guatemala, rates of violence are epidemic and persecution are rampant.   Mexico, too, is extremely dangerous for migrants.   *Id.* ¶ 63.   Approximately 60% of women and girls are raped while migrating across Mexico, and the murder rate in Mexico has already reached its highest level ever.   *Id.* ¶¶ 64-65.   When individuals reach the southern border of the United States, they are often left stranded in Mexico while waiting for backlogs at ports of entry to clear.   *Id.* ¶ 68. There, asylum seekers are vulnerable to kidnapping, extortion, and other threats by organized crime elements.   *Id.*

Against this backdrop of violence, few individuals choose to seek asylum in Mexico.   *Id.* ¶ 62.   Mexico's refugee agency lacks the resources and funding to adequately process asylum

applications, and requires that applications be filed within 30 days of an individual's arrival in the country. *Id.* ¶¶ 72-75. Furthermore, Mexican detention centers suffer from severe overcrowding, with over 94% of migrants in detention centers suffering abuse while detained. *Id.* Mexican immigration officials reportedly threaten to detain migrants in retaliation for applying for asylum. *Id.* ¶ 78. Given these threats, and the dangerous conditions Mexico presents for many migrants, it is small wonder that most asylum-seekers turn to the United States.

> **B.     Prior Asylum Policies**

Despite the widespread hardship faced by asylum-seekers, Defendants have implemented a series of increasingly harsh and unlawful policies designed to deter foreign nationals from seeking asylum at the Nation's southern border. *Id.* ¶ 74. In April 2018, the Administration announced a "Zero Tolerance Policy" under which the Government began separating detained migrant children from their parents. *Id.* ¶ 75. After a national outcry and numerous judicial orders deeming this policy unlawful, the Administration announced that it would halt the policy. *Id.* ¶ 78. Widespread reports indicate that it continues.

In November 2018, the Administration announced a categorical ban on asylum eligibility for individuals who cross the southern border outside a port of entry. *Id.* ¶¶ 80-82. That policy was challenged in multiple courts—including by Plaintiffs—and was promptly enjoined by the Northern District of California. *Id.* ¶ 83. Both the Ninth Circuit and Supreme Court refused to stay that injunction. The Administration continues to defend the policy and seek vacatur of the injunction. *Id.* ¶ 86.

In December 2018, the Administration announced a series of "Migrant Protection Protocols," under which certain individuals found to have a "credible fear of persecution" would

be required to remain in Mexico while their asylum applications were adjudicated.  That policy too was enjoined, although the injunction was stayed by a sharply divided panel of the Ninth Circuit.  *See Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019).

    **C.**    **The Challenged Rule**

    On July 16, 2019, Defendants imposed the newest, harshest, and most sweeping restriction on asylum eligibility to date.  Invoking the Attorney General's rulemaking authority under Section 1158, this Rule purports to deny asylum eligibility to any individual who "enters, attempts to enter, or arrives in the United States across the southern land border," after "transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States."  84 Fed. Reg. at 33,843 (amending 8 C.F.R. § 208.13).   The Rule contains only three "limited exceptions," *id.* at 33,835: for individuals who applied for and were denied protection from persecution or torture in at least one country en route to the United States; for individuals who are "victim[s] of a severe form of trafficking in persons" under 8 C.F.R. § 214.11; and for individuals who passed through countries that are not parties to the major international treaties governing refugees and protection from torture.  84 Fed. Reg. at 33,843.

    This Rule will be applied in the same manner as Defendants' earlier asylum ban. Individuals placed in expedited removal proceedings must be found to lack a "credible fear of persecution" if they are subject to the rule, and can only be granted relief if they surpass the more onerous "reasonable fear" standard.   *Id.* at 33,843-44.   Individuals placed in full removal proceedings will not be eligible for asylum, and will only be able to seek relief under the withholding-of-removal statute and the Convention Against Torture.  *Id.*

    The upshot of this Rule, then, is simple:  Individuals will not be able to seek asylum on

the southern border unless they seek and are denied asylum in at least one country they pass through en route to the United States.  In practice, this rule will operate as a virtually total ban on asylum by individuals fleeing persecution in the Northern Triangle.   Individuals fleeing persecution in those countries will either be required to seek asylum in Mexico—where violence and persecution are rampant—or return to the Northern Triangle.

## ARGUMENT

A plaintiff seeking a temporary restraining order or preliminary injunctive relief must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).  All four showings are amply made here.

## I.       Plaintiffs' Claims Are Likely To Succeed On The Merits.

### A.       The Rule Violates Section 1158.

The Rule suffers from a straightforward and fatal legal flaw.  In Section 1158, Congress set forth two carefully drawn circumstances in which aliens who have transited through or are eligible for asylum in a third country are barred from seeking asylum.  *See* 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi).   The Rule rewrites those provisions, stripping away the qualifications Congress imposed and replacing them with a blanket ban on asylum eligibility for *anyone* who has transited through or is eligible for asylum in a third country.  The residual rulemaking authority granted by Section 1158(b)(2)(C) does not permit Defendants to contravene the statute in this way.  And that is confirmed by the international-law backdrop against which Section 1158 was enacted.

    *1.     Section 1158(b)(2)(C) does not permit the Attorney General to rewrite specific provisions of the INA.*

Under the Immigration and Nationality Act, an alien is generally eligible for asylum if she can show a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."   8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1).   A grant of asylum allows an alien to live and work in safety in the United States with her immediate family.  *Id.* § 1158(b)(3), (c)(1).

The procedures and standards for obtaining asylum in the United States are laid out in 8 U.S.C. § 1158.  The first subsection grants to "[a]*ny* alien who is physically present in the United States[,] . . . irrespective of such alien's status," the right to "apply for asylum." *Id.* § 1158(a)(1). The statute then enumerates a few carefully circumscribed exceptions to that right.  As relevant here, the first exception involves aliens who may be removed to a "[s]afe third country" pursuant to an international agreement where the alien would have "access to a full and fair procedure" to apply for asylum.  *Id.* § 1158(a)(2)(A).  The statute also enumerates several bars that render an alien ineligible for asylum, including a bar on asylum eligibility for an alien who "was firmly resettled in another country prior to arriving in the United States." *Id.* § 1158(b)(2)(A)(vi).

In addition to these specific limits, Congress has empowered the Attorney General "by regulation [to] establish *additional* limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum."  *Id.* § 1158(b)(2)(C) (emphasis added).   This provision does not allow the Attorney General to arbitrarily erase undesirable or inconvenient provisions of the INA:  By its terms, Section 1158(b)(2)(C) requires that any "additional limitations" imposed by the Attorney General be "consistent with this section."  *See also* 8 U.S.C. § 1158(d)(5)(B) (in subsection regarding "[a]sylum procedure," authorizing the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of

an application for asylum *not inconsistent with this chapter*" (emphasis added)). The words "consistent with" mean just that: that additional regulations must fit together with, rather than undercut or countermand, other provisions of this section. And "additional" limitations are ones that are "supplementary." Oxford English Dictionary (online ed. 2019). The Attorney General does not "supplement[ ]" what Congress has done by nullifying the provisions it has enacted.

This accords with basic principles of administrative law. "[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018). An agency therefore "cannot escape Congress's clear intent to specifically limit an agency's authority under [one provision] by grasping at its separate, more general authority under [another provision]," thus "depriv[ing] the more specific authority of virtually all effect." *Id.* (quoting *Halverson v. Slater*, 906 F.3d 180, 189 (D.C. Cir. 2018)) (brackets in original omitted); *see also Gonzalez v. Oregon*, 546 U.S. 243, 262 (2006) (refusing to infer that a broad provision grants the Attorney General "unrestrained" power where Congress "painstakingly described the Attorney General's limited authority" over the subject); *NRDC v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992) (a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the Act").

In sum, Congress enacted a detailed scheme for granting and limiting eligibility for asylum. And the residual power granted by Section 1158(b)(2)(C) cannot be used to countermand the statutory scheme that Congress enacted.

2.   *The Rule rewrites provisions governing asylum contained in Section 1158(a)(2)(A) and 1158(b)(2)(A)(vi).*

Defendants have done just that: By imposing a blanket bar on asylum eligibility for any individual who *transited through* a third country in which she *could have* sought asylum, the Rule rewrites two separate provisions of Section 1158: Section 1158(a)(2)(A), which restricts

8

asylum eligibility for individuals who could have sought asylum in a *safe third country*; and Section 1158(b)(2)(A)(vi), which restricts asylum eligibility for individuals who *firmly resettled* in another country.   The Rule effectively strikes out the limits contained in these rules and imposes new restrictions that wholly subsume the provisions Congress enacted, "depriv[ing] the more specific authorit[ies] of virtually all effect.'" *Air All. Houston*, 906 F.3d at 1061 (quoting *Halverson*, 129 F.3d at 189).

      a.  Start with section 1158(a)(2)(A), which specifies in detail the circumstances in which foreign nationals may be required to seek asylum in a third country before exercising their right to apply for asylum here.   This provision states that an alien may not apply for asylum if five circumstances are met:

> [1] the alien may be removed, pursuant to a bilateral or multilateral agreement,

> [2] to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence),

> [3] in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion,

> [4] and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection,

> [5] unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

8 U.S.C. § 1158(a)(2)(A).   Unless all of those conditions are satisfied, the safe third-country exception is inapplicable and the alien's right to "apply for asylum," granted by Section 1158(a), is intact.   The United States does not have a "safe third country" agreement with any Central American country.

      The Rule, however, places a bar on asylum eligibility for aliens who satisfy only *two* of those five criteria.   Specifically, it prohibits asylum for any foreign national who (1) could have "applie[d] for protection from persecution or torture" in a country that (2) is not "the alien's

country of citizenship, nationality, or lawful permanent residence." 84 Fed. Reg. at 33,843.  In so doing, the Rule bars asylum for anyone who satisfies the second and fourth criteria (and only part of the fourth criterion at that).  The Rule writes out of the statute all of the remaining requirements: that the United States must have "a bilateral or multilateral agreement" with the third country, that "the alien's life or freedom would not be threatened" there, that the asylum procedures in that country are "full and fair," and that the Attorney General not "find[] that it is in the public interest for the alien to receive asylum in the United States."  In other words, Congress created a narrow bar on asylum eligibility for a specific class of people based on their capacity to apply for asylum in a third country, and the Rule tries to broaden the bar by destroying Congress' limits on it.

