JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
Capital Area Immigrants' Rights         )
Coalition, *et al.*,                    )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      )        Civil Action No. 1:19-cv-02117-TJK
                                        )
William Barr, *et al.*,                 )
                                        )
            Defendants.                 )
_____)


## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

LEGAL AND PROCEDURAL BACKGROUND ...................................................................... 5

ARGUMENT ................................................................................................................................ 9

I.      **Plaintiffs Lack Article III Standing and Are Not Within the Zone of Interests.** ........ 9

II.     **The Government is Likely to Succeed on the Merits.** ............................................... 18

       A.     The Rule Is Consistent With The INA. ............................................................ 18

       B.     The Rule Does Not Conflict With the TVPRA. ................................................ 26

       C.     The Rule Satisfies the APA's Procedural Requirements. ................................... 26

       D.     The Rule Is Not Arbitrary and Capricious. ....................................................... 32

III.    **The Other TRO Factors Foreclose Issuing a TRO.** ................................................. 37

IV.    **Any Interim Relief Must Be Sharply Limited.** ........................................................ 39

CONCLUSION ........................................................................................................................... 42

CERTIFICATE OF SERVICE .................................................................................................. 43

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ............................................................. 39

*Air All. Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) ........................................................... 23

*Am. Ass'n for Homecare v. Leavitt,*
  No. 08-cv-0992, 2008 WL 2580217 (D.D.C. June 30, 2008) ........................................... 14, 39

*\*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
  751 F.2d 1239 (Fed. Cir. 1985) ........................................................... 29, 31

*\*Am. Immigration Lawyers Ass'n v. Reno,*
  199 F.3d 1352 (D.C. Cir. 2000) ............................................................. 9

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ............................................................. 12

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ........................................................................ 38

*\*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ............................................................. 13

*Bains v. Schiltgen,*
  No. C 97-2573 SI, 1998 WL 204977 (N.D. Cal. Apr. 21, 1998) ........................................... 17

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ........................................................................ 16, 17

*Cal. Ass'n of Private Postsecondary Sch. v. DeVos,*
  No 17-cv-999, 2018 WL 5017749 (D.D.C. Oct. 16, 2018) .......................................... 38

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ............................................................. 38

*City of Los Angeles v. Barr,*
  --- F.3d --- (9th Cir. July 12, 2019) 2019 WL 3049129, at *8. ................................. 33

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir. 1995) ............................................................. 28

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..............................................................................13

*Clarke v. Secs. Indus. Ass'n,*
    479 U.S. 388 (1987) ..........................................................................14, 15

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..............................................................................10

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ..........................................................................37

*EarthLink, Inc. v. FCC,*
    462 F.3d 1, 9 (D.C. Cir. 2006) ...........................................................33, 37

*East Bay Sanctuary Covenant v. Trump,*
    909 F.3d 1219 (9th Cir. 2018) .......................................................*passim*

*East Bay Sanctuary Covenant v. Trump,*
    354 F. Supp. 3d 1115 (N.D. Cal. 2018) .........................................4, 27, 39

*Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.,*
    858 F. Supp. 2d 1 (D.D.C. 2012) ...........................................................39

*Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing,*
    28 F.3d 1268 (D.C. Cir. 1994) ...............................................................10

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) .................................................................15

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ..............................................................................11

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ..............................................................................29

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ...............................................................14

*Fook Hong Mak v. INS,*
    435 F.2d 728 (2d Cir. 1970) ..................................................................19

*Fund for Animals, Inc. v. Kempthorne,*
    472 F.3d 872, 879 (D.C. Cir. 2006) .......................................................25

*Gill v. Whitford,
    138 S. Ct. 1916 (2018) ...................................................................9, 39

Gonzales v. Oregon,
    546 U.S. 243 (2006) ...........................................................................23

*Haitian Refugee Ctr. v. Gracey,
    809 F.2d 794 (D.C. Cir. 1987) ..........................................................11

*Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) ....................................................................10, 12

*Hawaii Helicopter Operators Ass'n v. FAA,
    51 F.3d 212 (9th Cir. 1995) ...............................................................27

Hill Dermaceuticals, Inc. v. Food & Drug Admin.,
    709 F.3d 44, 47 (D.C. Cir. 2013) .......................................................27

Holder v. Humanitarian Law Project,
    561 U.S. 1 (2010) ...............................................................................29

*Innovation Law Lab v. McAleenan,
    924 F.3d 503 (9th Cir. 2019) .............................................................39

*INS v. Aguirre-Aguirre,
    526 U.S. 415 (1999) ...........................................................................18

INS v. Cardoza-Fonseca,
    480 U.S. 421 (1987) ...........................................................................25

*INS v. Legalization Assistance Project of L.A. Cty.,
    510 U.S. 1301 (1993) ...................................................................15, 16

*J.E.F.M. v. Lynch,
    837 F.3d 1026 (9th Cir. 2016) ...........................................................17

Jifry v. F.A.A.,
    370 F.3d 1174 (D.C. Cir. 2004) .........................................................27

Khan v. Holder,
    584 F.3d 773 (9th Cir. 2009) .............................................................26

Landon v. Plasencia,
    459 U.S. 21 (1982) .............................................................................37

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................38

*\*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ..............................................................................10, 13

*\*Lindeen v. SEC*,
  825 F.3d 646, 656 (D.C. Cir. 2016) .......................................................24, 33, 37

*Lopez v. Davis*,
  531 U.S. 230 (2001) ......................................................................................19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................9

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ....................................................................................39

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .......................................................................................11

*Medellín v. Texas*,
  552 U.S. 491 (2008) .....................................................................................25

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) .....................................................................16

*\*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (TECA 1983) .........................................................................27

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................................33

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) .......................................................................15

*Nat. Res. Def. Council, Inc. v. Reilly*,
  976 F.2d 36 (D.C. Cir. 1992) .........................................................................23

*\*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .......................................................................14

*\*Nat'l Treasury Emps. Union (NTEU) v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ......................................................................12

*New Jersey v. United States,*
  91 F.3d 463 (3d Cir. 1996) ..........................................................................11

*\*New York v. NRC,*
  824 F.3d 1012, 1022 (D.C. Cir. 2016) ....................................................33, 37

*\*NW Immigrant Rights Project v. USCIS,*
  325 F.R.D. 671 (W.D. Wash. 2016) .............................................................15

*O'Bannon v. Town Court Nursing Ctr.,*
  447 U.S. 773 (1980) ....................................................................................11

*PETA v. United States Dep't of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ...................................................................12

*PI v. U.S. Immigration and Customs Enforcement,*
  1:19-cv-1336, ECF 102 (S.D.N.Y. June 21, 2019) ......................................17

*Plyler v. Doe,*
  457 U.S. 202 (1982) ....................................................................................11

*\*Raoof v. Sullivan,*
  315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) ....................................................31

*\*R-S-C- v. Sessions,*
  869 F.3d 1176 (10th Cir. 2017) ...................................................................25

*\*Rajah v. Mukasey,*
  544 F.3d 427 (2d Cir. 2008) ........................................................................32

*Saavedra Bruno v. Albright,*
  197 F.3d 1153 (D.C. Cir. 1999) ...................................................................17

*Sacora v. Thomas,*
  628 F.3d 1059, 1068-69 (9th Cir. 2010) ..................................................33, 37

*Saleh v. Bush,*
  848 F.3d 880, 891 n.9 (9th Cir. 2017) ..........................................................25

*Sessions v. Morales-Santana,*
  137 S. Ct. 1678 (2017) ...................................................................................9

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ..............................................................................9, 10

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................14

*\*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ................................................................11

*\*Tchitchui v. Holder*,
  657 F.3d 132 (2d Cir. 2011) ................................................ 34, 36, 37

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ............................................................40

*United States v. Malenge*,
  294 F. App'x 642 (2d Cir. 2008) ................................................22

*United States v. Mendoza*,
  464 U.S. 154, (1984) ..............................................................40

*United States v. Yunis*,
  924 F.2d 1086 (D.C. Cir. 1991) ................................................25

*Warth v. Seldin*,
  422 U.S. 490 (1975) ..................................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 20 (2008) ..................................................................40

*\*Yassini v. Crosland*,
  618 F.2d 1356 (9th Cir. 1980) ............................................ 30, 31, 32

## ADMINISTRATIVE DECISIONS

*Matter of B–R–*,
  26 I&N Dec. 119 (BIA 2013) ....................................................23

*\*Matter of Pula*,
  19 I&N Dec. 467 (BIA 1987) ............................................ 19, 22, 36

## FEDERAL STATUTES

5 U.S.C. § 553(a)(1) ..............................................................26, 32

5 U.S.C. § 553(b) ....................................................................4, 8

5 U.S.C. § 553(b)(B) ..............................................................4, 26

5 U.S.C. § 553(c) .......................................................................................................8

5 U.S.C. § 553(d) .......................................................................................................8

5 U.S.C. § 553(d)(3) ..............................................................................................4, 26

5 U.S.C. § 701(a)(1) ................................................................................................17

5 U.S.C. § 702 ........................................................................................................14

5 U.S.C. § 706 ..........................................................................................................8

5 U.S.C. § 706(2)(A) ..................................................................................................8

8 U.S.C. § 1101(a)(42) ...............................................................................................5

8 U.S.C. § 1158 ............................................................................................5, 6, 8, 18

8 U.S.C. § 1158(a)(1) ..............................................................................................3, 6

8 U.S.C. § 1158(a)(2) .................................................................................................6

8 U.S.C. § 1158(a)(2)(A) ..........................................................................3, 8, 20, 22, 24, 36

8 U.S.C. § 1158(b)(1)(A) .......................................................................................3, 6, 18

8 U.S.C. § 1158(b)(2)(A) .........................................................................................18, 36

8 U.S.C. § 1158(b)(2)(A)(iv) ....................................................................................8, 22, 24

