**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>  Defendants. | Civil Action No. 1:19-cv-02117-TJK |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

   I.    Plaintiffs Are Properly Before This Court ...................................................... 2

       A.    Plaintiffs Have Standing. ............................................................................ 3

       B.    Plaintiffs Fall Within the Statutory Zone of Interests ................................. 6

   II.   Plaintiffs Are Likely To Prevail On The Merits .............................................. 8

       A.    The Rule Violates the Plain Text of Section 1158 ...................................... 8

       B.    The Rule Violates the TVPRA. ................................................................ 16

       C.    Defendants Lack Any Valid Reason for Forgoing Notice and Comment ............................................................................................... 17

   III.  The Equities Strongly Favor Entry Of A TRO ............................................. 20

       A.    The Rule Inflicts Irreparable Harm on Plaintiffs ...................................... 20

       B.    The Balance of Equities and the Public Interest Favor Injunctive Relief ...................................................................................................... 22

   IV.  Nationwide Injunctive Relief Is Appropriate ............................................... 24

CONCLUSION .................................................................................................................... 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ............................................................................................3, 4

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986) .................................................................................................5

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ...............................................................................................23

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ..........................................................................................9, 10

*Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ..............................................................................................20

*Am. Bar. Ass'n v. Dep't of Educ.*,
370 F. Supp. 3d 1 (D.D.C. 2019) .............................................................................................6

*Am. Immigration Lawyers Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ..............................................................................................3

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*,
659 F.3d 13 (D.C. Cir. 2011) ...................................................................................................5

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) .................................................................................................6

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) .....................................................................................................5

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) .....................................................................................................4

*City of New York v. Permanent Mission of India to United Nations*,
618 F.3d 172 (2d Cir. 2010) ...................................................................................................19

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ...................................................................................................................6

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*,
138 S. Ct. 1061 (2018) ..............................................................................................................9

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*East Bay Sanctuary Covenant v. Trump*,
349 F. Supp. 3d 838 (N.D. Cal. 2018) ......................................................22

*East Bay Sanctuary Covenant v. Trump*,
354 F. Supp. 3d 1085 (2018) ......................................................23

*East Bay Sanctuary Covenant v. Trump*,
909 F.3d 1219 (9th Cir. 2018) ...................................... *passim*

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897, 900 (D.C. Cir. 1996) ...................................................7

*Fook Hong Mak v. INS*,
435 F.2d 728 (2d Cir. 1970)......................................................16

*Gonzalez v. Oregon*,
546 U.S. 243 (2006)......................................................10

*Harmon v. Holder*,
758 F.3d 728 (6th Cir. 2014) ......................................................16

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ......................................................24

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)......................................................3, 4

*Hawaii v. Trump*,
241 F. Supp. 3d 1119 (D. Haw. 2017) ......................................................25

*Humane Soc'y of the U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) ......................................................25

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)......................................................6, 14

*INS v. Legalization Assistance Project of the Los Angeles Cty. Fed'n of Labor*,
510 U.S. 1301 (1993)......................................................7

*In re B-R-*,
26 I&N Dec. 119 (BIA 2013) ......................................................15

*Int'l Bhd. of Teamsters v. Peña*,
17 F.3d 1478 (D.C. Cir. 1994) ......................................................20

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Int'l Refugee Assistance Project v. Trump,*
  241 F. Supp. 3d 539 (D. Md. 2017) ......................................................25

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,*
  319 F. Supp. 3d 491 (D.D.C. 2018) ......................................................23

*Jacksonville Port Auth. v. Adams,*
  556 F.2d 52 (D.C. Cir. 1977) ...............................................................22

*Jifry v. FAA,*
  370 F.3d 1174 (D.C. Cir. 2004) ...........................................................17

*Landon v. Plascencia,*
  459 U.S. 21 (1982) ...............................................................................22

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .................................................................21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ...........................................................................6, 7

*Lopez v. Davis,*
  531 U.S. 230 (2001) .............................................................................16

*Mack Trucks, Inc. v. EPA,*
  682 F.3d 87 (D.C. Cir. 2012) ...............................................................18

*Madsen v. Women's Health Ctr.,*
  512 U.S. 753 (1994) .............................................................................25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ...............................................................................8

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) .............................................................8

*Mobil Oil Corp. v. Dep't of Energy,*
  728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ................................17, 18

*N. Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) .........................................................22

*Nijjar v. Holder,*
  689 F.3d 1077 (9th Cir. 2012) ..............................................................10

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................22

*North Carolina v. Covington*,
    137 S. Ct. 1624 (2017)............................................................25

*Open Communities All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ........................................21

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) .......................................3, 4, 5

*Pub. Citizen Health Research Grp. v. Acosta*,
    363 F. Supp. 3d 1 (D.D.C. 2018) ..............................................4

*Purepac Pharm. Co. v. Thompson*,
    238 F. Supp. 2d 191 (D.D.C. 2002) ........................................24

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008).....................................................20

*Ramirez v. U.S. Immigration & Customs Enf't*,
    310 F. Supp. 3d 7 (D.D.C 2018)..............................................22

*Rapanos v. United States*,
    547 U.S. 715 (2006).................................................................15

*R-S-C- v. Sessions*,
    869 F.3d 1176 (10th Cir. 2017) ...............................................10

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993).................................................................14

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*,
    132 F.3d 775 (D.C. Cir. 1998) ...................................................8

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) .....................................17, 18, 19

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990).................................................4, 5

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)...............................................................8

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014)..............................................................1, 8, 10, 11

*Washington All. of Tech. Workers v. Dep't of Homeland Sec.,*
   892 F.3d 332 (D.C. Cir. 2018) ...................................................................4

*Yassini v. Crosland,*
   618 F.2d 1356 (9th Cir. 1980) ...........................................................19, 20

**STATUTES:**

6 U.S.C. § 279.................................................................................................16

8 U.S.C. § 1101(i)(1) .......................................................................................6

8 U.S.C. § 1158(a)(2).................................................................................9, 15

8 U.S.C. § 1158(a)(2)(A) ........................................................................ *passim*

8 U.S.C. § 1158(a)(2)(B) ................................................................................9

8 U.S.C. § 1158(a)(2)(C) ...........................................................................9, 10

8 U.S.C. § 1158(b)(1)(A) ..............................................................................16

8 U.S.C. § 1158(b)(2)(A) ................................................................................9

8 U.S.C. § 1158(b)(2)(A)(ii) ...........................................................................9

8 U.S.C. § 1158(b)(2)(A)(vi) ...........................................................1, 11, 13, 15

8 U.S.C. § 1158(b)(2)(C) ........................................................................ *passim*

8 U.S.C. § 1158(b)(3)(C) ...............................................................................16

8 U.S.C. § 1158(d)(4).......................................................................................6

8 U.S.C. § 1182(f)............................................................................................8

8 U.S.C. § 1184(p)(3)(A).................................................................................6

8 U.S.C. § 1228(b)(4)(B).................................................................................6

8 U.S.C. § 1229(a)(1).......................................................................................6

8 U.S.C. § 1229(b)(2).......................................................................................6

## TABLE OF AUTHORITIES—Continued

Page(s)

