**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Local Civil Rule 65.1 and Federal Rule of Civil Procedure 65, Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES"), Human Rights First ("HRF"), J.M.M., D.L.R., Z.B.M., Y.G.C., M.Y.R.B., K.M.V.M., W.M.R.O., C.C.R.O., and N.G.R.L. hereby move the Court to issue a preliminary injunction enjoining the implementation and enforcement of the Rule challenged in the Amended Complaint, Dkt. 37, entitled *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule").

The Rule currently is subject to a limited preliminary injunction within the 9th Circuit. *See East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019). Throughout the rest of the United States, however, the Rule unlawfully denies asylum eligibility to virtually every alien who enters through the southern border, for failure to first apply for (and be denied) asylum in a "third country" through which she traveled. These asylum eligibility restrictions are contrary to the Immigration and Nationality Act, the Administrative

Procedure Act ("APA"), the U.S. Constitution, and other federal laws.  They also were issued without notice and an opportunity to comment pursuant to APA requirements, the "good cause" and "foreign relations" exceptions to which have no proper application here.

In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and accompanying declarations.  A proposed order granting a preliminary injunction is attached.  Oral argument is requested, as set forth in the parties' Joint Statement on Scheduling Concerning Plaintiffs' Renewed Motion for Preliminary Inunction and Request to Hold Summary Judgment Proceedings in Abeyance, Dkt. 40.

Dated: August 21, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Manoj Govindaiah
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.com

*\* Motion for admission forthcoming*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West* (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

*Counsel for Plaintiff Capital Area Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Thomas P. Schmidt
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

*\* Motion for admission pending*

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 7

    I.     This Court Has Jurisdiction. ................................................................................ 7

    II.    Plaintiffs' Claims Are Likely To Succeed On The Merits. ..................................... 9

        A.    The Rule Was Unlawfully Issued Without Notice And Comment Or A 30-Day Delay In Implementation. ........................................................... 9

            1.    The good cause exception does not apply. ....................................... 10

            2.    The foreign affairs exception does not apply. .................................. 18

        B.    The Rule Violates 8 U.S.C. § 1158. ......................................................... 20

        C.    The Rule Is Arbitrary And Capricious. ...................................................... 24

    III.   The Rule Inflicts Irreparable Harm On Plaintiffs. ................................................ 30

        A.    The Individual Plaintiffs Will Be Irreparably Harmed Absent An Injunction. ................................................................................................ 31

        B.    The Organizational Plaintiffs Will Be Irreparably Harmed Absent An Injunction. .......................................................................................... 34

    IV.   The Public Interest And Balance Of Equities Weigh In Favor Of Injunctive Relief. .............................................................................................................. 36

    V.    Nationwide Injunctive Relief Is Appropriate. ....................................................... 37

CONCLUSION ................................................................................................................. 42

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES:**

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ............................................................................7

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ..........................................................................21

*Am. Ass'n of Exporters & Importers-Textile and Apparel Grp. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985) ..........................................................................18

*Am. Bar. Ass'n v. Dep't of Educ.*,
   370 F. Supp. 3d 1 (D.D.C. 2019) .........................................................................7

*Am Fed'n of Gov't Emps. v. Block*,
   655 F.2d 1153 (D.C. Cir. 1981) .....................................................................11, 36

*Amgen, Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) .............................................................................7

*Apotex, Inc. v. FDA*,
   No. Civ.A. 06-0627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ...........................33

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) ....................................................................36

*Arizona v. United States*,
   567 U.S. 387 (2012) ...........................................................................................38

*Aziz v. Trump*,
   234 F. Supp. 3d 724 (E.D. Va. 2017) .................................................................39

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...........................................................................................37

*California Communities Against Toxics v. EPA*,
   928 F.3d 1041 (D.C. Cir. 2019) ..........................................................................25

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .......................................................................31, 32

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) ......................................................................................22, 23

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*City of New York v. Permanent Mission of India to United Nations*,
    618 F.3d 172 (2d Cir. 2010)............................................................................18, 19

*Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control*,
    71 F.3d 909 (D.C. Cir. 1995).................................................................................37

*Doe v. Trump*,
    288 F. Supp. 3d 1045 (W.D. Wash. 2017)............................................................36

*East Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. 2019) ........................................................ *passim*

*East Bay Sanctuary Covenant v. Barr*,
    No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ......................... *passim*

*East Bay Sanctuary Covenant v. Trump*,
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ..................................................................40

*East Bay Sanctuary Covenant v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ........................................................................19, 38

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)..........................................................................................29

*Envtl. Def. Fund v. EPA*,
    922 F.3d 446 (D.C. Cir. 2019)..............................................................................30

*Grijalva v. Ilchert*,
    815 F. Supp. 328 (N.D. Cal. 1993) ......................................................................34

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989)..............................................................................38

*Henson v. Santander Consumer USA Inc.*,
    137 S. Ct. 1718 (2017).........................................................................................23

*Hoctor v. United States Dep't of Agric.*,
    82 F.3d 165 (7th Cir. 1996) ..................................................................................10

*Humane Soc'y of the U. S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017)..............................................................................38

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)........................................................................................33, 35

## <u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
   502 U.S. 183 (1991)..................................................................................37

*Int'l Bhd. of Teamsters v. Peña*,
   17 F.3d 1478 (D.C. Cir. 1994) ................................................................18

*Int'l Fabricare Inst. v. EPA*,
   972 F.2d 384 (D.C. Cir. 1992) ................................................................26

*Int'l Refugee Assistance Project v. Trump*,
   241 F. Supp. 3d 539 (D. Md. 2017) ........................................................39

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
   407 F.3d 1250 (D.C. Cir. 2005) ..............................................................10

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*,
   19 F. Supp. 3d 491 (D.D.C. 2018) ..........................................................37

*Jean v. Nelson*,
   711 F.2d 1455 (11th Cir. 1983) .........................................................18, 19

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004)...................................................11, 12, 17

*Kirwa v. U.S. Dep't of Def.*,
   285 F. Supp. 3d 21 (D.D.C. 2017)...........................................................33

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)........................................................35, 36, 37

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) .............................................................33, 34

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992)...................................................................................8

*Mack Trucks, Inc. v. EPA*,
   682 F.3d 87 (D.C. Cir. 2012) ............................................................11, 17

*Mid-Tex Elec. Coop. v. FERC*,
   822 F.2d 1123 (D.C. Cir. 1987)..................................................10, 11, 14

*Mobil Oil Corp. v. U.S. Dep't of Energy*,
   728 F.2d 1477 (Temp. Emer. Ct. App. 1983) .........................................15

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Morgan Stanley DW, Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ....................................................................7, 36

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile*
    *Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................24, 27, 30

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................36, 37

*N.J. Dep't of Envt'l Protection v. EPA*,
    626 F.2d 1038 (D.C. Cir. 1980) ...........................................................................11

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ......................................................................38

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) .......................................................................38, 41

*Nat'l Parks Conservation Ass'n. v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017) ......................................................................30

*Nat'l Venture Capital Ass'n v. Duke*,
    291 F. Supp. 3d 5 (D.D.C. 2017) .........................................................................17

*Nken v. Holder*,
    556 U.S. 418 (2009) ...........................................................................................36

*North Carolina v. Covington*,
    137 S. Ct. 1624 (2017) .......................................................................................39

*O.A. v. Trump*,
    No. CV 18-2718 (RDM), 2019 WL 3536334 (D.D.C. Aug. 2, 2019) .................................9, 39

*Open Communities All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................36, 37

*Orantes-Hernandez v. Meese*,
    685 F. Supp. 1488 (C.D. Cal. 1988) ......................................................................33

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) .................................................................................18

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Serono Labs., Inc. v. Shalala*,
　158 F.3d 1313 (D.C. Cir. 1998) ............................................................................37

*Sessions v. Dimaya*,
　138 S. Ct. 1204 (2018) ........................................................................................32

*Sorenson Commc'ns Inc. v. FCC*,
　755 F.3d 702 (D.C. Cir. 2014) ..................................................................... *passim*

*Sullivan v. Zebley*,
　493 U.S. 521 (1990) ............................................................................................38

*Tenn. Gas Pipeline Co. v. FERC*,
　969 F.2d 1141 (D.C. Cir. 1992) .................................................................... *passim*

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271
　(2016) ..................................................................................................................38

*United States v. Ross*,
　848 F.3d 1129 (D.C. Cir. 2017) ............................................................................11

*Util. Air Regulatory Grp. v. EPA*,
　573 U.S. 302 (2014) ............................................................................................22

*Util. Solid Waste Activities Grp. v. EPA*,
　236 F.3d 749 (D.C. Cir. 2001) ..............................................................................11

*Vulcan Soc'y v. Civil Serv. Comm'n*,
　490 F.2d 387 (2d Cir. 1973) .................................................................................41

*Yassini v. Crosland*,
　618 F.2d 1356 (9th Cir. 1980) .......................................................................18, 19

**CONSTITUTIONAL PROVISION:**

U.S. Const. art. I, § 8, cl. 4 ...................................................................................38

**STATUTES:**

5 U.S.C. § 553 .........................................................................................................9

5 U.S.C. § 553(a)(1) ..........................................................................................16, 18

# TABLE OF AUTHORITIES—Continued

Page(s)

5 U.S.C. § 553(b)(3)(B) ...................................................................10

5 U.S.C. § 706(2) ..........................................................................38

6 U.S.C. § 279(g)(2) .......................................................................30

8 U.S.C. § 1158 ........................................................................20, 23

8 U.S.C. § 1158(a) .......................................................................8, 21

8 U.S.C. § 1158(b) ........................................................................21

8 U.S.C. § 1158(a)(2)(A) ...................................................................21

8 U.S.C. § 1158(a)(2)(C) ...................................................................32

8 U.S.C. § 1158(a)(2)(E) ...................................................................29

8 U.S.C § 1158(b)(2)(A)(vi) ................................................................22

8 U.S.C. § 1158(b)(2)(C) ...........................................................4, 21, 24

8 U.S.C. § 1158(b)(3)(A) ...................................................................33

8 U.S.C. § 1158(b)(3)(C) ...................................................................30

8 U.S.C. §1158(c)(1)(A) ....................................................................33

8 U.S.C. §1158(c)(1)(B) ....................................................................33

8 U.S.C. §1158(c)(1)(C) ....................................................................33

8 U.S.C. § 1225(b)(1)(B)(iii)(I) ............................................................31

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .......................................................4, 31

8 U.S.C. § 1225(b)(1)(B)(v) .................................................................4

8 U.S.C. § 1252 .............................................................................8

8 U.S.C. § 1252(b)(1)(A)(i) ..................................................................5

8 U.S.C. § 1252(e)(3) ........................................................................9

8 U.S.C. § 1427(a) .........................................................................33

# TABLE OF AUTHORITIES—Continued

**Page(s)**

8 U.S.C. § 1613(b)(1) ............................................................................................33

28 U.S.C. § 1331 .................................................................................................8, 9

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ...................38

**REGULATIONS:**

*Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16,
2019) ......................................................................................................... *passim*

*Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) ......................14

*Eliminating Exception to Expedited Removal Authority for Cuban Nationals
Arriving by Air*, 82 Fed. Reg. 4769 (Jan. 17, 2017)..................................................14

*Visas: Documentation of Nonimmigrants Under the Immigration and Nationality
Act, As Amended*, 81 Fed. Reg. 5906 (Feb. 4, 2016) ...............................................14

## INTRODUCTION

Last month, this Court denied a motion for a temporary restraining order ("TRO") filed by Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") on the sole ground that, as organizations, these Plaintiffs had not shown—on "th[e] limited record" before the Court—that they would be irreparably harmed "within the time frame of a TRO."  Tr. of Oral Ruling at 7:4-9:17.  The Court "want[ed] to be clear," however, that it was "not concluding that this rule, if deemed unlawful, would cause no irreparable harm to those asylum applicants subject to it."  *Id.* at 8:25-9:4.  Further, while the Court expressed doubt about some of Plaintiffs' claims, it stated that it found Plaintiffs' procedural challenge to the Rule "a much closer call," in light of the high burden Defendants must satisfy to forgo notice and comment and the "thin" record on which they based their decision to do so.  *Id.* at 11:4-12:10.

In the intervening month, there have been three important developments.  First, both the District Court for the Northern District of California and a panel of the Ninth Circuit have concluded that the Government is unlikely to succeed on the merits of its procedural defense of the Rule.  *See East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 947-951 (N.D. Cal. 2019); *East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *1 (9th Cir. Aug. 16, 2019).  Second, Plaintiffs have amended their complaint to add nine individual asylum-seekers subject to the Rule, all of whom would face "threats of severe violence or death" if removed from this country.  Mem. Op. and Order at 1-2, Dkt. 36.  And, third, the Ninth Circuit has narrowed the scope of the *East Bay* injunction, meaning that the individual Plaintiffs, and thousands more individuals like them, are once again subject to the Rule and under immediate threat of removal to places in which their lives and safety would be gravely threatened.  *East*

*Bay*, 2019 WL 3850928, at *1-2.

In light of these developments, it is appropriate—and vitally important—that this Court issue a preliminary injunction barring enforcement of the Rule.  As four judges have now concluded, the Rule is likely unlawful, at minimum because it "did not comply with the Administrative Procedure Act's (APA) notice-and-comment and 30-day grace period requirements."  *Id.* at *1.  Plaintiffs would suffer irreparable harm if the Rule remains in effect: Unlike at the TRO stage, Plaintiffs include several individual asylum-seekers directly subject to the Rule, and the accompanying declarations further demonstrate that it is a "virtual certainty" that the organizational Plaintiffs would suffer harm to their missions over the much longer timeframe of a preliminary injunction relative to a TRO.  Cubas Supp. Decl. ¶ 5; Garza Pareja Supp. Decl. ¶ 4; McBride Decl. ¶ 13.  Finally, a nationwide injunction is the only way to afford Plaintiffs full relief, and the only fair or remotely workable remedy.  The instant motion should be granted.

## BACKGROUND

The Court is familiar with the background of this case.  On July 16, 2019, Defendants issued a rule, without undergoing notice and comment or granting a 30-day grace period before implementation, that denies asylum eligibility to virtually every alien who enters through the southern border of the United States after transiting through a third country, unless the alien first sought and was denied asylum in a third country.  *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule").  On July 17, Plaintiffs CAIR Coalition and RAICES filed suit in this Court and moved for a TRO and a preliminary injunction.  Complaint, Dkt. 1; Pls.' Mot. for TRO, Dkt 3.  They argued that the Rule is substantively and procedurally unlawful, and that if implemented it would inflict severe and

irreparable harm on the organizations and their clients seeking asylum.

After expedited briefing and a hearing, this Court denied Plaintiffs' TRO motion. Dkt. 28. It concluded that CAIR Coalition and RAICES likely have standing and fall within the zone of interests of the asylum statute. Tr. of Oral Ruling at 4:17-5:8. But it found that, "on th[e] limited record" before it, the evidence was insufficient to determine how many, "if any," of the organizations' clients would be denied asylum and removed from the country "over the next few weeks," which would be "the time frame of a TRO." *Id.* at 7:4-8:10. The Court thus concluded that CAIR Coalition and RAICES "ha[d] not shown on this record that they, as organizations, will be irreparably harmed absent a temporary restraining order," and "den[ied] the TRO on that basis alone." *Id.* at 9:7-17.

The Court "want[ed] to be clear," however, that its ruling was limited to the organizational plaintiffs and the record before it. *Id.* at 9:1-2. The Court stated that it recognized that the effect of the Rule "is far-reaching and significant," and that it was "not concluding that this rule, if deemed unlawful, would cause no irreparable harm to those asylum applicants subject to it." *Id.* at 8:25-9:4. "[B]ut," it added, "the plaintiffs before me here are not asylum seekers affected by this rule." *Id.* at 9:4-5. The Court also noted that, while it had serious doubts about the merits of Plaintiffs' substantive challenge to the Rule, it found plaintiffs' procedural APA claim "a much closer call," given the high standard imposed by Circuit precedent for forgoing notice and comment, and the "thin" record the agency produced in support of its decision to do so. *Id.* at 11:4-12:10. The Court stated that it was "open to further development of the factual record and additional legal argument on these points as we move forward." *Id.* at 12:21-25.

The same day that this Court issued its ruling, the District Court for the Northern District

of California granted a preliminary injunction barring enforcement of the Rule nationwide.  *East Bay*, 385 F. Supp. 3d at 960.  Applying Ninth Circuit precedent, it found that the plaintiffs before it had established irreparable harm.  *Id.* at 957-958.  It also held that the Rule exceeds the Attorney General's authority under 8 U.S.C. § 1158(b)(2)(C), was improperly issued without notice and comment, and is arbitrary and capricious.  *Id.* at 937-957.  The parties to this case agreed to hold in abeyance Plaintiffs' motion for a preliminary injunction for as long as the *East Bay* injunction remained in full effect.  Joint Status Report, Dkt. 30.

On August 6, Plaintiffs filed an Amended Complaint in which they added nine individuals and one pro bono legal services organization, Human Rights First ("HRF"), as plaintiffs, and raised a new count challenging the Rule as arbitrary and capricious.  Am. Compl., Dkt. 31.  Each of the individual Plaintiffs is an "asylum seeker[ ] affected by this rule."  Tr. of Oral Ruling at 9:4-5.  And their claims are illustrative of the grave persecution and violence faced by many subject to the Rule, the difficulty that asylum seekers encounter in obtaining protection in third countries, and the swiftness with which Defendants have denied asylum claims pursuant to the Rule:

- Plaintiff J.M.M. fled El Salvador for Mexico in May 2018 after years of threats, beatings, and sexual abuse from members of the MS-13 gang.  J.M.M. Decl. ¶¶ 3-6, Dkt. 31-3.  MS-13 found J.M.M. in Mexico, however, and once again subjected her to beatings and threats. Id. ¶ 7.  On July 16, 2019, J.M.M. entered the United States without inspection and sought asylum.  *Id.* ¶¶ 8-9.  Six days later, J.M.M. received a negative determination at her credible fear interview because she was subject to the Rule.  *Id.* ¶¶ 8-9.[1]  On July 30, after the Rule was enjoined*,* an immigration judge

---

[1] When an asylum seeker is placed in expedited-removal proceedings, an asylum officer interviews the alien to determine whether she has a "credible fear of persecution," which is defined as "a significant possibility . . . that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).  An alien who receives a negative credible-fear determination may obtain review of that decision in a hearing before an immigration judge, which must occur "in no case later than 7 days" after the asylum officer's decision.  *Id.* § 1225(b)(1)(B)(iii)(III).  An alien who is found to lack a credible fear of persecution and does not obtain any other relief from removal must be "removed from the United States without further hearing or review."  *Id.*

reversed that negative determination. *Id.* ¶ 9.