To see why this is so clearly unlawful, consider a closely analogous example.  Right below the "safe third country" provision in Section 1158 is another exception, saying that an alien cannot apply for asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B).  Suppose a President passed a regulation reciting the exact same statistics about the burdens on the present asylum system and providing that, in light of those burdens, going forward only those who apply within 6 months of arrival would be able to apply for asylum.  The effect of that regulation would be to narrow the scope of the exception, and thus broaden the class of aliens who are unable to apply for asylum.  And it would be plainly unlawful: 1 year does not mean 6 months, and a regulation purporting to make them equivalent would be an affront to the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).  The Rule is a barely disguised variant of that

clearly forbidden policy—it broadens the safe harbor exception and thus narrows the class of those who can apply for asylum, in derogation of Congress's scheme.

That is confirmed by another feature of the exceptions in Section 1182(a)(2). Subsection (E) provides that the safe third country exception "shall not apply to an unaccompanied alien child." Thus, when a child enters the country alone, even if she meets *all five* of the criteria for a safe third country, the Attorney General is prohibited from denying asylum on that basis. The effect of the Rule is that the very same child *can* be denied asylum if she meets *one and a half* of those criteria. Indeed, the Rule nakedly states this is so. 84 Fed. Reg. at 33,839 n.7. That perverse outcome cannot be—and is not—right. *Air All. Houston*, 906 F.3d at 1061 (quoting *Halverson*, 129 F.3d at 189).

b.   The Rule conflicts starkly with another provision of Section 1158. Section 1158(b)(2)(A)(vi) provides that foreign nationals are ineligible for asylum "if the Attorney General determines that . . . the alien was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi). This language has been interpreted (including by the Government) to mean that a foreign national may be denied asylum if, after leaving the country in which she allegedly suffered persecution, she "received[] an offer of permanent resident status, citizenship, or some other type of permanent resettlement" elsewhere. *Sall v. Gonzales*, 437 F.3d 229, 232 (2d Cir. 2006) (quoting 8 C.F.R. § 208.15).

The Rule turns that provision on its head. It says that a foreign national may not seek asylum in the United States so long as she "transit[ed] through at least one country *outside* the alien's country of citizenship, nationality, or last lawful habitual residence." 84 Fed. Reg. at 33,843 (emphasis added). This rule is tantamount to striking the words "firmly resettled" out of the provision entirely, so that it reads: an alien is ineligible for asylum "if the Attorney General

determines that . . . the aliens was ~~firmly resettled~~ in another country prior to arriving in the United States." Neither courts nor agencies are "free to rewrite clear statutes under the banner of [their] own policy concerns." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1815 (2019).

In short, Defendants have effectively rewritten two of the statute's exceptions to asylum. Congress specified that foreign nationals are asylum-ineligible if they could have sought asylum in a country with which the United States has a safe third-country agreement, or if they have firmly resettled in another country. Defendants have enacted something else entirely: rules providing that foreign nationals are asylum-ineligible if they could have sought asylum in *any* country that they *passed through* en route to this one. It is hard to think of a clearer affront to the bedrock principle that an "agency" cannot "rewrite . . . a clear statutory term." *Util. Air Regulatory Grp.*, 573 U.S. at 328 n.8.

> 3.   *The Rule is inconsistent with international law and the* Charming Betsy *canon.*

And not just that: The Rule is in blatant tension with international law, too. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) (explaining that "one of Congress's primary purposes" in enacting the Refugee Act "was to bring United States refugee law in to conformance" with international refugee law). It has long been a widely accepted principle of international refugee law that "asylum should not be refused solely on the ground that it could be sought from another State." UNHCR Exec. Comm., Refugees Without an Asylum Country, Conclusion No. 15(h)(iv) (XXX) (Oct. 16, 1979).[1] Rather, the U.N. High Commissioner on Refugees—whose views represent "significant guidance" in interpreting the Refugee Convention, *Cardoza-Fonseca*, 480 U.S. at 439 n.22—has stated that before transferring asylum-

---

[1]   *Available at* https://www.unhcr.org/en-us/excom/exconc/3ae68c960/refugees-asylum-country.html.

seekers to another country, a state "*needs* to guarantee that each asylum-seeker" will receive basic protections, including "access to fair and efficient procedures for the determination of refugee status," "protect[ion] against *refoulement*," and an "individual[ized] assesss[ment] as to the appropriateness of the transfer." UNHCR, Guidance Note on bilateral and/or multilateral transfer arrangements of asylum seekers ¶ 3(vi) (May 2013) (emphasis added).[2]

Congress codified those international-law requirements in Section 1158(a)(2)(A). In language that unmistakably mirrors the international-law standard, it provided that an alien may be referred to a third country to seek asylum only where that country would afford the alien "a full and fair procedure for determining a claim to asylum," "the alien's life or freedom would not be threatened," and the Attorney General declines to make an individualized assessment that "it is in the public interest for the alien to receive asylum in the United States. 8 U.S.C. § 1158(a)(2)(A). These are the protections that the Rule has effectively stripped *out* of the law. Indeed, the Rule has replaced the INA's standard with the very rule that international law forbids: a categorical bar on asylum "solely on the ground that it could be sought from another State." It is unsurprising, then, that the UNHCR has flatly declared that this Rule "is not in line

---

[2] *See also* UNHCR Exec. Comm, Conclusion on International Protection, Conclusion No. 85(aa) (XLIX) (Oct. 9, 1998), *available at* https://www.unhcr.org/en-us/excom/exconc/3ae68c6e30/conclusion-international-protection.html (stating that before returning an asylum-seeker to a third country, "it should be established that the third country will treat the asylum-seeker . . . in accordance with accepted international standards, will ensure effective protection against *refoulement*, and will provide the asylum-seeker (asylum-seekers) with the possibility to seek and enjoy asylum"); Guy Goodwin-Gill & Jane McAdam, The Refugee in International Law 393 (3d ed. 2007) ("In order for States to observe their *non-refoulement* and human rights obligations, a precondition to exercising the safe third country mechanism is that the third State can provide the individual with 'effective protection.' ").

with international obligations." UNHCR, *UNHCR deeply concerned about new U.S. asylum restrictions* (July 15, 2019).[3]

That provides an additional weighty reason to hold the Rule unlawful. Statutes must be construed, if possible, in a manner consistent with international law. *See Port Auth. of N.Y. & N.J. v. Dep't of Transp.*, 479 F.3d 21, 31 (D.C. Cir. 2007) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains" (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804))); *see Cardoza-Fonseca*, 480 U.S. at 439; *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) ("we must assume" that "Congress ordinarily seeks to follow" "principles of customary international law"). And it is wholly implausible that the same Congress that took such obvious care to codify the Nation's international-law obligations in Section 1158(a)(2) also gave the Attorney General authority to flout those obligations at will—particularly in a provision requiring that any new limitations on asylum be "consistent with this section." 8 U.S.C. § 1158(b)(2)(C).

### 4. *Defendants have offered no valid defense of the Rule.*

Defendants have offered no valid defense of their brazen violation of the statute.

The Rule's preamble claims that the Rule is analogous to cases in which the Attorney General has held that aliens are ineligible for asylum if there has been a "fundamental change of circumstances" or if the alien could "safely relocate internally within the alien's country of nationality or of last habitual residence." 84 Fed. Reg. at 33,833 (citing Asylum Procedures, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000). But the statute expressly allows the termination of asylum on the basis of a "fundamental change in circumstances" pertinent to an individual case,

---

[3]  *Available at* https://www.unhcr.org/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html.

and Defendants do not ground the Rule on that express statutory grant here.  8 U.S.C. § 1158(c)(2)(A).  And the question of whether an alien can reasonably be expected to relocate internally is directly relevant to whether the alien satisfies the definition of "refugee status." *Singh v. Illchert*, 63 F.3d 1501, 1511 (9th Cir. 1995); see UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status, ¶ 91 (1992).  Permitting consideration of this factor does not undermine, let alone rewrite, any of the specific criteria for asylum ineligibility that Congress imposed.

The preamble also asserts that this rule "protect[s] the 'core regulatory purpose' of asylum law by prioritizing applicants 'with nowhere else to turn.'"  84 Fed. Reg. at 33,834 (quoting *In re B-R-*, 26 I&N Dec. at 122).  That is a severe distortion of Congress's purpose.  As Defendants' own citation explains—indeed, earlier in the very same sentence Defendants quote—Congress sought to limit asylum where aliens have a "choice of *safe homelands*."  *In re B-R-*, 26 I&N Dec. at 122 (emphasis added).  That is why the statutory provisions cited above "all limit an alien's ability to claim asylum in the United States when other *safe options* are available," whether because the alien benefits from a "safe third-country" agreement or because the alien has permanently resettled outside the country in which she faced persecution.  *Id.*; see *Sall*, 437 F.3d at 233 (construing "firm resettlement" bar to apply to aliens who have found "alternative places of refuge abroad").  The Rule thwarts that purpose, by stripping from the statute the very limitations designed to ensure that a foreign national's alternative places for seeking asylum are in fact safe, and by requiring aliens to seek asylum in countries where foreign nationals often face severe threats of persecution and violence.  *See* 84 Fed. Reg. at 33,834 (acknowledging that the rule bars asylum for aliens who merely have "*avenues to* protection" (emphasis added)).  In any event, "no legislation pursues its purposes at all costs," *Rodriguez v.*

*United States*, 480 U.S. 522, 525-526 (1987) (per curiam), and "[v]ague notions of statutory purpose provide no warrant for expanding" the specific exceptions built into Section 1158 "beyond the field to which [they are] unambiguously limited." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012).

A final point: The Attorney General here claims the power, with a stroke of his pen, to render a huge percentage of the aliens that cross into this country ineligible for asylum. It is unlikely—to say the least—that Congress meant to vest such a vast power in the Attorney General in a residual sub-sub-section of a provision of the INA. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."). Especially when the exercise of that purported power is in blatant tension with the specific provisions that Congress *did* pass.