8 U.S.C. § 1158(b)(2)(C) ......................................................................................*passim*

8 U.S.C. § 1158(d)(5)(B) .............................................................................................6

8 U.S.C. § 1225 ........................................................................................................5

8 U.S.C. § 1225(b) .....................................................................................................6

8 U.S.C. § 1231(b)(3)(A) .........................................................................................6, 25

8 U.S.C. § 1252 .....................................................................................................2, 16

8 U.S.C. § 1252(a) ...................................................................................................16

8 U.S.C. § 1252(a)(5) .............................................................................................10, 16

8 U.S.C. § 1252(b)(9) .......................................................................................... 16, 17

8 U.S.C. § 1252(e)(1) .......................................................................................... 39

8 U.S.C. § 1252(e)(3) .......................................................................................... 16, 39

8 U.S.C. § 1329 .................................................................................................. 2, 17

## FEDERAL REGULATIONS

8 C.F.R. § 208.15 ............................................................................................... 22

8 C.F.R. § 1208.16(c) .......................................................................................... 6

8 C.F.R. § 1208.16(c)-1208.18 .............................................................................. 25

## FEDERAL REGISTER

69 Fed. Reg. 69,480 ............................................................................................ 20

69 Fed. Reg. 69,490 ............................................................................................ 20

84 Fed. Reg. 33,384 ............................................................................................ 22

84 Fed. Reg. 33,829 ............................................................................................ 1

84 Fed. Reg. 33,830 ............................................................................................ 6, 21

84 Fed. Reg. 33,831 ........................................................................................ *passim*

84 Fed. Reg. 33,834 ............................................................................................ 7, 38

84 Fed. Reg. 33,837 ............................................................................................ 7

84 Fed. Reg. 33,838 ............................................................................................ 1, 29

84 Fed. Reg. 33,839 ...................................................................................... 1, 18, 21, 22, 36

84 Fed. Reg. 33,841 ........................................................................................ 4, 27, 28, 30

84 Fed. Reg. 33,842 ...................................................................................... 1, 4, 30, 31, 35

## INTRODUCTION

This case arises from two advocacy groups' efforts to halt on a nationwide basis an important, timely, and well-supported interim final rule promulgated jointly by the Departments of Justice and Homeland Security to address the urgent, ongoing crisis on the United States' southern border. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019). During the first eight months of FY2019, the Department of Homeland Security (DHS) has apprehended an astonishing 524,446 non-Mexican border-crossers—nearly double from the prior two years combined. *Id.* at 33,838; *see* AR21, 208-10, 222-30. Based on historical trends, many of these aliens are expected to claim a fear of persecution, secure release into our country, and then never apply for asylum, never show up for their asylum hearings, or ultimately have their asylum claims rejected as meritless. 84 Fed. Reg. at 33,839-41; *see* AR21-22, 45, 192, 558-59, 664, 770.

Faced with this overwhelming crush on our asylum system—and amidst ongoing diplomatic discussions with the governments of Mexico, El Salvador, Guatemala, and Honduras, 84 Fed. Reg. at 33,831, 33,842; AR537, 635-37—the Departments issued a rule that renders ineligible for asylum an alien who enters or attempts to enter the United States' southern border after failing to apply for protection from persecution or torture while in a third country through which the alien transited en route to the United States. *See* 84 Fed. Reg. at 33,838. The rule thus addresses the problems presented by the many aliens who have no bona fide asylum claim "by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity," raising "questions about the validity and urgency of the alien's claim." *Id.* at 33,839. The rule encourages aliens to apply for protection in other countries that they enter before proceeding to the United States, aids ongoing negotiations with

Mexico and other countries on deterring mass migration to the United States, and promotes asylum's purpose of helping desperate refugees who reach our shores with truly nowhere else to turn.  Importantly, aliens subject to the rule's eligibility bar can still seek protection from removal here, so they will not be sent back to countries where they are more likely than not to face persecution or torture.

Despite the Executive Branch's established authority and sound policy aims, the two Plaintiff organizations ask this Court to issue immediate nationwide relief halting this rule.  This Court should deny Plaintiffs' extraordinary request.

Plaintiffs lack standing.  They are advocacy groups who claim injury based on the need to adapt to a new policy and speculation about its effect on their funding.  That view of injury defies Article III by conferring standing whenever the law changes.  Plaintiffs' predictions about how their funding streams might change are far too speculative to support standing.  And Plaintiffs' asserted injuries fall outside the zone of interests of our Nation's immigration laws—which provide a cause of action for individual *aliens* affected by immigration regulations, but limit challenges to such regulations to administrative proceedings followed by review in the courts of appeals.  8 U.S.C. § 1252, 1329.  Plaintiff organizations—bystanders to the immigration scheme—have no cognizable role to play in this review scheme, and cannot circumvent it by rushing to federal court before the aliens directly affected by this rule even do so.

Plaintiffs' claims also lack merit.  *First*, Plaintiffs contend that the new rule violates the Administrative Procedure Act (APA) because it is inconsistent with 8 U.S.C. § 1158(a)(2)(A) and (b)(2)(A)(vi), which, respectively, bar an asylum application if (among other things) an alien may be removed under a bilateral or multilateral agreement and render ineligible for asylum aliens who firmly resettled in another country before arriving in the United States.  TRO Br. ("Br.") 6-12.  But

section 1158 squarely authorizes the Departments to issue the rule here, and the rule is consistent with each of those provisions. The Immigration and Nationality Act (INA) confers broad discretionary authority on the Attorney General and Secretary of Homeland Security as to whether to grant asylum, 8 U.S.C. § 1158(b)(1)(A), including authority to adopt categorical "limitations and conditions" on asylum eligibility by rule, beyond those specified in the statute, so long as those rules are "consistent with" section 1158, *id.* § 1158(b)(2)(C). The rule, promulgated under that broad authority, is consistent with section 1158. The rule does not restrict any alien's right to apply for asylum, and so is consistent with section 1158(a)(1)'s general entitlement that an alien "may apply for asylum." Nor does the rule conflict with section 1158(b)(2)(A)(iv), which renders ineligible for asylum any alien who "was firmly resettled in another country prior to arriving in the United States." The new rule addresses a different set of aliens from the firm-settlement bar (those who could have applied (but did not apply) for protection in a third country, rather than aliens who firmly resettled in a third country) and imposes the bar based on a different ground (failure to seek relief rather than having firmly resettled). And the rule is consistent with section 1158(a)(2)(A)—which bars applications for asylum if, among other things, "the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country"—because (among other things) nothing in section 1158(a)(2)(A) prohibits the Departments from taking into account, in considering eligibility for asylum, an applicant's failure to seek relief in a third country while in transit to the United States.

*Second*, Plaintiffs contend that the rule violates the Trafficking Victims Protection Reauthorization Act (TVPRA) because it does not afford special rights to unaccompanied alien children. Br. 16-17. But there is no general mandate in the INA that every rule must treat unaccompanied children differently, and such children are subject to the same eligibility criteria

as other aliens.  Unaccompanied alien children, like all other aliens, have no statutory right to be eligible for or granted asylum, and the rule accords with all statutory requirements.

*Third,* Plaintiffs maintain that the rule violates the APA's notice-and-comment and effective-date requirements.  Br. 17-23.  Those requirements do not apply, however, where (as here) they would harm important national interests—good cause excuses those procedures.  *See* 5 U.S.C. § 553(b)(B), (d)(3).  And here, where notice and comment "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect" by encouraging a "surge in migrants," 84 Fed. Reg. at 33,841, good cause is satisfied.  *See East Bay Sanctuary Covenant v. Trump,* 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018); AR119, 208, 434-56, 664, 676, 682.  Nor is notice and comment required when agencies are implementing a measure linked intimately with foreign affairs—here, ongoing negotiations between the United States, Mexico, and Northern Triangle countries to address the current crisis in mass migration and methods for burden-sharing in addressing claims for asylum.  *See* 5 U.S.C. § 553(a)(1).  Awaiting notice and comment would "[h]inder" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis," precisely the "undesirable international consequence that warrants invocation of the foreign affairs exception."  *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018); *see* 84 Fed. Reg. at 33,842; AR533-46, 635-37, 676, 698.

*Fourth,* Plaintiffs suggest that the rule is arbitrary and capricious (although they do not raise such a claim in their complaint) because "Defendants have offered no valid defense of the Rule," but this argument fails too.  Br. 14; *see* Br. 14-16.  But the agencies explained the reason for the rule, and have supported that rule with a robust administrative record.  AR1-784.  The rule explains its rationale—the need to dis-incentivize aliens with meritless asylum claims from

seeking admission to the United States, thereby relieving stress on immigration enforcement and adjudicatory authorities, prioritizing individuals who are unable to obtain protection from persecution elsewhere, curtailing human smuggling, and strengthening the United States' negotiating hand in "ongoing diplomatic negotiations ... between the United States and Mexico," 84 Fed. Reg. at 33,831—and provides a robust evidentiary basis for its conclusions. *E.g.*, AR21-24, 37-44, 45, 109-10, 119, 121-37, 192, 208-32, 558-65, 581-88, 634, 679, 768-70. Plaintiffs' policy disagreements with the Executive's considered policy judgments are no basis to second-guess the considered conclusions of the agency heads.