8 U.S.C. § 1232 ................................................................................................16

8 U.S.C. § 1252 ..................................................................................................7

8 U.S.C. § 1252(e)(1) ......................................................................................24

8 U.S.C. § 1252(e)(3) ......................................................................................24

8 U.S.C. § 1329 ..................................................................................................7

8 U.S.C. § 1443(h) .............................................................................................6

REGULATIONS:

8 C.F.R. § 208.15 ......................................................................................13, 14

*Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) .................................................................................................... *passim*

*Asylum Procedures*, 65 Fed. Reg. 76,121 (Dec. 6, 2000) ...............................10

LEGISLATIVE MATERIAL:

S. Rep. No. 79-752 (1945) ...............................................................................20

OTHER AUTHORITIES:

Safe Third Country Agreement, Can.-U.S., arts. 5.a, 6, Dec. 5, 2002 ............13

Oxford English Dictionary (online ed. 2019) ...................................................9

Vanessa Romo et al., *Acting Head of Customs and Border Protection Says New Asylum Rule In "Pilot" Phase*, NPR (July 18, 2019), https://www.npr.org/2019/07/18/743162496/acting-head-of-customs-and-border-protection-says-new-asylum-rule-in-pilot-phase ...................................19, 23

## INTRODUCTION

Defendants devote much of their opposition brief to defending the Rule's ostensibly "sound policy aims."  Opp. 2; *see id.* at 1-2, 4-5, 7, 18-19, 21-22, 28-31, 33-39.  But no policy—whether "sound" or otherwise—permits the Executive to revise the text of the laws that Congress enacted.  As Judge Bybee wrote in reference to a similar bar on asylum just a few months ago: "There surely are enforcement measures that the President and the Attorney General can take to ameliorate the [immigration] crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws."  *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250-51 (9th Cir. 2018).

This Rule is another attempt at "rewrit[ing] our immigration laws."  In substance and effect, it revises two of the carefully drawn exceptions to asylum eligibility Congress enacted, stripping out the limitations Congress imposed and replacing them with far broader limitations that the Executive prefers.  It is no "overstatement" (Opp. 19 n.4) to say that the Rule effectively strikes out the terms of those provisions that the Executive considers overly constraining.  *See infra* p. 11 (illustrating the strikeouts).  In our constitutional system, the Executive lacks "a power to revise clear statutory terms that turn out not to work in practice."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("*UARG*").  And Congress surely did not vest the Attorney General with that authority through a general, residual provision explicitly requiring that any new limitations on asylum be "consistent with" existing law.  8 U.S.C. § 1158(b)(2)(C).

Defendants' efforts to defend this statutory violation are unavailing.  They contend that the Rule is "different" than the statutory exceptions to asylum eligibility, Opp. 22-23, but the only meaningful "differences" Defendants identify are the very revisions that render the Rule "[in]consistent with" the statute: substituting "firmly resettled" with "transited through," *see* 8

U.S.C. § 1158(b)(2)(A)(vi), and eliminating the requirement that the country in which aliens are required to seek asylum be party to a safe-third-country agreement, *see id.* § 1158(a)(2)(A). Defendants also claim that the Rule has the same "purpose" as the statutory exceptions, Opp. 22, but the limitations Congress enacted are just as much part of its purposes as its prohibitory language. Ultimately, Defendants do not deny that their interpretation would enable the Executive to change even the *numbers* in the statute if it wished. Opp. 25 n.6. A construction of Section 1158(b)(2)(C) that gives the Executive such extravagant power cannot be correct.

Defendants' remaining arguments are also infirm. Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for Education and Legal Services ("RAICES") are plainly injured by the Rule, which "frustrate[s] their mission[s]" and requires a "diversion of [their] resources," and the organizations' interest in helping aliens obtain asylum is "more than marginally related to the . . . purpose" of the asylum laws. *East Bay*, 909 F.3d at 1242, 1245. Defendants have identified no factual basis that supports their decision to issue this sweeping Rule without undergoing notice and comment. And the equities all tilt in favor of Plaintiffs: The Rule will irreparably impair Plaintiffs' ability to assist aliens fleeing persecution; the Executive has no legitimate interest in enforcing an illegal rule that departs dramatically from the *status quo*; and only a nationwide injunction will afford Plaintiffs complete relief. The Motion should be granted.

## ARGUMENT

## I.      Plaintiffs Are Properly Before This Court.

Defendants open by claiming that Plaintiffs lack standing and fall outside the statutory zone of interests. The Ninth Circuit rejected identical threshold objections in *East Bay*, *see* 909 F.3d at 1241-45, and its persuasive logic should control here, as well.

### A.      Plaintiffs Have Standing.

Organizations can assert standing on their own behalf, on behalf of their members, or both. *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  Here, Plaintiffs assert "organizational standing" only,[1] so the Court should "conduct the same inquiry as in the case of an individual," asking whether "the plaintiff [has] alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982) (internal quotation marks omitted).  Plaintiffs have standing so long as they have suffered a "concrete and demonstrable injury to [their] activities," such as a "drain on the organization's resources," but "more than simply a setback to the organization's abstract social interests."  *Id.* at 379; *see People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*").  Plaintiffs easily satisfy that standard.

The organizations already have suffered and, absent an injunction, will continue to suffer "concrete and demonstrable" injuries that are directly traceable to the Rule.  *PETA*, 797 F.3d at 1093.  CAIR Coalition's mission is to "ensure equal justice for all migrant men, women, and children at risk of detention and deportation in the Washington, D.C. metropolitan area," including by "serv[ing] as many detained immigrants lawfully seeking asylum as possible."  Cubas Decl. ¶¶ 4, 14; Compl. ¶¶ 112-115.  "RAICES' mission is to promote justice by providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas."  Garza Decl. ¶ 4; Compl. ¶¶ 134-135.  The Rule "perceptibly impair[s]" Plaintiffs'

---

[1] Defendants' reliance on *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000), is thus misplaced.  There, Judge Randolph held that organizations lacked third-party standing to sue on behalf of persons whom the statute explicitly barred from seeking review.  Here, CAIR Coalition and RAICES seek redress for injuries they have each *personally* suffered and will continue to suffer if the Rule is not enjoined.

ability to carry out their missions and provide the services they were formed to provide.  *Havens*,

455 U.S. at 379.  The Rule also forces Plaintiffs to divert significant time and resources to

helping their clients navigate the new asylum landscape under the Rule.  Compl. ¶¶ 116-118,

120-129, 141, 145; Cubas Decl. ¶¶ 16-17, 19, 21-22, 25-30, 34-36; Garza Decl. ¶¶ 14-15, 18, 31-

34, 36-37.