- Plaintiff D.L.R. fled Cuba in June 2019 after being persecuted by the Cuban government for her opposition to Communism. D.L.R. Decl. ¶¶ 3-12, Dkt. 31-4. After traveling through Central America, D.L.R. presented at a U.S. port of entry on July 17 and requested asylum. *Id.* ¶¶ 13-14. Four days later, D.L.R. received a negative credible fear determination because she was subject to the Rule. *Id.* ¶ 14. An immigration judge reversed that determination on July 30 after the Rule was enjoined. *Id.*

- Plaintiff Z.B.M. is a national of Angola who was persecuted, kidnapped, and subjected to death threats because she is a Jehovah's Witness and a member of the Bakongo Tribe. Z.B.M. Decl. ¶¶ 1, 5-11, Dkt. 31-5. Z.B.M. fled via Central America and Mexico to the United States, where she was quickly detained upon her arrival on July 16. *Id.* ¶¶ 13-15. On July 21, Z.B.M. received a negative credible-fear determination because of the Rule. *Id.* ¶ 16. An immigration judge reversed that determination on July 26. *Id.* ¶ 17.

- Plaintiff Y.G.C. fled Guatemala because a man whom Y.G.C. believes is a gang member threatened to kill her if she did not agree to be "his woman." Y.G.C. Decl. ¶¶ 3-9, Dkt. 31-6. Y.G.C. entered the United States without inspection on July 16 and was quickly detained by U.S. immigration officials. *Id.* ¶ 10. She received a negative credible-fear determination on July 21 because of the Rule. *Id.* ¶ 11. An immigration judge reversed that determination on July 29. Am. Compl. ¶ 38.

- Plaintiff M.Y.R.B. is a young indigenous woman from Guatemala who fled Guatemala with her four-year-old son to escape extortion from the Barrio 18 gang, and because of discrimination to which she was subjected for being an indigenous woman. M.Y.R.B. Decl. ¶¶ 1-2, 4-14, Dkt. 31-7. In Mexico, M.Y.R.B. continued to be targeted by extortion and violence. *Id.* ¶ 15. She entered the United States without inspection on July 17, and was quickly detained by U.S. immigration officials. *Id.* ¶ 16. On July 23, she received a positive credible-fear determination. *Id.* ¶ 17.

- Plaintiff K.M.V.M. is a citizen of Honduras who left her hometown with her six-year-old daughter after a violent gang moved into her town and threatened her family. K.M.V.M. Decl. ¶¶ 1-2, 4-15, Dkt. 31-8. She did not stop in Guatemala or Mexico because she believed the gang could reach her in either of those countries. *Id.* ¶ 17. K.M.V.M. and her daughter entered the United States on July 17, and received a negative credible-fear determination on July 24 because she was found to be subject to the Rule. *Id.* ¶¶ 18-19. An immigration judge reversed that negative determination after the Rule was enjoined. *Id.* ¶ 20. K.M.V.M. and her daughter remain detained at the South Texas Family Residential center. *Id.* ¶ 21.

- Plaintiffs W.M.R.O. and C.C.R.O. are unaccompanied minors who fled Honduras

---

§ 1252(b)(1)(A)(i).   The Rule requires asylum officers to "enter a negative credible fear determination" for any alien subject to the Rule. 84 Fed. Reg. at 33,843.

after two men threatened to kill their family because their older brother is gay. W.M.R.O. Decl. ¶¶ 1, 3-8, Dkt. 31-9; C.C.R.O. Decl. ¶¶ 1, 3-10, Dkt. 31-10. They traveled through Guatemala and Mexico *en route* to the United States. W.M.R.O. Decl. ¶ 8; C.C.R.O. Decl. ¶ 11. W.M.R.O. and C.C.R.O. entered the United States on July 16 without inspection and were quickly detained by U.S. immigration officials, classified as unaccompanied minors, and transferred to the custody of the Office of Refugee Resettlement. W.M.R.O. Decl. ¶¶ 10-11; C.C.R.O. Decl. ¶¶ 13-14; Am. Comp. ¶ 57. Both W.M.R.O. and C.C.R.O. have received documents styled as notices to appear ("NTAs") for removal proceedings, and they intend to apply for asylum. Am. Comp. ¶¶ 58-59.

- Plaintiff N.G.R.L. is an unaccompanied minor who fled Honduras in May 2019 after being raped and threatened by her stepfather. N.G.R.L. Decl. ¶¶ 1, 3-7, Dkt. 31-12. N.G.R.L. remained in Mexico for approximately one month, but did not feel safe there. *Id.* ¶ 8. On July 24, she presented at a port of entry in the United States where she was detained by U.S. immigration officials, classified as an unaccompanied minor, and transferred to the custody of the Office of Refugee Resettlement. *Id.* ¶¶ 9-10; Am. Comp. ¶ 62. N.G.R.L. intends to apply for asylum, and has received a document styled as a NTA. N.G.R.L. Decl. ¶ 11; Am. Compl. ¶ 63.

In short, each of the individual Plaintiffs—like numerous other clients of CAIR Coalition, RAICES, and HRF—fled horrific persecution and violence to seek protection in this country, and would likely be swiftly found ineligible for asylum and placed at risk of removal if the Rule were reinstated.

On August 16, the Ninth Circuit denied in part and granted in part Defendants' motion for a stay pending appeal of the *East Bay* injunction. *East Bay*, 2019 WL 3850928, at *1. The Ninth Circuit concluded that Defendants had "not made the required 'strong showing' that they are likely to succeed on the merits" of Plaintiffs' claim that Defendants failed to comply with the APA's "notice-and-comment and 30-day grace period requirements." *Id.* It therefore denied the motion for stay pending appeal "insofar as the injunction applies within the Ninth Circuit." *Id.* But the court stayed the injunction outside the Ninth Circuit because it found that "the nationwide scope of the injunction is not supported by the record as it stands." *Id.*

As a result of this decision, the Rule is once again in effect outside the Ninth Circuit. And Plaintiffs are once again under grave threat of irreparable harm. Plaintiffs have accordingly

renewed their motion for a preliminary injunction.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). Four judges have now properly concluded that the Government is unlikely to prevail in its defense of the Rule. The individual Plaintiffs would suffer irreparable harm if the Rule remains in effect over the course of this litigation—and the expanded record makes clear that the organizational Plaintiffs would, as well. And only a nationwide injunction would redress these harms. Plaintiffs' motion should be granted.

## I. This Court Has Jurisdiction.

As an initial matter, each of the Plaintiffs has standing to challenge the Rule, falls within the statutory zone of interests, and properly invokes this Court's jurisdiction.

This Court has already found that CAIR Coalition and RAICES likely have standing and fall within the zone of interests of the asylum statute. Tr. of Oral Ruling at 4:17-5:8. HRF is properly before this Court for the same reasons: Like the other organizational Plaintiffs, it has submitted a detailed declaration explaining how the Rule will "disrupt [its] day-to-day ability to provide legal representation and other services for recent migrants." *Id.* at 5:3-4; *see* McBride Decl. ¶¶ 5-9, 12-30, 32-34. And it too "'in practice can be expected to police the interests that the statute protects.'" *Am. Bar. Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019) (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004)).

The individual Plaintiffs also have standing.  "[T]here is ordinarily little question" that a plaintiff has Article III standing if he "is himself an object of the action . . . at issue."  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561-562 (1992).  Each of the individual Plaintiffs is an object of the challenged Rule:  Each crossed the southern border on or after July 16, 2019, without first applying for asylum in a third country through which they transited *en route* to the United States.  J.M.M. Decl. ¶¶ 7-8; D.L.R. Decl. ¶ 13; Z.B.M. Decl. ¶¶ 13-15; Y.C.G. Decl. ¶¶ 9-10; M.Y.R.B. Decl. ¶¶ 15-16; K.M.V.M. Decl. ¶¶ 17-18; W.M.R.O. Decl. ¶¶ 8-10; C.C.R.O. Decl. ¶¶ 11-13; N.G.R.L. Decl. ¶¶ 8-9; *see also* Am. Compl. ¶¶ 1, 13-63.  Indeed, most of the Plaintiffs were initially deemed ineligible for asylum because they were found to be subject to the Rule.  *See* J.M.M. Decl. ¶ 8; D.L.R. Decl. ¶ 14; Z.B.M. Decl. ¶ 16; Y.C.G. Decl. ¶ 11; K.M.V.M. Decl. ¶ 20; *see also* Am. Compl. ¶¶ 16, 25, 31, 37, 51.  The Rule thus inflicts injury in fact, by rendering these individuals ineligible for asylum and subjecting them to a risk of removal to countries in which they face a grave risk of persecution and violence; that injury is directly traceable to the Rule itself; and it would be redressed if the Rule were enjoined.  Article III requires nothing more.  *Lujan*, 504 U.S. at 560-561.

The individual Plaintiffs also fall within the zone of interests of the asylum statute.  By its terms, that statute gives aliens physically present in the United States a right to apply for asylum, and affords them numerous substantive and procedural protections.  8 U.S.C. § 1158(a).  Defendants concede that these provisions are "directed at aliens" and that those "applying for asylum" may sue to vindicate their statutory rights.  Mem. of Points and Authorities in Opp. to the Mot. for TRO (hereinafter "Opp.") at 15-16, Dkt. 20.

Finally, there is no jurisdictional impediment to this Court's adjudication of the individual Plaintiffs' claims.  This Court has federal question jurisdiction under 28 U.S.C.

§ 1331, and Plaintiffs have a cause of action under the APA.  The Government has previously argued that 8 U.S.C. § 1252 bars aliens from challenging a categorical bar on asylum eligibility until the aliens undergo full removal proceedings and appeal a final order of removal.  *See O.A. v. Trump*, No. CV 18-2718 (RDM), 2019 WL 3536334, at *8 (D.D.C. Aug. 2, 2019); Opp. at 10; 16-17.  In *O.A.*, however, the District Court rejected that argument, explaining that "§ 1252 does not divest the Court of jurisdiction" to suits challenging rules restricting asylum eligibility, and detailing at length the numerous reasons why the Government's reading of § 1252 is untenable. *O.A.*, 2019 WL 3536334, at *19; *see id.* at *8-19.  Those reasons apply with equal force here.

In any event, the Government informed this Court last month that, in its view, an alien who "is in expedited removal" and "has those procedures applied to them" "can bring a suit" challenging the rule under 8 U.S.C. § 1252(e)(3).  Tr. of TRO Hr'g at 149:16-150:9; *see also id* at 132:1-10.  Plaintiffs do not agree that § 1252(e)(3) provides the sole avenue for them to sue: As the *O.A.* court explained, that statute is limited to "challenges to expedited removal orders and the implementation of the expedited removal provisions that Congress enacted in the" Illegal Immigration Reform and Immigrant Responsibility Act.  *O.A.*, 2019 WL 3536334, at *19.  But, at minimum, Plaintiffs are exactly the type of plaintiffs who the Government acknowledged could properly "bring a suit" in this Court to challenge the Rule.  No matter which jurisdictional route it takes, this Court may therefore adjudicate their claims.

## II.     Plaintiffs' Claims Are Likely To Succeed On The Merits.

### A.      The Rule Was Unlawfully Issued Without Notice And Comment Or A 30-Day Delay In Implementation.

The APA requires agencies to publish notice of any proposed rule in the Federal Register, invite and respond to public comments on that rule, and delay implementation of the rule for not less than 30 days before its effective date.  5 U.S.C. § 553.  These requirements are not mere

technicalities; they constitute the central procedural protections in the APA, "designed to . . . ensure that agency regulations are tested via exposure to diverse public comment," guarantee "fairness to affected parties," and "give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005). And "public notice and comment . . . gain[s] in importance 'the more expansive the regulatory reach of [agency] rules.'" *Mid-Tex Elec. Coop. v. FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Hoctor v. United States Dep't of Agric.,* 82 F.3d 165, 171 (7th Cir. 1996).

In this case, Defendants forwent notice and comment and the 30-day publication period before issuing the Rule. To justify that shortcut, Defendants invoked two of the APA's narrowly drawn exceptions to its public participation requirements: the good cause exception and the foreign affairs exception. 84 Fed. Reg. at 33,840-42. The District Court in *East Bay* concluded that the Government's invocation of these exceptions was likely unlawful. *East Bay*, 385 F. Supp. 3d at 948-951. And a panel of the Ninth Circuit unanimously rejected Defendants' request to stay that decision pending appeal, finding that they had "not made the required 'strong showing' that they are likely to succeed on the merits of this issue." *East Bay*, 2019 WL 3850928, at *1. Those determinations are correct.

### 1. The good cause exception does not apply.

The good cause exception exempts rules from notice and comment and the 30-day pre-implementation grace period when an agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The D.C. Circuit has repeatedly held that this exception "is to be 'narrowly

construed and only reluctantly countenanced.'" *United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017) (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).   Its use is "limited to emergency situations," *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)), where "delay would imminently threaten life or physical property," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014); *see Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (giving examples).

The judicial inquiry into good cause is "meticulous and demanding." *Sorenson*, 755 F.3d at 706 (quoting *N.J. Dep't of Envt'l Protection v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). An agency's "legal conclusion of good cause" is reviewed *de novo*.  *Id.*   Further, a court must review "the basis for [the agency's] prediction" and "satisfy itself" that the agency's judgment was "reasonable."   *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992) (internal quotation marks omitted).  That inquiry "is inevitably fact- or context-dependent," *Mid-Tex*, 822 F.2d at 1132, and the D.C. Circuit has not hesitated to reject an agency's invocation of good cause where the agency "[l]ack[ed] record support proving the emergency" it claimed, *Sorenson*, 755 F.3d at 707, or where the agency "provided little factual basis for its belief" that regulated parties would "rush to avoid the mandates of a final rule," *Tenn. Gas Pipeline*, 969 F.2d at 1144-45.

In this case, the Rule's good cause argument proceeds in two steps.  First, the Rule asserts that a delay in implementation would lead to "a surge in migrants hoping to enter the country before the rule becomes effective."  84 Fed. Reg. at 33,841.  Second, the Rule claims that such a surge "would jeopardize the lives and welfare of aliens who surge to the border" and "be destabilizing to the region, as well as to the U.S. immigration system."  *Id.*  Both steps are

necessary to establish the conclusion that notice and comment "would be impracticable and contrary to the public interest." *Id.* But neither can survive the "meticulous and demanding" scrutiny the APA requires. *Sorenson*, 755 F.3d at 706.

*First*, there is virtually no record support for the prediction that publication of the Rule would have led to a "surge in migrants" prior to the rule's effective date. For that prediction to be correct, the following series of assumptions would need to hold true: (1) a large number of foreign nationals in the Northern Triangle would need to quickly become aware of a proposed rule published in the Federal Register; (2) a sizable number of those individuals would need to alter their travel plans and promptly transit to the United States because of the proposed rule; and (3) many of those individuals would need to arrive at the United States during the 30-day pre-publication period or notice-and-comment period and surge across the border. There is no record evidence supporting any of these propositions.

The only record evidence that the Rule itself points to is a newspaper article claiming that the "rollback" of the Administration's policy of "separating parents from their children" led some human smugglers to "tell potential customers that Americans do not jail parents who bring children—and to hurry up before they might start doing it again." AR439; *see* 84 Fed. Reg. at 33,841. This statement is of highly questionable probative value: It is a single, unverified statement in a newspaper article referring in general terms to statements made by unnamed human smugglers. Reliance on this sort of vague hearsay report as a basis for any agency decision—let alone a decision of this enormous magnitude—would be arbitrary and capricious. *See Sorenson*, 755 F.3d at 706 n.3 ("findings and judgments" underlying good cause determination cannot be "arbitrary and capricious"); *cf. Jifry*, 370 F.3d at 1179 (crediting the government's threat assessments based on declaration by the TSA Deputy Administration). But

even taken for all it is worth, this article does not support the Government's prediction.   It suggests awareness of a policy that was actually *put into effect* for an extended period of time, not merely proposed in the Federal Register.   It says only that human smugglers *told* some customers about the policy, not that any migrants altered their travel plans in response to those self-serving exhortations.   And it says nothing to suggest that migrants altered their plans with the speed or in the numbers necessary to produce a surge on the southern border.

Defendants' counsel have cited two other newspaper articles to support their prediction of a surge, but they too provide only the most attenuated support.   One article observes that many migrants "appear to be informed about the basics" of U.S. immigration law, such as that they may "request asylum" and "are unlikely to remain detained if they travel with a child."   AR768. But all that proves is that migrants are aware of some actual U.S. laws—not that they are aware of proposed rules, that they alter their travel plans because of them, or that they are capable of doing so in large numbers in the time before the notice-and-comment or 30-day grace periods close.   The other article notes that when Mexico granted "renewable, one-year humanitarian visas to many of the roughly 13,000 Central American migrants who have accumulated at the country's southern border," it experienced an "influx of new arrivals."   AR662, 664-665.   But that merely shows that a policy of admitting asylum seekers had its intended result for persons already "accumulated at the country's . . . border" over some unspecified timeframe.   It does not remotely suggest that a *proposed* policy would cause persons *thousands of miles away* to alter their travel plans *immediately*.