**B.    The Rule Violates the TVPRA**

In addition to violating the INA, the Rule violates the Trafficking Victims Protection Reauthorization Act (TVPRA). Congress passed that Act to provide additional procedural protections to unaccompanied children who had previously been subjected to an immigration system designed for adults. Under the TVPRA, unaccompanied children have a statutory right to present their case for asylum to a USCIS asylum officer, as opposed to an immigration judge in an adversarial setting. *See Harmon v. Holder*, 758 F.3d 728, 734 (6th Cir. 2014). This additional procedural mechanism affords unaccompanied children a less intimidating and adversarial setting to recount the traumatic and sensitive details surrounding their claims for asylum. *Cf.* 154 Cong. Rec. S10886-01 (daily ed. Dec. 10, 2008) (statement of Sen. Feinstein explaining the purpose of the TVPRA). An unaccompanied child subject to the Rule, however, is immediately ineligible for asylum, irrespective of the merits of her claim. 84 Fed. Reg. at

33,839 n.7.  Accordingly, unaccompanied children are forced back into the immigration system designed for adults:  They must present their claims for statutory withholding of removal or protection under the Convention Against Torture to an immigration judge in an adversarial proceeding.  *Id.*  The Rule thus vitiates the TVPRA.

### C.  The Rule Is Invalid Because It Went Into Effect Immediately And Did Not Go Through The Required Notice And Comment.

This Rule also contravenes the fundamental procedural protection of the APA.  Pursuant to the APA, administrative agencies generally must provide a "notice of proposed rule making . . . in the Federal Register" and "give interested persons an opportunity to participate in the rule making" before the promulgation of a final rule. 5 U.S.C. § 553(b), (c).  This notice-and-comment requirement is not a technicality.  The procedure "ensure[s] that agency regulations are tested via exposure to diverse public comment," "ensure[s] fairness to affected parties," and "give[s] affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005).  Participation may also help legitimize controversial rules in the eyes of the public; as Judge Posner has explained, "[t]he greater the public interest in a rule, the greater reason to allow the public to participate in its formation."  *Hoctor v. United States Dep't of Agric.,* 82 F.3d 165, 171 (7th Cir. 1996).

### 1.  Good Cause Exception

The APA "creates a narrow exception" to the notice and comment requirement, "applicable only when an 'agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.'"  *Council of S. Mountains, Inc. v. Donovan,* 653 F.2d 573, 580 (D.C. Cir. 1981) (quoting 5 U.S.C. § 553).  As

the D.C. Circuit has explained, "the good-cause inquiry is 'meticulous and demanding.'
*Sorenson Commc'ns Inc. v. FCC,* 755 F.3d 702, 706 (D.C. Cir. 2014) (quoting *N.J. Dep't of
Envt'l Prot. v. EPA,* 626 F.2d 1038, 1046 (D.C. Cir. 1980)).  Courts must "'narrowly construe[]'
and 'reluctantly countenance[]' the exception," *id.*  (quoting *Mack Trucks, Inc. v. EPA,* 682 F.3d
87, 93 (D.C. Cir. 2012)), and the agency's good-cause determination must be supported by
"factual findings" grounded in the record, not "unsupported assertion" or evidence "too scant to
establish a[n] . . . emergency." *Id.* at 707.

The D.C. Circuit has "approved an agency's decision to bypass notice and comment" on
the ground of "[i]mpracticability" only "where delay would imminently threaten life or
physical property." *Sorensen Commc'ns,* 755 F.3d at 706; *see, e.g., Jifry v. FAA,* 370 F.3d
1174, 1179 (D.C.Cir.2004) (finding good cause when rule was "necessary to prevent a possible
imminent hazard to aircraft, persons, and property within the United States"); *Donovan,* 653
F.2d at 581 (finding good cause where rule was of "life-saving importance" involving miners in
a mine explosion).  In other words, this exception "should be limited to *emergency* situations."
*Mack Trucks, Inc.,* 682 F.3d at 93 (quoting *Am. Fed'n of Gov't Emp., AFL-CIO v. Block,* 655
F.2d 1153, 1156 (D.C. Cir. 1981)); *see Jifry,* 370 F.3d at 1179 (same).  Defendants have
pointed to no emergency warranting a bypass of the normal administrative process here.

Instead, Defendants recycle their familiar claim that immediate publication of this Rule
is necessary to avoid a hypothesized "surge of aliens who would have strong incentives to seek
to cross the border during pre-promulgation notice and comment."  84 Fed. Reg. at 33,841.
The Court has encountered this justification before: Defendants relied on the same imagined
surge as the basis for the asylum ban on illegal entrants it announced in November 2018.
*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for*

*Protection Claims*, 83 Fed. Reg. 55,934, 55,950 (Nov. 9, 2018).  That surge did not materialize when the rule was temporarily enjoined shortly after its promulgation.  *See* U.S. Customs and Border Protection, Southwest Border Migration FY2019 (last modified July 10, 2019) (showing no increase in border crossings from November 2018 to January 2019).[4]  Yet Defendants were undeterred, repeatedly relying on similar claims of impending crisis to assert other unprecedented authorities, including a declaration of national emergency on the southern border, *see* Proclamation No. 9844 (Feb. 15, 2019), two proclamations extending the initial asylum ban, *see* Proclamation No. 9842 (Feb. 7, 2019); Proclamation No. 9880 (May 8, 2019), and a set of Migrant Protection Protocols, *see Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols*, 84 Fed. Reg. 6811 (Feb. 28, 2019).

Given these repeated claims, one would think Defendants would have come up with *some* "record support" for their promised surge.  *Sorensen Commc'ns*, 755 F.3d at 706. Remarkably, however, the only factual support Defendants identify (and cite repeatedly) is the same frail support they trotted out for their initial asylum ban: a newspaper article containing a double-hearsay characterization of a single human smuggler's threat that foreign nationals should "hurry up" and cross the border before the government began "jail[ing] who bring children." *O.A. v. Trump*, No. 18-2718, AR 391; *see* 84 Fed. Reg. at 33,841.  That statement practically defines "unsupported assertion." *Sorensen Commc'ns*, 755 F.3d at 706.  It cannot serve as the fulcrum for dispensing with notice-and-comment for arguably the most sweeping asylum policy in history.

---

[4] *Available at* https://www.cbp.gov/newsroom/stats/sw-border-migration.

That is particularly so given that the threat Defendants hypothesize would be self-inflicted. When the D.C. Circuit has found good case to dispense with notice and comment, it has generally been because the rule is designed to *prevent or halt* some emergency. *See, e.g.*, *Donovan*, 653 F.2d at 581 (rule was of "life saving importance"); *Jifry*, 370 F.3d at 455 (rule necessary to prevent "a security threat").[5] Here, in contrast, the threat Defendants rely on consists entirely of people anticipating the very rule Defendants wish to put in place. If that were enough for good cause, the notice-and-comment requirement would become "an all purpose escape-clause." *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983). The good cause exception is not designed to rescue Defendants, any more than a private party, from their "own choices." *Mack Trucks*, 682 F.3d at 93 (citation omitted).

*2. Foreign Affairs Exception*

Defendants also claim that the procedural requirements of the APA are inapplicable because the Rule involves a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). That narrow exception plainly does not apply here.

---

[5] Likewise, the rulemakings Defendants cite dispensed with notice and comment in order to address some existing emergency well-supported by the record, not a speculative future surge caused by the rule itself. *See Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4769, 4770 (Jan. 17, 2017) (stating that "DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States " through "dangerous" means, "driven in part by the perception that there is a limited window" before an adjustment in diplomatic relations); *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877, 48,880 (Augh. 11, 2004) (describing "urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders" in light of recent rescues of "hundreds of aliens in distress" and discovery of "40 aliens who have died in an attempt to enter the U.S."); *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, As Amended*, 81 Fed. Reg. 5906, 5906-5907 (Feb. 4, 2016) (invoking good cause to address "fraud and security concerns that have developed subsequent to [a prior] rule's publication").

As multiple courts have explained, the "foreign affairs" exception "'is not to be loosely interpreted to mean any function extending beyond the borders of the United States.'" *Hou Ching Chow v. Att'y General,* 362 F. Supp. 1288, 1290 (D.D.C. 1973) (quoting S. Rep. No. 752, 79th Cong. 1st Sess. (1946)). "[I]mmigration matters typically implicate foreign affairs at least to some extent," and "it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *See City of New York v. Permanent Mission of India to United Nations,* 618 F.3d 172, 202 (2d Cir. 2010) (internal quotation marks and citation omitted). Thus, it is not enough that a rule merely "implicate[s] foreign affairs." *Yassini v. Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). "For the exception to apply," going through the notice-and-comment process "should provoke definitely undesirable international consequences," *id.*, such as causing the United States to "reneg[e] on international obligations," *Int'l Bhd. of Teamsters v. Peña,* 17 F.3d 1478, 1486 (D.C. Cir. 1994), or prolonging a diplomatic crisis, *Yassini,* 618 F.2d at 1360; *see also WBEN, Inc. v. United States,* 396 F.2d 601, 616 (2d Cir. 1968) (Friendly, J.).

Defendants fail to identify any such consequences in this case. Their principal argument for invoking the foreign affairs exception is that "[t]he flow of aliens across the southern border . . . directly *implicates* the foreign policy and national security interests of the United States." 84 Fed. Reg. at 33,841 (emphasis added). But that rationale is exactly the type that the APA deems inadequate: It is an assertion merely that the rule "implicate[s] foreign affairs," as every immigration rule does, not that delaying implementation of the rule would "provoke definitely undesirable international consequences." *Permanent Mission,* 618 F.3d at 202; *see Yassini,* 618 F.2d at 1360 n.4.

Pivoting only slightly, Defendants then claim that immediate implementation of the rule would aid "long-term U.S. relations with Mexico and the Northern Triangle countries" by more quickly "address[ing] the enormous flow of aliens through these countries to the southern border." 84 Fed. Reg. at 33,842. It is more than a little surprising for Defendants to claim that even slight delay in addressing a decades-old problem would "definitely," *Permanent Mission*, 618 F.3d at 202, undercut long-term U.S. relations with its neighbors. In any event, Defendants do not so much as hint as to why Mexico and the Northern Triangle countries would prefer (as oppose to strenuously object to) a U.S. policy of unilaterally turning away large numbers of asylum-seekers and leaving them instead on its neighbor's doorstep. And even if they did prefer it, the argument proves too much, since it would allow the circumvention of notice and comment for all sorts of regulations that have some incidental impact on a relationship with another country.