Finally, Plaintiffs cannot demonstrate that the balance of harms warrants drastic and immediate injunctive relief based on the alleged risk that these organizations may need to adapt to new rules. Br. 23-27. The rule aims to save lives by discouraging asylum seekers from making dangerous, unlawful border crossings, while promoting asylum's core purpose of providing refuge to desperate refugees who reach our shores with nowhere else to turn. And the Executive has a paramount sovereign interest in maintaining the integrity of the United States' borders, in enforcing the immigration laws, and in ensuring that immigration cases can be adjudicated swiftly. Indeed, Plaintiffs have not even brought before this Court a single alien plaintiff to claim harm. The United States and the public, by contrast, would plainly be harmed by any halting of the important measure adopted by the rule at issue in this case. The Court should deny a TRO.

## LEGAL AND PROCEDURAL BACKGROUND

<u>Legal Background.</u>   Congress has empowered the Attorney General and Secretary of Homeland Security to decide who may be admitted to this country as a refugee. 8 U.S.C. §§ 1101(a)(42), 1158, 1225. As a general matter, aliens have a right to apply for asylum. "Any alien who is physically present in the United States or who arrives in the United States (whether

5

or not at a designated port of arrival ... ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b), which governs expedited removal of aliens]."  *Id.* § 1158(a)(1).  But a grant of asylum is entirely discretionary.  Asylum "*may* [be] grant[ed] to an alien who has applied," *id.* § 1158(b)(1)(A) (emphasis added), if the alien satisfies certain standards and is not subject to an application or eligibility bar, *id.* § 1158(a)(2), (b)(1)(B), (b)(2).  As part of this discretion, "[t]he Attorney General [and Secretary] may by regulation establish additional limitations and conditions, consistent with this section [§ 1158], under which an alien shall be ineligible for asylum."  *Id.* § 1158(b)(2)(C).  Separate from the discretionary authority to grant asylum, the United States has a mandatory duty to provide two forms of protection from removal: withholding of removal (when an alien faces a probability of persecution on a protected ground in another country) and protection under the Convention Against Torture (CAT) (when an alien faces a probability of torture in another country). *See* 8 U.S.C. § 1231(b)(3)(A) (withholding); 8 C.F.R. § 1208.16(c) (CAT).

Joint Rule.  On July 16, 2019, the Attorney General and Acting Secretary issued a joint interim final rule providing (with limited exceptions) that "an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum."  84 Fed. Reg. at 33,830.  The Attorney General and Acting Secretary invoked their authority to establish "additional limitations … under which an alien shall be ineligible for asylum" (8 U.S.C. § 1158(b)(2)(C)), and to impose "limitations on the consideration of an application for asylum" (*id.* § 1158(d)(5)(B)). *See* 84 Fed. Reg. at 33,830-31.  The rule provides that aliens who are

ineligible for asylum may still receive protections from removal if they establish a reasonable fear of persecution or torture.  *Id.* at 33,834, 33,837-38.

The rule seeks to discourage "asylum claims raised by those apprehended at the southern border [that] are ultimately determined to be without merit" and that impose a "strain on the nation's immigration system," "undermine[ ] many of the humanitarian purposes of asylum," have "exacerbated the humanitarian crisis of human smuggling," and "affect[ ] the United States' ongoing diplomatic negotiations with foreign countries."  84 Fed. Reg. at 33,831.  It does so by "de-prioritizing the applications of individuals who could have obtained protection in another country" and "ensur[ing] that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly."  *Id.*  "[C]urrently more than 900,000 cases are pending before immigration courts," *id.*, many tens of thousands of which involve asylum claims that will not be granted.  AR21, 121.  The rule combats that serious systemic strain by "reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief."  *Id.*  The rule thus "mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture."  *Id.*  "Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category."  *Id.*

The rule was issued as an interim final rule, effective immediately during the comment period under the good-cause and foreign-affairs exceptions to the notice-and-comment and effective-date requirements of the APA.  *See id.* at 33,840-41.

<u>This Lawsuit.</u>  The day the rule was published, two organizations that provide legal and social services to immigrants and refugees filed this suit seeking immediate injunctive relief. Plaintiffs allege that the rule unlawfully "strip[s] asylum eligibility" from many aliens.  Compl. ¶ 7.  Plaintiffs' own alleged injuries are different, however, since none of them is an alien: Plaintiffs allege that they must "diver[t] ... their human and financial resources" to, among other things, "create more complicated new resources and procedures to assist clients with their claims," *id.* ¶¶ 110, 115, 135, 136, and that the rule could mean fewer cases and fewer "volunteers at law firms," which will lead to "fewer ... donations," *id.* ¶¶ 130, 142.

Plaintiffs bring three APA claims and one constitutional claim.  *First*, they claim that the rule conflicts with the asylum statute, 8 U.S.C. § 1158, and so is contrary to law.  Compl. ¶¶ 153-60; *see* 5 U.S.C. § 706.  Plaintiffs principally contend that the rule conflicts with INA provisions that:  (1) render ineligible for asylum aliens who "may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened," 8 U.S.C. § 1158(a)(2)(A); and (2) prohibit granting asylum to an alien who "was firmly resettled in another country prior to arriving in the United States," *id.* § 1158(b)(2)(A)(iv). Compl. ¶¶ 153-60.  *Second*, Plaintiffs claim that the rule violates the APA because it was improperly issued without notice and an opportunity to comment and was published less than 30 days before its effective date.  Compl. ¶¶ 144-47; *see* 5 U.S.C. § 553(b), (c), (d).  *Third*, Plaintiffs allege that the rule violates the due-process rights of "Individual Plaintiffs and the other putative class members in the United States," although the suit names no individual plaintiffs and no class-action component.  Compl. ¶¶ 168-75; *see* 5 U.S.C. § 706(2)(A).  *Fourth,* they allege a violation of the TVPRA.  Compl. ¶¶ 176-83.  They bring a mandamus claim and seek a declaratory judgment. *Id.* ¶¶ 184-95.  Plaintiffs moved for a TRO—based on their APA and TVPRA, but not

due-process, claims—preventing the rule from taking effect.  *See* Br. 1.  Plaintiffs argue that such relief is necessary because they are irreparably harmed by their inability to comment on the proposed rule, by the need to divert resources to respond to the new rule, and by the increased resources that would need to be spent on asylum applications in light of the rule.  *Id.* 23-26.

## ARGUMENT

The Court should deny a TRO—Plaintiffs lack standing and are not within the INA's zone of interests, their claims lack merit, the equities are against them, and their requested relief is far too broad in any event.

## I.    Plaintiffs Lack Article III Standing and Are Not Within the Zone of Interests

Standing.  The Plaintiff organizations have not suffered a cognizable injury necessary to establish Article III standing.  To satisfy the "'irreducible constitutional minimum' of standing" under Article III, the party invoking federal jurisdiction must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized.'"  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560).  Where, as here, an organization sues on its own behalf, it must establish standing in the same manner as an individual.  *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).[1]

---

[1] To the extent that Plaintiffs rely on the harms to third parties to justify both their own standing and the need for a temporary restraining order, "a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017).  Plaintiffs cannot allege that they are asserting third-party standing based on any purported right that extraterritorial aliens have to apply for asylum within the United States.

The organizational Plaintiffs seek to establish standing based on an alleged interference with their missions, under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See* Compl. ¶¶ 110-52. Organizations may have standing in some situations where their core activities are impaired, as recognized in *Havens*. But, notably, *Havens* arose under a private right of action under the Fair Housing Act, not the generalized challenges that Plaintiffs pursue here where Congress made plain its interest in channeling review to those directly affected—aliens. *See Spokeo*, 136 S. Ct. at 1549 ("Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'"). Congress's aim to allow private enforcement of statutory prohibitions against discriminatory housing practices thus drove the Court's standing analysis. *See Havens*, 455 U.S. at 373-74. And even in the fair-housing context, an organization alleging standing under *Havens* must establish that it would have suffered some other injury if it had not diverted resources to counteracting the problem, because otherwise the diversion of resources is a purely self-inflicted injury. *See Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). Here, however, the INA confers no "legally cognizable interests," *Spokeo*, 136 S. Ct. at 1549, on advocacy organizations, but it does the opposite by channeling review of aliens' immigration-related claims into removal proceedings (in administrative proceedings and then federal courts of appeals), 8 U.S.C. § 1252(a)(5), (b)(9), and no Plaintiff has alleged that it is being forced to divert resources to avoid other cognizable injuries.

Further, a person "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410

---

*See Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (rejecting organizational standing "to raise claims, whether statutory or constitutional, on behalf of aliens," noting "the judicial presumption against suits seeking relief for a large and diffuse group of individuals, none of whom are party to the lawsuit").

U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987) (applying principle to immigration context).  An organization similarly has "no judicially cognizable interest in procuring enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).  And a person generally lacks standing to challenge the government's provision (or denial) of benefits to a third party.  *E.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006); *cf. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788 (1980) (discussing "[t]he simple distinction between government action that directly affects a citizen's legal rights" and "action that is directed against a third party and affects the citizen only indirectly or incidentally").

These principles are particularly important in the immigration context.  The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotation marks omitted).  It has emphasized that "[t]he obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into" the field of immigration.  *Plyler v. Doe*, 457 U.S. 202, 225 (1982).  Decisions involving immigration "may implicate our relations with foreign powers" and also must account for "changing political and economic circumstances."  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Because of the need for "flexibility in [immigration] policy choices," such choices are typically "more appropriate to either the Legislature or the Executive than to the Judiciary."  *Id.*; *see also New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (immigration enforcement decisions "patently involve policy judgments about resource allocation and enforcement methods [that] fall squarely within a substantive area clearly committed by the Constitution to the political branches").

Even if *Havens* applies, the D.C. Circuit has interpreted *Havens* to impose a two-part test for determining "whether an organization's injury is concrete and demonstrable or merely a setback to its abstract social interests." *PETA v. United States Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). First the Court asks "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). "If the answer is yes, [it] then ask[s] whether the plaintiff used its resources to counteract that injury." *Id.* Here, the organizational Plaintiffs do not satisfy these requirements.