The D.C. Circuit has repeatedly held that organizations suffering analogous injuries have

standing.  *See, e.g.*, *PETA*, 797 F.3d at 1093, 1097; *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27

(D.C. Cir. 1990).  So has this Court.  *See Pub. Citizen Health Research Grp. v. Acosta*, 363 F.

Supp. 3d 1, 11-12 (D.D.C. 2018).  And as Defendants acknowledge, Opp. 15 n.2, the Ninth

Circuit in *East Bay* found that materially indistinguishable organizations alleging similar harms

had standing to challenge a rule broadly limiting asylum eligibility.  909 F.3d 1219, 1242-43.

Defendants' principal response is to critique existing Circuit law on organizational

standing.  They argue at length that *Havens Realty* should be read to confer organizational

standing only where a statute creates a private right of action for organizations, Opp. 10-11, a

reading contradicted by D.C. Circuit precedent.  *See, e.g.*, *PETA*, 797 F.3d at 1093; *Abigail All.*,

469 F.3d at 133.  Defendants also repeatedly invoke Judge Millett's separate opinion "criticizing

'precedents'" of the D.C. Circuit "'[that] now hold'" organizations may invoke standing arising

from policies directed at individuals.  Opp. 12-13 (alteration in original) (quoting *PETA*, 797

F.3d at 1099 (Millett, J., dubitante)).  Needless to say, this Court is bound by Circuit law, which

also conforms to the law of other Circuits.  *See, e.g.*, *East Bay*, 909 F.3d at 1241-43; *Centro de la

Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017).[2]

---

[2] Defendants intimate that more stringent limitations on standing apply in the immigration
context.  Opp. 11.  That suggestion is baseless.  Courts apply ordinary standing precedents in

Defendants also assert that Plaintiffs lack standing because the Rule will not "*prevent*[ ]" Plaintiffs from providing at least some "legal services." Opp. 12.  But a policy need not entirely "prevent" an organization from carrying out its mission to confer standing, just "inhibit" it. *PETA*, 797 F.3d at 1094 (finding standing where government conduct "inhibit[ed] . . . [organization's] daily operations"); *Action All. of Senior Citizens of Greater Phil. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986) (finding that "inhibition of [an organization's] daily operations" is an "injury both concrete and specific.").  Plaintiffs have amply made that showing.  *See* Compl. ¶¶ 112-115, 134-135; Cubas Decl. ¶¶ 4, 14, 39; Garza Pareja Decl. ¶¶ 4, 7, 33.

Defendants are similarly incorrect to claim that Plaintiffs have insufficiently explained how they have "'used [their] resources to counteract'" their injuries.  Opp. 12 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 25 (D.C. Cir. 2011)).  Both organizations have submitted declarations providing detailed descriptions of how they will be forced to divert resources because of the Rule.  Compl. ¶¶ 116-118, 120-128, 141, 145; Cubas Decl. ¶¶ 16, 19, 22, 27-30, 35-36; Garza Decl. ¶¶ 14-15, 18, 32-34, 37.  These declarations, coupled with the allegations in the Complaint, are more than sufficient at this preliminary stage. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).  Nor are Plaintiffs' harms "self-inflicted" injuries incurred in "litigation" against the Rule, Opp. 13-14; they are expenses incurred in addressing the *effects* of the Rule.  *See Spann*, 899 F.2d at 27 ("[A]n organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action."). And as Defendants evidently recognize, Plaintiffs suffered additional injury when they were deprived of the opportunity to comment on the Rule.  *See* Opp. 14, 40.

---

adjudicating challenges to immigration rules.  *See, e.g.*, *East Bay*, 909 F.3d at 1232; *Washington All. of Tech. Workers v. Dep't of Homeland Sec.*, 892 F.3d 332, 339 (D.C. Cir. 2018).

**B.      Plaintiffs Fall Within the Statute's Zone of Interests.**

Plaintiffs also fall within the zone of interests Congress sought to protect in the asylum provisions of the INA.  The zone of interests test is "not especially demanding" and forecloses suit only when a plaintiff's interests are "marginally related to or inconsistent with" the purposes of the statute.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). Congress need not have intended to benefit particular plaintiffs, nor must they be "the subject of the contested regulatory action."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).  An entity "need only show that its interests in the agency action 'in practice can be expected to police the interests that the statute protects.' "  *Am. Bar. Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019) (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004)).

Here, Plaintiffs' interest in providing legal services to asylum seekers is more than "marginally related" to the statute's purpose of establishing statutory procedures for granting asylum.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427-28 (1987).  Indeed, multiple provisions of the INA explicitly give legal services organizations a role in implementing the statutory procedures to assist asylum seekers.  *East Bay*, 909 F.3d at 1245; *see, e.g.*, 8 U.S.C. § 1158(d)(4) (requiring the Attorney General to provide asylum applicants "a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis"); *see also id.* §§ 1101(i)(1); 1184(p)(3)(A); 1228(b)(4)(B); 1229(a)(1), (b)(2); 1443(h).

Moreover, Plaintiffs' interests can "in practice be expected to police the interests that the statute protects."  *Amgen*, 357 F.3d at 109.  Plaintiffs' interests in helping asylum seekers apply for asylum and assert their rights under the INA "fall squarely in line with the interests" of the individuals whom Defendants acknowledge are protected by the statute.  *Am. Bar. Ass'n*, 370 F. Supp. 3d at 19.  In light of the APA's "generous review provisions" and the fact that "the benefit

of any doubt goes to the plaintiff," that is more than sufficient to demonstrate that CAIR

Coalition and RAICES fall within the INA's zone of interests.  *Lexmark*, 572 U.S. at 130; *see*

*East Bay*, 909 F.3d at 1243-45 (reaching same conclusion).[3]

Defendants claim that courts have "routinely" concluded that legal services organizations

fall outside the zone of interests of the immigration laws.  But neither of the two authorities they

rely on involved the asylum laws.  *See INS v. Legalization Assistance Project of the Los Angeles*

*Cty. Fed'n of Labor*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers); *Fed'n for Am.*

*Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 ("*FAIR*") (D.C. Cir. 1996).  Furthermore,

Justice O'Connor's inquiry in *Legalization Assistance Project* was concededly "difficult and

speculative," 510 U.S. at 1304, and "the interest asserted by the organization in that case—

conserving organizational resources to better serve *non*immigrants—is markedly different from

the interest in aiding immigrants asserted here."  *East Bay*, 909 F.3d 1245 n.10 (emphasis in

original).   Meanwhile, *FAIR* involved claims by states and localities trying to prevent

immigration on the ground that it would generate increased competition—a wholly different set

of interests than those at issue here.  93 F.3d at 903.