In contrast to these frail scraps of support, it is telling what the record lacks: a single example, from any point in recent (or even distant) American history, when the announcement of a change in immigration policy caused a swift (or even delayed) change in the rate of unlawful

migration. Not one. *See East Bay*, 385 F. Supp. 3d at 951 ("Why is there no objective evidence to link a similar announcement and a spike in border crossings or claims for relief?"). That omission is all the more notable given that the Federal Government collects enormous amounts of data on migrants seeking admission to this country, *see, e.g.*, AR589-634 (statistical report by the Planning, Analysis, & Statistics Division of the Executive Office for Immigration Review), and so would presumably know whether a sizable number of apprehended migrants traveled to this country in response to an expected change in immigration policy. That the Government does not identify such evidence is strong reason to suspect it does not exist.[2]

Indeed, the D.C. Circuit rejected invocation of the good cause exception for remarkably similar reasons in *Tennessee Gas Pipeline*. There, the Federal Energy Regulatory Commission invoked the good cause exception based on a rationale much like the one the Government offers here: It claimed that if it delayed implementation of a new rule restricting pipeline construction, companies would "seek to avoid [the] rule by rushing new construction and replacements," thereby causing "damage to the environment." 969 F.2d at 1145. The court rejected the agency's claim because it "provided little factual basis" to support its prediction of a "rush." *Id.* The court observed that even though the applicable pipeline regulation had "been in effect for

---

[2] The Government claims that it invoked a similar "surge" rationale in connection with prior rules. *See* 84 Fed. Reg. at 33,841. But most of those policies did not involve such a rationale at all, and each of those rules—unlike this one—was justified by direct evidence that substantiated the claimed harm. *See Mid-Tex*, 822 F.2d at 1132 (explaining that the good cause inquiry "is inevitably fact- or context-dependent"); *cf. Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004) (describing "urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders" in light of recent rescues of "hundreds of aliens in distress" and discovery of "40 aliens who have died in an attempt to enter the U.S."); *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, As Amended*, 81 Fed. Reg. 5906, 5906-5907 (Feb. 4, 2016) (invoking good cause to address "fraud and security concerns that have developed subsequent to [a prior] rule's publication"); *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4769, 4770 (Jan. 17, 2017) (stating that "DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States "through dangerous" means).

some forty years," the agency "cited only one case" in which a pipeline company had engaged in comparable conduct—too "thin [a] reed," the court said, "on which to base a waiver of the APA's important notice and comment requirements." *Id.* Likewise, the court rejected the Commission's claim that its "practical experience" supported its prediction, countering that "if the agency ha[d] . . . a wealth of practical experience," it should not have been "forced to rely on the 'self-evident' need for the interim rule." *Id.* at 1146.[3]

Here, the evidence the agency relies on for its 'surge' is at least as "thin" as the evidence for a 'rush' in *Tennessee Gas Pipeline*. Tr. of Oral Ruling at 11. And the Government's dearth of evidence, after far more than four decades of immigration restrictions, belies its conclusory claim that "experience" supports its prediction of a surge. 84 Fed. Reg. at 33,841; *cf. Sorenson*, 755 F.3d at 707 (explaining that "something more than unsupported assertion is required" to "establish good cause"). Simply put, the Government "[l]acks record support proving the emergency" it claims. *Sorenson*, 755 F.3d at 707.

*Second*, even if the Government had adequate record basis for its hypothesis of a "surge," it would still falter at the second step of its good cause argument: that a surge "would jeopardize the lives and welfare of aliens who surge to the border," "be destabilizing to the region," and "destabiliz[e] . . . the U.S. immigration system." 84 Fed. Reg. at 33,841. Each of these alleged

---

[3] The D.C. Circuit also distinguished *Mobil Oil Corp. v. U.S. Dep't of Energy*, 728 F.2d 1477 (Temp. Emer. Ct. App. 1983). In that case, the Federal Energy Administration invoked the good cause exception for a rule "equaliz[ing] prices charged to different class of customers by oil refiners during the energy crisis of the early 1970s," on the ground that "advance notice of the regulation would lead to regulatory avoidance by way of long-term contracts." *Tenn. Gas Pipeline*, 969 F.2d at 1146. The D.C. Circuit explained that *Mobil Oil Corp.* involved "special circumstances that set it apart from" *Tennessee Gas Pipeline*: "[i]t is well recognized that prices can be changed rapidly to accommodate shifts in regulatory policy," whereas "[c]onstruction and replacement projects . . . are planned well in advance and take time to accomplish." *Id.* The same distinction holds here. There is no evidence that migration rates "change[ ] rapidly to accommodate shifts in [immigration] policy." And fleeing one's home and traveling to the United States is a decision that also takes considerable "time to accomplish." *Id.*

harms is either unsupported by the record or legally insufficient to justify the good cause exception.

The record affirmatively contradicts the claim that barring migrants from seeking asylum in this country—and instead requiring them to remain in Mexico or return to the Northern Triangle—protects migrants' lives and welfare.  Crossing the southern border undoubtedly poses risks to migrants, and several tragic deaths have occurred during or shortly after such crossings. *See, e.g.*, AR684.  But the administrative record makes clear that those risks are dramatically eclipsed by the dangers migrants face in Mexico and the Northern Triangle.  While transiting through Mexico, approximately 68% of migrants are exposed to violence, and almost one-third of refugee and migrant women are sexually assaulted.  AR290, 703.  And the Northern Triangle is undergoing "unprecedented level[s] of violence," with 43.5% of migrants reporting that a relative died of violence in the last two years.  AR290, 293-294.  The Government cannot plausibly claim, and has not seriously attempted to argue, that migrants are safer in Mexico or the Northern Triangle than in the United States, even accounting for the risks inherent in a border crossing.  That is enough to defeat this argument.

The record is similarly bereft of support for the claim that a surge would "be destabilizing to the region."  The Rule itself does not explain how the region would be destabilized by an increase in migration to the United States over a short period of time.  *See* 84 Fed. Reg. at 33,841 (making this statement without explanation).  The Government has never pointed to evidence supporting such a claim.  And it is doubtful that such a nebulous harm could establish good cause in any event, *see Sorenson*, 755 F.3d at 706 (good cause limited to imminent threats to "life or physical property"), particularly given that the APA continues a separate exception for rules "involv[ing] . . . foreign affairs function[s]."  5 U.S.C. § 553(a)(1).

That leaves the Government's argument that a surge would "destabiliz[e] . . . the U.S. immigration system." 84 Fed. Reg. at 33,841. We may assume for the sake of argument that a temporary uptick in immigration would impose increased costs on federal agencies responsible for immigration enforcement. *See id.* at 33,839 (claiming that increased immigration consumes "scarce government resources"). But an administrative and fiscal cost of this kind is not sufficient to invoke the good cause exception. The good cause exception, as the D.C. Circuit has repeatedly made clear, is limited to emergencies involving "imminent" threats to "life or physical property." *Sorenson*, 755 F.3d at 706; *Mack Trucks*, 682 F.3d at 93-94; *Jifry*, 370 F.3d at 1179. An "agency's concern for its (or its components') own bottom line," or a felt need to "save the agency resources," is not enough to establish the requisite "emergency." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 17-18 (D.D.C. 2017); (citing *Sorenson*, 755 F.3d at 706). And if "fiscal calamity" were ever sufficient to invoke good cause—a question the D.C. Circuit has expressly reserved—*Sorenson* made clear that an agency must at minimum be able to establish "when [its program] expected to run out of money, whether [it] would run out of money before a notice-and-comment period could elapse, or whether there [a]re reasonable alternatives available" to forestall the threat. *Sorenson*, 755 F.3d at 707. Defendants have not made any of those showings: They have not attempted to quantify the magnitude of the "surge" they predict, let alone shown (or even claimed) that it would impose such significant costs on the system as to create a fiscal emergency.[4] Defendants have accordingly "failed to demonstrate sufficient cause for setting aside [the APA's] important safeguards." *Tenn. Gas Pipeline*, 969 F.2d at 1146.

---

[4] Notably, Defendants have not claimed that any temporary increase in immigration would harm the life or physical property of third parties. *See* 84 Fed. Reg. at 33,838-40 (describing "anticipated effects of the rule"). And the record contains no evidence that asylum seekers pose any such threat.

2. *The foreign affairs exception does not apply.*

The foreign affairs exception exempts rules from the APA's procedural requirements where they "involve[ ]" a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). An agency may not invoke this exception merely because a rule "implicate[s] foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). "'[I]mmigration matters typically implicate foreign affairs' at least to some extent," and Congress plainly did not intend to "eliminate[ ] public participation in this entire area of administrative law." *City of New York v. Permanent Mission of India to United Nations,* 618 F.3d 172, 202 (2d Cir. 2010) (quoting *Yassini*, 618 F.3d at 1360 n.4). Rather, the APA requires that a rule "*involv[e]*" a "foreign affairs *function* of the United States." 5 U.S.C. § 553(a)(1) (emphases added). The "paradigm case" is a rule that carries out a "diplomatic function," such as a rule that regulates the conduct of foreign diplomats or implements a treaty. *Permanent Mission*, 618 F.3d at 202 (rule concerned "the treatment of foreign missions"); *see Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (rule "did no more than implement an agreement between the United States and Mexico"); *Am. Ass'n of Exporters & Importers-Textile and Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (rule entailed exercise of "the President's foreign affairs power"). Some Circuits have held that this exception extends further, to circumstances in which delaying implementation of a rule would "provoke definitely undesirable international consequences," such as prolonging a diplomatic crisis or causing the United States to renege on an international agreement. *Yassini*, 618 F.2d at 1360 n.4; *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Am. Ass'n of Exporters & Importers*, 751 F.2d at 1249. *Jean v. Nelson*, 711 F.2d 1455, 1477-78 (11th Cir. 1983). But even under that more generous construction, it is critical that an agency point to evidence in "the record" showing "how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed

18

by a thirty-day period of notice and comment, is necessary for negotiations" or some other diplomatic function.  *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252-1253 (9th Cir. 2018).   There must be "evidence of undesirable international consequences that would result *if rulemaking were employed*."  *Jean*, 711 F.2d at 1478 (emphasis added).

In this case, Defendants have not met that burden.  The Rule plainly falls outside the "paradigm case"; it involves "immigration," not diplomacy or the execution of a treaty. *Permanent Mission*, 618 F.3d at 202.  And Defendants have neither identified nor produced record support showing that there would be "definitely undesirable international consequences" if rulemaking procedures were employed.

On the contrary, Defendants' principal argument for invoking the foreign affairs exception is precisely the one courts have long deemed insufficient:  They claim that "[t]he flow of aliens across the southern border . . . directly *implicates* the foreign policy and national security interests of the United States" and that the Rule will "strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations."  84 Fed. Reg. at 33,841-42 (emphasis added).  That argument merely claims that the rule "implicate[s] foreign affairs," as every immigration rule does. *Yassini,* 618 F.2d at 1360 n.4.  It does not show that *delaying implementation* of the rule would "provoke definitely undesirable international consequences."  *Id.*

When Defendants do gesture toward that burden, they fall woefully short.  Defendants posit that "negotiations [with other countries] would be disrupted if notice-and-comment procedures" were allowed, because "public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries."  84 Fed. Reg. at 33,842.  But the Rule does not eliminate the right to comment; it

just implements the Rule during the comment period.  *See East Bay*, 385 F. Supp. 3d at 949 (noting that "the Rule actually *invites* public comment" (citing 84 Fed. Reg. at 33,830)).  Thus, even if allowing individuals to post comments on an administrative docket somehow affected goodwill more than the public debate that always attends immigration issues (a dubious proposition), the Rule does nothing to prevent that outcome.

Defendants also suggest that immediate implementation of the rule would somehow aid "long-term U.S. relations with Mexico and the Northern Triangle countries" by "address[ing] the enormous flow of aliens through these countries to the southern border."  84 Fed. Reg. at 33,842.  But the Rule gives no reason why "long-term . . . relations" would be affected if the Rule's implementation were briefly delayed following its announcement.  Furthermore, the Government does not explain why Mexico and the Northern Triangle countries would prefer (as opposed to strenuously object to) a U.S. policy of unilaterally turning away large numbers of asylum seekers and leaving them instead on its neighbor's doorstep.  Indeed, at oral argument, the Government's counsel made the opposite claim, arguing that the Rule "puts pressure on our . . . international partner[s]" and increases "the onus on those countries."  Tr. of TRO Hr'g at 99:19-102:4.

The Rule thus falls far outside even the broadest construction that courts have given the foreign affairs exception.  The Government's failure to follow the APA's notice-and-comment and pre-implementation delay requirements was unlawful, and the Rule should be enjoined on that basis.  *See East Bay*, 385 F. Supp. 3d at 950-951; *East Bay*, 2019 WL 3850928, at *1.

### B.    The Rule Violates 8 U.S.C. § 1158.

The Rule is also unlawful because it "fundamentally conflicts with the [approach] Congress took in enacting mandatory bars based on a safe option to resettle or pursue other relief in a third country."  *East Bay*, 385 F. Supp. 3d at 945.

Section 1158 gives "[a]ny alien who is physical present in the United States" the right to seek asylum.  8 U.S.C. § 1158(a).  It then sets forth a list of carefully drawn exceptions to that right, delineating the circumstances in which Congress thought an alien should be ineligible to seek or obtain asylum.  *Id*. § 1158(a), (b).  After that list, Section 1158 gives the Attorney General the residual power to "establish *additional* limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum."  *Id*. § 1158(b)(2)(C) (emphasis added).  The Rule at issue here employs that residual authority to override two of the carefully drawn limitations that Congress enacted into law.  That renders the Rule unlawful: "[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority."  *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018).  In support of this argument, Plaintiffs hereby incorporate by reference the following pages from their TRO briefs:  Mem. in Support of Pls.' Mot. for TRO (hereinafter "Pls.' TRO Br.") at 6-17, Dkt. 3-1; Reply in Support of Pls.' Mot. for TRO (hereinafter "Pls.' TRO Reply") at 8-16, Dkt. 22.

A few additional points.  At the TRO hearing, Defendants characterized Plaintiffs' position as a form of preemption.  They said that Plaintiffs' argument "rests on . . . this idea that" the safe-third-country provision and firm-resettlement bar "occupy the field of anything about a relationship" with another country.  Tr. of TRO Hr'g at 58:3-13; *see* Tr. of Oral Ruling at 10 (tentatively accepting that characterization).  That is inaccurate.  The theory is not that Congress has preempted a category of Executive action; it is that the Executive cannot use a residual authority to override the limits Congress has placed on exceptions to asylum eligibility.  In other words, Plaintiffs' argument rests not on preemption but on the elementary principle that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."

*Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000).  The Rule clearly violates that principle for three reasons.

*First*, the Rule is the product of effectively striking out language from the text of the provisions that Congress actually enacted.  The Rule takes a red pen to the limited safe-third-country and firm-resettlement exceptions, replacing the limits Congress imposed with far broader limits that Defendants prefer.  Pls.' TRO Br. at 9-12.  The Rule has effectively rewritten Section 1158(a)(2)(A) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed~~, pursuant to a bilateral or multilateral agreement,~~ to a country ~~(other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and~~ where the alien <u>was present and </u>would have access to a ~~full and fair~~ procedure for determining a claim to asylum ~~or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States~~.

And the Rule has rewritten Section 1158(b)(2)(A)(vi) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that . . . the alien was ~~firmly resettled~~ in another country prior to arriving in the United States.

Defendants cannot "rewrite clear statutory terms" in this manner.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).[5]

*Second*, the Rule leaves both the safe-third-country and firm-resettlement provisions with no real work to do.  Practically speaking, any alien subject to the Rule will necessarily be subject to the firm resettlement bar or the safe-third-country provision.  The Rule thus renders those

---

[5] Defendants argued at the TRO hearing that the addition of the phrase "was present" is significant, and shows that the Rule is addressed to a "different situation" than the safe-third-country provision.  Tr. of TRO Hr'g at 59-60, 69.  That is incorrect.  *Any* alien who is seeking asylum in this country who has crossed the southern border and has forgone some opportunity to seek asylum—that is, any alien subject to the Rule—has *necessarily* been "present" in another country where she could have sought asylum: Mexico.

statutory provisions superfluous.  Worse than that, it expands them in a manner that overthrows congressionally drawn limits: The firm resettlement bar requires a certain quality and duration of contact with another country, and the safe-third-country provision requires, as the name would imply, that the alternative forum for asylum be *safe*.  The Rule disregards those requirements. "While the firm resettlement bar requires a determination regarding each alien's individual circumstances, and the safe third country bar requires a formalized determination as to the individual country under consideration, the Rule ignores an applicant's individual circumstances and categorically deems most of the world a 'safe option' without considering—or, as set forth below, in contravention of—the evidence in its own record." *East Bay*, 385 F. Supp. 3d at 944.

*Third*, the Rule countermands the balance that Congress struck in the safe-third-country and firm-resettlement provisions.  Those provisions balance competing interests.  One interest is to relieve burdens on the asylum system by requiring aliens to apply or resettle elsewhere.  But another, equally important interest is confirming that the third country is in fact safe and has a fair asylum process, and that the alien is in fact "firmly resettled in" rather than merely transiting through that other country.   By striking an appropriate balance, these provisions assure that asylum law can continue to fulfill its humanitarian purposes and the United States' international obligations.  When Congress strikes a particular balance in this way, it is not for the Executive to restrike the balance.  Again, "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen*, 529 U.S. at 583 (internal quotation marks and citation omitted); *see Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage").