Straining the reader's credulity even further, Defendants posit that "negotiations [with other countries] would be disrupted if notice-and-comment procedures" were allowed, because "public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries." 84 Fed. Reg. at 33,842. But Defendants fail entirely to explain how permitting individuals to submit written comments on an administrative docket could appreciably affect goodwill with Mexico and the Northern Triangle any more than the vociferous public debate that already attends immigration issues in this country every day.

Finally, Defendants claim that "[t]he interim final rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations." *Id.* This rationale just skirts Defendants' burden, which asks

not whether the *Rule* will assist the United States, but whether "immediate *publication* of the Rule . . . is necessary for negotiations with Mexico." *East Bay*, 909 F.3d at 1252.  It too fails to justify dispensing with notice and comment.

## II.     The Other TRO And Preliminary Injunction Factors Are Readily Met.

### A.     The Rule Inflicts Irreparable Harm on Plaintiffs.

In deciding whether to grant a temporary restraining order or preliminary injunction, a court must also consider whether the plaintiffs will "suffer irreparable harm before a decision on the merits can be rendered." *Nat'l Parks Conservation Ass'n. v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017) (quotation and emphasis omitted).  Plaintiffs here have demonstrated that the Rule will inflict the sort of "actual" and "imminent" injury necessary to establish irreparable harm.  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quotations and alterations omitted).[6]  And that is apart from the massive human toll of denying a realistic path to asylum for people in desperate, even unimaginable, circumstances.  Indeed, the harm threatened here is particularly grave, inflicting the consequences of Government evasion of the law upon the most vulnerable.

The Rule inflicts numerous irreparable harms on CAIR Coalition and RAICES.  As this and many other courts have recognized, policies making it "more difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes [of] . . . irreparable harm." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017); *see also, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (similar).  In addition, the D.C. Circuit has held that an organization's

---

[6] Because Plaintiffs can establish irreparable harm, there should be no question that Plaintiffs have also satisfied the requirements of Article III standing.  *See East Bay*, 909 F.3d at 1241-43. Moreover, Plaintiffs fall within the INA's zone of interests.  *Id.* at 1243-45.

expense of staff time and resources in responding to policy may be deemed an irreparable injury because "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9 (internal quotation marks and citation omitted).  CAIR Coalition and RAICES have experienced both of these types of irreparable harm as a result of the Rule.  *See East Bay*, 909 F.3d at 1241-43.

Facilitating asylum applications for those who enter along the border with Mexico is an essential component of the mission of both CAIR Coalition and RAICES.  Compl. ¶¶ 112-14; Cubas Decl. ¶ 4; 14; 39; Garza Decl. ¶ 4; 7; 33.  The Rule would interfere with this mission. CAIR Coalition provides this assistance to individuals in the Washington, D.C. area, many of whom have been transferred from the border, while RAICES generally offers its services in Texas.  Compl. ¶¶ 14-15; Cubas Decl. ¶ 4; Garza Decl. ¶ 4.  CAIR Coalition would be unable to assist nearly all individuals who enter the southern border because many of these individuals would be summarily deported before they even reach the D.C. metropolitan area.  Compl. ¶ 114; Cubas Decl. ¶ 14.  And both organizations would be severely limited in the number of asylum seekers they could serve due to the increased resources that would be required on a per-client basis to staff screening interviews and deportation proceedings under the new system proposed by the Rule.  Compl. ¶¶ 114-16; 135-36; Cubas Decl. ¶ 15; Garza Decl. ¶ 7.  For example, CAIR Coalition estimates that as a result of the Rule, its staff members would need to spend about double the amount of time to prepare asylum seekers subject to the Rule for credible fear interviews, reducing the number of such individuals that CAIR Coalition could serve.  Compl. ¶ 120; Cubas Decl. ¶ 22.

Moreover, the increased resources required to protect asylum seekers subject to the Rule would require the organizations to divert time and resources from the provision of other services.

Notably, while both organizations have previously relied on legal assistants, paralegals, and law students to accompany clients to their credible fear interviews, CAIR Coalition and RAICES anticipate that the Rule would require them to staff credible fear interviews with attorneys, because the interviews would involve complex legal and factual issues regarding multiple countries.  Compl. ¶¶ 120-28; 141; 145; Cubas Decl. ¶¶ 27-28; Garza Decl. ¶¶ 14; 18.  As a result, those attorneys would be unable to take on as many merits stage clients.  Compl. ¶¶ 122; 141; 144; Cubas Decl. ¶¶ 15; 26;Garza Decl. ¶¶ 19; 21; 34.  Similarly, because children and spouses also are no longer eligible for derivative asylum consideration under the new policy, the organizations would need to spend additional resources on each member of a family.  Compl. ¶¶ 129; 150; Cubas Decl. ¶ 35; Garza Decl. ¶¶ 31; 37.  And, in addition to these client-specific demands, the Rule would force the organizations to spend significant staff time analyzing the new policy, attempting to overhaul training materials, and designing new orientations and other client aids.  Compl. ¶¶ 117; 124; 141; Cubas Decl. ¶¶ 16; 19; Garza Decl. ¶¶ 18; 32-33; 37.

These strains on the organizations' resources would detract from their work on other initiatives, such as providing translations and conducting country conditions research.  Compl. ¶ 126; Cubas Decl. ¶ 30; Garza Decl. ¶ 30.  Additionally, the drain on resources would impede the organizations' ability to represent individual clients throughout their entire immigration cases, creating a risk of irreparable reputational harm.  Compl. ¶¶ 120-22; 144; Cubas Decl. ¶¶ 29; 39; Garza Decl. ¶¶ 34-35; *see, e.g., Morgan Stanley DW, Inc.,* 150 F. Supp. 2d at 77-78 (D.D.C. 2001) (loss of "customer trust and goodwill" constituted irreparable harm); *Doe v. Trump,* 288 F. Supp. 3d 1045, 1083 (W.D. Wash. 2017) (refugee resettlement organizations faced irreparable harm under executive action restricting refugee admissions in part because of need to "adequately build programs to service other populations" and risk that "any sudden shift in the

organizations' priorities will threaten their relationships and goodwill with community partners"). And, in CAIR Coalition's case, it could also jeopardize the organization's financial viability, because some of its funding is tied to the number of detained adults that CAIR Coalition represents at trial each year.  Compl. ¶ 131; Cubas Decl. ¶ 38.

In addition to all of these concrete harms, Plaintiffs have suffered irreparable injury through Defendants' deprivation of the 'procedural protection to which [they are] entitled" under the APA.  *Sugar Cane Growers Coop. of Fla. v. Veneman,* 289 F.3d 89, 94-95 (D.C. Cir. 2002). Had Defendants followed proper notice-and-comment procedures, CAIR Coalition and RAICES would have filed comments objecting to the Rule.  Compl. ¶¶ 132; 152; Cubas Decl. ¶ 40; Garza Decl. ¶ 38.  The deprivation of that opportunity is presumed to cause irreparable harm.  *See N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 17 (D.D.C. 2009).  Otherwise, as the D.C. Circuit has indicated, the APA's protections would be a "dead letter."  *Sugar Cane Growers Coop.,* 289 F.3d at 95; *see N. Mariana Islands,* 686 F. Supp. 2d at 18-19 (if a rule is allowed to go into effect for any significant period, the agencies will be "far less likely to be receptive to comments" or subsequent policy changes, and plaintiffs "will never have an equivalent opportunity to influence the Rule's contents").

**B.      The Balance of Equities and the Public Interest Weigh in Favor of Injunctive Relief.**

The public interest and the balance of the equities also favor entry of injunctive relief. There is always "a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder,* 556 U.S. 418, 436 (2009).  Indeed, this is one of the essential public interests that CAIR Coalition and RAICES seek to serve.  Compl. ¶¶ 112-14; 134-35; Cubas Decl. ¶ 4; 14; 39; Garza Decl. ¶ 4; 7; 33.  Temporary injunctive relief will immediately protect thousands of vulnerable migrants

from being improperly removed to countries in which they face a grave risk of harm, thereby freeing up Plaintiffs' resources to perform other aspects of their organizational missions. This Court has held that even the temporary denial of eligibility for parole determinations while in detention "constitutes serious potential damage" contrary to the public interest, weighing in favor of an injunction. *Aracely, R. v. Nielsen,* 319 F. Supp. 3d 110, 157.

Furthermore, where Congress has made an entitlement clear by statute, the Court need look no further to determine where the public interest lies. *See, e.g., League of Women Voters,* 838 F.3d at 13 (there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations"); *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1326-27 (D.C. Cir. 1998) (the "public interest balance plainly would weigh in favor of an injunction" where an agency fails to adhere to statutory standards); *Cresote Council v. Johnson*, 555 F.Supp.2d 36, 40 (D.D.C. 2008) (there is a "general public interest in open and accountable agency decision-making"). Congress made clear in the INA that it is in the public interest for all people to have access to asylum procedures, unless they fall within certain carefully circumscribed exceptions. 8 U.S.C. § 1158(a)(1). By the same token, the public interest is served "when administrative agencies comply with their obligations under the APA." *N. Mariana Islands,* 686 F. Supp. 2d at 21.

On the other hand, the burden of an injunction on Defendants would be minimal. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All.,* 286 F. Supp. 3d at 179. Moreover, the Rule sharply departs from asylum policies that have been in effect for many years. Plaintiffs' requested preliminary injunction will "preserve, rather than alter, the status quo—that is, the 'last uncontested status which preceded the pending controversy.' *Jacinto-Castanon de Nolasco v. U.S. Immigration &*

*Customs Enf't,* 319 F. Supp. 3d 491, 498 (D.D.C. 2018) (quoting *Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control,* 71 F.3d 909, 913 (D.C. Cir. 1995)).