To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union (NTEU) v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Standing exists only when "the action challenged ... [is] at loggerheads with the stated mission of the plaintiff." *Id.* at 1429; *see also PETA*, 797 F.3d at 1095; *cf. PETA*, 797 F.3d at 1100-01 (Millett, J., dubitante) (criticizing expansive readings of *Havens* and noting that the case involved "direct, concrete, and immediate injury" to the organization's services based on a "specific legal right"). Plaintiffs state their mission as "provid[ing] assistance to asylum seekers, including individuals who crossed the southern border without applying for asylum in third countries." Compl. ¶ 111. But nothing in the rule prevents them from continuing to represent asylum-seeking clients. Although the legal landscape may have partially changed because of the rule, the organizations can still provide legal services.

Even if there were an adequate conflict with those organizations' missions, they have failed to demonstrate that they meet the second requirement. Plaintiffs claim that they will suffer harm because, as a result of the rule, they will not be able to serve as many clients and that they will suffer corresponding financial harm. *Id.* ¶ 110-52. But these concerns are speculative and self-

12

inflicted. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (no standing where plaintiffs' costly measures to avoid government surveillance they believed reasonably likely were "self-inflicted"). CAIR claims that it will not be able to fulfill its mission "to serve as many migrants lawfully seeking asylum as possible," and that it will "face a drastic reduction in its client base." Compl. ¶ 114. And CAIR asserts that the government's decision to enforce the law by "deport[ing]" potential future clients "before they reach the Washington, DC metropolitan area" will decrease their "client base." *Id.* ¶ 114. Similarly, RAICES alleges that it will not be able to serve as many clients as a result of the rule. *See id.* ¶¶ 134-52. But Plaintiffs have provided no explanation why they cannot continue to represent asylum seekers who have already crossed the border or have met the requirements under the rule. Thus, Plaintiffs' claim that they are likely to suffer financially—because, perhaps, it will have fewer clients and law firms will contribute less support, id. ¶ 130—is insufficient to confer standing. And their desire to prevent the removal of potential future clients provides not basis for standing, as Plaintiffs have no "judicially cognizable interest" in preventing the government from enforcing the law against third parties. *See Linda R.S.*, 410 U.S. at 619; *see PETA*, 797 F.3d at 1099 (Millett, J., dubitante) (criticizing "precedents [that] now hold that the required Article III injury need not be what the defendant has done to the plaintiff; it can also be what the defendant has not done to a third party"). Moreover, Plaintiffs have no judicially cognizable basis to challenge a change in the law simply because it may affect future clients and then may in turn derivatively affect Plaintiffs' own decisions about how to allocate their own resources. *See Arpaio v. Obama*, 797 F.3d 11, 15 (D.C. Cir. 2015) (rejecting standing from the "[p]rojected increases ... in the county's policing burden and jail population" which "rest on chains of supposition and contradict acknowledged realities").

Plaintiffs also say that they must adapt to the new requirements by spending more time on

their clients' cases, adjusting staffing, and analyzing the new policy and revising new training and orientation materials. Compl. ¶¶ 110-52. But if such "injuries" could confer standing, then any legal services or advocacy organization could sue in federal court whenever there is a change in the law, simply by alleging that the organization must get up to speed on the impact of the change. Such impacts on legal representation do not satisfy Article III. Indeed, D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

Finally, Plaintiffs claim that they have been harmed because the lack of notice-and-comment procedures did not allow them to inform the government of the alleged harms that would result from the rule. Compl. ¶¶ 132, 152. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *cf. Am. Ass'n for Homecare v. Leavitt*, No. 08-cv-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) ("injury cannot stand on procedural violation alone without showing another actual injury"). And even were such an injury sufficient, it would supply Article III standing for only one claim.

Zone of Interests. The organizational Plaintiffs' claims are also outside the zone of interests of the statutes they invoke. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a

relevant statute." 5 U.S.C. § 702.  To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).  Plaintiffs invoke no such interest here.

Nothing in the INA and its asylum provisions even arguably suggests that the statute protects the interests of "nonprofit organizations that provide assistance to asylum seekers." Compl. ¶ 111. The asylum provisions neither regulate the organizational Plaintiffs' conduct nor create any benefits for which these organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at aliens, not the organizations advocating for them. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers).  The D.C. Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).[2]

---

[2] While the Ninth Circuit recently held otherwise in *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1243-44 (9th Cir. 2018), it did not consider *FAIR*, 93 F.3d at 903, which held that persons were outside the zone of interests of the INA provisions that they challenged even though they were within the zone of interests of another statutory provision, and the case is still being litigated.  Regardless, *East Bay* conflicts with controlling D.C. Circuit authority.

That reasoning fully applies here.  Plaintiffs are not applying for asylum; they seek to help others do so.  Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources."  *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016).  Because Plaintiffs are simply bystanders to the statutory scheme, the (alleged) effects on their resources are outside the statutory zone of interests.  *See Legalization Assistance Project*, 510 U.S. at 1305 ("The fact that the INS regulation may affect the way an organization allocates its resources … does not give standing to an entity which is not within the zone of interests the statute meant to protect.").[3]

The procedural nature of some of the organizational Plaintiffs' claims makes no difference.  A plaintiff asserting a violation of the APA's notice-and-comment requirements must show that the underlying concrete Article III injury comes within the zone of interests protected by the underlying substantive statute upon which the claim is based—here, the INA.  *See Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014).  Plaintiffs have not done so.

The INA specifies the manner and scope of judicial review in connection with removal proceedings, *see* 8 U.S.C. § 1252, and only the affected alien may seek that review, and only in petitions for review with the courts of appeals following completion of those proceedings.  *Id.* § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals in accordance with this section *shall be the sole and exclusive means* for judicial review of an order of removal ... .") (emphasis added); *id.* § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action

_____

[3] The INA itself confirms that such organizations are not within the zone of interests.  An alien's challenge to an asylum determination must occur in individual removal proceedings, and others may not bring suit on their behalf.  8 U.S.C. § 1252(a); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984).  And as to any change to expedited removal, should plaintiffs' claims be construed as challenging such changes, 8 U.S.C. § 1252(e)(3) creates the exclusive review scheme for such challenges and precludes organizational challenges.

taken or proceeding brought to remove an alien from the United States ... shall be available only in judicial review of a final order under this section" and no district court "shall have jurisdiction ... to review such an order or such questions of law or fact."); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("*[A]ny* issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the [administrative] process ... ."); *PI v. U.S. Immigration and Customs Enforcement*, No. 1:19-cv-1336, ECF 102, at 7 (S.D.N.Y. June 21, 2019) (holding that 8 U.S.C. § 1252(b)(9) bars claims raised by organizations challenging the rules that will apply to removal proceedings). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1032, arising from any "action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *See J.E.F.M.*, 837 F.3d at 1032. That specification precludes review at the behest of third parties, including plaintiffs here. *Block*, 467 U.S. at 344-45, 349-51; *see* 5 U.S.C. § 701(a)(1).

And Congress similarly made clear that no party other than the United States could litigate such claims in the district courts by withdrawing jurisdiction for such causes of action that had previously existed. Until Congress amended the INA to include the claim-channeling provisions of § 1252, a separate provision, 8 U.S.C. § 1329, provided an affirmative basis for jurisdiction in federal district courts for suits filed by any alien or organization challenging implementation of the immigration laws. *See, e.g.*, *Bains v. Schiltgen*, No. C 97-2573 SI, 1998 WL 204977, at *3 (N.D. Cal. Apr. 21, 1998) (describing statute's prior version). But Congress amended § 1329 in 1996, "making clear that district court jurisdiction founded on the immigration statute is confined to actions brought by the government." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C.

Cir. 1999).  This provision makes clear that under the INA, organizational plaintiffs like those here lack any cognizable cause of action with the relevant statute's zone of interests.

## II.    The Government is Likely to Succeed on the Merits

### A.  The Rule Is Consistent With The INA.

Plaintiffs' lead argument is that the rule violates the INA by denying eligibility for asylum to certain aliens.  *See* Br. 6-16.  That argument fails.

The rule is consistent with the INA—and, in particular, with the asylum statute, 8 U.S.C. § 1158.  The asylum statute provides that a grant of asylum is a matter of the Executive's discretion:  asylum "*may* [be] grant[ed] to an alien" who satisfies all governing requirements—it *never* must be granted to an alien.  8 U.S.C. § 1158(b)(1)(A) (emphasis added); *see INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) ("decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion").  And the asylum statute expressly authorizes the Executive to establish categorical "limitations and conditions" on asylum eligibility, on top of those already provided by statute (*see* 8 U.S.C. § 1158(b)(2)(A)), so long as those limitations and conditions are "consistent with" the asylum statute.  *Id.* § 1158(b)(2)(C).