Finally, Defendants seek support in 8 U.S.C. §§ 1252 and 1329.  Those provisions

specify the fora in which an individual alien may raise a challenge to a removal order or removal

proceedings.  They thus have nothing at all to do with the distinct question here: whether

organizations fall within the zone of interests the statute seeks to protect.  Defendants also

suggest that these jurisdiction-channeling provisions show that the INA precludes judicial review

over claims brought by anyone other than individual aliens.  That turns the presumption of

---

[3] Defendants claim that Ninth Circuit law on the zone of interests "conflicts with controlling D.C. Circuit authority."  Opp. 15 n.2.  Not so; *East Bay* applied exactly the same standards that govern in this Circuit.  *See* 909 F.3d 1243-45.

reviewability of agency action on its head.   To channel a specific set of claims by specific persons through a specific process does not somehow preclude judicial review of *other* claims brought by *other* persons.   *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 778 (D.C. Cir. 1998) (presumption of judicial review "may be overcome only upon a showing of 'clear and convincing' evidence of a contrary legislative intent").   And courts in this Circuit must "apply the zone-of-interests test in a manner consistent with 'Congress's evident intent when enacting the APA to make agency action presumptively reviewable.'"   *Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

## II.      Plaintiffs Are Likely To Prevail On The Merits

### A.      The Rule Violates the Plain Text of Section 1158.

1.  It is a bedrock principle of statutory interpretation and the separation of powers that an agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate."   *UARG*, 573 U.S. at 328.   That principle governs even the broadest delegations of authority.   *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018) ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions in the INA."). And it applies with redoubled force to Section 1158(b)(2)(C), a general grant of authority, appearing after a list of specific terms, that explicitly limits the Attorney General to promulgating "*additional* limitations" that are "*consistent with* this section."   8 U.S.C. § 1158(b)(2)(C) (emphasis added).

At minimum, this statutory language means that the Attorney General may not use Section 1158(b)(2)(C) to alter the scope of the exceptions to asylum that Congress enacted. Congress imposed clear limits on the scope of each of the exceptions it codified in Section

1158(a)(2) and (b)(2)(A).  It provided, for instance, that an alien is ineligible for asylum if she "has previously applied for asylum *and had such application denied*," 8 U.S.C. § 1158(a)(2)(C), if she has been convicted of "a *particularly serious* crime," *id.* § 1158(b)(2)(A)(ii), or if she has not "filed [an application] *within 1 year* after the date of the alien's arrival in the United States," *id.* § 1158(a)(2)(C) (emphasis added).  These limits constitute an integral part of the statutory design—a congressional judgment that the exceptions should "go so far, and no further."  *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1073 (2018).  The Attorney General does not act "consistent with this section" by invoking Section 1158(b)(2)(C) to effectively strike out the limits Congress imposed and replace them with far broader limits that the Attorney General prefers.  *See Consistent*, Oxford English Dictionary (online ed. 2019) (defining "consistent with" to mean "[a]greeing or according in substance or form; congruous, compatible").

Defendants resist this basic principle.  They claim that because Section 1158(b)(2)(C) grants the Executive "broad authority," the Attorney General's "judgment" as to what asylum restrictions to impose is entitled to "controlling weight."  Opp. 23-24.  But "broad" does not mean "limitless."  The D.C. Circuit has time and again held that an agency may *not* use a "general authority" to "avoid the restrictions" Congress imposed on a more specific grant of authority.  *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) (citing cases).  And here, Congress specifically limited the general authority itself, by stating that any limitations imposed under Section 1158(b)(2)(C) must be "consistent with this section."

Defendants also suggest that the statutory exceptions are merely "*definite* bars" on asylum, and that the Attorney General is free to impose any more-stringent restrictions he wishes.  Opp. 24.  That cannot be right: As Plaintiffs have observed, this view would mean that the Attorney General could revise Section 1158 at will, including by replacing the explicit one-

year bar in Section 1158(a)(2)(C) with a deadline of 6 months or (as Mexico does) 30 days. Mem. 10.   Remarkably, Defendants all but embrace this *reductio ad absurdum*:   In their view, the Attorney General may very well have the authority to replace the "1 year" limit with a "shorter deadline."  Opp. 25 n.6.  "[I]t is hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."  *UARG*, 573 U.S. at 326.   If the Attorney General could "replace[ ]" even "those numbers with others of his own choosing," *id.* at 326, then all of the "carefully described limits on the Attorney General's authority" in Section 1158 would be reduced to "mere suggestions." *Gonzales v. Oregon*, 546 U.S. 243, 261 (2006).  The "express limitations" on the scope of Section 1158(b)(2)(C), the nature of that provision as a general and residual authority, and the enumeration of specific limits on the statutory exceptions themselves all "belie any notion that the Attorney General has been granted this implicit authority."  *Id.* at 260-261; *see Air Alliance*, 906 F.3d at 1061 (rejecting an interpretation of a general authority that "would deprive the more specific authority of virtually all effect") (cleaned up).

Defendants also protest that Plaintiffs' interpretation "disable[s] the Attorney General from adopting . . . further limitation[s]" on asylum.  Opp. 25 (quoting *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017)).   Not so.  The Attorney General remains free to adopt "additional limitations" on asylum that are "consistent with" Section 1158, including every asylum restriction currently in force.  *See Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) (restricting asylum for aliens who committed fraud in their applications); *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (restricting asylum for aliens who can safely relocate within their country of origin or have undergone a "fundamental change of circumstances"). What the Attorney General may *not* do is use Section 1158(b)(2)(C) to revise the explicit statutory exceptions Congress enacted.

2.    The Rule contravenes that fundamental limit.   In Sections 1158(a)(2)(A) and (b)(2)(A)(vi), Congress created exceptions to asylum eligibility for aliens who could seek asylum in a third country or who were present in a third country prior to arriving in the United States, and imposed carefully drawn limits on the scope of each of those exceptions.   In effect, the Rule takes a red pen to both of these limited exceptions, striking out the limitations Congress imposed and replacing them with far broader limits Defendants prefer.   Mem. 9-12.   The Rule has effectively rewritten Section 1158(a)(2)(A) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, ~~pursuant to a bilateral or multilateral agreement,~~ to a country ~~(other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and~~ where the alien <u>was present and</u> would have access to a ~~full and fair~~ procedure for determining a claim to asylum ~~or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States~~.