That principle is especially apt for a statute that explicitly requires any regulation to be "consistent with" the statutory scheme as a whole.  8 U.S.C. § 1158(b)(2)(C).  To this day, Defendants have not provided a persuasive explanation of what work the words "consistent with" are doing in the statute.  When pressed at oral argument to identify something that would not be "consistent with" Section 1158, the best they could come up with was a regulation that allowed for asylum applications up to 18 months after entering the United States, even though the statute requires applications within a year.  Tr. of TRO Hr'g at 60-61.  The problem with that example is that it is already covered by the requirement that any new "limitation" on asylum eligibility be "*additional*."  *Id*. (emphasis added).  In other words, the Attorney General is only authorized to promulgate "additional limitations," and to vitiate an already-existing limitation is not to impose an "additional" one.  So, Defendants still have not identified any work that "consistent with" is doing in the statute.

In short, the Rule countermands both the safe-third-country provision and the firm-resettlement bar, and should be set aside as unlawful for that reason, as well.[6]

## C.     The Rule Is Arbitrary And Capricious.

As the District Court found in *East Bay*, the Rule is also arbitrary and capricious: It is premised on conclusions that are contradicted by the record and entirely neglects a crucial aspect of the problem it purports to address.  It therefore violates the APA and must be set aside for that reason too.  *East Bay*, 385 F. Supp. 3d at 951-957.

The APA requires an agency, when issuing rules and regulations, to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n. of United*

---

[6] The Rule also violates the TVPRA. Plaintiffs hereby incorporate by reference the following portions of their prior briefs: Pls.' TRO Br. 16-17; Pls.' TRO Reply 16.

*States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  Agency action is arbitrary and capricious under the APA—and therefore must be set aside—if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*; *see also California Communities Against Toxics v. EPA*, 928 F.3d 1041, 1056-57 (D.C. Cir. 2019).  The Rule fails this standard.

1.  The Rule is built on the premise that individuals who transit through third countries but do not seek asylum there generally lack meritorious asylum claims.  *See* 84 Fed. Reg. at 33,839.  According to the Rule, choosing "not to seek protection at the earliest possible opportunity" signals a lack of an "urgent or genuine need for asylum."  *Id.* at 33,831, 33,839.  But "the government cites nothing in the administrative record to support the inference."  *East Bay*, 385 F. Supp. 3d at 946.  In fact, the record tells a very different story:  Migrants do not seek asylum in Mexico because remaining in Mexico may expose those migrants to the very dangers they are attempting to flee.  *Id.* at 947.

The record is replete with reports, articles, and studies cataloguing the dangers migrants face in Mexico.  Migrants travelling through Mexico "are often easy prey" for gangs—one of the very menaces many Northern Triangle migrants are fleeing.  AR292.  Violence towards migrants is disturbingly high: "68.3 percent of the migrant and refugee populations entering Mexico reported being victims of violence during their transit toward the United States."  AR290; *see also* AR703 (similar).  Migrant women, in particular, are targets.  "[A]lmost one third of refugee and migrant women ha[ve] been sexually assaulted" while travelling across Mexico.  AR703.  Other "women and girls have been trafficked to Mexico's southern border where they have been

exploited in bars and night clubs that cater to police, military, and other forces." AR703. This last point—terror by state forces—is repeatedly mentioned by the record. *See* AR290 (report noting that migrants had been victimized by "members of the Mexican security forces responsible for their protection."); AR292 ("Torture is inflicted by governmental security actors."); AR775 (noting that migrants "suffer violence and other abuses at the hands of . . . corrupt migration authorities."). In short, "refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico." AR703.

Migrants are often targeted over the very traits for which they seek asylum: "their race, nationality, gender, sexual orientation, [and] gender identity." AR703. In particular, LGBTQ and indigenous peoples "face consistent persecution in Mexico and are often forced to seek protection outside of the country." AR703. The record explains that "[t]he Inter-American Commission on Human Rights, an arm of the Organization of American States, has spoken out against the high rates of violence against L.G.B.T. people in Central American countries and Mexico and has noted that the crimes against them are often committed with impunity." AR759.

The Rule wholly fails to grapple with these facts, and instead offers the conclusory statement that a person who travels through another country, but did not seek asylum there, likely has a meritless asylum claim. But "[a] conclusory statement, of course, does not in itself provide the 'satisfactory explanation' required in rulemaking." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 392 (D.C. Cir. 1992) (citation omitted).

2. The Rule is arbitrary and capricious in a second way: It asserts that a migrant crossing Mexico or Guatemala—two countries that anyone travelling on the ground from the Northern Triangle to the United States must traverse—"could have obtained protection" there. 84 Fed. Reg. at 33,831; *see also id.* at 88,839 (claiming that migrants cross "multiple countries in which

they may seek humanitarian protection."). But it offers *no* evidence-based explanation for why that is the case.

Turning first to Mexico, the Rule claims that Mexico has a "functioning asylum system" because it is a party to the Refugee Convention and the Refugee Protocol, and because "Mexico has expanded its capacity to adjudicate asylum claims in recent years." 84 Fed. Reg. at 33,838, 33,839. But the fact that Mexico has signed the Convention and Protocol is not itself evidence of a functioning asylum system. *East Bay*, 385 F. Supp. 3d at 952. And the record evidence shows that the Mexican asylum system will not be able to handle the massive influx of new asylum seekers that the Rule will channel to Mexico.

To begin, the Rule's claim that Mexico's asylum system is *currently* "functioning" well, 84 Fed. Reg. at 33,838, "runs counter to the evidence" in the record, *State Farm*, 463 U.S. at 43. The record contains a United Nations High Commission on Refugees report from April 2019 concluding that there is a "lack of information to access the asylum procedure." AR533. Compounding that issue, "75 percent of migrants and asylum seekers . . . were not informed of their right to seek asylum by migration officers in detention facilities." AR703; *see also* AR772 ("Adult and child migrants in need of international protection are not routinely informed about their rights or screened for international protection concerns as is required by Mexican law.").

Worse yet, the record indicates that Mexico is a repeat violator of the non-*refoulement* principle. *See* AR306 ("[T]he non-refoulement principle is systematically violated in Mexico."); AR703 ("Mexican authorities continue to improperly return asylum seekers to their countries of persecution."); AR708 (report from Amnesty International cataloguing instances of *refoulement*). Indeed, the record suggests that the "default process" is for Mexican immigration officials to coerce detained migrants into "signing a number of papers, accepting their 'voluntary return' to

27

their country and waiving their rights to present legal arguments in their favour within the stipulated 15-day procedural window."  AR717.  Given that U.S. asylum law is "based on the principle of 'non-refoulement,'" this breach alone calls for an explanation.  AR444.

But even if a migrant (1) is told that she can seek asylum and (2) avoids the default process of *refoulement*, the record contains substantial evidence highlighting the procedural issues afflicting Mexico's asylum regime.  Migrants face "an untenable 30-day filing deadline."  AR703.  There are "expedited deportation procedures that do not consider individual exposure to violence."  AR306.  Asylum officers routinely rule that "refugees targeted by groups with national reach can safely relocate within their countries."  AR703.  And the system "lack[s] an effective appeal process to correct wrongful denials of protection."  *Id.*

But these shortcomings are only the beginning, because the Rule depends not just on the *current* functioning of Mexico's asylum system but on its capacity to withstand a relatively significant increase in asylum seekers.  The last time Mexico expanded protections to migrants, it was quickly overwhelmed.  AR683; AR688.  And the record contains substantial evidence that the Mexican asylum agency is already at the breaking point.  The agency is "[b]uckling under surging asylum applications and the lowest budget in years."  AR699; *see also* AR700 (head of agency decrying that agency was "overwhelmed" and "simply trying to survive").  It has only four offices (AR703) and a "limited . . . presence in the South" and in other "key locations" (AR534).  Accordingly, "[r]efugee processing in Mexico remains plagued by backlogs and understaffing."  AR703.  Circumstances have grown so dire that the agency has turned to the United Nations for assistance.  AR700.

It is incontrovertible that the Rule would result in a massive uptick in asylum applications in Mexico.  The Rule itself projects that, even independent of the Rule, Mexico in 2019 will

receive more than *five times* as many asylum claims as it did in 2016.  84 Fed. Reg. at 33,839-40.

Meanwhile, "[b]y any reasonable estimation, the Rule anticipates that tens of thousands of

additional asylum claimants—i.e., most of the persons who would otherwise seek asylum in the

United States—will now seek relief in Mexico."  *East Bay*, 385 F. Supp. 3d at 952.  "The Rule

does not even acknowledge this outcome, much less suggest that Mexico is prepared to

accommodate such a massive increase."  *Id*.  As the *East Bay* Court aptly summarized:

> [T]he bulk of the administrative record consists of human rights organizations
> documenting in exhaustive detail the ways in which those seeking asylum in Mexico are
> (1) subject to violence and abuse from third parties and government officials, (2) denied
> their rights under Mexican and international law, and (3) wrongly returned to countries
> from which they fled persecution. Yet, even though this mountain of evidence points one
> way, the agencies went the other—*with no explanation*.  This flouts "[o]ne of the basic
> procedural requirements of administrative rulemaking," namely "that an agency must
> give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.
> 2117, 2125 (2016).  Its failure to do so here, particularly viewed against the mass of
> contrary evidence, renders the agencies' conclusion regarding the safety and availability
> of asylum in Mexico arbitrary and capricious.

*Id*. at 955-956.  And that failure is fatal to the Rule:  *Every* alien subject to the Rule must pass

through Mexico, and almost every alien therefore must apply for asylum in Mexico prior to

applying in the United States.  *Id.* at 956 & n.25.  "[I]f the agencies are wrong about Mexico, the

Rule is wrong about everyone it covers."  *Id.* at 956.

That said, at least the Rule and the record paid lip service to Mexico's asylum system.

Besides a passing reference to Guatemala's agreement to the Refugee Convention and the

Refugee Protocol, *see* 84 Fed. Reg. at 33,839, the Rule is wholly silent as to the adequacy of

Guatemala's asylum regime, another country through which many asylum seekers transit *en

route* to the United States.  The record is tellingly devoid of evidence on this point, besides an

article recounting "concerns over Guatemala's ability to provide shelter and assistance to asylum

seekers crossing into the country from Honduras and El Salvador."  AR636-637.  The Rule

"offers no sensible explanation at all for that gap in substantiation, nor does it even acknowledge the consequences of its omission." *Envt'l Def. Fund v. EPA*, 922 F.3d 446, 454 (D.C. Cir. 2019). That, too, renders it invalid.

3. Finally, the Rule is arbitrary and capricious because it fails to exempt unaccompanied children, as defined in 6 U.S.C. § 279(g)(2), from its coverage.   Congress afforded unaccompanied children special rights under the Immigration and Nationality Act ("INA") and the Trafficking Victims Protection Reauthorization Act ("TVPRA"):   Unaccompanied children have the right to present their asylum case first to a USCIS asylum officer in a non-adversarial setting, 8 U.S.C. § 1158(b)(3)(C), and unaccompanied children are exempt from the safe-third-country bar, 8 U.S.C. § 1158(a)(2)(E).   These explicit congressional protections make unaccompanied children "an important aspect of the problem" for an agency constricting asylum eligibility to consider. *State Farm*, 463 U.S. at 43.   And yet the Rule revokes those protections without an adequate explanation. *See supra* pp. 24-29; *East Bay*, 385 F. Supp. 3d at 956.   The Rule thus violates the APA and must be set aside. *See State Farm*, 463 U.S. at 43.

## III.   The Rule Inflicts Irreparable Harm On Plaintiffs.

Each of the Plaintiffs also satisfies the second prerequisite for a preliminary injunction: They will "suffer irreparable harm before a decision on the merits can be rendered." *Nat'l Parks Conservation Ass'n. v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017) (internal quotation marks, citation, and emphasis omitted).   At the TRO stage, the Court found that two of the organizational Plaintiffs had not shown, "on th[e] limited record" then present, that they would suffer irreparable harm within the two-week "time frame of a TRO."   Tr. of Oral Ruling at 7:4-9:10.   But things have changed substantially since then.   Plaintiffs now include nine individual "asylum seekers affected by this rule," *id.* at 9:5, several of whom are clients of RAICES; the organizational Plaintiffs (which now also include HRF), have submitted supplemental

declarations addressing the factual issues that this Court identified in its TRO ruling; and the lengthened time frame of a preliminary injunction relative to a TRO—from two weeks to as much as two years—eliminates any uncertainty that the organizational and individual Plaintiffs would face irreparable harm during the relevant time period.

### A.     The Individual Plaintiffs Will Be Irreparably Harmed Absent An Injunction.

There can be no real doubt that the individual Plaintiffs would suffer irreparable harm absent an injunction.  All of the individual Plaintiffs are asylum seekers subject to the Rule. Many of them had the Rule applied against them before it was enjoined, and were issued negative credible-fear determinations—that is, summarily denied asylum—as a result.  *See supra* pp. 4-5.  If the Rule remains in effect outside the Ninth Circuit during the pendency of this litigation, these individuals will once again be categorically denied asylum and subjected to the grave harms that entails.

That risk is "certain and great," and "not theoretical."  *Chaplaincy v. of Full Gospel Churches England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citation omitted).  The terms of the Rule mandate that individuals subject to its terms (as Plaintiffs indisputably are) be "found ineligible for asylum."  84 Fed. Reg. at 33,843.  And that harm is "imminen[t]."  *Chaplaincy*, 454 F.3d at 297 (internal quotation marks, citation, and emphasis omitted).  As the facts of Plaintiffs' cases illustrate, the entire expedited-removal process—from credible-fear screening to immigration-judge review—frequently takes less than two weeks.  *See supra* pp. 4-5 & n.4; *see also* 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III) (requiring that immigration judge review credible-fear determination "in no case later than 7 days" after it is rendered, and that aliens found to lack a credible fear be removed "without further hearing or review").  Plaintiffs are therefore at great risk of removal even during the pendency of this Motion.  And in the event that the Government chooses not to use expedited procedures to remove some of those aliens, most of the individual

Plaintiffs have already received notices attempting to initiate full removal proceedings.  *See* Am. Compl. ¶¶ 33, 39, 59, 63.  Those proceedings are often conducted in a matter of months after such a notice is issued, *see, e.g.*, Cubas Supp. Decl. ¶ 15, Garza Pareja Supp. Decl. ¶ 16, after which time these Plaintiffs would be subject to prompt removal.

In addition, the denial of asylum is an injury "beyond remediation."  *Chaplaincy*, 454 F.3d at 297.  Removal from this country is inherently a serious and irreparable injury, which carries irreversible practical and legal consequences.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (describing "'the grave nature of deportation'—a 'drastic measure,' often amounting to lifelong 'banishment or exile'" (citations omitted)); *see also, e.g.*, 8 U.S.C. § 1158(a)(2)(C) (rendering alien ineligible to apply for asylum "if the alien has previously applied for asylum and had such application denied").  For Plaintiffs, removal would also mean return to countries in which they have faced severe persecution, violence, and death threats.  *See, e.g.*, J.M.M. Decl. ¶¶ 3-8 (fleeing extortion, beatings, and sexual abuse by gang members in El Salvador); D.L.R. Decl. ¶¶ 3-12 (fleeing government persecution in Cuba, including arrests and assault, due to her opposition to communism); Z.B.M. Decl. ¶¶ 3-11 (fleeing kidnapping, beatings, and death threats by police officers because of her Jehovah's Witness affiliation and tribal membership in Angola); Y.G.C. Decl. ¶¶ 4-6 (fleeing death threats and extortion by a suspected gang member in Guatemala); M.Y.R.B. Decl. ¶¶ 5-12, 15 (fleeing extortion and death threats by gang members and violence due to her indigenous background in Guatemala, as well as extortion, threats, and assault while transiting Mexico); K.M.V.M. Decl. ¶¶ 2-12 (fleeing death threats by gang members in Honduras); C.C.R.O. Decl. ¶¶ 3-9 (child fleeing death threats due to her brother's sexual orientation in Honduras); W.M.R.O. Decl. ¶¶ 3-8 (same); N.G.R.L. Decl. ¶¶ 3-8 (child fleeing threats and rape by her stepfather in Honduras, as well as safety concerns while transiting

Mexico).   Asylum officers and immigration judges found all of those risks to constitute a "credible fear of persecution" during the period when the Rule was enjoined.  J.M.M. Decl. ¶ 9; D.L.R. Decl. ¶ 14; Z.B.M. Decl. ¶ 17; Y.G.C. Decl. ¶ 11; M.Y.R.B. Decl. ¶ 17; K.M.V.M. Decl. ¶ 20.  Courts have found the denial of asylum to constitute an irreparable harm where aliens face such threats.  *See, e.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504-05 (C.D. Cal. 1988).

It makes no difference that Plaintiffs could still attempt to seek protection under the withholding of removal statute or the Convention Against Torture ("CAT").  As the Rule acknowledges, those statutes impose a "significantly higher" burden for aliens to obtain relief. 84 Fed. Reg. at 33,836-37; *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 431, 440 (1987) (obtaining withholding of removal or CAT protection effectively requires a migrant to demonstrate a 51% chance of persecution or violence, contrasted to showing a 10% chance of such harm for asylum); Am. Compl. ¶¶ 165, 183 (same).  Subjecting aliens to a heightened risk of removal and denying them their statutory entitlement to seek asylum are themselves irreparable injuries.  *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 43-44 (D.D.C. 2017) (finding irreparable injury where government is "blocking access to an existing legal avenue for avoiding removal"); *Apotex, Inc. v. FDA*, No. Civ.A. 06-0627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (loss of "a statutory entitlement" constitutes "a harm that has been recognized as sufficiently irreparable" to merit preliminary injunctive relief).  Further, withholding of removal and CAT relief do not confer the same benefits as asylum, including derivative beneficiary status for an alien's spouse and children, work authorization, and eligibility for means-tested public benefits.  *See* 84 Fed. Reg. at 33,834; Am. Compl. ¶¶ 94-96, 173 (citing 8 U.S.C. §§ 1158(b)(3)(A), (c)(1)(A)-(C), 1427(a), 1613(b)(1)).  Denying an alien

the right to live with her family, work, or receive government assistance are all irreparable harms, as well.  *See, e.g.*, *Leiva-Perez*, 640 F.3d at 969-970; *Grijalva v. Ilchert*, 815 F. Supp. 328, 331 (N.D. Cal. 1993).