## III.   Nationwide Injunctive Relief Is Appropriate.

This Court should issue nationwide relief and enjoin the application of the Rule to deny asylum anywhere.  As the Supreme Court has made clear, "the scope of injunctive relief" must be "dictated by the extent of the violation established." *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979).  When an Executive Branch policy contravenes a statute, it is invalid and should be struck down in its entirety.  *See, e.g., I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 188 (1991) (a "regulation" that is "without statutory authority" is "facially invalid"); *Sullivan v. Zebley,* 493 U.S. 521, 536 n.18 (1990); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409-10 (D.C. Cir. 1998).  Here, the Rule is flatly contrary to the INA and invalid in all applications, and should therefore be enjoined in full.  *See* 5 U.S.C. § 706(2); *East Bay,* 909 F.3d at 1255-56.  As the D.C. Circuit has explained, "[t]raditional administrative law principles" counsel against the position that "named plaintiffs alone should be protected by the injunction." *Harmon v. Thornburgh,* 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Id.*

Moreover, a nationwide injunction is particularly appropriate in the immigration realm.  The Constitution requires a *"uniform* Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4 (emphasis added).  And Congress "has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly.'" Texas v. United States,* 809 F.3d 134, 187-188 (5th Cir. 2014) (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added)), *aff'd by equally divided Court,* 136 S. Ct. 2271

(2016) (per curiam).   A narrower injunction would contravene those commands.   Congress'
"comprehensive and unified system" of immigration should not be splintered by narrow
injunctions. *Arizona v. United States,* 567 U.S. 387, 401 (2012); *see NAACP v. Trump,* 298 F.
Supp. 3d 209, 243 (D.D.C. 2018); *East Bay,* 909 F.3d at 1255.

Further, in fashioning equitable relief, courts must take into account "what is workable."
*North Carolina v. Covington,* 137 S. Ct. 1624, 1625 (2017).   Here, a narrower injunction would
be unworkable.   It is not clear how an injunction limited to the organizational plaintiffs "would
work in practice," and "whether the clients of the Plaintiff [organizations] would have special
rights that other immigrants would not have." *East Bay Sanctuary Covenant v. Trump*, 349 F.
Supp. 3d 838, 866 n.21 (N.D. Cal. 2018).   In short, a narrow injunction would only sow chaos,
unfairness, and inefficiency.[7]

---

[7] If the Court finds the Rule unlawful solely on the ground that it violates the procedural
requirements of the APA, the result would be the same.   "Normally when an agency clearly
violates the APA we would vacate its action." *Humane Soc'y of the U.S. v. Zinke,* 865 F.3d
585, 614 (D.C. Cir. 2017) (alterations omitted) (quoting *Sugar Cane Growers Coop.,* 289
F.3d at 97).   That course is especially proper here.   First, "vacatur would not trigger
disruptive consequences." *Id.* at 615.   Rather, it would simply require the Defendants to do
what they have already been doing for years.   Second, remanding without vacatur would be
severely prejudicial to Plaintiffs.   "A remand-only disposition is, in effect, an indefinite stay
of the effectiveness of the court's decision and agencies naturally treat it as such." *Nat. Res.
Def. Council v. EPA,* 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (Randolph, J., concurring).
If this Court were to remand only, countless aliens could be removed to countries where
they face grave danger or persecution on the basis of a policy that will ultimately prove
illegal.   Those severe humanitarian consequences militate strongly in favor of vacatur.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order should

be granted, to be followed by a preliminary injunction.  Given the immediate threat of irreparable

harm the Rule poses, an administrative stay should be entered pending adjudication of Plaintiffs'

Motion.

July 16, 2019                                              Respectfully submitted,

                                                          **HOGAN LOVELLS US LLP**

                                                          _____
                                                          Justin W. Bernick

Manoj Govindaiah                                          Neal K. Katyal (Bar No. 462071)
RAICES, Inc.                                              T. Clark Weymouth (Bar No. 391833)
802 Kentucky Ave.                                         Craig A. Hoover (Bar No. 386918)
San Antonio, TX 78212                                     Justin W. Bernick (Bar No. 988245)
Telephone: (210) 222-09642                                Mitchell P. Reich (Bar No. 1044671)
Facsimile: (210) 212-4856                                 Elizabeth Hagerty (Bar No. 1022774)
manoj.govindaiah@raicestexas.org                          Kaitlin Welborn (Bar No. 88187724)
                                                          555 Thirteenth Street NW
*Counsel for Plaintiff Refugee and Immigrant*             Washington, DC 20004
*Center for Education and Legal Services, Inc.*           Telephone: (202) 637-5600
                                                          Facsimile: (202) 637-5910
Adina Appelbaum* (Bar No. 1026331)                        neal.katyal@hoganlovells.com
CAPITAL AREA IMMIGRANTS'                                  t.weymouth@hoganlovells.com
RIGHTS COALITION                                          craig.hoover@hoganlovells.com
1612 K Street NW, Suite 204                               justin.bernick@hoganlovells.com
Washington, DC 20006                                      mitchell.reich@hoganlovells.com
Telephone: (202) 899-1412                                 elizabeth.hagerty@hoganlovells.com
Facsimile: (202) 331-3341                                 kaitlin.welborn@hoganlovells.com
adina@caircoalition.org
*Pro hac vice application forthcoming*                    Thomas P. Schmidt*
                                                          Mohan Warusha Hennadige*
*Counsel for Plaintiff Capital Area*                      390 Madison Avenue
*Immigrants' Rights Coalition*                            New York, NY 10017
                                                          Telephone: (212) 918-3000
                                                          Facsimile: (212) 918-3100
                                                          thomas.schmidt@hoganlovells.com
                                                          mohan.warusha-
                                                          hennadige@hoganlovells.com

\* *Motion for admission and pro hac vice*
*application pending admission forthcoming*

*Counsel for Plaintiffs*

## DECLARATION OF MICHELLE GARZA PAREJA

I, Michelle Garza Pareja, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.       The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.  I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

2.       I serve as the Chief Legal Programs Officer for Refugee and Immigrant Center for Education and Legal Services ("RAICES"), an organizational plaintiff in this action.  I have been licensed in the State of Texas since 2010 and have worked at RAICES since that time, first as a staff attorney, then program director, then Associate Executive Director, and currently as Chief Legal Programs Officer.  I manage all administrative and programmatic aspects of the legal programs and its staff of over 50 attorneys.

3.       RAICES is a 501(c)(3) nonprofit organization headquartered in San Antonio, Texas.

4.       Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas, with offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio.  RAICES's mission is to promote justice by providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas.  RAICES has three main programs: Family Detention Services, the Children's Program, and Community Immigration Services.  In 2017, RAICES closed approximately 51,000 cases at no cost to the client.

5.       The Northern Triangle countries—Honduras, Guatemala, and El Salvador—are three of the top four countries of origin for the clients whom RAICES serves.  Between January

1, 2018 and July 15, 2019, roughly two to three times the number of RAICES's clients came from Honduras and Guatemala as compared to Mexico (9,090 and 8,576 compared to 3,679).

6.      Outside of Mexican nationals, the vast majority of RAICES's clients seeking asylum crossed the southern border after traveling through a third country.

7.      The Interim Rule challenged in the Complaint, *see Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019), would irreparably harm RAICES in multiple ways absent enjoinder of the Interim Rule, including by frustrating RAICES's mission to serve as many migrant clients as possible.  RAICES would be unable to represent the same number of clients that it does currently, both because fewer clients would be eligible for relief and because RAICES would spend more resources on each individual case. The Interim Rule would also force RAICES to divert scarce resources away from other important programs to compensate for the additional time, procedures, and staff required to continue serving clients under the policy.

8.      At the Karnes County Residential Center in Texas ("Karnes"), RAICES's Family Detention Services program has a commitment to universal representation through all aspects of the immigration process during detention.   The program conducts intake sessions for each detainee and attempts to accompany most detainees to their credible fear interviews. Additionally, the program represents detainees in appealing negative decisions from their credible fear interviews.   Due to several operational changes at Karnes over the past several months, many detainees are not released and instead forced to proceed to merits hearings on their asylum claims while detained. RAICES staff and volunteers represent the majority of these clients on a pro bono basis at their asylum merits hearings.

9.     Family Detention Services would need to radically change its entire program because of the Interim Rule. The effects of the rule would be similar to, but if anything more dramatic than, the effects of the asylum rule announced in November 2018.

10.     The Interim Rule would fundamentally affect Family Detention Services' intake procedures at each of the detention centers. Currently, the intake process is relatively short. A form records how, when, and where each client entered the United States; biographical information; how long the client was with U.S. Customs and Border Patrol; and when the client was transferred to the detention facility.

11.     Under the Interim Rule, however, RAICES staff would need to conduct in-depth questioning of each client at the intake stage to determine eligibility for asylum under the Interim Rule, or eligibility for withholding of removal or relief under the Convention Against Torture ("CAT") in the alternative. In particular, RAICES would need to determine whether the client crossed the southern border after traveling through a third country, whether the client sought protection in that third country, whether a decision was made on that application prior to the client's arrival in the United States, and whether he or she is likely to meet the higher legal standards applicable to withholding of removal and CAT claims. This intake process would be more extensive and time-consuming for staff than the form-based intake RAICES traditionally used.

12.     The Interim Rule also would require Family Detention Services to create an entirely new process for assisting asylum seekers subject to the Interim Rule with their credible fear interviews.

13.     Currently, Family Detention Services assists most detainees at Karnes with their credible fear interviews.

3

14.     RAICES staff typically represent detainees at unique or especially difficult initial interviews, however beginning in June 2018 we have strived to represent at every interview, either through RAICES staff or volunteers including pro bono attorneys and law students.

15.     The Interim Rule would force Family Detention Services to create a dual-track system to prepare their clients for interviews: one for clients not subject to the Interim Rule (e.g., those who entered outside of the southern border, those who did not travel through a third country, those from Mexico, and those who entered prior to the effective date for the Interim Rule), and another entirely new system for asylum seekers subject to the Interim Rule. This new system would be much more time- and resource-intensive.

16.     Under U.S. Citizenship and Immigration Services ("USCIS") guidance for the Interim Rule, asylum seekers subject to the Interim Rule effectively would need to meet the higher "reasonable fear" standard rather than the traditional "credible fear" standard to obtain relief. To prevail in a reasonable fear interview, an individual must show effectively at least a 51% chance—i.e., that they "more likely than not"—will be persecuted or tortured in their country of origin.    In contrast, in a credible fear interview, an individual must show an approximately 10% chance—i.e., that they have a "well-founded fear"—of persecution or torture in their country of origin.