The rule here is well within those discretionary grants of authority over asylum.  To start, the rule is consistent with the discretionary nature of asylum and the authority to adopt new eligibility bars.  In the rule, the Department heads determined, in the exercise of discretion, that aliens who fail to apply for protection in at least one third country through which they transited should not be granted the discretionary benefit of asylum, because they are not refugees with nowhere else to turn.  84 Fed. Reg. at 33,839.  The broad delegation of authority to establish additional eligibility bars requires only that regulatory asylum-eligibility bars be "consistent with" section 1158.  8 U.S.C. § 1158(b)(2)(C).  That describes the rule here.  The rule bars asylum

*eligibility* for aliens who fail to seek asylum at the first available opportunity, and instead wait to reach their preferred destination of the United States, rendering doubtful the validity and urgency of the alien's claim.  Nothing in section 1158 precludes such a rule.  This rule further is consistent with Board of Immigration Appeals precedent recognizing that an alien's attempts to seek asylum in a third country are relevant to the discretionary determination whether to grant him asylum.  *See Matter of Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987) (adverse factors supporting denial of asylum include "whether the alien passed through an other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States"); *see also Kalubi v. Ashcroft*, 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country").  The rule does adopt a categorical bar rather than a case-by-case approach. But that too is consistent with the asylum statute.  If the Attorney General and the Acting Secretary may take account of that factor in individual cases, settled principles of administrative law dictate that they may do so categorically as well.  *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (upholding INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

Plaintiffs make several arguments that the new eligibility bar "contravene[s]" the asylum statute, Br. 6, but each of their arguments lacks merit.[4]

---

[4] Throughout their brief, Plaintiffs rely on rhetorical overstatement—using words and phrases like "countermand" (Br. 8), "purports to rewrite" (Br. 2), "rewrite" (Br. 2), "rewrites" (Br. 6, 8), "guts" (Br. 1), "override" (Br. 2), "nullifying" (Br. 8), "strikes out" (Br. 9), "wholly subsume" (Br. 9), "destroying" (Br. 10), "turns that provision on its head" (Br. 11), "effectively rewritten" (Br. 12), "blatant tension" (Br. 12, 16), "brazen" (Br. 14), "severe distortion" (Br. 15), "[s]training the

*First*, Plaintiffs contend that the rule "effectively strikes out the limits contained in" 8 U.S.C. § 1158(a)(2)(A), which bars an alien from applying for asylum if he or she may be removed to a safe third country under a bilateral or multilateral treaty, and in which he or she would be able to seek asylum. *See* Br. 9-11. Plaintiffs claim that "Congress created a narrow bar on asylum eligibility for a specific class of people based on their capacity to apply for asylum in a third country." Br. 10. They argue that the rule "tries to broaden the bar by destroying Congress' limits on it." *Id.* They analogize it to a hypothetical rule that provides a shorter timeframe for applying for asylum than the statute explicitly requires. *Id.*

Plaintiffs are mistaken. The rule is consistent with section 1158(a)(2)(A). The safe-third-country provision is not merely about the ability to "have sought asylum in a safe third country." Br. 9 (emphasis omitted). Section 1158(a)(2)(A) categorically bars applications for asylum "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened on account" of a protected ground. The safe-third-country bar is potent and unyielding:  it prohibits an alien from even *applying* for asylum in the United States. But nothing in section 1158(a)(2)(A)'s asylum-*application* bar forecloses the Department heads from taking into account, in considering the applicant's *eligibility* for relief, the applicant's failure to seek potential relief in a third country while in transit to the United States—particularly when that transit was undertaken to flee a different country for the purported purpose of finding a safe country. Further, the safe-third-country provision offers a potential mechanism for categorically sending away all would-be asylum applicants to a third country to apply for relief, *see* 8 U.S.C. § 1158(a)(2)(A), and to entirely bypass withholding-of-removal proceedings, *see Asylum Claims Made By Aliens Arriving From*

---

reader's credulity" (Br. 22), and "evasion of the law" (Br. 23)—without engaging in robust statutory interpretation to justify that language.

*Canada at Land Border Pors-of-Entry*, 69 Fed. Reg. 69,480, 69,490 (Nov. 29, 2004).  This rule is significantly different, providing for a more tailored determination of whether an alien passed through a country where he could have, but did not, apply for relief.  Further, this rule preserves withholding of removal for aliens who demonstrate that they have a reasonable fear of persecution. *See* 84 Fed. Reg. at 33,830, 33,831.

An additional distinction between the present rule and the types of agreements permissible under the safe-third-country statutory provision is that, under this country's safe-third-country agreement with Canada, a potential asylee traveling through Canada would be barred from applying for asylum in the United States *even if* that applicant had applied for asylum in Canada and had his or her claim *rejected*.  *See Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries*, U.S.–Can., Dec. 5, 2002, State Dep't No. 05-35, art. 5; *see also* 69 Fed. Reg. 69,480, 69, 480 (Nov. 29, 2004).  Not so under this rule.  Here, the rule bars eligibility *only if* an alien failed to *seek* potential relief in at least one third country while in transit to the southern border.  If that claim is denied in that country, then, unlike aliens subject to the safe-third-country agreement with Canada, an alien is not subject to the new eligibility bar and can still obtain asylum in the United States.  84 Fed. Reg. at 33,831.  That agreement makes it so that an alien may apply for asylum only in the first of the two countries he steps foot in; this new rule, by contrast, provides no such one-country limit and instead just requires certain aliens to have exhausted at least one other potential avenue for relief before being eligible for relief in the United States.  *Id.* at 33,839.  And contrary to Plaintiffs' suggestions, Br. 5-6, the rule does not ban merely transiting through Mexico to reach the United States.  Rather, it renders aliens ineligible for asylum if they pass through a country but fail to apply for asylum there, thereby "rais[ing] questions about

the validity and urgency of the alien's claim." 84 Fed. Reg. at 33,839.  Thus, Plaintiffs' argument fails, because the rule relates to *eligibility*, it relies on sound considerations in addressing eligibility, and it is qualitatively different from the third-country provisions, as described above. It is a distinct rule, not an attempt to circumvent other bars.

Finally, as noted above, the failure to seek such relief in a country where there is a colorable claim that relief could have been obtained has long been recognized as a sufficient factor to deny asylum. *See Pula*, 19 I&N Dec. at 473-74.  And denying asylum on this ground is consistent with the purpose of the safe-third-country bar, which is "to prevent forum-shopping by asylum seekers, and to promote the orderly handling of asylum claims." *United States v. Malenge*, 294 F. App'x 642, 645 (2d Cir. 2008).  Thus, far from conflicting with section 1158(a)(2)(A), the rule complements it, reaching a different class of aliens who the agencies have concluded may be "forum-shopping ... after transiting through one or more third countries where they could have sought protection, but did not," 84 Fed. Reg. at 33,384, while—unlike the safe-third-country bar—permitting those aliens to apply for asylum if they first apply in another country.  *See* AR121, 770.

*Second,* Plaintiffs contend that the rule conflicts with the firm-resettlement bar to asylum eligibility, 8 U.S.C. § 1158(b)(2)(A)(iv), because it precludes asylum relief in the United States in circumstances that fall short of a permanent offer of residence in a third country.  Br. 11-12.

Plaintiffs are incorrect.  The third-country-transit bar addresses a different set of aliens than the firm-settlement bar—those who could have applied (but did not apply) for protection in a third country.  The firm-resettlement bar in section 1158(b)(2)(A)(iv), by contrast, renders ineligible for asylum any alien who "was firmly resettled in another country prior to arriving in the United States."  It applies to aliens who, "prior to arrival in the United States, ... entered into another country with, or while in that country received, an offer of permanent resident status, citizenship,

or some other type of permanent resettlement." 8 C.F.R. § 208.15. The two bars are thus concerned with different circumstances, different classes of aliens, and different actions (or inactions). There is no inconsistency between barring both classes from asylum eligibility. Far from the Plaintiffs' contention that the rule "turns that provision on its head," Br. 11-12, the rule here promotes aims that are complementary to the firm-resettlement bar—it prioritizes applicants "with nowhere else to turn." *Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013). The logic of the firm-resettlement bar is that if someone was offered permanent status in a third country, there is categorically no need to afford them asylum in the United States. Similarly, the logic of the third-country-transit bar is that if someone could have applied for and obtained protection in a third country but failed to do so, there is categorically no need to afford them asylum in the United States. Those harmonized, reinforcing judgments reflect that the new bar is just the sort of "condition" or "limitation" that Congress authorized the Department heads to adopt.[5]

Plaintiffs rely on administrative-law cases holding that an agency "cannot escape Congress's clear intent to specifically limit the agency's authority." *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see* Br. 8. (citing *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) & *Nat. Res. Def. Council, Inc. v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992)). But Congress specifically provided the Executive the broad authority to establish additional bars and those bars apply to a distinct class of aliens. In this case, given Congress's "express delegation of authority [through 8 U.S.C. § 1158(b)(2)(C)] to the agency to elucidate a specific provision of the statute by regulation," the agency's "judgement [is owed] more than mere deference or weight," and

---

[5] In a recent case, these Plaintiffs previously contended that under section 1158(b)(2)(C) the government can promulgate an eligibility bar only if that bar is similar to existing statutory bars. Br. (ECF 6-1), No. 1:18-cv-2838, at 22 (arguing that eligibility bar must be "similar in nature to those enumerated) (internal quotation marks and citation omitted). Now they argue the converse, that a bar is unlawful if it is similar to or complements a pre-existing bar. Br. 6-16. They cannot have it both ways.

courts give the agency interpretation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Lindeen v. SEC*, 825 F.3d 646, 656 (D.C. Cir. 2016).