And the Rule has rewritten Section 1158(b)(2)(A)(vi) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that . . . the alien was ~~firmly resettled~~ in another country prior to arriving in the United States.

Defendants cannot "rewrite clear statutory terms" in this manner.   *UARG*, 573 U.S. at 328.   And Defendants cannot refute that that is exactly what they have done.

Defendants claim that the Rule is "consistent with section 1158(a)(2)(A)" because there are several supposed "distinctions" between the provision and the Rule.   Opp. 20-21.   The only real "distinction" the Attorney General offers, however, is the very reason the Rule is illegal:   It replaces the limitation Congress imposed—that asylum is barred only where an alien could seek asylum in a "safe third country"—with a substantially broader limitation—that asylum is barred where an alien could seek asylum in *any* "third country" through which she transited.   Opp. 20.

11

Defendants' other proposed distinctions are makeweights.  Defendants note that Section 1158(a)(2)(A) is phrased as a limit on "*applying* for asylum" whereas the Rule is phrased as a limit on "*eligibility* for relief."  Opp. 20.  But Section 1158(b)(2)(C) requires that any limits on eligibility be "consistent with this *section*" as a whole, not just the limits on eligibility.  8 U.S.C. § 1158(b)(2)(C).  And a bar on eligibility is, in every practical and legal sense, "the equivalent of a bar to *applying* for asylum."  *East Bay*, 909 F.3d at 1247.  As Judge Bybee explained the last time the Government tried to justify an asylum bar on the basis of this semantic distinction, "[t]he technical difference between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same."  *Id.* at 1247-48.

Defendants also note that safe-third-country agreements sometimes address the availability of "withholding-of-removal proceedings" in addition to asylum.  Opp. 20.  That is a *non sequitur.*  The right to seek withholding of removal is distinct from the right to seek asylum.  *See Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, 33,834 (July 16, 2019).  The availability of that separate protection has no bearing on whether the Attorney General has contravened the restrictions on his authority to restrict eligibility "for *asylum*."  8 U.S.C. § 1158(b)(2)(C) (emphasis added).

Defendants also assert (at Opp. 21) that one safe-third-country agreement, entered into years after the statute was enacted, "bar[s]" asylum by individuals who have had their asylum claims rejected, whereas the Rule includes a "limited exception[ ]" for individuals who have been denied asylum.  84 Fed. Reg. at 33,831.  As an initial matter, the agreement does not say that; both the agreement and Section 1158(a)(2)(A) expressly permit the Attorney General to consider any asylum claims in his discretion.  *See* Safe Third Country Agreement, Can.-U.S., arts. 5.a, 6, Dec. 5, 2002; 8 U.S.C. § 1158(a)(2)(A).  In any event, the mere *potential* for

divergence between the terms of a safe-third-country agreement and one of the exceptions to the Rule does not make the Rule "consistent with" Section 1158(a)(2)(A); if anything, it highlights that the Rule has stripped out Congress's limitations and replaced them with different ones.

Defendants' efforts to square the Rule with Section 1158(b)(2)(A)(vi) are even more infirm.  Defendants claim that the Rule and the statutory exception are "concerned with different circumstances, different classes of aliens, and different actions (or inactions)."  Opp. 23.  But all of those "differen[ces]" refer to the same thing:  Whereas the statute bars asylum for aliens who were " '*firmly resettled* in another country prior to arriving in the United States,' " *id.* at 22, the Rule bars asylum for aliens who "*transit[ed] through* at least one other country . . . en route to the United States," 84 Fed. Reg. at 33,843.  That difference is the very act of rewriting that Section 1158(b)(2)(C) forbids.  Indeed, the longstanding regulation interpreting the firm resettlement bar explicitly states that it does *not* bar asylum for an individual who can show that "her entry into that [third] country was a necessary consequence of his or her flight from persecution," "she remained in that country only as long as was necessary to arrange onward travel," and "she did not establish significant ties in that country."  8 C.F.R. § 208.15.  Now, of course, aliens meeting that precise definition have been rendered ineligible for asylum.

Defendants suggest that the Rule meaningfully differs from the statute because it is limited to aliens who have transited through countries in which they "could have applied (but did not apply) for protection."  Opp. 22.  But the fact that an alien "could have applied" for asylum in a country she transited through en route to the U.S. adds nothing; *every* country through which an alien must pass to reach the southern border is party to the Refugee Convention, and so provides some opportunity (however inadequate) to apply for asylum.  *See* 84 Fed. Reg. at 33,839 ("All seven countries in Central America plus Mexico are parties to both the Refugee

Convention and the Refugee Protocol.").  And excluding aliens from asylum eligibility unless they have *sought* permanent protection in another country directly contravenes the congressional judgment embodied in the firm resettlement bar, which renders aliens ineligible for relief only if they have *been "offer[ed]" and "receive[d]"* such protection.  8 C.F.R. § 208.15.  This "limited exception[ ]," 84 Fed. Reg. at 33,831, does not alter the fact that the Rule subsumes the firm resettlement bar and renders it inoperative in virtually all of its applications.

3.    Defendants also have no response to the Rule's clear incompatibility with international law.  *See* Mem. 12-13.  Their principal contention is that international law is irrelevant.  Opp. 25-26.  But the Supreme Court has already held otherwise:  Because the Refugee Act was enacted specifically to "bring U.S. law into conformance" with international refugee law, the Act's provisions should be interpreted in a manner that "conforms with" international refugee law.  *Cardoza-Fonseca*, 480 U.S. at 436-438; *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177-178 (1993).  And the Court has further held that the views of the U.N. High Commissioner for Refugees ("UNHCR") provide "significant guidance" in determining what international refugee law provides.  *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

Defendants suggest that the Rule does not violate international law because "asylum is a discretionary benefit" under international law.  Opp. 26.  That does not follow.  Although international law does not require countries to grant asylum to anyone, it prohibits them from denying asylum for impermissible reasons.  *See* Amicus Br. of UNHCR at 4, *S.M.S.R. v. Trump*, No. 18-2838 (D.D.C. Dec. 11, 2018).  In particular, UNHCR has repeatedly explained that asylum-seekers may not be made to seek asylum in another state unless guarantees exist to ensure the alien's safety and access to full and fair asylum procedures.  Mem. 12-13.  Defendants

do not deny that the Rule—and their position that Section 1158(b)(2)(C) may be used to gut the limits in Section 1158(a)(2)(A)—would contravene that clear international-law requirement.[4]