**B.     The Organizational Plaintiffs Will Be Irreparably Harmed Absent An Injunction.**

The organizational Plaintiffs will also suffer irreparable injury absent an injunction. Plaintiffs have already described the types of injuries the Rule will inflict on these organizations, and hereby incorporate those arguments by reference.  Pls.' TRO Br. at 23-26; Pls.' TRO Reply at 20-22.  Two critical changes since the TRO stage have also made clear those injuries would be irreparable.

First, Plaintiffs have supplemented the record to remove any doubt that the Rule would drastically reduce the number of clients they can serve.   As all of the organizations have explained, their missions include helping as many asylum-seekers as possible to obtain the unique statutory benefits of asylum.  Cubas Decl. ¶¶ 4, 8-9, 14, 39 (CAIR Coalition's mission is "to serve as many detained immigrants lawfully seeking asylum as possible"); Cubas Supp. Decl. ¶¶ 3, 4; Garza Pareja Decl. ¶¶ 4, 7-8, 33-37; Garza Pareja Supp. Decl. ¶¶ 3; McBride Decl. ¶¶ 13, 21, 32.  RAICES, CAIR Coalition, and HRF explain that, based on a review of their client-base statistics and their experience since the Rule was implemented, the "vast majority" of their clients are subject to the Rule and fall outside the scope of the limited *East Bay* injunction. Cubas Supp. Decl. ¶¶ 4, 6-7; Garza Pareja Supp. Decl. ¶ 5; McBride Decl. ¶ 21.  In light of the increased difficulty of representing these clients in withholding of removal and CAT proceedings, and the associated outlays of resources necessary to adjust to the Rule, CAIR Coalition estimates that it would be "able to serve 50% fewer asylum seekers" while the Rule is in effect, Cubas Supp. Decl.¶ 19; and RAICES estimates that it would "be able to serve less than

half as many asylum seekers" as they serve today, Garza Pareja Supp. Decl. ¶ 19.  *See also* McBride Decl. ¶ 17 (due to increased per-case resources under the Rule, HRF "invariably" will be able to assist fewer clients).

Second, there is no longer any doubt that the Rule will irreparably harm these organizations' ability to carry out their missions during the "time frame of a[n] [injunction]."  Tr. of Oral Ruling at 8:9-10.  As noted above, expedited removal proceedings occur—and indeed are required by statute to occur—in a few weeks.  *See supra* p. 4 n.4.  Many of the organizational Plaintiffs' clients—including the individual Plaintiffs, several of whom are clients of RAICES— are placed into such proceedings.  *See, e.g.*, Garza Pareja Decl. ¶ 8; Cubas Decl. ¶¶ 6, 7, 10.  And despite the organizations' efforts, individuals are dramatically more likely to be removed in these proceedings if they are ineligible for asylum, given the five-fold increase in a migrant's burden under the withholding of removal and CAT statutes as compared to the asylum statute.  *See Cardoza-Fonseca*, 480 U.S. at 431, 440.  While there may have been uncertainty as to whether removals would occur during the two-week life of a TRO, it is a "virtual certainty" that many of the organizations' clients will be removed from the country during the months or years in which a preliminary injunction would be in effect.  Cubas Supp. Decl. ¶ 5; Garza Pareja Supp. Decl. ¶ 4; McBride Decl. ¶ 13.

It follows that the organizational Plaintiffs will suffer irreparable harm absent a preliminary injunction.  The D.C. Circuit has made clear that an organization suffers irreparable injury where (1) the challenged policy makes it "more difficult" for the organization to assist persons whom its primary mission is to help, and (2) the organizations must provide that assistance to individuals by a particular time, after which " 'there can be no do over and no redress.' "  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation

omitted); *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017).[7]

The Rule will cut roughly in half the number of persons the organizations can help protect from

removal.  And the organizations have at most a few weeks to fulfill their mission of helping any

given individual, after which the individuals will be removed, and "there can be no do over and

no redress."  *League of Women Voters*, 838 F.3d at 9.  In short, the organizations' ability to help

countless individuals will irrevocably pass while this litigation is ongoing.  That is an irreparable

blow to their missions.[8]

## IV.     The Public Interest And Balance Of Equities Weigh In Favor Of Injunctive Relief.

The public interest and the balance of the equities also favor entry of injunctive relief.

There is always "a public interest in preventing aliens from being wrongfully removed,

particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556

U.S. 418, 436 (2009); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 157 (D.D.C. 2018)

(erroneous denial of eligibility for "conditional parole[ ] constitutes serious potential damage that

merits an injunction").    Furthermore, there is a "substantial public interest in having

---

[7] *See also Morgan Stanley DW, Inc.*, 150 F. Supp. 2d at 77-78 (loss of "customer trust and goodwill" constituted irreparable harm); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1083 (W.D. Wash. 2017) (resettlement organizations faced irreparable harm under policy restricting refugee entry in part because of need to "adequately build programs to service other populations" and risk that "any sudden shift in the organizations' priorities will threaten their relationships and goodwill with community partners").

[8] That injury is compounded by the deprivation of an opportunity to provide pre-implementation comments on the rule.  *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18-19 (D.D.C. 2009) (finding irreparable injury based on loss of opportunity to "influence the Rule's contents" before it is implemented).  Had they been afforded the opportunity to do so, all of the organizational Plaintiffs would have provided comments objecting to the rule.  Cubas Decl. ¶ 40; Garza Pareja Decl. ¶ 38; McBride Decl. ¶ 25.  And the opportunity to provide comments *after* the rule already went into effect does not cure this injury.  *See Am. Fed'n of Gov't Emps.*, 655 F.2d at 1158  ("Permitting the submission of views after the effective date of a regulation is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way" (alteration and citation in original omitted)).

governmental agencies abide by the federal laws that govern their existence and operations"—including, of course, the APA and its central procedural requirements. *League of Women Voters*, 838 F.3d at 13 (internal quotation marks and citation omitted); *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326-27 (D.C. Cir. 1998) (the "public interest balance plainly would weigh in favor of an injunction" where an agency fails to adhere to statutory standards); *N. Mariana Islands*, 686 F. Supp. 2d at 21 (finding public interest in having "administrative agencies comply with their obligations under the APA").

On the other side of the scale, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All.*, 286 F. Supp. 3d at 179 (internal quotation marks and citation omitted). Furthermore, the central premise of the APA is that ensuring public comment on regulations before they are implemented will improve their quality and the legitimacy—serving, not undermining, the public interest. And the Government's interest in enacting a policy is particularly diminished where, as here, it dramatically departs from the *status quo* in effect for many years. *See Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,* 319 F. Supp. 3d 491, 498 (D.D.C. 2018) (stating that a preliminary injunction is proper where it will merely "preserve, rather than alter, the status quo—that is, the 'last uncontested status which preceded the pending controversy'" (quoting *Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control*, 71 F.3d 909, 913 (D.C. Cir. 1995))).

## V.     Nationwide Injunctive Relief Is Appropriate.

This Court should enjoin the Rule nationwide. As the Supreme Court has made clear, "the scope of injunctive relief" must be "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). When an Executive Branch policy contravenes a statute, it is invalid and should be enjoined in its entirety. *See, e.g., INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991) (a regulation that is "without statutory

authority" is "facially invalid"); *Sullivan v. Zebley*, 493 U.S. 521, 536 n.18 (1990); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998).  That rule makes sense: as the D.C. Circuit has explained, "[t]raditional administrative law principles" counsel against the proposition that "named plaintiffs alone should be protected by the injunction." *Harmon v. Thornburgh,* 878 F.2d 484, 495 & n.21 (D.C. Cir. 1989) (upholding nationwide injunction that left agency "free to promulgate new, narrower regulations, subject to the review of the district court"); *cf. Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("Normally when an agency clearly violates the APA" a court "vacate[s] its action.").  Here, the Rule has no potentially lawful applications under the INA and the APA, and it should be enjoined in full.  *See* 5 U.S.C. § 706(2).

A nationwide injunction also is particularly warranted given the immigration context. The Constitution requires a "*uniform* Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4 (emphasis added).  And Congress "has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*.'"  *Texas v. United States*, 809 F.3d 134, 187-188 (5th Cir. 2015) (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added)), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam); *East Bay*, 909 F.3d at 1255-56.  A narrower injunction, and particularly one limited geographically, would contravene those commands.  Congress' "comprehensive and unified system" of immigration should not be splintered by narrow injunctions that protect only the rights of constricted subsets of migrants located within the issuing jurisdictions.  *Arizona v. United States*, 567 U.S. 387, 401 (2012); *see NAACP v. Trump*,

298 F. Supp. 3d 209, 243 (D.D.C. 2018).[9]

Courts fashioning equitable relief also must take into account "what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017).  The realities of the asylum process—in particular, detention, transfer, and removal procedures—make a geographically limited injunction unworkable here.  Upon being apprehended by Defendant CBP, migrants generally are detained for several days in facilities near the southern border, and may be subjected to credible fear interviews there or transferred to detention facilities in a different jurisdiction first.  Cubas Supp. Decl. ¶ 14; Garza Pareja Decl. ¶ 14.  It is unclear at what stage a geographically limited injunction like the Ninth Circuit's would apply.  And the confusion compounds from there: Is a migrant who enters the country through California or Arizona entitled to the benefits of the *East Bay* injunction on an ongoing basis—or does that protection end if she is transferred in detention outside the Ninth Circuit, particularly before she has her CFI?  What about if a detained migrant receives a "negative" finding as a result of the Rule during a CFI conducted outside the Ninth Circuit, but later is transferred to a location within the Ninth Circuit—does she then become eligible for a new CFI?  What happens if a migrant receives a "positive" credible fear finding while held within the Ninth Circuit, but later is transferred in detention or released

---

[9] The *East Bay* motions panel majority suggests that "granting a more limited injunction" will "allow[ ] other litigants wishing to challenge the Rule to do so." *East Bay*, 2019 WL 3850928, at *3.  But a limited injunction is not necessary to allow other litigation to proceed.  District courts are capable of issuing parallel—sometimes divergent—decisions on requests for nationwide preliminary injunctive relief.  *See id.* at 6 (recognizing that this Court "denied materially identical relief to organizations similar to the Plaintiffs" hours before the *East Bay* nationwide injunction was entered); *see also, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) (granting nationwide temporary restraining order ten days after similar relief was issued by another court); *Aziz v. Trump*, 234 F. Supp. 3d 724 (E.D. Va. 2017) (same). The existence of a standing nationwide injunction might incentivize a litigant to pursue a different procedure, such as an early ruling on summary judgment, but it hardly eliminates the opportunity to obtain a final, appealable determination on the merits in another court. *See O.A.*, 2019 WL 3536334, at *2 (granting plaintiffs' cross-motion for summary judgment regarding a Rule that had already been enjoined nationwide).

into the community for full Section 240 immigration proceedings elsewhere—can the Rule bar her ultimately from being granted asylum?  These sorts of scenarios are quite common given the limited capacity at border detention centers, especially for women and children.[10]  Cubas Supp. Decl. ¶ 17.  And the profound uncertainties that these scenarios would engender are enough to show that a geographically limited injunction would not be workable.  *See* Cubas Supp. Decl. ¶¶ 14-18; Garza Pareja Decl. ¶¶ 14-18; McBride Decl. ¶¶ 27-31.

Moreover, a geographically limited injunction would not be "properly tailored to the alleged harm" suffered by the organizational Plaintiffs.  *East Bay*, 2019 WL 3850928, at *3. Like the plaintiffs in *East Bay*, the organizational Plaintiffs here serve migrants who enter their service areas from all over the country, either because they have been transferred from a different detention center or have been released at a location other than their point of entry.  CAIR Coalition, for example, serves migrants in the Washington, D.C. area, which has one of the largest asylum offices in the country.  Cubas Supp. Decl. ¶ 6.  Approximately one-third of CAIR Coalition's adult clients entered through the southern border and are applying for asylum, and over 95% of their child clients—about 90% of whom have asylum claims—arrived through the southern border and transited through a "third country" without applying for asylum.  *Id.*.  A geographically limited injunction would thus not necessarily protect CAIR Coalition's clients or the organization itself.  In addition, it is not clear how an injunction limited to the organizational Plaintiffs "would work in practice, for example, whether the clients of the Plaintiff firms would have special rights that other immigrants would not have."  *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 866 n.21 (N.D. Cal. 2018).

---

[10] Children are detained by Defendant CBP but often immediately transferred to other shelters or detention centers all over the country.  In the Washington, D.C. area, there are four such shelter programs, which hold about 200 children at a time.  Cubas Supp. Decl. ¶ 17.  About 20-30 of these children typically are girls with babies or who are pregnant.  *Id.*

Finally, as a matter of efficiency, limiting relief to the individual Plaintiffs, the District of Columbia, or some other subset of migrants would be "likely merely to generate a flood of duplicative litigation" by other similarly situated individuals seeking the same relief. *Nat'l Mining*, 145 F.3d at 1409. As Judge Friendly noted, when a regulation is found to be unlawful, it would be "unthinkable" for executive officials to "insist on other actions being brought" over and over again. *See Vulcan Soc'y v. Civil Serv. Comm'n*, 490 F.2d 387, 399 (2d Cir. 1973). Any attempt to fashion a narrower injunction here would create immediate and crippling uncertainty in the immigration system, and should be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: August 21, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Manoj Govindaiah
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant*
*Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.com

* *Motion for admission forthcoming*

*Counsel for Plaintiff Capital Area*
*Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West* (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* *Motion for admission pending*

*Counsel for Plaintiffs*

42

**SUPPLEMENTAL DECLARATION OF CLAUDIA CUBAS**

I, Claudia Cubas, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.  I submit this sworn declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      I serve as the Litigation Director for Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), a nonprofit organizational plaintiff in this action.  I previously submitted a declaration in this matter in support of Plaintiffs' Motion for Temporary Restraining Order, dated July 19, 2016.  Dkt. 3-3.  The statements set forth in my initial declaration are incorporated herein by reference and remain accurate and relevant to Plaintiffs' Motion for Preliminary Injunction, which challenges the same policy, *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule"), that CAIR Coalition and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") challenged in their earlier Motion for Temporary Restraining Order.

3.      As noted in my initial declaration, all of CAIR Coalition's clients are in active removal proceedings, and our organizational mission is to serve as many detained immigrants lawfully seeking asylum as possible.  Cubas Decl. ¶¶ 8, 14.  Asylum applications therefore represent a vital component of that mission and account for much of the services we provide to detained migrants.  *Id.* ¶ 9.

4.      Helping as many clients as possible to obtain the unique statutory benefits of asylum—such as derivative eligibility for family members, employment authorization, access to public benefits, legal permanent resident status adjustment, a path to citizenship, and the ability to travel abroad—is a key component of CAIR Coalition's mission, which is not accomplished

merely by providing different legal services or attempting to help clients obtain alternative forms of relief from removal.

5.     Moreover, because withholding of removal and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") are more difficult to obtain than asylum—requiring a migrant to demonstrate essentially a 51% likelihood that she will be persecuted or tortured in her home country, contrasted to the 10% likelihood required for asylum—it is a virtual certainty that more of CAIR Coalition's clients will be ordered deported under the Rule.   Again, this outcome severely compromises CAIR Coalition's fundamental mission to protect asylum seekers against removal.

6.     A substantial proportion of CAIR Coalition's clients are seeking asylum.   One of the largest asylum offices in the country is located in the Washington, DC area, making it a common place for the Government to transfer migrants, especially children, while detained. Approximately one-third of CAIR Coalition's adult clients entered through the southern border and are applying for asylum, and over 95% of their child clients—about 90% of whom have asylum claims—arrived through the southern border after transiting a "third country" in which they did not apply for asylum.

7.     As noted in my initial declaration, most of CAIR Coalition's clients—again, especially children—are from the Northern Triangle countries of Honduras, Guatemala, and El Salvador.   Cubas Decl. ¶¶ 11-12.   Based on my experience as Litigation Director for CAIR Coalition and numerous discussions with our clients and staff, I understand that the vast majority of such clients, both children and adults, have transited "third countries" en route to the United States without first applying for asylum or analogous protections in those countries.

8.      Based on similar and numerous conversations with CAIR Coalition clients and staff, as well as my more than ten years' experience as an immigration practitioner in the Washington, DC metropolitan area working with asylum seekers and remaining informed of immigration procedures and safety risks in other countries, I understand that many if not most migrants transiting "third countries" do not feel safe and are unable to apply for asylum there as a practical matter.

9.      In Mexico, for example, migrants face substantial risks of kidnapping, assault, extortion, and other severe harms, especially at the hands of organized criminal groups.  Many are targeted not only because of their vulnerability as traveling refugees but also on account of their race, gender, sexual orientation, nationality, or minority group.   Several of CAIR Coalition's clients have reported that gangs persecuting them in their home countries followed them through Mexico; others have reported having been trafficked or tortured by cartels in Mexico, and that such cartels later reached their families in the Northern Triangle.  The Mexican government has been unable or unwilling to provide adequate security for such asylum seekers.

10.     Even if migrants wished to seek asylum in Mexico, notwithstanding such continuing risks of persecution and violence, many find that it is infeasible to apply there. Mexico's refugee agency, La Comisión Mexicana de Ayuda a Refugiados ("COMAR"), lacks adequate resources and is staffed by only about fifty employees nationwide.  My understanding is that only three COMAR offices currently are open, and that they are overtaxed and seeking support from outside the country.  However, asylum may only be pursued in Mexico from detention centers, where abuse and overcrowding are rampant.  Asylum seekers also frequently are forced to navigate the system without representation, and nonprofit organizations and attorneys report that asylum adjudications are arbitrary and unfair.  The success rate on asylum

applications in Mexico is very low.  Further, many adult and child clients have reported to CAIR Coalition that they had to evade Mexican forces to avoid being deported immediately.