17.     It is, therefore, much more difficult for migrants to receive a positive determination in a reasonable fear interview.

18.     This shift to reasonable fear interviews would be a significant one for Family Detention Services. The program's staff would spend double or triple the time interviewing and preparing each client to meet the higher reasonable fear standard. Due to the higher stakes, more staff would need to attend interviews, rather than relying on volunteers.  The staff themselves

would need to spend more time preparing for each interview, as there is a higher likelihood that they would need to make legal arguments during the interview, and conduct legal research prior to the interview. For the pro bono attorneys that still could attend, Family Detention Services would need to create new training resources on how to make legal arguments that were rarely necessary during previous credible fear interviews.

19.     As a result of the Interim Rule, Family Detention Services would no longer be able to fulfill its goal of assisting each client to prepare for an interview. The program would need to prioritize representation at fear interviews for asylum seekers subject to the Interim Rule. Family Detention Services might not be able to provide any assistance at credible fear interviews for asylum seekers who entered through a port of entry or who entered prior to the effective date of the policy.

20.     Family Detention Services also would struggle under the weight of increased appeals under the Interim Rule. Currently, negative determinations from credible fear interviews are rare. In 2018, Family Detention Services appealed 177 negative fear determinations (less than 1% of all interviews) to an Immigration Judge. These appeals are time-consuming for staff, because they must prepare the client to testify, draft affidavits, gather evidence and country conditions documents, research legal arguments, prepare court filings, and represent at court hearings which are often scheduled with only a few days' notice.

21.     With the higher reasonable fear standard, however, more clients with meritorious claims would receive negative determinations to be appealed. If many more clients must go before an Immigration Judge, Family Detention Services could not continue to represent them all. The program must narrow its case acceptance criteria as the volume of appeals increases.

This would further undermine Family Detention Services' commitment to universal representation.

22.     Nor could Family Detention Services rely on pro bono attorneys to represent clients in immigration court; unlike with telephonic credible fear interviews, few pro bono attorneys are available to represent clients in person at immigration court, especially in rural Texas.

23.     The Interim Rule also create new burdens for RAICES's Children's Program.

24.     Unaccompanied minors bypass the credible fear interview process and are placed directly in removal proceedings. Under the Trafficking Victims Protection Reauthorization Act, removal proceedings for unaccompanied minors have the opportunity to apply for asylum first at the Asylum Office, rather than in immigration court. The process is designed to be non-adversarial to protect these vulnerable children.

25.     Under the Interim Rule, however, unaccompanied minors who enter through the southern border after traveling through a third country would no longer be eligible for asylum. The Asylum Office would have no jurisdiction over the case; an Immigration Judge would hear the case for withholding of removal and protection under CAT.

26.     What has been a non-adversarial process using minimal resources would become a lengthy and costly process for the Children's Program staff under the Interim Rule. Staff would have to prepare formal briefings and sophisticated legal arguments for the Immigration Judge, both of which are uncommon for proceedings before an Asylum Officer.

27.     The adversarial process in immigration court is also a traumatic one for the children. Rather than tell their story to an Asylum Officer in an office, children would have to testify in court and be cross-examined by a U.S. Department of Homeland Security attorney.

Children's Program staff would expend tremendous time and resources preparing the children not only for the contents of their testimony, but also for the emotional toll that testimony would take. All of this is much less likely to occur absent the Interim Rule.

28.     The Interim Rule would add new obstacles for RAICES's Community Immigration Services program as well.

29.     Community Immigration Services provides legal services and representation to detained adults, and nondetained adults and families. Many of the issues described above would apply equally to Community Immigration Services' work with detained adults.

30.     Dedicated staff members within RAICES Community Immigration Services also represent clients after they have been released from detention. The program's lawyers represent asylum seekers before USCIS and the immigration courts, but also provide pro se services including assistance in completing asylum applications and translation of documents.

31.     Under the Interim Rule, Community Immigration Services would spend at least double the traditional time on each family's applications. If the family could not apply for asylum, spouses and children would not be considered derivatives on the primary applicant's application. That is, each individual would have to submit a separate application, rather than one application per family. It would take significantly more time and resources for Community Immigration Services lawyers to assist families with their applications than before the policy. RAICES anticipates that Community Immigration Services would need to assist with approximately at least twice as many applications.

32.     Community Immigration Services staff may have to shift roles to other RAICES programs. If fewer clients are released from detention under the higher reasonable fear standard, there would be fewer clients in the community for Community Immigration Services lawyers to

7

serve.   Family Detention Services and the Children's Program, conversely, would be understaffed due to the increased burdens created by the Interim Rule.  RAICES would need to retrain Community Immigration Services staff to perform unfamiliar duties for other programs.

33.     In sum, the Interim Rule would irreparably harm RAICES, including by frustrating its fundamental organizational mission to serve as many detained migrants as possible.   The Interim Rule would significantly frustrate RAICES's purpose of providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas. Under the Interim Rule, RAICES would need to divert scarce resources—including staff time— to: (1) creating new intake procedures for detained families; (2) preparing asylum seekers subject to the Interim Rule for more onerous reasonable fear interviews; (3) preparing children of asylum seekers subject to the Interim Rule for reasonable fear interviews, which is generally unnecessary under the credible fear standard; (4) appealing more negative determinations to immigration court and beyond; (5) preparing unaccompanied minors to testify and be cross-examined in immigration court, rather than at the non-adversarial Asylum Office; (6) assisting families to prepare multiple applications for relief, instead of one application with derivative family members; (7) creating new resources and policies to implement these changes; (8) training staff on these new policies; and (9) retraining staff from certain programs to move into new roles to implement these policies.

34.     If the Interim Rule were to go into effect, RAICES would be able to serve fewer clients. For Family Detention Services, the increased time preparing asylum seekers subject to the Interim Rule for reasonable fear interviews and appealing their negative determinations to the Immigration Court would make it impossible to serve the number of clients that the program

currently serves.  The program would need to reduce the services it provides to all detained clients, including those who crossed at a port of entry.

35.     As a result, RAICES would not be able to keep its commitment to universal representation at Karnes. This would be a significant blow to RAICES's mission.

36.     The Children's Program also would serve fewer clients under the Interim Rule. Because children would need to testify and be cross-examined in immigration court rather than undergo a non-adversarial process at the Asylum Office, the Children's Program staff would need to expend more time and resources on each case, in turn reducing the number of children they can represent.   The Children's Program's reduced capacity would frustrate its entire mission—to represent unaccompanied minors in immigration proceedings.

37.     Community Immigration Services also would face severe difficulties under the Interim Rule.   Staff would have to spend double the time filling out applications for non-derivative family members.  And some staff would likely have to be re-assigned and re-trained to serve other roles, given that fewer clients would be released from detention.

38.     The Interim Rule's lack of notice and comment procedures also irreparably compromised RAICES's ability to inform the Government of the substantial harms—both to the organization and its clients—that the policy would create.  Commenting on rules and regulations is an integral part of RAICES's mission to improve the lives of migrants in Texas.  In 2018, RAICES has commented on four proposed rules and regulations.  Had RAICES been given the opportunity to comment on the Interim Rule, it would have done so.

39.     The relief requested in the Complaint would properly address the injuries to RAICES as described above.  If Plaintiffs prevail in this action, RAICES will be able to devote its staff time and resources to all its clients, not just a select few.

40.     RAICES has no plain, adequate, or complete remedy at law.  It would suffer immediate and irreparable injury under the Interim Rule, if not enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 16, 2019

Dallas, Texas

_____
Michelle Garza Pareja

## DECLARATION OF CLAUDIA CUBAS

I, Claudia Cubas, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.   I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order.

2.      I serve as the Litigation Director for the Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), an organizational plaintiff in this action.   Prior to serving as Litigation Director, I was the Senior Program Director for the Detained Adult Program at CAIR Coalition.   I worked for CAIR Coalition since 2011.  I manage and coordinate litigation across the organization, involving issues related to access to justice, detention, and eligibility for immigration relief for children and adults who are detained by U.S. Immigration and Customs Enforcement ("ICE").

3.      CAIR Coalition is a 501(c)(3) nonprofit organization headquartered in Washington, D.C.

4.      CAIR Coalition is the only organization dedicated to providing legal services to immigrant men, women, and children who are detained by ICE or the Office of Refugee Resettlement ("ORR") in Virginia and Maryland.   CAIR Coalition strives to ensure equal justice for all migrant men, women, and children at risk of detention and deportation in the Washington, D.C. metropolitan area and beyond.

5.      CAIR Coalition is comprised of three main programs: the Detained Adult Program, the Detained Children's Program, and the Immigration Impact Lab. The Detained Adult Program helps detained migrants learn to understand the Immigration Court and deportation process so they can make better-informed decisions about their cases.   CAIR Coalition also represents detained clients and refers clients to pro bono attorneys if they are unable to pay counsel to represent them.

6.     The Detained Adult Program has four main work components: (1) providing educational services in the form of "know your rights" presentations, conducting individual consultations (intakes), and conducting *pro se* workshops with unrepresented detained noncitizens in the custody of ICE at facilities located in Virginia and Maryland; (2) connecting unrepresented detained migrants who cannot afford a lawyer with pro bono attorneys from CAIR Coalition's various pro bono partners; (3) representing detained immigrants found legally incompetent while appearing *pro se* before an immigration judge as part of the National Qualified Representative Program ("NQRP"); and, as the newest component, (4) providing in-house  direct representation to indigent immigrants throughout the course of their removal proceedings.

7.     The Detained Children's Program has three main work components:  (1) providing educational services in the form of "know your rights" presentations and conducting individual consultations (intakes) with unrepresented detained noncitizens in the custody of ORR at facilities located in Virginia and Maryland; (2) connecting unrepresented detained immigrants who cannot afford a lawyer with pro bono attorneys from CAIR Coalition's various pro bono partners; and, (3) providing in-house direct legal representation to indigent immigrants throughout the course of their removal proceedings.