There is a repeated, erroneous suggestion running through Plaintiffs' lead arguments: that section 1158's asylum bars regarding third countries somehow occupy the field for how an alien's relationship with a third country can bear on eligibility to be granted asylum. Br. 6-12. For example, Plaintiffs suggest that the rule exceeds the agencies' authority if it does not parrot section 1158(a)(2)(A) in full, asserting that the safe-third-country-provision as "five criteria," and the rule "satis[fies] only two of those five criteria." Br. 8-10. (emphasis omitted) And they assert that the rule "rewrite[s]" section 1158(b)(2)(a)(iv), presumably because it is not identical to that eligibility bar. Br. 11-12. These suggestions are baseless. As already noted, there is no conflict between the rule and these provisions—the rule complements them, reaching a different class of aliens who the agencies have concluded may be "forum-shopping ... after transiting through one or more third countries where they could have sought protection, but did not," 84 Fed. Reg. at 33,384. But more importantly, in section 1158 Congress simply made clear, in the safe-third-country provision and firm-resettlement bar, that two particular third-country actions or relationships are *definite* bars. Congress nowhere said that those express bars are the only permitted bars concerning an alien's relationship with a third country. Far from it: section 1158(b)(2)(C) authorizes the Executive to adopt further categorical "*additional* limitations" on asylum eligibility that are "consistent" with the rest of section 1158—including those that promote the logic and purposes of those statutory bars. (Emphasis added.) In contrast to many other regulatory statutes, here Congress expressly specified the creation of additional extra-statutory limitations on asylum eligibility, which need not be identical to prior bars that section 1158 codifies explicitly, even if they complement them. *See, e.g.*, *Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) ("[f]raud in the application is not

mentioned explicitly [in the statute], but is one of the 'additional limitations ... under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation"). Plaintiffs' contrary reading would "disabl[e] the Attorney General from adopting [a] further limitation[]" that the statute "clearly empowers him" to adopt. *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017).[6]

Finally, Plaintiffs contend that the rule is "inconsistent with international law and the *Charming Betsy* canon," citing recent statements from the United Nations High Commissioner for Refugees. *See* Br. 12-14. But neither the Convention nor the Protocol is self-executing and so do not have "the force of law in American courts," *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009); *see Medellín v. Texas*, 552 U.S. 491, 522 (2008) ("Congress knows how to accord domestic effect to international obligations [in a non-self-executing treaty] when it desires such a result"). Accordingly, it is an open question whether the *Charming Betsy* canon has any application at all in these circumstances. *See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting the open question); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 879 (D.C. Cir. 2006) (Kavanaugh, J., concurring) ("the canon against construing an ambiguous statute to abrogate a treaty . . . should not apply in cases involving non-self-executing treaties").

Plaintiffs nevertheless cite a D.C. Circuit case applying the *Charming Betsy* principle to

---

[6] There is no merit to Plaintiffs' analogy to the one-year asylum-application deadline. Br. 10-11. To start, the deadline is a process-rule that governs time-limits on *applications*. It says nothing about substantive eligibility for asylum, which is what the rule here addresses. Moreover, it is far from obvious that a shorter deadline would be inconsistent with that provision, which puts the burden on the "alien" to show that he has filed his application "within 1 year" of arrival. 8 U.S.C. § 1158(a)(2)(B) ("clear and convincing evidence"). Plaintiffs do not explain what part of that provision requires the *government* to provide a full year to file asylum applications in every case. The text by its terms addresses the limits that apply to an alien's procedural right to apply for asylum, and does not say (for example) that the government must afford a specific minimum time period. The Court need not wade into all of this, however, because, for reasons already given, the new rule is consistent with section 1158, and in any event does not purport to address any part of section 1158(a)(2)(B).

argue that the United States must interpret its regulations in accordance with 2013 guidance from the UNHCR. But that guidance is not entitled to weight in American courts. *See, e.g.*, *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."). Regardless, nothing in the rule puts the United States at odds with any international obligations: The United States has implemented its non-refoulement obligations under the relevant treaties by providing for withholding of removal, 8 U.S.C. § 1231(b)(3)(A), and CAT protection, 8 C.F.R. §§ 1208.16(c)-1208.18. *See Cardoza-Fonseca*, 480 U.S. 421, 429 (1987). The rule leaves those protections in place. Asylum, by contrast, is a discretionary benefit that is not required by any U.S. treaty commitment. *See id.* at 441. Moreover, the Refugee Convention and its 1967 Protocol[7] contemplate the permissibility of formal safe-third-country agreements, *see* Article 31(1) (states "shall not impose penalties, on account of their illegal entry or presence, on refugees who, *coming directly from a territory where their life or freedom was threatened* ... enter or are present in their territory without authorization"), meaning that the availability of relief in a third country may be a factor that a State Party can take into account in assessing asylum eligibility. So, for aliens fleeing harm who transit through third countries, the Convention and Protocol allow the imposition of conditions and limitations on that class's eligibility for relief.

### B. The Rule Does Not Conflict With the TVPRA.

Plaintiffs also challenge the rule under the TVPRA, claiming that it strips children of their right to present their case before a USCIS officer and requires them to present their claims to an immigration judge in an adversarial proceeding. Br. 16-17. But there is no general mandate in the

---

[7] The United States is not a signatory to the Convention but rather to the 1967 Protocol that adopted the substantive provisions of the Convention. *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 429.

INA that every rule must treat unaccompanied children differently, and such children are subject to the same eligibility criteria as other aliens.  Section 1158(b)(2)(A)'s eligibility bars make no exception for unaccompanied alien children, and so there is no reason to believe that an eligibility bar promulgated under section 1158(b)(2)(C) must make special dispensation for such individuals. In other words, unaccompanied alien children, like all other aliens, have no statutory right to be eligible for or granted asylum.  And the rule is consistent with 8 U.S.C. § 1158(b)(3)(C), as unaccompanied alien children who retain asylum eligibility will still have their claims heard initially by the asylum officer, as that provision directs.

### C.  The Rule Satisfies the APA's Procedural Requirements.

Plaintiffs contend that the rule was unlawfully issued without notice and an opportunity for comment.  Br. 17-23.  But the APA provides exceptions to its notice-and-comment and publication requirements when either "the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), (d)(3), or the rule "involve[s] ... [a] foreign affairs function of the United States," *id.* § 553(a)(1). The rule here fits within both exceptions and is consistent with similar interim rules affecting the border.

Good Cause.  The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare."  *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983). Significant public-safety harms provide good cause to make rule changes without pre-promulgation notice and comment.  *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (delay may increase "threat[s] to public safety"); *see Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004) (relying on *Hawaii Helicopter*).  This standard is met where "an

announcement of a proposed rule creates an incentive for those affected to act prior to a final administrative determination." *East Bay*, 909 F.3d at 1253; *see East Bay*, 354 F. Supp. 3d at 1115.

Consistent with these principles, the Departments recognized that pre-promulgation notice and comment or a delayed effective date "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect" by encouraging a "surge in migrants." 84 Fed. Reg. at 33,841; *e.g.*, AR438-48, 664. Their "experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border." 84 Fed. Reg. at 33,841 (citing *East Bay*, 354 F. Supp. 3d at 1115); *e.g.*, AR438-48, 676. The Departments described the "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 84 Fed. Reg. at 33,841; *e.g.* AR682. Further, the Departments determined that "an additional surge of aliens ... would be destabilizing to the region, as well as to the U.S. immigration system." 84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 45, 119, 208-20, 679. They specified the factors that contribute to the "massive increase in aliens arriving at the southern border who assert a fear of persecution [that] is overwhelming our immigration system." 84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 37-44, 45, 119, 121, 192, 208-20, 222-30, 241-63, 634, 679, 768-70. They stressed that the "concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events." 84 Fed. Reg. at 33,841; *e.g.*, AR438-48, 540-54, 664, 682. The Departments therefore lawfully concluded that "[a] large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis." 84 Fed. Reg. at 33,841 The promulgation of the rule

without notice and comment "is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx," and "[a]n extended notice-and-comment rulemaking process would be impracticable and self-defeating" for those reasons.[8]  84 Fed. Reg. at 33,841; AR119, 208, 434-56, 664, 676, 682; *see East Bay*, 909 F.3d at 1253; *East Bay*, 54 F. Supp. 3d at 1115 (noting that the Departments' evidence on border surges "supports the inference that smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy" and in turn precipitate changes in immigration patterns, warranting the application of the good-cause exception).  The rule addresses the current crisis, which was not caused by its "own choice[ ]" in promulgating the rule.  Br. 20 (internal quotation marks and citation omitted).

Plaintiffs argue that the government's conclusion that a delayed effective date may cause a surge of migrants is "imagined" and that it offers "frail support," notwithstanding the *East Bay* court's agreement with the government's conclusion.  Br. 18; *see East Bay*, 54 F. Supp. 3d at 1115.  Under Plaintiffs' argument, the federal government could never rely on the good-cause exception by making predictive judgments about how people will rationally act based on past behavior.  Yet the court in *East Bay* found good cause on a similar showing.  *See East Bay*, 354 F. Supp. 3d at 1115; AR439 ("Americans do not jail parents who bring children—and to hurry up before they might start doing so again.").  That was appropriate:  the government obviously cannot provide evidence for actions that have not occurred in response to a rule that has yet to be promulgated,

---

[8] The Departments did not invoke the "impracticability" exception to notice and comment— concerning the "threat of impending fiscal peril"—that is discussed in *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).  *See* Br. 18.  Therefore, Plaintiffs' discussion of it is inapposite.

and courts are ill-equipped to second-guess the Executive Branch's prospective judgment.[9] *See*

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government, when seeking

to prevent imminent harms in the context of international affairs and national security, is not

required to conclusively link all the pieces in the puzzle before we grant weight to its empirical

conclusion.").  In an APA case, the Court's review of the merits must be "based on the record the

agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44

(1985). Plaintiffs' attempt to substitute its own record and views for that of the Departments is

thus inappropriate.[10]

<u>Foreign Affairs.</u>  The foreign-affairs exception covers agency actions "linked intimately

with the Government's overall political agenda concerning relations with another country." *Am.*

*Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249

(Fed. Cir. 1985). "A rule of law that would inhibit the flexibility of the political branches [in

matters of foreign affairs] should be adopted with only the greatest caution." *Yassini v. Crosland*,

618 F.2d 1356, 1361 (9th Cir. 1980).

The Departments properly invoked this exception.  First, the "flow of aliens across the

southern border, unlawfully or without appropriate travel documents, directly implicates the

foreign policy and national security interests of the United States."  84 Fed. Reg. at 33,841; *e.g.,*

---

[9] Plaintiffs' claim that a surge is self-inflicted from the promulgation of the rule means that a good-cause exception based on the promulgation of a rule could never be justified.  Br. 19-20.  That cannot be the case—and, even accepting Plaintiffs' terms, *see* Br. 20 n.5, the Departments documented the current border crisis that is the impetus for the rule as they have in the prior rules that Plaintiffs cite.  84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 37-44, 45, 119, 121, 192, 208-20, 222-30, 241-63, 634, 679, 768-70.