4. Defendants make a few final arguments in the Rule's defense.  All are meritless.

Defendants claim that the Rule is consistent with Section 1158(a)(2)(A) and (b)(2)(A)(vi) because it promotes the same "purpose" and "aims" as those provisions—"prioritiz[ing] applicants 'with nowhere else to turn.' "  Opp. 22-23 (quoting *In re B-R-*, 26 I&N Dec. 119, 122 (BIA 2013)).  But "[n]o law pursues its purposes at all costs."  *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion).  Like most statutes, the firm-resettlement bar and the safe-third-country provision strike a balance between competing aims: prioritizing aliens who cannot settle elsewhere while also ensuring that the other places in which aliens may settle are "safe."  *B-R-*, 26 I&N Dec. at 122.  In other words, the limits that Congress placed on the scope of the exceptions to asylum eligibility are part and parcel of the "logic" and "purpose" of those Sections.  Opp. 22-23.  An agency does not act consistently with the statute by upsetting the balance Congress struck and prioritizing one statutory purpose at the expense of another.

Defendants also argue that they necessarily have authority to enact the Rule because the BIA has sometimes taken into consideration similar factors when evaluating asylum applications on a case-by-case basis.  *Id.* at 18-19.  As Judge Bybee explained in *East Bay*, however, the fact that the BIA may consider a given factor "as one piece of a broader application" does not mean that same factor can be elevated into a *categorical* bar on eligibility.  909 F.3d at 1249.  Congress made specific judgments about which characteristics warrant imposing a categorical bar on asylum eligibility, and subject to what limits.  *See* 8 U.S.C. § 1158(a)(2), (b)(2)(A).  The

---

[4] Defendants also do not deny that the Rule would effectively deprive the overwhelming majority of asylum applicants of the statutory right to seek asylum.  *See* Opp. 37-38.  The fact that the Rule would work such a convulsive change to the statute, and impair the core right if affords, is further reason to doubt that it is "consistent with" Section 1158.  Mem. 15.

Attorney General does not contravene those judgments by considering characteristics that Congress considered insufficient to merit categorical exclusion as non-dispositive factors in the course of deciding individual asylum applications.  *See id.* § 1158(b)(1)(A).[5]  But the Attorney General flouts Congress's judgments, and exceeds the limited scope of Section 1158(b)(2)(C), by imposing new categorical bars that effectively rewrite the limits Congress imposed.

### B.    The Rule Violates the TVPRA.

The Rule also violates the Trafficking Victims Protection Reauthorization Act ("TVPRA").  Defendants claim that the Rule is consistent with the TVPRA because "unaccompanied alien children who retain asylum eligibility will still have their claims heard initially by the asylum officer."  Opp. 27.  Yet while the Rule does not change the procedural protections afforded to unaccompanied children under 8 U.S.C. § 1232 and 6 U.S.C. § 279, the Rule *does* deny unaccompanied children the rights afforded to them under 8 U.S.C. § 1158(b)(3)(C), which "gives unaccompanied alien children the right to have their asylum applications reviewed in the first instance by an asylum officer with the USCIS."  *Harmon v. Holder*, 758 F.3d 728, 734 (6th Cir. 2014); *see also* 8 U.S.C. § 1158(b)(2)(C).  An unaccompanied child subject to the Rule is immediately ineligible for asylum, 84 Fed. Reg. at 33,839 n.7, and so any interview that an unaccompanied child subject to the Rule would have with an asylum officer is meaningless.  *See also* Amicus Br. of Kids in Need of Defense ("KIND"), at 4-5 & Frydman Decl. ¶¶ 26-29.

---

[5] The cases that Defendants cite (at Opp. 19) do not suggest otherwise:  In none of these cases was there a contention that a categorical rule would conflict with other categorical rules that Congress had enacted, nor were there specific textual limits requiring the agency to exercise its rulemaking authority in a manner "consistent with this section."  *See Lopez v. Davis*, 531 U.S. 230, 243-244 (2001); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970).

C.      **Defendants Lack Any Valid Reason for Forgoing Notice and Comment.**

Defendants also fail to establish why they should be free to skirt the APA's notice-and-comment requirement.

1.  The good cause exception excuses notice and comment only "in emergency situations or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted).  To invoke this "narrowly construe[d]" exception, an agency must affirmatively demonstrate—with "record support," and without any "entitle[ment] to . . . deference"—that notifying the public of the rule would produce harms that are both "imminent[ ]" and sufficiently "serious." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706-707 (D.C. Cir. 2014) (internal quotation marks omitted).  A "speculative[ ]" claim of harm is not sufficient.  *Id.* at 706.

Defendants contend that the good cause exception applies here because advance notice of the rule would encourage migrants to "surge to the border to enter the United States before the rule took effect."  Opp. 28 (internal quotation marks omitted).[6]  According to Defendants, this is a circumstance where "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare."  *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983); Opp. 27.

That narrow exception does not apply here.  Agencies can "frequently" (if not always) claim that regulated parties will adjust their behavior in response to an anticipated rule, by attempting to engage in the regulated conduct before the rule goes into effect.  *Mobil Oil Corp.*,

---

[6] Defendants claim that they did not invoke the "impracticability" prong of the good cause exception.  Opp. 29 n.8.  The Rule expressly says otherwise.  *See* 84 Fed. Reg. at 33,841 (stating that notice and comment "would be impracticable and contrary to the public interest").  In any event, the "impracticability" and "public interest" prongs do not differ in these circumstances. *See Sorenson*, 755 F.3d at 707 n.4 (rejecting both prongs "for the same reasons").

728 F.2d at 1492.  To prevent the good cause exception from becoming "an all purpose escape-clause" from the APA's default requirements, courts have insisted that an agency making such a claim demonstrate that delaying publication would pose "a significant threat of serious damage to important public interests," *id.*, or—in the D.C. Circuit's words—that "the usual procedures would *defeat the purpose* of the proposal." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).  The only case either party has identified that credited such a justification is a decision by the aptly named Temporary Emergency Court of Appeals, which upheld an agency's decision to immediately implement a petroleum price increase during the 1974 oil crisis in order to prevent refiners from engaging in "discriminatory pricing" during the notice period, in light of the established economics indicating such behavior was likely.  *Mobil Oil Corp.*, 728 F.2d at 1492.