11.     Likewise, in Guatemala, the country's recently created asylum system—staffed by approximately ten employees nationwide—is largely untested, and thus far has proven inadequate to meet the needs of asylum seekers.  The State Department has publicly recognized as much.   U.S.  State  Dep't,  *Guatemala  2018  Human  Rights  Rpt.*  at  13, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf  (reporting,  based on findings from the Office of the United Nations High Commissioner for Refugees, that "identification and referral mechanisms for potential asylum seekers were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status").

12.     At the same time, migrants crossing Guatemala remain susceptible to high risks of the same violence and criminal activity that they have fled in other countries, particularly to the extent that gang affiliations cross national borders in the region.  Indeed, the largest share of child clients served by CAIR Coalition is from Guatemala, and they report persecution or fear of persecution in that country.  The Guatemalan government has been unable or unwilling to provide adequate security for their residents and such asylum seekers.

13.     Because CAIR Coalition operates in the Washington, DC area, outside the Ninth Circuit, the organization already has clients that it understands are subject to the Rule without the protection of the narrowed injunction approved in *East Bay Sanctuary Covenant, et al. v. Barr, et al.*, No. 19-16487, slip op. (9th Cir. Aug. 16, 2019).  In particular, CAIR Coalition began assisting several new child clients last week who entered the country at various points across the southern border on or after July 16, 2019 without first applying for asylum in "third countries"

that they transited, presumptively subjecting them to the Rule.  CAIR Coalition anticipates that most of its clients will be subject to the Rule going forward, absent a new nationwide injunction.

14.     However, the *East Bay* motions panel decision creates significant practical uncertainty for legal services organizations like CAIR Coalition and the clients they serve.  Upon being apprehended by U.S. Customs and Border Protection ("CBP"), migrants generally are detained for several days in facilities near the southern border, and then may be subjected to credible fear interviews ("CFIs") there or transferred to geographically disparate detention facilities before undergoing such interviews.

15.     It is entirely unclear what the continuing effect of the *East Bay* injunction may be for CAIR Coalition clients in a wide variety of situations involving relocation.  For example, where a migrant entered the country through California or Arizona (where the Rule is enjoined) but later was transferred in detention or released into the community in CAIR Coalition's service area in the Washington, DC area (where the Rule no longer is enjoined), it is unclear whether she will remain eligible for asylum and whether CAIR Coalition will be able to assist her in that application.  That is so whether such a client had her CFI while detained within the Ninth Circuit or has yet to undergo her CFI in a detention facility in CAIR Coalition's service area.  Final removal proceedings can be completed in as little as a few months.

16.     Conversely, it remains unclear what is to occur if a CAIR Coalition client receives a "negative" CFI finding as a result of the Rule in the Washington, DC area but later is transferred in detention or released into the community to a location within the Ninth Circuit.  CAIR Coalition assists clients even after they are relocated outside of its service area near Washington, DC but will be unable to predict how clients' asylum claims may be treated in other jurisdictions.

17.     These are especially concerning questions for CAIR Coalition, given that the vast majority of its clients enter the United States far from the Washington, DC area, typically at the southern border, and are only transferred here in detention.  Such transfer is quite common given the limited capacity at border detention centers, especially for women and children.   In particular, children are detained by CBP at the border but often immediately transferred to other shelters or detention centers all over the country.   In the Washington, DC area, there are four such shelter programs, which hold about 200 children at a time.   About 20-30 of these children typically are girls with babies or who are pregnant.

18.     My understanding, based on discussions with other immigration practitioners around the country, is that similar confusion regarding the implementation of the *East Bay* motions panel decision is widespread.

19.     As addressed in my initial declaration, the *total* number of asylum seekers that CAIR Coalition can serve also will be drastically reduced under the Rule, due to the increased *per-client* resources that will be required to staff and prepare for interviews and removal proceedings in which the Rule's heightened reasonable fear standard now will apply.   Cubas Decl. ¶¶ 15, 21-24, 39.  CAIR Coalition estimates that it will be able to serve 50% fewer asylum seekers under the Rule, based on its years of experience perfecting and timing its service delivery models, its client base statistics, and the human and fiscal resource shifting that it already is undertaking and will continue to undertake in an effort to respond to the Rule.  This estimate also is based on a review of internally generated reports using Salesforce that take into account the client intakes, placements, and *pro se* services completed per year for the last several years.

20.     In particular, CAIR Coalition is able to calculate with precision the impact that the Rule will have in reducing the number of detained clients that the organization can help

prepare for fear interviews while in local jail facilities.  CAIR Coalition has spent the last ten years tailoring its jail visit service model, which carefully allocates the time that staff members spend per-client in an effort to reach all individuals during the length of time in which the organization is permitted to enter the facility.

21.     During those time-limited visits, CAIR Coalition staff must seek to visit hundreds of people at a time.  For instance, during a typical visit, two staff members and three volunteers from CAIR Coalition may be permitted ninety minutes to enter a jail dormitory with fifty new detained individuals.  In order to maximize the value of its services, CAIR Coalition has trained staff to spend thirty minutes calling roll and providing a general orientation, and to use the remaining sixty minutes for individual intake and interview preparation.  Using a watch to keep themselves on track, staff and volunteers have been trained to spend no more than five to ten minutes per client in order to meet with each detained person at the jail in the time allotted.  The five to ten minute intake model is based on CAIR Coalition's structured delivery of services and, as noted, has been perfected over ten years of work with detained migrants in Washington, DC area detention facilities in an effort to serve as many detained individuals as possible.  In the foregoing jail visit scenario, for example, if CAIR Coalition's five volunteers and staff each limit themselves to spending six minutes with each client, they would be able to assist all fifty detained persons in the dormitory during the sixty minutes available for interview preparation.

22.     However, because CAIR Coalition estimates that it will take about twice as long—ten to twenty minutes—to prepare each client for an interview under the higher "reasonable fear" standard, CAIR Coalition simply will not be able to meet with all detained persons during its jail visits.  It will be able to serve only about half as many people.  For example, in the foregoing jail visit scenario, CAIR Coalition's five volunteers and staff, taking

an estimated fifteen minutes per client, would be able to assist only about twenty of the fifty new detained individuals in the dormitory during the sixty minutes available for interview preparation.   Again, this reduction in total clients served irreparably compromises CAIR Coalition's fundamental mission to assist as many asylum seekers as possible to access the unique benefits of asylum and exercise their protections against removal under the law.

23.     As part of its strategic planning, CAIR Coalition recently had identified the need to triple its individual representations within three years.   Because of the Rule's broad implications for CAIR Coalition's client base, those plans are now uncertain.

24.     The relief requested in the Amended Complaint would properly address the injuries to CAIR Coalition as described above and in my initial declaration.   If Plaintiffs prevail in this action, CAIR Coalition will be able to devote its staff time and resources to all its clients, not just a select few, and continue to represent as many asylum applicants as possible consistent with its mission.

25.     CAIR Coalition has no plain, adequate, or complete remedy at law.   It would suffer immediate and irreparable injury under the Rule, if not enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 21, 2019

Washington, DC


Claudia Cubas

## SUPPLEMENTAL DECLARATION OF MICHELLE GARZA PAREJA

I, Michelle Garza Pareja, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

     1.     The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.  I submit this sworn declaration in support of Plaintiffs' Motion for Preliminary Injunction.

     2.     I serve as the Chief Legal Programs Officer for Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES"), a nonprofit organizational plaintiff in this action.  I previously submitted a declaration in this matter in support of Plaintiffs' Motion for Temporary Retraining Order, dated July 19, 2016.  Dkt. 3-2.  The statements set forth in my initial declaration are incorporated herein by reference and remain accurate and relevant to Plaintiffs' Motion for Preliminary Injunction, which challenges the same policy, *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule"), that RAICES and Capital Area Immigrants' Rights Coalition ("CAIR Coalition") challenged in their earlier Motion for Temporary Restraining Order.

     3.     As noted in my initial declaration, RAICES's broader mission is to promote justice by providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas.  Garza Pareja Decl. ¶ 4.  Helping as many clients as possible to obtain the unique statutory benefits of asylum—such as derivative eligibility for family members, employment authorization, access to public benefits, legal permanent resident status adjustment, a path to citizenship, and the ability to travel abroad—is a key component of the mission, which is not accomplished merely by providing different legal services or attempting to help clients obtain alternative forms of relief from removal.

4.     Moreover, because withholding of removal and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") are more difficult to obtain than asylum—requiring a migrant to demonstrate essentially a 51% likelihood that she will be persecuted or tortured in her home country, contrasted to the 10% likelihood required for asylum—it is a virtual certainty that more of RAICES's clients will be deported under the Rule.     Again, this outcome severely compromises RAICES's fundamental mission to protect asylum seekers against removal.

5.     A substantial proportion of RAICES's clients are seeking asylum.  For example, at the Karnes County Residential Center, approximately 72% of our clients are claiming asylum. And as noted in my initial declaration, the Northern Triangle countries—Honduras, Guatemala, and El Salvador—are three of the top four countries of origin for RAICES clients.  Based on my experience as Chief Legal Programs Officer for RAICES and numerous discussions with RAICES clients and staff, I understand that the vast majority of such clients have transited "third countries" en route to the United States without first applying for asylum or analogous protections in those countries.

6.     Based on similar and numerous conversations with RAICES clients and staff, as well as my nearly ten years' experience as an immigration practitioner in Texas working with asylum seekers and remaining informed of immigration procedures and safety risks in other countries, I understand that many if not most migrants transiting "third countries" do not feel safe and are unable to apply for asylum there as a practical matter.

7.     In Mexico, for example, migrants face substantial risks of kidnapping, assault, extortion, and other severe harms, especially at the hands of organized criminal groups.  Many are targeted not only because of their vulnerability as traveling refugees but also on account of

their race, gender, sexual orientation, or nationality.  The Mexican government has been unable or unwilling to provide adequate security for such asylum seekers.

8.     Even if migrants wished to seek asylum in Mexico, notwithstanding such continuing risks of persecution and violence, many find that it is infeasible to apply there. Mexico's refugee agency, La Comisión Mexicana de Ayuda a Refugiados ("COMAR"), lacks adequate resources and is staffed by only about fifty employees nationwide.  However, asylum may only be pursued in Mexico from detention centers, where abuse and overcrowding are rampant.     Asylum seekers also frequently are forced to navigate the system without representation, and nonprofit organizations and attorneys report that asylum adjudications are arbitrary and unfair.  The success rate on asylum applications in Mexico is very low.

9.     Likewise, in Guatemala, the country's recently created asylum system—staffed by approximately ten employees nationwide—is largely untested, and thus far has proven inadequate to meet the needs of asylum seekers.  The State Department has publicly recognized as    much.     U.S.    State    Dep't,    *Guatemala    2018    Human    Rights    Rpt.*    at    13, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf (reporting, based on findings from the Office of the United Nations High Commissioner for Refugees, that "identification and referral mechanisms for potential asylum seekers were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status").

10.     At the same time, migrants crossing Guatemala remain susceptible to high risks of the same violence and criminal activity that they have fled in other countries, particularly to the extent that gang affiliations cross national borders in the region.  The Guatemalan government has been unable or unwilling to provide adequate security for such asylum seekers.

11.     Most of the Individual Plaintiffs in this case—J.M.M., D.L.R., Y.G.C., Z.B.M., C.C.R.O., W.M.R.O., and N.G.R.L., the latter three of whom are unaccompanied minors—are clients of RAICES.  As set forth in their declarations, several of the adults initially received negative credible fear determinations between July 21-24, because the Rule barred them from asylum eligibility at that time.  Immigration Judges subsequently reversed each of those findings after the *East Bay* injunction was issued.  *See* J.M.M. Decl. ¶ 9; D.L.R. Decl. ¶ 14; Z.B.M. Decl. ¶¶ 16-17.

12.     Unaccompanied minors generally are not placed in expedited removal and do not undergo credible fear screenings.  Under the process set forth in the Trafficking Victims Protection Reauthorization Act ("TVPRA"), children are supposed to have the opportunity in the first instance to present their asylum claims and explain the potentially traumatic details of what has happened to them before an asylum officer in a non-adversarial setting, rather than before an Immigration Judge in an intimidating contested proceeding.  *See* 8 U.S.C. §§ 1158(b)(3)(C), 1232.  But the Rule applies to bar asylum eligibility for unaccompanied minors, *see* 84 Fed. Reg. 33,839, making any such appearances before asylum officers unnecessary.  Indeed, I understand that C.C.R.O., W.M.R.O., and N.G.R.L. already have been issued documents styled as notices to appear ("NTAs") for full adversarial removal proceedings under Section 240 of the Immigration and Nationality Act, without dates and times for such hearings.  *See* Am. Compl. ¶¶ 59, 63.

13.     Because RAICES operates in Texas, outside the Ninth Circuit, the organization expects that most of its clients, including the Individual Plaintiffs in this case, will now be subject to the Rule without the protection of the narrowed injunction approved in *East Bay Sanctuary Covenant, et al. v. Barr, et al.*, No. 19-16487, slip op. (9th Cir. Aug. 16, 2019).

14.     However, the *East Bay* motions panel decision creates significant practical uncertainty for legal services organizations like RAICES and the clients they serve. Upon being apprehended by U.S. Customs and Border Protection ("CBP"), migrants generally are detained for several days in facilities near the southern border, and then may be subjected to credible fear interviews ("CFIs") there or transferred to geographically disparate detention facilities before undergoing such interviews.

15.     It is entirely unclear what the continuing effect of the *East Bay* injunction may be for RAICES clients in a wide variety of situations involving relocation. For example, where a migrant entered the country through California or Arizona (where the Rule is enjoined) but later was transferred in detention or released into the community in RAICES's service area in Texas (where the Rule no longer is enjoined), it is unclear whether RAICES may assist her in seeking asylum. That is so whether such a client had her CFI while detained within the Ninth Circuit or has yet to undergo her CFI in a detention facility in RAICES's service area.

16.     Conversely, if a migrant entered the country in Texas and became a client of RAICES, it remains unclear what is to occur if she receives a "negative" CFI finding as a result of the Rule there but later is transferred in detention or released into the community to a location within the Ninth Circuit. RAICES assists clients even after they are relocated outside of its service area in Texas but will be unable to predict how clients' asylum claims may be treated in other jurisdictions. Final removal proceedings can be completed in as little as a few months.

17.     Moreover, to the extent that the *East Bay* injunction now incentivizes asylum seekers to enter the country through California and Arizona, there is a possibility that RAICES may end up with fewer clients to serve in Texas at all.

18.     My understanding, based on discussions with other immigration practitioners around the country, is that similar confusion regarding the implementation of the *East Bay* motions panel decision is widespread.

19.     As addressed in my initial declaration, the *total* number of asylum seekers that RAICES can serve also will be drastically reduced under the Rule, due to the increased *per-client* resources that will be required to staff and prepare for interviews and removal proceedings in which the Rule's heightened reasonable fear standard now will apply.  Garza Pareja Decl. ¶¶ 7, 10-15, 18-19, 31, 34, 36.  Although it is impossible to provide figures before the policy is being implemented we would estimate that we will be able to serve less than half as many asylum seekers as we serve today. Again, this reduction in total clients served irreparably compromises RAICES's fundamental mission to assist as many asylum seekers as possible to access the unique benefits of asylum and exercise their protections against removal under the law.

20.     The relief requested in the Amended Complaint would properly address the injuries to RAICES as described above and in my initial declaration.  If Plaintiffs prevail in this action, RAICES will be able to devote its staff time and resources to all its clients, not just a select few, and continue to represent as many asylum applicants as possible consistent with its mission.

21.    RAICES has no plain, adequate, or complete remedy at law.  It would suffer immediate and irreparable injury under the Rule, if not enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 20, 2019

Dallas, Texas

Michelle Garza Pareja

## DECLARATION OF SHARON MCBRIDE

I, Sharon McBride, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.  I submit this sworn declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      I serve as the senior vice president for advocacy at Human Rights First ("HRF"), an organizational plaintiff in this action.  In my current role at HRF, I oversee the organization's advocacy campaigns, government relations work, and the mobilization of partners and constituents around the organization's public policy agenda, including its advocacy for an asylum system that respects human rights and the rule of law.

3.      HRF is a 501(c)(3) nonprofit, nonpartisan international human rights organization with offices in Washington, D.C.; New York, New York; Houston, Texas; and Los Angeles, California.

4.      Founded in 1978, we challenge America to live up to its ideals and foster U.S. leadership to advance the universal values of human rights around the world.  HRF focuses on three primary areas: 1) promoting and protecting the rights of refugees; 2) advancing U.S. foreign policies that uphold human rights; and 3) restricting U.S. national security policies that violate human rights.  Our efforts to protect refugees—one of the most fundamental human rights commitments—are deeply aligned with our mission.  For over 40 years, we have assisted individual asylum seekers in gaining protection while pushing for fair and humane U.S. asylum laws and policies to help refugees become engaged members of American society and bring about sustained, positive change in laws and policies toward refugees.

5.      Through the Refugee Representation program, HRF operates one of the largest programs for pro bono legal representation of asylum seekers in the nation, working in partnership with volunteer lawyers at leading law firms to provide legal representation, without charge, to thousands of indigent asylum applicants.  In addition to its work in partnership with volunteers from leading law firms, HRF's in-house attorneys also represent asylum seekers in immigration-related proceedings, focusing on asylum and other protection-based forms of immigration status.  HRF serves asylum seekers across the country, via its four offices.  Over the last 40 years, HRF has helped tens of thousands of individuals who arrived in the United States fleeing persecution, torture, and threats of death.  In 2018, HRF's pro bono partners donated over 101,000 hours of in-kind support.

6.      Asylum applications represent a vital component of HRF's organizational mission and account for much of the services we provide.

7.      HRF interacts with hundreds of immigrants seeking asylum who entered the United States at the southern border each year.