8.     With respect to asylum, CAIR Coalition focuses on defensive asylum applications, as all of CAIR Coalition's clients are in active removal proceedings.

9.     Asylum applications represent a vital component of CAIR Coalition's organizational mission and account for much of the services we provide to detained immigrants.

10.     CAIR Coalition interacts with hundreds of immigrants seeking asylum who entered the U.S. at the southern border each year.  Between January 1, 2018 and July 15, 2019, CAIR

Coalition conducted intakes for 434 adults and 1,318 children who reported being apprehended at the southern border or having lived outside the U.S. before they were apprehended.

11.    Most of these individuals were from the Northern Triangle countries (Guatemala, Honduras, and El Salvador), not Mexico.  For example, of the 2,991 adult intakes CAIR Coalition conducted between January 1, 2018 and July 15, 2019, 1,809 (60%) were for individuals from the Northern Triangle.  Only 444 (15%) were for individuals from Mexico.

12.    CAIR Coalition encounters even more children from the Northern Triangle.  Of the 1,486 child intakes CAIR Coalition conducted between January 1, 2018 and July 15, 2019, 1,394 (94%) were for individuals from the Northern Triangle.  Only 47 (3%) were for individuals from Mexico.

13.    The New Interim Rules and caselaw issued by former Attorney General Sessions in 2017 and 2018 have made Special Immigrant Juvenile Status ("SIJS") a more difficult path for children to seek as a means of relief from removal.  Due to this, children with factual backgrounds that support both SIJS and asylum claims are now more apt to seek asylum or both forms of relief simultaneously, whereas in the past SIJS was more prevalent or the only identified form of relief.

14.    Absent an injunction, the Interim Rule challenged in the Complaint, *see Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019), would irreparably harm CAIR Coalition in multiple ways similar to the asylum rule issued in November 2018, including by frustrating CAIR Coalition's mission to serve as many detained immigrants lawfully seeking asylum as possible.  If fewer asylum seekers are able to reach the Washington, D.C. area, CAIR Coalition would face a drastic reduction in its client base.

15.    The Interim Rule would also significantly limit the overall number of clients CAIR Coalition serves, whether or not those clients entered through the southern border after traveling

through a third country.  Because CAIR Coalition must create costly new resources and procedures
under the Interim Rule, it cannot serve as many individuals.  The Interim Rule would put the
organization in an impossible position: it must raise more funds to serve the same number of
clients, or reduce the number of clients it serves to fit within the current budget.

16.     CAIR Coalition would be forced to divert significant staff resources to analyzing
and interpreting the Interim Rule, overhauling its client information database, and preparing new
informational and advocacy materials.

17.     Under the Interim Rule, CAIR Coalition must develop new materials and
procedures for jail visits specifically for asylum seekers who crossed the southern border after
traveling through a third country.  Traditionally, CAIR Coalition provided one orientation for all
detainees, regardless of how or where they entered the country.  But under the Interim Rule, CAIR
Coalition must prepare separate orientations for adult asylum seekers who traveled through another
country before crossing the southern border to explain the different standard for their credible fear
interview and the limited forms of relief available.  CAIR Coalition would also need to prepare a
new set of orientation materials for children asylum seekers who crossed the southern border after
traveling through a third country and new methods to intake children to account for travel and
potentially persecutory experiences in each country. This latter change in our process is very
concerning as it already takes a significant amount of time to question a child about persecutory
or torturous conduct experienced in home country, the country they most know, not to mention
countries where children have stayed for a passing or fleeting period of time.

18.     Under the Interim Rule, CAIR Coalition's staff would spend substantial resources
identifying and sorting asylum seekers subject to the Interim Rule from other asylum seekers (i.e.,
those who entered outside of the southern border, those who did not travel through a third country,

those from Mexico, and those who entered prior to the effective date for the Interim Rule).  Unlike organizations at the southern border who primarily serve clients who are detained after apprehension at the border, CAIR Coalition serves clients who are placed in detention following a variety of scenarios, including entering the country at the southern border, being apprehended in the interior of the United States, or entering the country at ports of entry at the three major international airports in the Washington, D.C. area.

19.     CAIR Coalition also must develop materials for this new orientation, train its staff on the new orientation, exert double staff time to conduct two orientations rather than one for children and adults, and spend more staff time on the longer, more complicated dual orientations. Simply updating CAIR Coalition's client database to include information relevant to asylum eligibility under the Interim Rule, for example, would take between three to five days of a staff member's time.

20.     With respect to adult immigrants, CAIR Coalition will incur significant expenditures of funds and staff time due to the Interim Rule.

21.      CAIR Coalition also would expend more resources to prepare each adult asylum seeker who crossed the southern border after traveling through a third country for his or her credible fear interview.  During the approximately 1,500 intake sessions for detained adults that CAIR Coalition conducts each year, a staff member traditionally spent about five to ten minutes with each adult eligible for such an interview preparing him or her for the credible fear interview process.

22.     Following the Interim Rule, however, CAIR Coalition estimates that its staff would need to spend about double that time (ten to twenty minutes), at least, in order to prepare each adult asylum seeker subject to the Interim Rule for interviews.   Under U.S. Citizenship and

Immigration Services ("USCIS") guidance for the Interim Rule, asylum seekers subject to the Interim Rule effectively would need to meet the higher "reasonable fear" standard rather than the traditional "credible fear" standard to obtain relief. To prevail in a reasonable fear interview, an individual must show effectively at least a 51% chance—i.e., that they "more likely than not"—will be persecuted or tortured in their country of origin. In contrast, in a credible fear interview, an individual must show an approximately 10% chance—i.e., that they have a "well-founded fear"—of persecution or torture in their country of origin.

23.     As a result of the heightened reasonable fear standard, each preparation session for an adult asylum seeker subject to the Interim Rule would take longer, whether to elicit and prepare more facts to satisfy the higher standard or related to follow-up interviews. It is much more difficult for migrants to receive a positive determination in a reasonable fear interview. It is our experience at CAIR Coalition that the heightened standard significantly alters the ability of immigrants to receive a positive outcome from an interview. During 2018, roughly 13% of credible fear interviews CAIR Coalition was involved with received a negative determination. Conversely, during the same time period 38% reasonable fear interviews CAIR Coalition was involved with received a negative determination—a three-fold increase.

24.     The Interim Rule would cut in half the number of adults CAIR Coalition can prepare during each jail visit. CAIR Coalition cannot compensate for this loss; it has finite resources and permission to make jail visits only a few times a month.

25.     CAIR Coalition's staff would spend more resources during credible fear interviews for adult asylum seekers subject to the Interim Rule, too. For about eight years, CAIR Coalition has had a Memorandum of Understanding with U.S. Citizenship and Immigration Services ("USCIS") permitting CAIR Coalition's staff and volunteer attorneys to attend credible fear

interviews with clients.   Prior to the Interim Rule, CAIR Coalition stopped sending staff and volunteers to attend credible fear interviews in person, because the vast majority of clients received positive determinations.   Rather than spending limited staff and volunteer time attending interviews with clients who would be successful anyway, CAIR Coalition staff would review the transcripts from interviews with negative determinations to advise on further proceedings.

26.     Now that the interviews will apply the higher reasonable fear standard under the Interim Rule, however, it is crucial that CAIR Coalition send staff and volunteer attorneys to as many interviews as possible to increase the likelihood that the person will pass.  If CAIR Coalition staff members are busy attending these interviews, they would be unable to assist as many clients in trial proceedings under Section 240 of the Immigration and Nationality Act ("INA") as is typical.

27.     Given the increased burden of proof that would be required at interviews, CAIR Coalition also anticipates that it would not be able to staff interviews with legal assistants or law student volunteers, as it sometimes had in the past.

28.     CAIR Coalition also would need to recreate its now-defunct volunteer program for attending credible fear interviews as a result of the higher standard under the Interim Rule.  This program would require a dedicated staff member—either a new hire or a staff member reallocated from another already understaffed program—to recruit and train volunteer lawyers to sit in on credible fear interviews.  CAIR Coalition already has discussed hiring another attorney or legal assistant to manage this program.

29.     The heightened need for volunteer lawyers would have a ripple effect on the rest of CAIR Coalition's programs.  When volunteer attorneys are used for credible fear interviews, they would have less time available to volunteer for trial stage proceedings under INA Section 240 or

perhaps would not be in a position to volunteer for that subsequent representation at all. Because CAIR Coalition's organizational model relies on volunteer lawyers to represent clients in those trial stage proceedings, reduced volunteer capacity overall naturally reduces CAIR Coalition's capacity to represent as many clients as possible.

30.     Reduced volunteer capacity also would divert resources from other of CAIR Coalition's initiatives, such as providing translations or conducting country conditions research.

31.     The Interim Rule also would force CAIR Coalition to spend more time and resources on each child client, because all child cases would be time- and resource-intensive trial cases.

32.     Children do not undergo credible fear interviews. Prior to the Interim Rule, children would undergo proceedings at the USCIS Asylum Office, meaning that despite being issued a Notice to Appear in Immigration Court, because under the Trafficking Victims Protection Reauthorization Act (TVPRA) children get an opportunity for an affirmative asylum interview to apply for asylum, unlike adults it is often the case most children's cases get adjudicated without having to to go trial in immigration court . These USCIS asylum application proceedings for children are conducted as interviews with an asylum officer and are less adversarial than a full trial with an immigration judge. The interviews are not attended by counsel for DHS or the Department of Health and Human Services (which oversees ORR) advocating against the child, as occurs in immigration court trials. There is also no direct or cross-examination in asylum office interviews and no third-party witnesses. As such, asylum interviews for children require significantly less preparation time of CAIR Coalition staff than a hearing in front of an immigration judge in immigration court.

33.     The Interim Rule, however, prevents asylum seekers who crossed the southern border after traveling through a third country, including children, from obtaining asylum.  There thus would be nothing for the Asylum Office to adjudicate in terms of a child's asylum case; the case would move directly to trial at immigration court.  This is because the Asylum Office does not have jurisdiction to grant a child (or any person), relief from removal in the form of Withholding of Removal under the INA or protection under the Convention against Torture, which are alternative forms of protective relief available to people when they are barred from asylum.