[10] Plaintiffs disingenuously claim no evidence of a surge in *East Bay* ever materialized.  Br. 19.  Of course, the rule was enjoined almost immediately and has not been just "temporarily enjoined" but rather remains enjoined, so no surge directly tied to the rule could arise.  *Id.*  But certainly aliens continue to surge across the border in ever greater numbers, as the rule at issue here, 84 Fed. Reg. at 33,838, and the record, AR119, demonstrate.

AR676, 698.  The Departments found that the "rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States ... and the urgent need to address the current humanitarian and security crises along the southern land border between the United States and Mexico."  84 Fed. Reg. at 33,842; AR537, 635-37.  The Departments concluded that the "negotiations would be disrupted" by the surge of migrants who would attempt to enter the United States in response to the rule:  the rule's delayed effective date would "provok[e] a disturbance in domestic politics in Mexico and the Northern Triangle countries, and erod[e] the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners."  *Id.* Moreover, a delay in effectiveness would prompt the undesirable consequence of an increase in the number of migrants who could have sought assistance in foreign countries at the "U.S. border, which has little present capacity to provide assistance."  84 Fed. Reg. at 33,842; AR208-20, 222-30, 558-59, 679.  "Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place" to slow the "enormous flow of aliens through these countries to the southern U.S. border," thereby "facilitat[ing] the likelihood of success" in the United States' ongoing negotiations with Mexico "regarding regional and bilateral approaches to asylum," and supporting the President's foreign-policy aims.  84 Fed. Reg. at 33,842; *e.g.*, AR231-32, 676, 698.  Indeed, just last month, the United States, relying on another immigration initiative—the "Migrant Protection Protocols" (MPP)—successfully negotiated a partial agreement with Mexico concerning asylum seekers whereby MPP would be implemented "across its entire Southern Border" and "Mexico will take unprecedented steps to increase enforcement to curb irregular migration, to include the deployment of its National Guard throughout Mexico" and take "decisive

31

action to dismantle human smuggling and trafficking organizations as well as their illicit financial and transportation networks."  AR24, *see* AR45-50, 138-39, 231-32 533-57, 635-37, 676, 698. The two countries will "continue their discussions on the terms of additional understandings to address irregular migrant flows and asylum issues."  84 Fed. Reg. at 33,842.

An immigration initiative like the rule here—which promotes the interlocking goals of securing the border and promoting negotiations with other countries—is thus "linked intimately with the Government's overall political agenda concerning relations with another country."  *Am. Ass'n of Exporters*, 751 F.2d at 1249; *see Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (affirming Department of State's invocation of the foreign-affairs exception to promulgate a rule governing the "exchange visitor program" without notice and comment because it "relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department").  The Executive Branch's choice—to require aliens seeking asylum here to first seek protection in countries that offer asylum and thus stem the transit through countries with which the United States is negotiating—is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy."  *Yassini*, 618 F.2d at 1361.  Indeed, this is a more straightforward case than *Yassini*, which involved Iranians *already in the United States* who were required to leave.  *Id.*  This case involves only aliens transiting countries with whom the United States is negotiating.

Plaintiffs argue that the rule does not show notice and comment "will provoke definitely undesirable international consequences."  Br. 21.  The statute requires no such showing.  The exception applies when a rule "involve[s]" a "foreign affairs function of the United States"— without regard to harm.  5 U.S.C. § 553(a)(1); *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir.

2008) (there is "no requirement" that agency state a finding of undesirable international consequences, particularly "when the consequences are seemingly as evident" as they are here). Indeed, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *East Bay*, 909 F.3d at 1252.  And even if a showing that harm will follow "immediate *publication* of the Rule, instead of *announcement*," were required, it is present here:  the Executive has shown that a delay in publishing the rule would overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration that the negotiations seek to decrease, undermining the United States' negotiations with Mexico.  84 Fed. Reg. at 33,842; *Yassini*, 618 F.2d at 1360 ("prompt response" required to embassy takeover).  The rule satisfies the foreign-affairs exception.

### D.  The Rule Is Not Arbitrary and Capricious.

Plaintiffs also assert that they are entitled to a TRO because "Defendants have offered no valid defense of the rule."  Br. 14.  It is unclear what claim Plaintiffs purport to invoke here, but they may mean to contend that the new rule is arbitrary and capricious because the Departments "have offered no valid defense," Br. 14; *see* Br. 14-16.  Plaintiffs did not raise this claim in their complaint, and so cannot obtain a TRO based on a claim they did not bother to plead.  *See* Compl. ¶¶ 154-59 (bringing an APA claim based on statutory authority alone).  Even were their complaint somehow to raise such a claim, this claim also lacks merit.

To begin, arbitrary-and-capricious review is "limited," *EarthLink, Inc. v. FCC*, 462 F.3d 1, 9 (D.C. Cir. 2006), and courts may not substitute their "judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  "'An agency's predictive judgments about areas that are within the agency's field of discretion and

expertise are entitled to *particularly deferential* review'" and "need not rest on 'pure factual determinations.'" *EarthLink, Inc.*, 462 F.3d at 213 (quoting *In re Core Commc'ns, Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006) & *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981)) (emphasis in original).  An agency thus "does not engage in arbitrary or capricious decision-making by making 'predictive judgement[s]' or even by relying on '[i]ncomplete data.'" *New York v. NRC*, 824 F.3d 1012, 1022 (D.C. Cir. 2016); *see Sacora v. Thomas*, 628 F.3d 1059, 1068-69) (9th Cir. 2010) (it is "reasonable for the [agency] to rely on its experience" to arrive at its conclusions, even if those conclusions are not supported with "empirical research.").  The agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle*, 463 U.S. at 43, and Plaintiffs cannot demonstrate a likelihood of success by relying on non-record materials.[11] *See, e.g.*, *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013).  In cases like this one, which does not concern a statutory gap but rather the express grant of authority to prescribe rules and standards, the agency's "judgement [is owed] more than mere deference or weight," and courts give the agency interpretation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Lindeen*, 825 F.3d at 656; *see City of Los Angeles v. Barr*, --- F.3d --- (9th Cir. July 12, 2019), 2019 WL 3049129, at *8 (in such circumstances "agency's promulgations are entitled to more than mere deference or weight; rather, they are entitled to legislative effect").

The rule here was promulgated based on several considerations, including: (1) the need to

---

[11] This includes the declarations submitted by proposed amicus KIND, which amicus relies on to present their own view of facts relied upon by the government in the administrative record. The general rule precludes extra-record review, and the court may not consider materials—including declarations—that are outside the administrative record when reviewing Plaintiffs' likelihood of success on the merits of their claims.  he general rule against extra-record review, the court may not consider materials—including declarations—that are outside the administrative record. Ctr. for Auto Safety v. Fed. Highway Admin., 956 F.2d 309, 314 (D.C.Cir.1992);*Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

dis-incentivize aliens with meritless asylum claims from seeking entry into the United States, thereby relieving stress on immigration enforcement and adjudicatory authorities; (2) the policy decision to "prioritize[] individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a 'severe form of trafficking in persons,'" "ensur[ing] that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking can obtain relief more quickly"; (3) the need "to curtail the humanitarian crisis" of human smuggling; and (4) the goal of strengthening the United States' negotiating hand in "ongoing diplomatic negotiations" "regarding migration issues in general, related measures employed to control the flow of aliens in the United States ... , and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico."  84 Fed. Reg. at 33,831.

The rule is reasonably related to all these objectives. As the rule concludes, aliens with non-meritorious asylum claims will have less incentive to seek entry to the United States, and thus less incentive to rely on "human smuggling" and suffer "its tragic effects," if they cannot take advantage of a lengthy delay in adjudicating that claim to live and work in this country. *Id.* at 33,840; AR109-10, 664, 676, 682.  This relieves stress on the adjudicatory authorities of both DHS and DOJ, and relieves stress on border enforcement given fewer incentives to illegally seek entry. *See* 84 Fed. Reg. at 33,831, 33,840-41; AR21-22, 37-45, 109-10, 119, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70.  Likewise, by ensuring that the adjudicators are able to focus on the claims of aliens who have not been able to obtain relief in a third country, the rule focuses on the class of aliens who have no other country to turn to, making it easier for those adjudicators to fulfill the humanitarian nature of asylum relief.  *See id.*; *accord Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011) ("core regulatory purpose of asylum … is not to provide [aliens] with a broader

choice of safe homelands, but rather, to protect refugees with nowhere else to turn"). And by declining to consider asylum claims by aliens who transit Mexico and Northern Triangle countries without seeking relief, the government is in a better position to negotiate a formal and lasting resolution to the "humanitarian and security crisis along the southern" border with those same countries. 84 Fed. Reg. at 33,831, 33,842; AR231-32.  This shifts the onus to consider such claims to other countries within that region that are able to provide fair adjudications of requests for asylum, while pointing towards an eventual burden-sharing framework of the kind that already governs consideration of asylum claims made by many aliens on the northern border with Canada. AR138-39, 231-32, 537, 635-36.