Defendants have identified no remotely comparable evidence here.  Defendants do not provide any "record support" for the counterintuitive assertion that refugees fleeing persecution would alter their plans en masse in the short period after an asylum rule had been noticed in the Federal Register.  *Sorenson*, 755 F.3d at 707.  Defendants cite a series of news articles, but none of them make this claim; if anything, the articles suggest that aliens' decisions to seek asylum are driven by far more immediate concerns.  *See* AR438-439 ("[T]orture, gang recruitment, abusive spouses, extortionists and crooked police" have led to an "extraordinary surge of asylum seekers"); AR676 (similar); AR664-665 (Mexico's policy of offering visas to certain immigrants led to an "influx of new arrivals" to Mexico); AR 682-683 (Mexico's humanitarian visas "made it much easier for Central Americans already in Mexico to come to the US").  The best Defendants can offer is an article containing a double-hearsay characterization of a human smuggler's threat that foreign nationals should "hurry up" and cross the border before the government began "jail[ing] [those] who bring children."  AR439.  Perhaps recognizing the

thinness of the record, Defendants retreat to deference.  Opp. 30.  But this Court "cannot find that an exception applies simply because the agency says" it should.  *Sorenson*, 755 F.3d at 706.

Defendants offer a final salvo of arguments, but none of them lands.  Ruling against them, Defendants assert, would tie their hands and make it too difficult to invoke the good cause exception.  Opp. 29-30 & n.9.  But, first, this exception is difficult by design; and, second, the key requirement is simply that an agency's "predictive judgment[s]" actually be tied to "factual findings" grounded in the record.  *Sorenson*, 755 F.3d at 706-708.  Defendants also accuse Plaintiffs of "disingenu[ity]" for looking to the circumstances surrounding the prior asylum restriction to evaluate the claim of good cause.  Opp. 30 n.10.  But the point stands:  The fact that a surge did not materialize, even after the policy was enjoined, proves Plaintiffs' point.  If there was ever to be a surge, it would likely have been *after* the courts enjoined the port-of-entry rule and *before* the Government could respond with some new restriction on immigration.  Defendants' own statistics make clear that did not occur.  Mem. 19.[7]

2.    The foreign affairs exception also does not apply.  As multiple Circuits have explained, that exception does not excuse an agency from following notice-and-comment procedures merely because a rule "implicate[s]" foreign affairs.  *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010).  Virtually every immigration rule does that.  *Id.*; *see Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (per curiam).  Rather, an agency must show that following notice-and-comment procedures

---

[7] Indeed, even with respect to the present policy, Defendants repeatedly stated in the days after the Rule was issued that they would only implement it as a "pilot" program and not in all locations.  Vanessa Romo et al., *Acting Head of Customs and Border Protection Says New Asylum Rule In "Pilot" Phase*, NPR (July 18, 2019), https://www.npr.org/2019/07/18/743162496/acting-head-of-customs-and-border-protection-says-new-asylum-rule-in-pilot-phase. To the extent Defendants were actually worried about a surge, announcing that implementation of the policy would be limited in this way would be just as damaging as holding notice-and-comment.

would "provoke definitely undesirable international consequences," *Yassini*, 618 F.2d at 1360 n.4 (citing S. Rep. No. 79-752, at 13 (1945)), such as by causing the United States to "reneg[e] on international obligations," *Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994), or prolong a diplomatic crisis, *Yassini*, 618 F.2d at 1360.

Rather than make their case under the settled standard, Defendants ask for a different one. They assert that "[t]he statute requires no" showing of "undesirable international consequences," Opp. 32, and instead posit that the exception merely requires that the agency action be "linked intimately" with an international relationship, Opp. 30, 32 (internal quotation marks omitted). But *both* cases cited by Defendants in support of these assertions apply the undesirable-international-consequence rule, and courts have widely followed that standard for decades. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985); *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

Other than advocate a new standard, Defendants do nothing more than repeat, without elaboration, the rationales for invoking the exception offered in the Rule itself. Opp. 30-33. Plaintiffs pointed out numerous flaws in those justifications, Mem. 21-23, none of which Defendants respond to. As the Ninth Circuit explained as to the prior asylum rule—in words that are equally applicable here—"the Government has not explained how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment, is necessary for negotiations with Mexico." *East Bay*, 909 F.3d at 1252.

## III.  The Equities Strongly Favor Entry Of A TRO

### A.  The Rule Inflicts Irreparable Harm on Plaintiffs.

Plaintiffs will suffer irreparable harm if the Rule is implemented. Defendants claim that the "*only* harms [Plaintiffs] allege to themselves are speculations about their funding and the

need to plan for the new rules," Opp. 39 (emphasis in original), but that is not true. As Plaintiffs have explained, *see* Mem. 23-24, nearly all of their clients immediately will become ineligible for asylum under the Rule, and face imminent risks of removal to countries in which they face grave threats of gang violence and death. Compl. ¶ 114; Cubas Decl. ¶ 14. As a direct result, CAIR Coalition and RAICES will suffer a severe and irremediable blow to their ability to assist asylum-seekers who enter the United States along the southern border, which is a core part of their organizational missions. *See* Mem. 24-25; Compl. ¶¶ 112-114, 134-135; Cubas Decl. ¶¶ 4, 14, 39; Garza Pareja Decl. ¶ 4, 7, 33.

Defendants have no answer to the long line of Circuit cases recognizing that organizations suffer irreparable injuries where government actions would " 'perceptibly impair[]' [their] programs and 'directly conflict with the organization[s'] mission.' " *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)); *see also League of Women Voters*, 838 F.3d at 7-9 (affirming that Plaintiffs demonstrated "actual" and "imminen[t]" injury). In particular, the D.C. Circuit has recognized the irreparability of harms where "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9 (internal quotation marks omitted) (finding irreparable harm where policy made it "more difficult for the Leagues to accomplish their primary mission of registering voters," and redress would be impossible after registration deadlines had passed). CAIR Coalition and RAICES could not restore the damage to their core organizational mission—serving asylum seekers—if the Rule prevents them from serving numerous clients who will be removed to countries where they face persecution and violence.

The harms to Plaintiffs are not lessened by the fact that the migrants they serve theoretically remain eligible for alternative protection under the Convention Against Torture or

withholding of removal. *See* Opp. 39. Both of those forms of relief are substantially more difficult to obtain and confer substantially fewer benefits—including less protection from removal—than asylum. *See* Compl. ¶¶ 36-46. And even setting aside the harms that it will cause to Plaintiffs' organizational missions, Defendants do not dispute that the Rule will, in fact, force Plaintiffs to divert resources, reconfigure their programs, and, by extension, serve fewer clients. *See* Opp. 39-40. Given those harms, it is not the case that Plaintiffs are claiming merely "putative procedural" injuries, *id.* at 40, and the deprivation of an opportunity to comment on the Rule constitutes an independent cognizable injury in any event. *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009); *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 865 (N.D. Cal. 2018).