8.      Many of these individuals are from the Northern Triangle countries (Guatemala, Honduras, and El Salvador), not Mexico.  Of the 1,315 intake screenings HRF conducted between January 1, 2018, and August 19, 2019, 544 (41%) were for individuals from the Northern Triangle.  Only 56 (4%) were for individuals from Mexico.

9.      Many of our clients have transited "third countries" en route to the United States without first applying for asylum or analogous protections in those countries. Based on my experience as senior vice president for advocacy at HRF, in which capacity I remain informed of immigration procedures and safety risks in other countries, as well as numerous discussions with our legal representation and advocacy staff, I understand that most third countries are unsafe for

refugees, who face substantial risks of kidnapping, assault, extortion, and other severe harms. The governments of those countries, especially Mexico and Guatemala, have been unable or unwilling to provide adequate security for their own residents and transiting migrants.

10.     Through the Refugee Protection program, HRF researches new and ongoing policies and issues related to asylum seekers and refugees, as well as advocates for policies that protect and advance the rights of refugees and asylum seekers.   HRF does this through a combination of engaging policy makers, on-the-ground research and reporting, and endeavoring to hold the United States government accountable to its international and domestic legal obligations.

11.     HRF has documented the virtual impossibilities of seeking asylum in Mexico, Guatemala, and other countries where, under the Rule challenged in the Amended Complaint, *see* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019), asylum seekers would be required to request protection.   HRF has conducted and published extensive research on the inadequacies of the asylum system in Mexico and Guatemala, as well as the dangers facing migrants there.   *See, e.g.*, HRF, *Is Guatemala Safe for Refugees and Asylum Seekers?* (July 1, 2019), https://www.humanrightsfirst.org/resource/guatemala-safe-refugees-and-asylum-seekers; HRF, *Delivered to Danger: Illegal Remain in Mexico Policy* (August 8, 2019), https://www.humanrightsfirst.org/sites/default/files/Delivered-to-Danger-August-2019%20.pdf.   Summarized briefly, migrants are frequently unable to apply for asylum in third countries, especially Mexico and Guatemala, as a practical matter, due to those countries' understaffed and underfunded asylum programs, unclear and arbitrarily adjudicated procedures, and in some cases pressure from government officials.

12.     Absent an injunction, the Rule would irreparably harm HRF in multiple ways.

13. The Rule will irreparably frustrate HRF's mission to represent asylum seekers and advocate for meaningful access to the asylum system. Because Defendants will summarily remove asylum seekers before they reach the interior of the United States—where HRF's offices are located—HRF will likely face a drastic reduction in its client base.

14. HRF's partnerships with volunteer attorneys from leading law firms would suffer as there would be fewer asylum seekers to represent. Without these sustainable relationships with law firm partners, HRF could not succeed in operating one of the largest programs for pro bono legal representation of asylum seekers in the nation.

15. This reduction in client base will, in turn, not only severely impair HRF's ability to fulfill its mission, but also its financial health. If HRF places fewer clients with law firms due to the reduction in its client base and the more complicated nature of each case, HRF risks its current level of law firm-derived funding, which is often tethered to the level of the law firm's engagement with HRF-mentored asylum cases. In addition, HRF will be at serious risk of losing funding tied to the number of clients it serves each year in certain areas. That per-client funding cannot be recouped by providing more or different services to a smaller number of clients.

16. To serve those clients who do reach HRF, HRF would need to train its staff and develop new training materials and procedures for pro bono attorneys to be able to effectively serve their clients. To do so, the organization will need to divert significant staff and financial resources. For example, HRF would have to analyze and interpret the Rule, as well as determine which clients and attorneys need specialized information or training on the impacts of the Rule, and then provide separate trainings and materials for those asylum seekers who traveled through another country before crossing the southern border and those who did not. HRF would have to

explain the different standards applied and the more limited forms of relief available to those individuals.

17.     The higher standards imposed by the Rule will force HRF to spend significantly more time preparing each impacted client for the various steps of their proceedings.  Spending more time on cases affected by the Rule will, invariably, mean the organization will assist fewer clients.

18.     Immigrants seeking protection who are subject to the Rule would need to meet the higher "reasonable fear" standard rather than the traditional "credible fear" standard to obtain relief.  In a reasonable fear interview, an individual must meet a "more likely than not" standard that she would be persecuted or tortured in her country of origin.  This amounts to a showing of at least 51 percent.  Comparatively, in the standard credible fear interview, an individual must only show a "well-founded fear" of persecution or torture in her home country, amounting to about a 10 percent chance of facing this harm.

19.     Many individuals fleeing serious harm and persecution may struggle to meet this higher burden because they must meet it in a preliminary interview that takes places only days after what is often a long and traumatic journey.  If these individuals should choose to appeal a negative decision and reach the interior of the United States, HRF might need to expend significant resources assisting these individuals with appealing those decisions.  This process would include, among other onerous tasks and legal briefing requirements, reviewing the transcripts from interviews with negative determinations to advise on further proceedings and preparing individuals for the appeal.

20.     HRF would also be required to spend more time and resources on preparing individual applications for relief where derivative relief would have otherwise been available,

absent the Rule.  Many of the parents HRF serves would be found ineligible for asylum under the Rule, such that their children and spouses would no longer be deemed derivative recipients of asylum, under the asylum application of the parent.  For example, for a family comprised of a parent and four children, HRF would, under the Rule, be forced to prepare five individual applications for relief, whereas, absent the Rule, HRF would have prepared one primary application—which, if successful, could have secured derivative relief for the four children. HRF would be required to divert additional resources to preparing separate cases for each family member given the absence of derivative asylum eligibility, significantly increasing the total time and resources that must be spent on each client family's case.  Furthermore, the increased time and resources required to serve a single-family unit may reduce the incentive for volunteer attorneys to take on these matters, compounding the diversion of HRF staff resources to represent these cases in-house.

21.     HRF's ability to serve clients in proceedings before the Asylum Office also will be substantially reduced under the Rule.   HRF represents approximately 40% of its clients, especially children, before the Asylum Office in non-adversarial interviews.  The Rule, however, forecloses asylum eligibility for those who crossed the southern border after traveling through a "third country" in which they did not apply for asylum protection.  As noted above, about 41% of HRF's clients in recent months have been from Northern Triangle countries, the overwhelming majority of whom did not apply for asylum in third countries en route to the United States.  Under the Rule, there would be nothing for the Asylum Office to adjudicate in terms of these clients' asylum cases, which would move directly to trial at immigration court. This is because the Asylum Office does not have jurisdiction to grant a child (or any person), relief from removal in the form of Withholding of Removal under the Immigration and

Nationality Act or protection under the Convention against Torture, which are alternative forms of protective relief available to individuals who are barred from asylum.

22.     For each fear-based case of a minor on which HRF serves as attorney or mentoring organization, staff would need to now spend significant time preparing themselves or pro-bono volunteers and the client for a trial rather than an interview.

23.     At the trial stage, HRF's staff would be forced to allocate significantly more time and resources briefing eligibility issues for each case of an asylum seeker subject to the Rule.

24.     HRF also serves clients who have been granted asylum, in their requests for family reunification, adjustment of status to legal permanent resident, and accessing benefits. Those of HRF's clients who are subject to the Rule would become ineligible for these benefits, which are only available to asylees rather than recipients of Withholding of Removal or protection under the Convention Against Torture.  HRF also receives funding that is specifically tied to its offering of these services to clients who have been granted asylum, and the Rule may cause a loss of that funding.

25.     The Rule's lack of notice-and-comment procedures also irreparably compromises HRF's Refugee Protection program's critical advocacy objectives, which are anchored in ensuring meaningful access to an asylum system that complies with domestic and international legal obligations.  It limits HRF's ability to inform the Government of the substantial harms— both to the organization and its clients—that the Rule creates.  Commenting on rules and regulations is an important part of HRF's mission to improve the lives of migrants and to protect meaningful access to the asylum system.  HRF frequently comments on rules and regulations related to protecting the interests of asylum seekers, and it often leads the efforts of civil society to analyze and advocate for regulations that protect access to asylum.  Had HRF been given the

opportunity to comment on the Rule before its issuance, it would have done so.  In fact, HRF submitted a comment on August 15, 2019, outlining the illegalities of the Rule, but this opportunity to comment was hollow, as the Rule had already been promulgated prior to the submission of HRF's comment.

26.    Because HRF operates in four locations across the country, including both inside and outside the Ninth Circuit, HRF will suffer considerable harm in the form of diversion of staff resources and impairment of mission due to the narrowing of the injunction approved in *East Bay Sanctuary Covenant, et al. v. Barr, et al.*, No. 19-16487, slip op. (9th Cir. Aug. 16, 2019).

27.    The *East Bay* motions panel decision creates significant uncertainty for organizations like HRF that serve asylum seekers and asylees throughout the country.  HRF staff will now be required to interpret the effects of the Rule, and its geographic applicability, on its clients.  It will be required to create new resources for its volunteer attorneys depending on where each client's claim will be adjudicated.

28.    HRF will be required to implement different procedures and practices for its Los Angeles office than for its remaining three offices.  Furthermore, many of HRF's clients move locations after entering the United States.  For instance, HRF's Los Angeles office staff may intake an asylum-seeking client and begin legal representation within the Ninth Circuit, but that client may later relocate across the country during the pendency of her asylum proceedings.  In such a case, HRF would need to prepare its staff attorneys and volunteer attorneys to operate within two different legal landscapes for the client.

29.    It is entirely unclear what the continuing effect of the *East Bay* injunction may be for HRF's clients in a wide variety of situations involving relocation.  If a migrant entered the country through California or Arizona (where the Rule is enjoined) but later relocated or was

transferred in detention to one of the areas served by HRF's three remaining offices (in Washington, D.C., New York City, or Houston), it is unclear whether HRF may assist her in seeking asylum.  That is so whether such a client had her credible fear interview ("CFI") while detained within the Ninth Circuit or has yet to undergo her CFI in a detention facility in one of HRF's other service areas.

30.     Conversely, it remains unclear what is to occur if an HRF client receives a "negative" CFI finding as a result of the Rule in the Washington, D.C., New York City, or Houston areas but later is transferred in detention or released into the community to a location served by HRF's Los Angeles office, within the Ninth Circuit.  HRF often assists clients even after they are relocated outside of the immediate locations of HRF's four offices.  HRF will not be able to predict how clients' asylum claims may be treated in different jurisdictions.

31.     In the days since the *East Bay* motions panel narrowed the injunction, HRF staff have communicated with advocates and attorneys across the country who have expressed similar confusion regarding the effects of the status quo on asylum seekers.

32.     In sum, the Rule would irreparably harm HRF, including by frustrating its fundamental organizational mission to serve asylum seekers and advocate for meaningful access to the asylum system, as well as by forcing a significant diversion of resources and creating a reduction in volunteer capacity and funding.  HRF would be unable to represent the same number of clients that it has traditionally, both because fewer clients would be eligible for asylum relief and because the organization would have to spend more of its limited resources on each individual case to apply for additional forms of relief such as withholding of removal or protection under the Convention Against Torture.  The Rule also would force HRF to divert

scarce resources away from other important programs to compensate for the additional time, procedures, and staff required to continue serving clients under the Rule.

33.     The relief requested in Plaintiffs' Complaint would properly address the injuries to HRF as described above.  If Plaintiffs prevail in this action, HRF would be able to devote its staff time and resources to more clients than if the Rule were in effect.  It would also be better equipped to fulfill its organizational mission.

34.     HRF has no plain, adequate, or complete remedy at law.  It would suffer immediate and irreparable injury under the Rule, if not enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 19, 2019

New York, New York

Sharon McBride

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>                              *Plaintiffs*,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                              *Defendants*. | Civ. Action No. 1:19-cv-02117 |

**DECLARATION OF LISA FRYDMAN**

I, Lisa Frydman, hereby declare as follows:

1.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction. If called as a witness, I could and would testify competently as follows.

**Professional Experience with Central American Children Seeking Asylum**

2.      I am an attorney and have been, since 2017, Vice President for Regional Policy and Initiatives ("Regional Team") at Kids in Need of Defense ("KIND"), a nonprofit advocacy and legal services organization based in the United States.  From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In this capacity, I supervise KIND's Regional Team and regularly visit Honduras, Guatemala, and El Salvador (the "Northern Triangle" countries) and Mexico to carry out the organization's work described here.

3.      KIND's Regional Team offers direct programming with children and adolescents in Central America (sometimes referred to herein as "the Region"). Currently, the Regional

1

Team, through civil society partner organizations, provides reintegration support services for

unaccompanied and separated children repatriating to Guatemala and Honduras, as well as

sexual and gender-based violence prevention programming for children in certain high migration

communities in Guatemala and Honduras. Through its Reintegration Program and other Regional

programming and visits, KIND's Regional Team has communicated with approximately 350

Central American unaccompanied and children in the past year. From 2015-2017, the Regional

Team provided support services to children in Honduras and El Salvador with pending cases for

refugee resettlement in the United States under an in-country refugee processing and parole

effort known as the Central American Minors ("CAM") Program. In 2018 the Regional Team,

through civil society partners, conducted a project in the Region to empower adolescent refugees

and migrants, as well as internally displaced adolescents from El Salvador, Guatemala, and

Honduras, to tell their stories related to immigration and internal displacement.

      4.     In addition to direct programming, the Regional Team engages in research and

fact finding related to the root causes of child migration from Central America and develops

recommendations on how to resolve the problems forcing children to leave their homes. In 2017,

I coauthored and KIND published two reports focused on sexual and gender-based violence and

children migration.[1] These reports were based on extensive interviews with unaccompanied

children from Honduras, El Salvador, and Guatemala; with government agencies; and with civil

---

[1] Rachel Dotson and Lisa Frydman, Kids in Need of Defense, "Neither Security nor Justice: Sexual and Gender-based Violence and Gang Violence in El Salvador, Honduras, and Guatemala" (2017), at https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf; Rachel Dotson and Lisa Frydman, Kids in Need of Defense and CDH Fray Matías, "Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refugee Children" (June 2017), at https://supportkind.org/wp-content/uploads/2017/06/Childhood-Cut-Short-KIND-SGBV-Report_June2017.pdf.

society organizations. KIND's Regional Team regularly collects information regarding country conditions and the root causes of migration and uses this information to inform our plans for work in the region, to update KIND's Legal Services Team about developing trends in the region that may impact claims for immigration relief, and to inform advocacy.

5.     The team, myself included, travels to the Region regularly to conduct fact finding, as well as to participate in training and capacity building sessions for government and civil society organizations; in regional conferences on child migration attended by civil society experts, international organizations involved in migration and refugee protection, and governments of the region; and in regional advocacy networks and forums. Since December 2018, the Regional Team has traveled to Mexico nine times to engage in fact finding and to participate in human rights monitoring along the northern and southern borders of Mexico, to provide training, and to meet with government agencies and civil society organizations with expertise in children's rights, migrants' rights, and refugee protection.

6.     The statements in this Declaration are based on (1) conversations with civil society organizations in Honduras, El Salvador, Guatemala and Mexico working directly with children and youth, (2) interviews with government agencies in the Region, (3) participation in fact finding trips and/or supervision of Regional Team staff participating in fact finding trips, (4) conversations with unaccompanied children in Tijuana, Mexico, (5) conversations with repatriated unaccompanied children and/or their parents, (6) conversations with children who had pending claims in the CAM program, including current cases with pending Requests for Review, (7) extensive tracking of news articles from the Region and extensive research into country conditions throughout the Region, and (8) calls for help from unaccompanied children and/or

their family members during migration, or from civil society organizations providing support to unaccompanied children.

**Causes of Child Migration from Central America**

7.       In KIND's research into the root causes of child migration from Central America we have found that violence, in combination with impunity and a failure of protection in the children's home countries, causes children to flee their homes and seek safety in the United States. The main forms of violence that we have found unaccompanied children from the Northern Triangle seek to escape are violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and extreme discrimination based on sexual orientation and/or gender identity; and child abuse. KIND has found through its research that lesbian, gay, bisexual, transgender, and intersex (LGBTI) children and youth also face very high level of sexual and gender-based violence in the Northern Triangle; human trafficking of children is also common there. Children are trafficked from rural to urban areas and across borders or to border areas, where they are sexually exploited or subject to exploitative labor, in many cases in agricultural or domestic work. Femicide, or the gender-motivated killing of women and girls, is pervasive in the Northern Triangle countries, and Honduras, El Salvador, and Guatemala are among the ten countries with the highest homicide rates globally.[2]

8.       Based on our interviews and research, KIND has found that children targeted by gangs and cartels, LGBTI children, and children targeted for other sexual and gender-based

---

[2] This understanding is informed by the United Nations Office on Drugs and Crime (UNODC), *Global Study on Homicide* (2019), at https://www.unodc.org/unodc/en/data-and-analysis/global-study-on-homicide.html.

violence cannot rely on the governments of Honduras, El Salvador, or Guatemala to protect them, and that children from these countries accordingly have no faith in their governments' ability to protect them. As a result, violence against children is highly underreported in each of these countries, and even those crimes that do get reported rarely result in justice. In the vast majority of cases the perpetrator is never punished. Over 90% of homicide cases in the Northern Triangle end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. LGBTI rights organizations in the Region have informed KIND that law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence.

9.      Closely related to impunity is also the significant problem of corruption in the region. Corruption is well documented, but KIND's Regional Team has also been told in particular by women's rights organizations of numerous cases involving domestic violence or sexual violence perpetrated by a male involved in organized crime who was able to "buy off" law enforcement. We have heard examples of police officers as well as judges being bought off. I personally have spoken with numerous women who fled abusive domestic partners in Central America whose partners had either money or family connections that protected them from prosecution. Severely repressive measures by state security forces, including military police, army, and other security forces in the region have frequently targeted adolescent boys from neighborhoods under control of organized crime. Extrajudicial killings of youth by security forces in Honduras and El Salvador have been well-documented, but other measures including mass arrests or threats against the young males of a particular neighborhood erodes public trust in law enforcement or security forces in the region. Experts at the Salvadoran Women's Organization for Peace (ORMUSA), for example, have explained to KIND that one reason girls

who are victims of sexual and gender-based violence in El Salvador underreport is their worry

that contacting the police or other law enforcement could lead to broad scale repression or

violence against all of the young males in the neighborhood, i.e. including against their brothers

and other male family members.