34.     For each fear-based case of a child that CAIR Coalition works on, staff will need to now spend considerable hours preparing for a trial rather than an interview.  Further, CAIR Coalition's staff members who work with unaccompanied minors would have less time to work on each child case, as the docket for detained children moves much faster than the timeframe at the Asylum Office.

35.     CAIR Coalition must spend more time and resources on cases for mothers and their children as well.  Each year, CAIR Coalition serves roughly 20 to 30 young mothers and their immigrant children who live in shelters.  Many of these mothers would be found ineligible for asylum under the new Interim Rule, such that their children can no longer be counted as derivatives within a single asylum application.  CAIR Coalition anticipates that it now would have to divert additional resources to preparing separate cases for each family member given the absence of derivative asylum eligibility, significantly increasing the total time that must be spent on each client family's case.

36.     At the trial stage, CAIR Coalition's staff also would spend added time and resources on each case for asylum seekers subject to the Interim Rule to brief eligibility issues.

37.     The Interim Rule also will jeopardize CAIR Coalition's already tight budget.  If the organization places fewer asylum cases with volunteers at law firms, it is likely to receive fewer of the much-needed firm donations upon which it depends on for close to 12% of its annual budget. Much of CAIR Coalition's funding from law firm donations also is targeted to work on asylum cases; to the extent many clients are no longer eligible for asylum, CAIR Coalition expects that such donations could decrease.

38.     Moreover, some of CAIR Coalition's funding is tied to the number of adult clients that the organization serves each year.  At the Caroline County detention center, for example, CAIR Coalition receives funding to provide adults with jail visit services and immigration court representations.  This funding is from an anonymous foundation that provides funding to serve a targeted number of detained adults each year.  The more hours that each asylum seeker is going to require will reduce the overall numbers of people served, putting future funding in jeopardy. Indeed, because the Interim Rule reduces the number of clients CAIR Coalition will be able to serve in trial proceedings; it is unclear whether CAIR Coalition would be able to comply with its existing funding conditions tied to numbers of trial representations.

39.     In sum, the Interim Rule would irreparably harm CAIR Coalition, including by frustrating its fundamental organizational mission to serve as many detained noncitizens as possible.  CAIR Coalition would be unable to represent the same number of clients that it has traditionally, both because fewer clients would be eligible for asylum relief and because the organization would have to spend more of its limited resources on each individual case to apply for additional forms of relief such as withholding of removal of protection under the Convention Against Torture.  The Interim Rule also would force CAIR Coalition to divert scarce resources

away from other important programs to compensate for the additional time, procedures, and staff required to continue serving clients under the Interim Rule.

40. The Interim Rule's lack of notice and comment procedures also irreparably compromised CAIR Coalition's ability to inform the Government of the substantial and irreparable harms—both to the organization and its clients—that the policy would create. Commenting on Interim Rules and regulations is an integral part of CAIR Coalition's mission to improve the lives of migrants in the Washington, D.C. area. Had CAIR Coalition been given the opportunity to comment on the Interim Rule, it would have done so.

41. The relief requested in Plaintiffs' Complaint would properly address the injuries to CAIR Coalition as described above. If Plaintiffs prevail in this action, CAIR Coalition would be able to devote its staff time and resources to more clients than if the Interim Rule were in effect.

42. CAIR Coalition has no plain, adequate, or complete remedy at law. It would suffer immediate and irreparable injury under the Interim Rule, if not enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 16, 2019

Washington, D.C.

_____
Claudia Cubas

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

CAPITAL AREA IMMIGRANTS' RIGHTS
COALITION, *et al.*,

               Plaintiffs,

  v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

               Defendants.

</td><td>

Civil Action No. _____

</td></tr>
</table>

## [PROPOSED] TEMPORARY RESTRAINING ORDER

This matter came before the Court on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"). Having considered the Motion and the documents filed therewith, including supporting declarations, Plaintiffs' Complaint, and the files and records herein, and good cause appearing therefor, the Court hereby finds and concludes as follows.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

To obtain a temporary restraining order, Plaintiffs must establish: (1) that irreparable harm is likely in the absence of preliminary relief, (2) a likelihood of success on the merits, (3) that the balance of the equities tips in Plaintiffs' favor, and (4) that an injunction is in the public interest. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Based on the record before the Court, Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") (together, "Plaintiffs") will face immediate and irreparable injuries as a result of the implementation and enforcement of the interim final rule issued by Defendants dated July 16, 2019, entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg.

33,892 (July. 16, 2019) (the "Rule").  Absent an injunction, the Rule will prevent migrants from being considered eligible for asylum consistent with the laws of the United States and place them at imminent risk of deportation to countries in which they may face persecution and violence. Correspondingly, implementation of the Rule also will substantially compromise the resources of Plaintiffs and their abilities to assist as many migrants as possible consistent with their organizational missions.  Further, Defendants' promulgation of the Rule without employing the notice and comment procedures required under the Administrative Procedure Act, 5 U.S.C. § 553, deprived Plaintiffs of the ability to file comments opposing the policy.  Each of the foregoing harms is significant and irreparable.

It is likely that Plaintiffs will prevail on the merits of the claims set forth in their Complaint.  A temporary restraining order against Defendants, in the manner set forth below, is necessary until a determination of the merits of Plaintiffs' claims may be held.

The balance of the equities and the public interest also favor the relief sought by Plaintiffs.  In particular, the issuance of a temporary restraining order will not cause substantial harm to Defendants and will maintain the status quo pending resolution of the merits of this case.

The Court further finds that Plaintiffs took reasonable steps to provide sufficient notice to Defendants as to their intention to file the instant motion by telephone and email correspondence dated July 16, 2019, the substance of which was relayed to the Court on the same date in Plaintiffs' Certificate of Counsel Regarding Compliance with Local Rule 65.1.  Plaintiffs' efforts to contact Defendants reasonably and substantially complied with the requirements of Federal Rule of Civil Procedure 65(b).

The Court continues to have jurisdiction over Defendants and the subject matter of this case.

No security bond is required under Federal Rule of Civil Procedure 65(c).

**TEMPORARY RESTRAINING ORDER**

Now, therefore, Plaintiffs' Motion is GRANTED, and it is hereby ORDERED that:

1.      Defendants and all of their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined fully from enforcing or implementing the Rule across the nation.  Enforcement or implementation of the Rule at all United States borders, ports of entry, and in the processing of asylum claims is prohibited, pending further order of this Court.

2.      Defendants shall immediately provide a copy of this Temporary Restraining Order to any persons or entity that may be subject to it, including Defendants' officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them or who have any involvement in the removal of individuals from the United States.

3.      Pursuant to Federal Rule of Civil Procedure 65(b)(2), the Court sets an expedited hearing for _____ to determine whether this Temporary Restraining Order should be extended.


Date: _____                          _____

                                              United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAPITAL AREA IMMIGRANTS' RIGHTS
COALITION, *et al.*,

                   Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                  Defendants.

Civil Action No. _____

**PLAINTIFFS' CERTIFICATE OF COUNSEL
REGARDING COMPLIANCE WITH LOCAL RULE 65.1**

Pursuant to Local Civil Rules 65.1 and 7(m) for the United States District Court for the District of Columbia, the undersigned hereby certifies as follows:

1.     I am a partner at Hogan Lovells US LLP, 555 Thirteenth Street NW, Washington, D.C., 20004.  I am counsel to Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES").

2.     I contacted counsel for Defendants by e-mail and telephone at approximately 1:00 p.m. on July 16, 2019, to inform them that Plaintiffs would be filing a complaint and motion for a temporary restraining order and/or a preliminary injunction on the same day.  A schedule of the personnel contacted is listed below:

| Defendant Officials and Agencies | Personnel Contacted |
| --- | --- |
| <ul><li>Donald J. Trump</li><li>U.S. Department of Justice</li><li>William Barr, Attorney General of the United States</li></ul> | <ul><li>I telephoned Mr. Erez Reuveni, Assistant Director of the Office of Immigration Litigation, U.S. Department of Justice, and left a voicemail advising him of Plaintiffs'</li></ul> |

| | |
|---|---|
| • Executive Office for Immigration Review<br>• James McHenry, Director of the Executive Office for Immigration Review | lawsuit and request for a temporary restraining order.<br>• I separately followed up with an email to Mr. Reuveni, Mr. Scott Stewart, Mr. Joseph Darrow, Ms. Kathryne Gray, and Mr. Thomas York at the Department of Justice Office of Immigration Litigation. |
| • U.S. Department of Homeland Security<br>• Kevin McAleenan, Acting Secretary of Homeland Security<br>• U.S. Immigration and Customs Enforcement<br>• Matthew Albence, Acting Director of Immigration and Customs Enforcement<br>• U.S. Customs and Border Protection<br>• John P. Sanders, Acting Commissioner of U.S. Customs and Border Protection<br>• U.S. Citizenship and Immigration Services<br>• Kenneth Cuccinelli, Acting Director of U.S. Citizenship and Immigration Services | • I left a voicemail for Mr. John Mitnick, General Counsel of the U.S. Department of Homeland Security, advising him of Plaintiffs' lawsuit and request for a temporary restraining order.<br>• I separately followed up with an email directed to Mr. Kevin McAleenan and Mr. Mitnick at the email addresses for the Secretary of Homeland Security and Office of General Counsel for the Department of Homeland Security. |

3.     In the foregoing voicemails and email communications, I advised counsel for Defendants that Plaintiffs are requesting that the Court set a hearing on Plaintiffs' motion for a temporary restraining orders as soon as feasible, and requested that the parties meet and confer promptly on a briefing schedule.

4.     As soon as possible today, we will be sending Defendants by email, hand delivery, or certified mail copies of all of the papers Plaintiffs are submitting in connection with their request for a temporary restraining order and/or a preliminary injunction, including the Complaint, the civil cover sheet, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion"), the Memorandum in Support of Plaintiffs' TRO

Motion, the Motion for Expedited Hearing on Plaintiffs' TRO Motion, the accompanying declarations, and Plaintiffs' proposed temporary restraining order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 16, 2019, in the District of Columbia.

**HOGAN LOVELLS US LLP**

Justin W. Bernick (Bar No. 988245)
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
justin.bernick@hoganlovells.com

*Counsel to Plaintiffs*

3