In arguing that "no valid defense" of the rule has been offered, Br. 14, Plaintiffs repeatedly seek to cast doubt on the government's judgments underlying the rule.  They argue, for instance, that contrary to the Rule's preamble, this case is not analogous to earlier exercise of the Attorney General's authority, because those rules did not "undermine, let alone rewrite, any of the specific criteria for asylum ineligibility that Congress imposed." Br. 15.  But as already explained, the rule does not "rewrite" or conflict with any of the other application conditions or eligibility requirements that Congress included in the statute.  *See* 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi). Rather, this rule is a complement to those provisions and a valid exercise of a specific statutory grant of authority to the Attorney General to impose just such additional limitations and conditions on eligibility.  *See id.* § 1158(b)(2)(C).  Plaintiffs also argue that the rule "is a severe distortion of Congress's purpose" in enacting the asylum statute, as it "strip[s] from the statute the very limitations designed to ensure that a foreign national's alternative places for seeking asylum are in fact safe," and "requir[es] aliens to seek asylum in countries where foreign nationals often face severe threats of persecution and violence." Br. 15-16.  But the rule is no such thing.  The rule

rests on (among other determinations) the judgment that the "decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful," and so the rule "ensure[s] that those asylees who need relief most urgently are better able to obtain it."  84 Fed. Reg. at 33,839.  That determination was reasonable:  Immigration law has long supported the denial of relief to individuals who could have sought, but failed to seek, relief in a third country while in transit to the United States, *see Pula*, 19 I&N Dec. at 473-74, and the asylum statute recognizes the relevance of third-country relief  as relevant to an alien's ability to apply for or be eligible for asylum in the United States, *see* 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi).  Moreover, the government determined that Mexico is a signatory to and in compliance with the relevant international instruments governing consideration of refugee claims, that its domestic law and procedures regarding such relief are robust and capable of handling claims made by Central American aliens in transit to the United States, and that the statistics regarding the influx of claims in that country support the conclusion that asylum in Mexico is a feasible alternative to relief in the United States.  *See* 84 Fed. Reg. 33,839; AR231-32, 286-433, 533-37, 560-65, 581-83, 588, 638-57, 702-66.  The point of the rule is that an "opportunity" to seek protection exists in those countries that an alien necessarily must transit to reach the southern border, *see* 84 Fed. Reg. 33,839, and so the rule only bars from relief those who made no attempt to avail themselves of those protections.  And consistent with the humanitarian aims of asylum, the Department heads reasonably decided to allow individuals who were unable to obtain relief elsewhere an opportunity to seek it in this country.  *See Tchitchui*, 657 F.3d at 137.

Plaintiffs finally argue that "[i]t is unlikely ... that Congress meant to vest" the authority to issue the rule in the Attorney General, as the scope of the rule may "render a high percentage of

the aliens that cross into this country ineligible for asylum."  Br. 16.  But the only limitations that Congress placed on the exercise of this authority is that the Rule must be otherwise consistent with the asylum statute.  *See* 8 U.S.C. § 1158(b)(2)(C).  As explained already, the rule is consistent with the other provisions of the asylum statute.

In the end, Plaintiffs' claims are nothing more than disagreement with the judgment of the agencies.  But this Court may not "second-guess[ ] the" Attorney General's and Secretary's "weighing of risks and benefits."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019); *New York*, 824 F.3d at 1022 ("a challenge to the agency's assumptions must be more than an effort by [a party] to substitute its own analysis' for the agency's").  The rule is supported by reasonable justifications rooted in the government's "expertise and experience," *Earthlink, Inc.*, 462 F.3d at 213 (quoting *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001)), and passes muster under the extraordinarily deferential review applicable to such rules, *Lindeen*, 825 F.3d at 656; *see Time Warner*, 240 F.3d at 1133 ("we must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency.").

## III.   The Other TRO Factors Foreclose Issuing a TRO.

A TRO would irreparably harm the United States and the public.  It is always in the public interest to protect the country's borders and enforce its immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  Here, the Executive Branch has identified a crisis at the southern border—of thousands of aliens entering our country, overwhelming the immigration system, incentivizing human trafficking, and risking their lives—and has taken targeted measures to address that crisis.  *See* 84 Fed. Reg. at 33,831 (noting an "increase of more than 100,000 cases (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019" and recognizing that between FY 2015 and FY 2019 there has been a "nearly 125 percent" increase

in pending cases even with "double the number of immigration judges as in 2010"); AR21-22, 37-45, 109-10, 119, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70.  Plaintiffs tar Defendants as "harsh" (Br. 4) and "cruel" (Br. 3) for seeking to address the crisis at the southern border, without ever acknowledging, in 30 pages of briefing, the extraordinary strain on our asylum system inflicted by those who have no valid claim for asylum at all.  *See* Br. 20, 27-28, 29 n.7.  The public interest is served by encouraging aliens to apply for asylum in the first country in which they may take refuge, rather than picking among preferred destinations.  *See Tchitchui*, 657 F.3d at 137.

Against this, "the basis of injunctive relief in the federal courts has always been irreparable harm."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  The "failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  "The D.C. Circuit has set a high standard for irreparable injury.  The injury must be unrecoverable; it must be both certain and great; [and] it must be actual and not theoretical."  *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, No 17-cv-999, 2018 WL 5017749, at *6 (D.D.C. Oct. 16, 2018).

Plaintiffs should not be rewarded a nationwide injunction when they do not even identify a single alien affected by the rule.  And even if they had, aliens ineligible for asylum lose only a discretionary benefit to which they are never entitled—and they remain eligible for mandatory protections from removal.  *See* 84 Fed. Reg. at 33,834.  Plaintiffs may not even properly invoke the alleged harm to third parties from the rule.  *East Bay*, 909 F.3d at 1240.  Plaintiffs are organizations and the *only* harms they allege to themselves are speculations about their funding and the need to plan for the new rules.  *See, e.g.*, Compl. ¶¶ 110-52; Br. 23-26.  Even these alleged harms ring hollow since expending resources is not irreparable injury.  *See, e.g., Chaplaincy of*

*Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).[12]  And the loss of an opportunity to comment, Br. 23, is not sufficient. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  Plaintiffs, relying on *N. Mariana Islands v. United* States, 686 F. Supp. 2d, 7, 17 (D.D.C. 2009), Br. 26), suggest otherwise, but they fail to acknowledge law in this Circuit that provides that a putative procedural violation does not produce irreparable injury because the violation has already occurred and can "be remedied by a decision on the merits" (by requiring the agency to re-do the decision using the proper procedures).  *See Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012).  Thus, "irreparable injury cannot stand on procedural violation alone." *Am. Ass'n for Homecare v. Leavitt*, 2008 WL 2580217, *5 (D.D.C. June 30, 2008).  And even if credited, those administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

## IV.    Any Interim Relief Must Be Sharply Limited.

Even if Plaintiffs were entitled to any relief, it would need to be strictly limited.

First, to the extent that Plaintiffs could be deemed to challenge any aspect of the rule as applied to expedited removals, the Court "lacks the authority" to issue any such relief. *East Bay*, 354 F. Supp. 3d at 1118; *see* 8 U.S.C. § 1252(e)(1), (3).

Second, Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to

---

[12] Plaintiffs cite *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), for the proposition that expending resources satisfies irreparable harm because there "can be no do over and no redress." *Id.* at 74. That case involved registering voters in time for an election, and so does not stand for that broader proposition.

redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934. And the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Contrary to the stay panel's decision in *East Bay*, 909 F.3d at 1255-56, immigration law is not a special context that warrants different consideration—especially where, as here, the farther plaintiffs are from being actually affected by a rule, the more likely they could assert a successful nationwide "harm": an individual plaintiff, who is actually affected by the rule, could receive a complete remedy by an individualized injunction, while under Plaintiffs' theory of Article III, an organizational plaintiff, less personally affected, could receive a far more encompassing remedy. A limit to nationwide injunctions ensures that the courts resolve actual cases and controversies rather than entering into disputes that are constitutionally delegated to the other two branches of government. And it is Plaintiffs who bear the burden of showing their requested injunction—a nationwide injunction on behalf of two organizations that lack a cognizable cause of action and who have failed to identify a single actual alien client on whose behalf they speak—is not impermissibly broad, given that it is their burden to demonstrate their entitlement to an injunction. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

Finally, this is not the only case challenging this rule, and this Court's ruling should respect that. *See East Bay Sanctuary Covenant v. Barr*, No. 19- 4073 (N.D. Cal.). If this Court issues any relief, it should not preempt the Northern District of California district court's ability to consider the issue under the relevant law of the Ninth Circuit. To do otherwise "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also United*

*States v. Mendoza*, 464 U.S. 154, 160 (1984) ("[a]llowing only one final adjudication would" "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue" and "deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.").  At a minimum, then, the Court may not issue an injunction affecting the California district court's ability to decide the same issues under the Ninth Circuit precedent.

## CONCLUSION

For these reasons, the Court should deny the motion for a TRO.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

Dated: July 20, 2019                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
  EREZ REUVENI
  Assistant Director
  United States Department of Justice
  Civil Division

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————

Capital Area Immigrants' Rights Coalition, )
*et al.,*                                   )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          )          Civil Action No. 1:19-cv-02117-TJK
                                            )
Donald J. Trump, *et al.*,                  )
                                            )
            Defendants.                     )
————————————————————————

**[PROPOSED] ORDER**

Pending before the Court is Plaintiffs' motion for temporary restraining order. Having

considered the motion, Defendants' opposition, Plaintiffs' reply, and oral argument held on July

22, 2019, the Court HEREBY DENIES the motion.

Dated: July __, 2019                        _____

                                            United States District Judge