### B. The Balance of Equities and the Public Interest Favor Injunctive Relief.

The balance of equities and public interest likewise favor an injunction. The public interest in "enforc[ing] [the] immigration laws," Opp. 38 (citing *Landon v. Plascencia*, 459 U.S. 21, 34 (1982)), favors Plaintiffs, not Defendants: Rewriting the immigration laws is not "enforcing" them, and there is no legitimate interest in implementing an asylum Rule that is contrary to the congressional policy judgments embodied in the INA and the TVPRA. *See Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977))); *Landon*, 459 U.S. at 34-35 (courts should not "displace congressional choices of policy"). There also is a powerful "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see Landon*, 459 U.S. at 34 (recognizing "weighty" interests of migrants who "stand[] to

lose the right 'to stay and live and work in this land of freedom'" (citation omitted)).

On the other side of the ledger, an injunction will simply maintain the *status quo*—"the last uncontested status which preceded the pending controversy"—pending resolution of Plaintiffs' claims. *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,* 319 F. Supp. 3d 491, 498 (D.D.C. 2018); *see East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1085, 1092 n.3 (2018) (distinguishing *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (per curiam) (cited at Opp. 40)). The Government contends that it is burdened by a "strain on our asylum system inflicted by those who have no valid claim for asylum at all." Opp. 39. But the rate of immigration at the border is in line with historical numbers, and even dropped in the last month before the Rule was promulgated. Were the strain as dire as described, it seems unlikely that the acting head of Defendant CBP would have considered "piloting" the rule "in just one location" while "anticipating . . . the regulation will be enjoined." Romo et al., *supra* n. 7. In any event, no amount of administrative "strain" at the border licenses the Executive Branch to replace the asylum scheme that Congress enacted into law with something of its own creation.

Defendants suggest that the Rule will benefit asylum-seekers by dissuading them from "risking their lives in transit to the United States, and by "[dis]incentivizing human trafficking." Opp. 38 (citing 84 Fed. Reg. at 33,831). But, as the experience of Plaintiffs and *amicus* KIND vividly illustrates, migrants seeking asylum in the United States face severe risks of gang violence, human trafficking, sexual and gender-based violence, and other abuse not only in their countries of origin but likewise in the "third countries" that they transit en route to the United States. *See* Compl. ¶¶ 65-70; KIND Amicus Br. at 3-4. Those dangers are particularly acute for children, who frequently find that the influence of criminal gangs extends far beyond the borders of their countries of origin and into neighboring Central American countries and Mexico. *See*

Frydman Decl. ¶¶ 12-13, 16-18.   Moreover, it is, at best, doubtful that asylum procedures in those other countries are up to the task.   Compl. ¶¶ 71-82.   In the case of Guatemala, for example, procedures are new and untested, and particularly difficult for children to understand. Frydman Decl. ¶¶ 14-15.   In Mexico, meanwhile, transiting migrants can be actively deterred from seeking asylum by officials, and rates of success in obtaining asylum remain extremely low.   Compl. ¶¶ 77-82 & n.45 (refugee organization statistics indicate that only 11% of asylum applicants from Northern Triangle countries were granted protection in 2017).   Asylum protections also are limited for unaccompanied children, who often are deported back to dangerous conditions in violation of the country's own laws.   Frydman Decl. ¶¶ 19-24.

## IV.   Nationwide Injunctive Relief Is Appropriate.

A nationwide injunction is appropriate.   *See* Mem. 28-29.[8]   The Rule is inconsistent with the INA, the TVPRA and the APA; it should therefore be vacated and its application enjoined. Defendants cite no precedent for the proposition that a regulation adjudged to be illegal should continue to apply around the country.   And Defendants do not even acknowledge—let alone dispute or distinguish—the D.C. Circuit's law on the proper scope of relief in administrative law cases:   "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."   *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also, e.g.*, *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 211 n.28 (D.D.C. 2002) ("[A]

---

[8] Defendants suggest that *any* injunctive relief would be inappropriate, "to the extent that Plaintiffs could be deemed to challenge any aspect of the rule as applied to expedited removals." Opp. 40 (citing 8 U.S.C. § 1252(e)(1), (3)).   Those provisions, however, merely channel certain claims related to removal orders or removal proceedings into particular courts, and do not "immunize the primary asylum eligibility portions of the Rule from judicial review." *East Bay*, 354 F. Supp. 3d at 1118; *see id.* (the fact that "any rule of asylum eligibility may *be applied* in expedited removal proceedings" does not limit the Court's jurisdiction to enjoin it (emphasis in original)).

nationwide injunction invalidating an agency rule of broad applicability is appropriate even where a single plaintiff has challenged the legality of the rule."); *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("Normally when an Agency clearly violates the APA we would vacate its action." (alterations and internal quotation marks omitted)).[9]

Moreover, in fashioning equitable relief, the Court must consider "what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017). Defendants have come forward with no proposal for a more limited yet "workable" injunction here, other than to suggest that "an individual plaintiff" could "receive a complete remedy by an individualized injunction." Opp. 41. Setting aside the inefficiencies of such an approach—particularly with respect to a rule that facially applies to nearly every asylum seeker crossing the southern border—the fact is that Plaintiffs are organizations serving large numbers of migrants across disparate locations, some of whom are transferred among facilities (often across state lines) while in detention. *See* Compl. ¶¶ 14-15. There is nothing workable about trying to fashion an injunction tied to individual migrants in a way that will provide "complete relief" for the irreparable harms facing Plaintiffs. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994).

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' opening Memorandum, Plaintiffs' Motion for a Temporary Restraining Order should be granted, to be followed by a preliminary injunction.

---

[9] To the extent that Defendants advocate for an injunction that will not "affect[] the California district court's ability to decide the same issues under the Ninth Circuit precedent," Opp. at 42, that objective is fully compatible with Plaintiffs' request for relief. Courts may issue parallel injunctions against the same unlawful conduct. *See, e.g.*, *Hawaii v. Trump*, 241 F. Supp. 3d 1119 (D. Haw. 2017); *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) (TROs issued against the same immigration policy on March 15 and 16, 2017, respectively).

July 21, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick
Justin W. Bernick


Manoj Govindaiah
RAICES, Inc.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-09642
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant
Center for Education and Legal Services, Inc.*



Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.org


*Pro hac vice application forthcoming

*Counsel for Plaintiff Capital Area
Immigrants' Rights Coalition*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs** (Bar. No. 241719)
Michael J. West** (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt*
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* Motion for admission and pro hac vice
application pending admission forthcoming

** Motion for admission pending

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*, |
| Plaintiffs, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, |
| Defendants. |

Civil Action No. 1:19-cv-02117-TJK

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.   Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

July 21, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com