10.     In addition to impunity, corruption, and repression, children from the Northern

Triangle in need of protection cannot rely on the child welfare system for help.  Child welfare

agencies throughout the region are underfunded, highly centralized (meaning no shelters outside

of the capital city), and weak, and often have inappropriate conditions for children. For example,

in March 2017 a fire broke out at a Guatemalan shelter for abused, abandoned, and neglected

children that led to the death of 40 teenagers. Following the incident numerous media articles

came out detailing accounts of physical, psychological, and sexual abuse of children in the

shelter that had never been investigated despite repeated complaints by children. When

conducting research for one of the reports referenced in footnote 1 above, KIND's Regional

Team heard from child welfare officials in the Northern Triangle countries they could not take

children fleeing gang violence into shelters because they could not protect those children.

11.     Based on KIND's research we found that sexual violence perpetrated by gangs is

one of the most common forms of violence that migrant children face. Gangs now dominate

much of the urban areas of Guatemala, El Salvador, and Honduras, and their control has

increasingly spread to rural areas as well. Where gangs dominate, women and girls are in

constant danger of being targeted for sexual violence. Gangs use rape and the threat of rape as a

tactic of control in the areas where they operate. Girls are also targeted for forced sexual

relationships with gang members and those who resist these advances face violence or even

death. Boys and increasingly girls are forcibly recruited by gangs and once invited to join a gang,

those who resist face threats, torture, and ultimately death. Civil society organizations working directly with children and families living in gang-controlled areas in Honduras, El Salvador, and Guatemala told KIND's Regional Team that when victims attempt to escape by relocating within their countries gangs often track them down and ruthlessly punish them.

**Common Risks and Inadequate Institutions Preclude Children from Obtaining Protection in Another Northern Triangle Country**

12.     From the conversations KIND's Regional Team has had with repatriated unaccompanied children in Guatemala and Honduras, and from our project working with Central American children to document their migration related stories, it is clear to me that children from the Northern Triangle who are seeking protection from violence do not believe that a different Northern Triangle country would be able to provide more protection than their own country, and the data proves them right. The problems of sexual and gender-based violence, forced gang recruitment, cartel violence, violence against LGBTI children and youth, and human trafficking exist throughout the Northern Triangle of Central America, as do the staggering rates of impunity and the weak child welfare systems mentioned above. Consequently, a teenager seeking to escape threats from a drug cartel in El Salvador, for example, would not be safe and would not feel safe to seek asylum in Honduras or Guatemala. An LGBTI teenager escaping persecution in Honduras would be no safer in Guatemala or El Salvador, and vice versa, as LGBTI individuals from the Northern Triangle are at risk of suffering violence at the hands of private actors, as well as the state.

13.      Experts on organized crime in the region have repeatedly told us that gangs and cartels have region-wide reach and can locate individuals throughout the region. Thus, fleeing a gang in El Salvador or Honduras means one is also unsafe in Guatemala.

14.      Guatemala's asylum system is brand new and is barely functioning. In May 2017, Guatemala's new migration code went into effect, with provisions for Guatemala's asylum system. The law, however, requires implementing regulations that were only issued in April 2019 and which have not yet been made public. In the past two years Guatemala has received about 350 applications for asylum and has only decided 20-30 of these cases. Immigration-focused organizations in Guatemala have informed KIND's Regional Team that between March 2018 and May 2019, Guatemala decided zero asylum cases and that the country only has three officers to interview asylum seekers.

15.      More generally, children traveling alone, without the protection of a parent or legal guardian, face significant difficulty in understanding the complex immigration laws and procedures in the countries they are transiting, even if those procedures are more effective than those of the Northern Triangle countries or Mexico.

**Risks to Unaccompanied Children in Mexico**

16.      I believe based on KIND Regional's research, numerous trips to Mexico, and interviews with unaccompanied children and with civil society organizations in Mexico, that unaccompanied children face significant risk of suffering harm in Mexico. Mexican crime data is to the same effect: Migrants and refugees are targets of violence in Mexico. Children in particular are at risk of robbery, sexual violence, kidnapping, falling prey to human traffickers, and femicide, as well as extortion, threats, and sexual violence, and the overwhelming majority

these crimes result in impunity. Violence against LGBTI individuals and violence against women are also pervasive problems in Mexico, often making unaccompanied children fleeing these forms of harm no safer there than in Central America. While in Mexico in February 2019, KIND met a Honduran teenager who, fleeing abuse in his own country, had been kidnapped and tortured in Mexico, and forced to watch as two of his friends—also unaccompanied children— were murdered. There have also been documented cases in which police, military, and other Mexican government officials have been directly and indirectly involved in violence against migrants and refugees, including kidnapping and extortion. These incidents increase migrants' mistrust of authorities in Mexico and their feeling of insecurity there, and they especially increase children's fear and mistrust.

17.     Mexico's proximity to the Northern Triangle countries from which many children have fled—and the presence of the same, and related, gangs and other organized criminal groups in Mexico—expose children to risk of being located and targeted by their persecutors. I recently spoke with a young man from El Salvador who fled gang violence there only to be beaten while in immigration custody in Mexico. He noted the presence of gang members in immigration custody and how terrified he felt the entire time he was in detention in Mexico. He decided he would be safer going back to El Salvador and trying again to reach the United States rather than remaining in custody in Mexico, where he felt he had no protection and where officials did not care if he was safe. During a visit to Mexico's northern border in March 2019, a human rights organization that assists migrants and refugees told me of a case involving a teenager from El Salvador who had fled violence and death threats by organized crime and had been placed in the custody of Mexico's child protection agency (Sistema Nacional para el Desarollo Integral de la

Familia, known as "DIF"), and for whom DIF had determined that the child could not safely remain in Mexico because his persecutors were pursuing him there.

18.     In Tijuana, Mexico in February 2019, a civil society shelter that cares for unaccompanied children asked KIND to meet with a Central American teenage girl who had become increasingly anxious upon learning that her persecutor, a gang member, had tracked her down and was making his way to Mexico to find her. The organization Human Rights Center of Fray Matias de Córdoba (Centro de Derechos Humanos Fray Matías de Córdoba, "Fray Matías"), based in Tapachula, Mexico, conducts monitoring of unaccompanied children in DIF shelters there and has engaged in monitoring in of children detained in centers run by Mexico's immigration agency (Instituto Nacional de Migración, or "INM") in the past. Fray Matías also provides legal representation to migrants, including families and children in Tapachula, Mexico. Fray Matías staff have told KIND during more than one visit to Tapachula that they are aware of cases in which unaccompanied children detained in Tapachula are terrified because they have been threatened by gang members who are held in the same INM detention center or DIF shelter.

## Mexico does not provide meaningful access to asylum or protection to unaccompanied children

19.     For the past three years KIND has been observing and researching Mexico's asylum system and the availability of international protection for unaccompanied children in Mexico. We have conducted interviews with child protection officials, with Mexico's refugee agency (Comisión Mexicana de Ayuda a Refugiados, or "COMAR"), children's rights organizations, immigrant and refugee rights organizations, immigrants and refugees, and international organizations.

20.     It is my belief that while COMAR has made some important progress, Mexico has a long way to go to provide meaningful protection, particularly when it comes to unaccompanied children. Despite Mexican law prohibiting the detention of children for migration control purposes, many children continue to be detained by INM. Conditions in INM detention centers have been widely reported to be harmful to children and in violation of international law. They include overcrowding, unhygienic conditions, mixing of unaccompanied children with unrelated adults, lack of education and recreation, and the use of isolation cells as punishment for misbehavior. Even children placed in DIF (child welfare) shelters endure inappropriate conditions for long term care of children. These conditions deter children from seeking asylum in Mexico. Unaccompanied children have confided this directly to KIND, and repeatedly have told this to Fray Matías staff. During a trip to Mexico in February 2019, unaccompanied teenage girls told KIND that they had previously been in Mexico in DIF custody and that they had been treated so terribly that they did not apply for asylum in Mexico.

21.     Mexico's child protection officers (OPIs), charged with identifying international protection needs and protecting children in custody, work for INM—the very agency detaining and seeking to deport them. This is an inherent conflict of interest, and very different from the system Congress created for protecting unaccompanied children under U.S. law. OPIs and officials from Mexico's child welfare agency, DIF, fail to inform children of their right to seek asylum and to identify children with protection needs in some cases; in others they fail to provide children with child-appropriate or clear information about the right to seek asylum. Officials frequently discourage children from seeking asylum, warning that they will face long-term detention if they do. Children are also often told that even if they are granted asylum, they will be institutionalized until their 18th birthday, dissuading them from seeking asylum.

22.     Unaccompanied children who do seek asylum in Mexico face significant barriers to protection. Mexico's child protection law provides for representation of migrant children by the Child Protection Authority (Procuraduría de Derechos de Niños, Niñas, y Adolescentes), the agency within the child protection system that is charged with determining children's best interests and guaranteeing their rights[3]; in reality, however, attorneys of the Child Protection Authority offices lack capacity to represent them and rarely represent them during asylum interviews with COMAR or seek other immigration relief for them. Civil society organizations in Mexico cannot provide legal consultation or representation to the vast majority of unaccompanied children in custody because Mexico limits the access that attorneys from civil society organizations have to children in INM and DIF facilities, and because a number of the Child Protection Authority offices refuse to permit these organizations to represent children. KIND recently documented discriminatory attitudes against unaccompanied children on the part of staff from the Child Protection Authority in Tapachula, (the office that sees the highest number of unaccompanied children) who described "all" Honduran youth as "aggressive."

23.     Although COMAR has had a nearly 200% increase in the filing of asylum applications in 2019, the agency has not grown to meet the need or number of claims being filed. Rather than increase COMAR's budget to grow the agency and meet the need, Mexico actually reduced the agency's budget by 20 percent. COMAR currently has only 4 offices and fewer than 30 Asylum Officers in the entire country that are qualified to interview and adjudicate asylum cases. Only 5-6 of these officers interview children seeking asylum. During a May 2019 trip, KIND's Regional Team documented that the COMAR office in Tapachula—the COMAR office

---

[3] In Mexico, DIF provides services such as shelter to children in the child protection system, while the Child Protection Authority is responsible for providing legal representation to children in the system and for protecting their rights.

that receives the highest number of claims—was completely overwhelmed by cases and lacked the staffing and resources needed to meet the demand. The Director of the office explained that staff had to use their own personal money to pay for gas needed to conduct their work. During this visit KIND observed about 100 families and unaccompanied children camping out on the street outside of COMAR's Tapachula office, exposing themselves to danger, in the hope that COMAR would receive them the next day.

24.     Mexico deports unaccompanied children to danger, in many cases in violation of Mexico's own child protection laws. Mexico's general children's law and migration law require consideration of the best interests of the child in all proceedings affecting them, and require best interests determinations (BIDs) prior to the deportation of a child. BIDs, which Mexico began in 2016, are conducted on a very limited basis due to lack of resources, capacity, and in some cases, will by Child Protection Authority offices. Very few children have BIDs prior to deportation decisions, and in some cases, children have been deported during the BID process.


**The U.S. Protection System Is Designed To Care for Unaccompanied Children Who Transit Mexico**

25.     Many unaccompanied children from the Northern Triangle have a close family member living in the United States, including a parent or stepparent, grandparent, aunt or uncle, or adult sibling. Even if children with close family in the United States could reasonably access protection in Mexico or in Guatemala, they often long to receive the love and support of a family member. If they were able to receive asylum in Mexico or in Guatemala they would face long term institutionalization, rather than the ability to reunify with close family as they seek protection.

26.     Congress has recognized that unaccompanied children are an especially vulnerable population and have extended extra procedural protections in U.S. immigration law to ensure they have safety from persecution, human trafficking, and *refoulment* (return to the country where they were persecuted). In 2008, Congress unanimously passed the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) to create critical protective measures for these unaccompanied children. [4] The protections include referral to the Department of Health and Human Services' Office of Refugee Resettlement (ORR), which provides care and custody for unaccompanied children and in whose care children can be screened by child welfare professionals and legal professionals for any protection needs or particular vulnerabilities. These provisions reflect Congress' recognition of the difficulties children might face in understanding their rights or the legal procedures governing their cases without a government funded attorney to assist them while in CBP custody. Once in ORR custody, children receive legal orientation presentations, legal screenings, and in some cases, an appointed child advocate to help them navigate a complex system, remain safe from exploitation in the process, and safeguard their best interests.

27.     The TVPRA also ensures that children will not be subjected to expedited removal by directing their placement in full immigration proceedings under Section 240 of the INA. 8 U.S.C. 1232(a)(5)(D). These provisions recognize the difficulty of ascertaining the full scope of a child's situation and needs in an expedited manner at the border and through a cursory interview by a CBP officer. As such, children are afforded the ability to tell their story and have their case heard before a trained adjudicator—an immigration judge—rather than having to make their case before a CBP agent shortly after apprehension.

---

[4] Pub. L. 110-457, 122 Stat. 5044, *codified in part at* 8 U.S.C. §§ 1158, 1232.

28.     The TVPRA also explicitly exempts unaccompanied children from the safe third country bar to asylum (8 U.S.C. §1158(a)(2)(E)) in further recognition that children traveling alone would have no one to explain complex international agreements governing immigration and international protection, and the risks of foreclosing access to protection under such circumstances. These concerns are echoed in the TVPRA's provisions on the safe repatriation and reintegration of unaccompanied children, which provide further evidence of congressional intent to ensure heightened protections for unaccompanied children to ensure they are not returned to harm. Among other requirements, these provisions direct the Secretary of Homeland Security to "consult the Department of State's Country Reports on Human Rights Practices and the Trafficking in Persons Report in assessing whether to repatriate an unaccompanied alien child to a particular country." 8 USC § 1232(a)(5)(B).

29.     Finally, while TVPRA broadly limits the ability of the government to directly return unaccompanied children to their home countries, Congress did allow more direct procedures for immediate repatriation of some children from "contiguous countries"—Mexico and Canada (8 U.S.C. § 1232(a)(2)). In differentiating so sharply between children from contiguous and non-contiguous countries, Congress acted with clear recognition that children with fear of return would transit the southern border with Mexico and need to be processed for protection. It then provided the range of procedural protections for those children noted above. These TVPRA protections provide unaccompanied children who transit Mexico, reach our southern border, and seek protection substantially more safety than do the limited protection systems in Mexico, Guatemala, and other possible transit countries. Barring such children from accessing the TVPRA protections would deprive them of the only meaningful protection system that is available to them.

30.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed: August 18, 2019

_____

Lisa Frydman

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>          Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>          Defendants. |

Civil Action No. 1:19-cv-02117-TJK

## [PROPOSED] PRELIMINARY INJUNCTION

This matter came before the Court on Plaintiffs' Motion for Preliminary Injunction (the "Motion"). Having considered the Motion and the documents filed therewith, including supporting declarations, Plaintiffs' Amended Complaint, and the files and records herein, and good cause appearing therefor, the Court hereby finds and concludes as follows.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

To obtain a preliminary injunction, Plaintiffs must establish: (1) that irreparable harm is likely in the absence of preliminary relief, (2) a likelihood of success on the merits, (3) that the balance of the equities tips in Plaintiffs' favor, and (4) that an injunction is in the public interest. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Based on the record before the Court, Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES"), Human Rights First ("HRF"), J.M.M., D.L.R., Z.B.M., Y.G.C., M.Y.R.B., K.M.V.M., W.M.R.O., C.C.R.O., and N.G.R.L. (together, "Plaintiffs") will face immediate and irreparable injuries as a result of the implementation and enforcement of the interim final rule

issued by Defendants dated July 16, 2019, entitled *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,892 (July. 16, 2019) (the "Rule").  Absent an injunction, the Rule will prevent migrants like Plaintiffs J.M.M., D.L.R., Z.B.M., Y.G.C., M.Y.R.B., K.M.V.M., W.M.R.O., C.C.R.O., and N.G.R.L. from being considered eligible for asylum consistent with the laws of the United States and place them at imminent risk of deportation to countries in which they may face persecution and violence.  Correspondingly, implementation of the Rule also will substantially compromise the resources of CAIR Coalition, RAICES, and HRF and their abilities to assist as many migrants as possible consistent with their organizational missions.  Further, Defendants' promulgation of the Rule without employing the notice and comment procedures required under the Administrative Procedure Act, 5 U.S.C. § 553, deprived Plaintiffs of the ability to file comments opposing the policy.  Each of the foregoing harms is significant and irreparable.

It is likely that Plaintiffs will prevail on the merits of the claims set forth in their Amended Complaint.  A preliminary injunction against Defendants, in the manner set forth below, is necessary until a determination of the merits of Plaintiffs' claims may be held.

The balance of the equities and the public interest also favor the relief sought by Plaintiffs.  In particular, the issuance of preliminary injunction will not cause substantial harm to Defendants and will maintain the status quo pending resolution of the merits of this case.

The Court continues to have jurisdiction over Defendants and the subject matter of this case.

No security bond is required under Federal Rule of Civil Procedure 65(c).

**PRELIMINARY INJUNCTION**

Now, therefore, Plaintiffs' Motion is GRANTED, and it is hereby ORDERED that:

1.     Defendants and all of their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined fully from enforcing or implementing the Rule across the nation.  Enforcement or implementation of the Rule at all United States borders, ports of entry, and in the processing of asylum claims is prohibited, pending further order of this Court.

2.     Defendants shall immediately provide a copy of this Preliminary Injunction to any persons or entity that may be subject to it, including Defendants' officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them or who have any involvement in the removal of individuals from the United States.


Date: _____                                    _____

                                                         United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>         Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>         Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.   Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

August 21, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick
Justin W. Bernick
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com