# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-02117-TJK |
| I.A., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-02530 |

## CONSOLIDATED OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL AND PROCEDURAL BACKGROUND .......................................................... 4

STANDARD OF REVIEW .................................................................................. 10

ARGUMENT .................................................................................................. 11

I.   Plaintiffs Lack Article III Standing and Are Not Within the Zone of Interests ............... 11

II.   The Individual Aliens' Claims Provide No Basis For An Injunction ............................. 19

III.   The Government is Likely to Succeed on the Merits. ....................................... 28

    A.   The Rule is Consistent with the INA .................................................... 28

    B.   The Rule Does Not Conflict With the TVPRA .................................... 37

    C.   The Rule Satisfies the APA's Procedural Requirements. ..................... 38

    D.   The Rule Is Not Arbitrary and Capricious ......................................... 44

IV.   The Equitable Factors Weigh Against a Preliminary Injunction ...................... 50

V.   Any Preliminary Relief Must Be Sharply Limited .......................................... 52

CONCLUSION ................................................................................................ 54

# TABLE OF AUTHORITIES

## CASES

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ................................................................. 52

*AFGE v. Sec'y of Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ................................................................. 26

*American Immigration Lawyers Asso. v. Reno*,
199 F.3d ..................................................................................................... 21

*Am. Ass'n for Homecare v. Leavitt*,
No. 08-cv-0992, 2008 WL 2580217 (D.D.C. June 30, 2008) ............................ 16, 52

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) .................................................................... 41, 42

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ..................................................................... 14

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .................................................................................. 51

*Ansaldo v. United States*,
No. 16-cv-328-CMA, 2018 WL 1084144 (D. Colo. Feb. 28, 2018) ................. 24

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ..................................................................... 15

*Arroyo v. U.S. DHS.*,
No. SACV19815JGBSHKX, 2019 WL 2912848 (C.D. Cal. June 20, 2019) ............ 18

*Bains v. Schiltgen*,
No. C 97-2573 SI, 1998 WL 204977 (N.D. Cal. Apr. 21, 1998) ..................... 19

*Bal v. Sessions*,
292 F. Supp. 3d 604 (E.D. Penn. 2017) ...................................................... 23

*Barron v. Ashcroft*,
358 F.3d 674 (9th Cir. 2004) ..................................................................... 25

*Block v. Community Nutrition Institute*,
467 U.S. ..................................................................................................... 18

*California Ass'n of Private Postsecondary Sch. v. DeVos*,
  No. 17-999, 2018 WL 5017749 (D.D.C. Oct. 16, 2018) ................................................. 10, 51

*Capital Area Immigrants' Rights Coal. v. Trump*,
  No. 1:19-CV-02117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019) ......................... 1, 7, 8, 9

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ...................................................................................... 51, 52

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) ................................................................................................ 54

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. 2019) .............................................................................................. 45

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................................... 51

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................. 14

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................................................................. 16

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ........................................................................................................ 13, 53

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................................................................. 25

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ......................................................................................................... 49

*EarthLink, Inc. v. FCC*,
  462 F.3d 1 (D.C. Cir. 2006) ........................................................................................... 44, 50

*East Bay Sanctuary Covenant v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ...................................................................... 8, 9, 46, 49

*East Bay Sanctuary Covenant v. Barr*,
  No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) .................................................. 1, 8

*East Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) .................................................................................... 3, ***passim***

*Elgin v. Department of Treasury,*
   567 U.S. ............................................................................................................ 27

*Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.,*
   858 F. Supp. 2d 1 (D.D.C. 2012) ...................................................................... 52

*Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing,*
   28 F.3d 1268 (D.C. Cir. 1994) ........................................................................... 12

*FCC v. WNCN Listeners Guild,*
   450 U.S. 582 (1981) ........................................................................................... 44

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ............................................................................. 17

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ........................................................................................... 13

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ........................................................................................... 41

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ........................................................................... 15

*Fook Hong Mak v. INS,*
   435 F.2d 728 (2d Cir. 1970) ............................................................................... 29

*Fund for Animals, Inc. v. Kempthorne,*
   472 F.3d 872 (D.C. Cir. 2006) ........................................................................... 36

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ................................................................................. 11, 52

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) ........................................................................................... 53

*Haitian Refugee Ctr. v. Gracey,*
   809 F.2d 794 (D.C. Cir. 1987) ........................................................................... 12

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................................................... 12

*Hawaii Helicopter Operators Ass'n v. FAA,*
   51 F.3d 212 (9th Cir. 1995) ............................................................................... 38

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
  709 F.3d 44 (D.C. Cir. 2013) ................................................................. 45

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .................................................................................. 40

*Howell v. INS*,
  72 F.3d 288 (2d Cir. 1995) .................................................................... 24

*Immigrant Rights Project v. USCIS*,
  325 F.R.D. 671 (W.D. Wash. 2016) ....................................................... 17

*In re Core Commc'ns, Inc.*,
  455 F.3d 267 (D.C. Cir. 2006) ............................................................... 44

*Innovation Law Lab v. McAleenan*,
  924 F.3d 503 (9th Cir. 2019) ................................................................. 52

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ......................................................................... 28, 37

*INS v. Legalization Assistance Project of L.A. Cty.*,
  510 U.S. 1301 (1993) ....................................................................... 17, 18

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ............................................ 18, 21, 22, 26

*Jama v. DHS*,
  760 F.3d 490 (6th Cir. 2014) ................................................................. 25

*Jarkesy v. S.E.C.*,
  803 F.3d 9 (D..C. Cir. 2015) .................................................................. 26

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ....................................................................... 23, 27

*Jifry v. F.A.A.*,
  370 F.3d 1174 (D.C. Cir. 2004) ............................................................. 38

*Judulang v. Holder*,
  132 S. Ct. 476 (2011) ............................................................................ 26

*Kalubi v. Aschroft*,
  364 F.3d 1134 (9th Cir. 2004) ............................................................... 29

*Khan v. Holder*,
   584 F.3d 773 (9th Cir. 2009) ................................................................ 36

*Landon v. Plasencia*,
   459 U.S. 21 (1982)................................................................................. 50

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)................................................................... 51

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973)......................................................................... 12, 15

*Lindeen v. Securities and Exchange Commission*
   825 F.3d 646, (D.C. Cir. 2016) ........................................................ 45, 50

*Lopez v. Davis*,
   531 U.S. 230 (2001)............................................................................. 29

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................. 11

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990)............................................................................. 24

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994)............................................................................. 53

*Martinez v. Napolitano*,
   704 F.3d 620 (9th Cir. 2012) ........................................................... 22, 23

*Maryland v. King*,
   567 U.S. 1301 (2012)........................................................................... 50

*Mathews v. Diaz*,
   426 U.S. 67 (1976)......................................................................... 13, 51

*Matter of B-R-*,
   26 I. & N. Dec. 119 (BIA 2013) ............................................................ 31

*Matter of Pula*,
   19 I. & N. Dec. 467 (BIA 1987) ............................................... 29, 33, 36

*McNary v. Haitian Refugee Ctr.*,
   489 U.S.  (1991)................................................................................. 27

*Medellin v. Texas*,
  552 U.S. 491 (2008) ........................................................................................... 36

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ........................................................................ 18

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (TECA 1983) ............................................................................. 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Inc. Co.*,
  463 U.S. 29 (1983) ............................................................................................. 44

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) .......................................................................... 17

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................................... 10

*Nat'l Ass'n for Fixed Annuities v. Perez*,
  219 F. Supp. 3d 10 (D.D.C. 2016) .................................................................... 10

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .......................................................................... 15

*Nelson v. Preap*,
  139 S. Ct. 954 (2019) ......................................................................................... 27

*New Jersey v. United States*,
  91 F.3d 463 (3d Cir. 1996) ................................................................................ 13

*New York v. NRC*,
  824 F.3d 1012 (D.C. Cir. 2016) ................................................................... 44, 49

*Nijjar v. Holder*,
  689 F.3d 1077 (9th Cir. 2012) ........................................................................... 35

*NTEU v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ........................................................................ 14

*O.A. v. Trump*,
  2019 WL 3556334 (D.D.C. August 2, 2019) ........................................... 25, 26, 27

*O'Bannon v. Town Court Nursing Ctr.*,
  447 U.S. 773 (1980) ........................................................................................... 13

*PETA v. United States Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................. 13, 14, 15

*Plyler v. Doe*,
   457 U.S. 202 (1982) ......................................................................................... 13

*Privacy Info. Ctr. v. United States Dep't of Commerce*,
   928 F.3d 95 (D.C. Cir. 2019) ........................................................................... 11

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ....................................................................... 26, 43

*Randall v. Meese*,
   854 F.2d 472 (D.C. Cir. 1988) ......................................................................... 24

*Raoof v. Sullivan*,
   315 F. Supp. 3d 34 (D.D.C. 2018) .................................................................... 42

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
   525 U.S. 471 (1999) ......................................................................................... 26

*Reno v. Catholic Social Servs., Inc.*,
   509 U.S. 43 (1993) ........................................................................................... 24

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ......................................................................................... 25

*R-S-C- v. Sessions*,
   869 F.3d 1176 (10th Cir. 2017) .................................................................. 35, 36

*Saavedra Bruno v. Albright*,
   197 F.3d 1153 (D.C. Cir. 1999) ....................................................................... 19

*Sacora v. Thomas*,
   628 F.3d 1059 (9th Cir. 2010) ......................................................................... 44

*Saleh v. Bush*,
   848 F.3d 880 (9th Cir. 2017) ........................................................................... 36

*Singh v. INS*,
   134 F.3d 962 (9th Cir. 1998) ........................................................................... 48

*Sorenson Communications, Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) .................................................................... 39, 49

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................ 11, 12

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................... 16

*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ..................................................................................... 13

*Tchitchui v. Holder*,
  657 F.3d 132 (2d Cir. 2011) ..................................................................... 46, 51

*Time Warner Entm't Co. v. FCC*,
  240 F.3d 1126 (D.C. Cir. 2001) ...................................................................... 50

*Trump v. Hawaii*,
  138 S. Ct. .................................................................................................... 53

*United States v. Cortez*,
  449 U.S. 411 (1981) ...................................................................................... 50

*United States v. Malenge*,
  294 F. App'x 642 (2d Cir. 2008) ................................................................. 33, 34

*United States v. Mendoza*,
  464 U.S. 154 (1984) ...................................................................................... 54

*University of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ...................................................................................... 53

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 10

*Xiao v. Barr*,
  979 F.2d 151 (9th Cir. 1992) .......................................................................... 24

*Yassini v. Crosland*,
  618 F.2d 1356 (9th Cir. 1980) ............................................................. 41, 43, 44

## **FEDERAL STATUES**

5 U.S.C. § 553(a)(1) ........................................................................................... 3, 38, 43

5 U.S.C. § 553(b) ..................................................................................................... 8

5 U.S.C. § 553(b)(B) .............................................................................................. 38

5 U.S.C. § 701(a)(1) ............................................................................................... 18

5 U.S.C. § 702 ........................................................................................................ 16

5 U.S.C. § 704 ........................................................................................................ 25

5 U.S.C. § 706 .......................................................................................................... 7

5 U.S.C. § 706(2)(A) ................................................................................................ 8

8 U.S.C. § 1158 ............................................................................................... 1, 7, 29

8 U.S.C. § 1158(a)(1) ..................................................................................... 2, 4, 10

8 U.S.C. § 1158(a)(2)(A) ...................................................................... 7, 31, 32, 36

8 U.S.C. § 1158(b)(1)(A) ....................................................................................... 28

8 U.S.C. § 1158(b)(2)(A) ....................................................................................... 49

8 U.S.C. § 1158(b)(2)(C) ....................................................................... 5, 28, 29, 47

8 U.S.C. § 1158(b)(3)(C) ................................................................................... 38, 49

8 U.S.C. § 1225(b) .................................................................................................... 4

8 U.S.C. § 1229a ....................................................................................................... 2

8 U.S.C. § 1229a(b)(1) ........................................................................................... 27

8 U.S.C. § 1231(b)(3)(A) .................................................................................... 5, 37

8 U.S.C. § 1252 ....................................................................................................... 18

8 U.S.C. § 1252(b)(9) ....................................................................................... 21, 23

8 U.S.C. § 1252(d) .................................................................................................. 24

8 U.S.C. § 1252(e)(3) ........................................................................................................ 19

8 U.S.C. § 1252(f)(1) ........................................................................................................ 21

8 U.S.C. § 1329 ................................................................................................................. 19

8 U.S.C. § 1101(a)(42) ........................................................................................................ 4

8 U.S.C. § 1221-32 ........................................................................................................... 20

8 U.S.C. § 1252(a)(5) ........................................................................................ 2, 12, 18, 21

8 U.S.C. § 1252(e) ............................................................................................................ 20

8 U.S.C. § 1252(e)(1) ........................................................................................................ 52

28 U.S.C. § 2347(b)(3) ...................................................................................................... 27

## FEDERAL REGULATIONS

8 C.F.R. § 208.15 .............................................................................................................. 30

8 C.F.R. § 208.30(f) .......................................................................................................... 23

8 C.F.R. § 1208.16(c) .......................................................................................................... 5

8 C.F.R. § 1239.1(a) .......................................................................................................... 23

## FEDERAL REGISTER

84 Fed. Reg. 33,829 ............................................................................................................ 1

84 Fed. Reg. 33,830 ...................................................................................................... 5, 32

84 Fed. Reg. 33,831 ............................................................... 3, 5, 32, 33, 45, 46, 50

84 Fed. Reg. 33,832 .......................................................................................................... 46

84 Fed. Reg. 33,834 ...................................................................................................... 34, 51

84 Fed. Reg. 33,838 ...................................................................................................... 41, 45

84 Fed. Reg. 33,839 ......................................................................... 28, 36, 45, 47, 48, 49

84 Fed. Reg. 33,840 ......................................................................... 45, 46, 47, 49

84 Fed. Reg. 33,841 ......................................................................... 3, 39, 40, 41, 46

84 Fed. Reg. 33,842 ......................................................................... 41, 42, 43

84 Fed. Reg. 33,843 ......................................................................... 48

69 Fed. Reg. 69,480 ......................................................................... 33

69 Fed. Reg. 69,490 ......................................................................... 32

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. of Civ. P. 23 ......................................................................... 53

## INTRODUCTION

The two cases presently before the Court stem from multiple advocacy groups' efforts to halt on a nationwide basis an important, timely, and well-supported interim final rule promulgated jointly by the Departments of Justice and Homeland Security to address the urgent, ongoing crisis on the United States' southern border. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019). This Court previously denied a nationwide temporary restraining order in *Capital Area Immigrants' Rights Coal. v. Trump*, No. 1:19-CV-02117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019), finding that Plaintiffs had not met the "high standard" to show irreparable harm. The court also noted its "strong doubts" about the viability of several of Plaintiffs' other claims, including that they would be able to show that the rule exceeded the Attorney General's authority under 8 U.S.C. § 1158, or that the rule violated the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA). *Id*. at 3. The Court also noted its doubt about the strength of Plaintiffs' procedural claim, although it was a "closer call." *Id*.

Plaintiffs in the two cases now assert that they have identified individual alien Plaintiffs who they say will be impacted by the rule. This does not warrant relief, either on behalf of the individual plaintiffs or, much less, on a nationwide basis. Nor does the stay order issued by the Ninth Circuit, *see East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *1 (9th Cir. Aug. 16, 2019), warrant changing course—indeed, if anything, that decision shows why nationwide relief is unwarranted.

Plaintiffs lack any basis to procure this relief. As before, the organizations are advocacy groups who claim injury based on the need to adapt to a new policy, but nothing has changed for

these organizations and, as before, their asserted injury does not justify relief, and the law precludes them from seeking relief on behalf of aliens subject to the immigration laws.

Furthermore, the individual Plaintiffs cannot seek relief in this Court. Two of the plaintiffs are presently in expedited removal proceedings under section 1225(b)(1), and thus their claims are subject to section 1252(e)(3), which circumscribes the scope of review and prohibits the entry of a preliminary injunction. The remaining individual Plaintiffs in both cases have been issued Notices to Appear (NTAs), which means they are now in removal proceedings under 8 U.S.C. § 1229a, where they can and must raise any legal challenges to the procedural rules that will govern their eligibility for relief, and which means this Court lacks jurisdiction over their claims. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (d). Thus, even assuming the individual alien's claims are meritorious (which they are not), their request for a nationwide preliminary injunction is jurisdictionally improper.

Even if this Court could consider Plaintiffs' request for preliminary relief, their claims lack merit, for the reasons explained in opposing the initial request for injunctive relief. Plaintiffs bring the same four claims for preliminary relief. *First*, they claim that the rule is inconsistent with section 1158. *See CAIR* Mot. 20-24, *I.A.* Mot.12-22. But section 1158 squarely authorizes the Departments to issue the rule here by making clear that asylum is a discretionary benefit and authorizing the Attorney General to establish additional categorical bars to eligibility. *See* 8 U.S.C. § 1158(a)(1), (b)(2)(C). Adding an additional categorical bar to prioritize those aliens who have not had an opportunity to seek asylum in a third country serves purposes distinct from the bars Congress provided for aliens who had firmly resettled in a third country or were subject to a safe third country agreement. *See* 8 U.S.C. § 1158(a)(1) & (b)(2)(A)(iv).

*Second*, Plaintiffs claim that the rule violates the TVPRA. *CAIR* Mot. n.6, *I.A.* Mot. 31-33.

But the TVPRA does not alter asylum eligibility rules, and it is no violation to issue a new eligibility limitation pursuant to section 1158(a)(2).

*Third*, Plaintiffs claim that the rule violates the Administrative Procedures Act's (APA) notice-and-comment requirements. *CAIR* Mot. 9-20, *I.A.* Mot. 22-27. But the good cause exception is satisfied here, as notice and comment "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect." 84 Fed. Reg. at 33,841. Notice and comment also is not required because the regulation is linked intimately with foreign affairs—here, ongoing negotiations between the United States, Mexico, and Northern Triangle countries to address the current border crisis and methods for burden-sharing in addressing claims for asylum. *See* 5 U.S.C. § 553(a)(1). Awaiting notice and comment would "[h]inder" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis," precisely the "undesirable international consequence that warrants invocation of the foreign affairs exception." *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018).

*Fourth,* Plaintiffs suggest that the rule is arbitrary and capricious, *CAIR* Mot. 24-30, *I.A.* Mot. 28-31, but the agencies explained the reason for the rule, and have supported that rule with a robust administrative record. AR1-784. As the preamble explains, the rule is needed to dis-incentivize aliens with meritless asylum claims from seeking admission to the United States, thereby relieving stress on immigration authorities, prioritizing individuals who are unable to obtain protection from persecution elsewhere, curtailing human smuggling, and strengthening the United States' negotiating hand in "ongoing diplomatic negotiations ... between the United States and Mexico," 84 Fed. Reg. at 33,831. Plaintiffs' policy disagreements are no basis to second-guess the considered conclusions of the agency heads.

Finally, Plaintiffs cannot demonstrate that the balance of harms warrants drastic and immediate injunctive relief based on the alleged risk that these organizations may need to adapt to new rules, or that the individual Plaintiffs may have the rule as applied to them at some point in the indeterminate future in their individual credible fear screenings or removal proceedings. The rule aims to help control our international border and save lives by discouraging asylum seekers from making dangerous, unlawful border crossings, while prioritizing those asylum-seekers who could not have sought relief elsewhere. Of course, mandatory non-refoulement obligations are unchanged and protect even those who could have sought asylum elsewhere. The Executive has a paramount sovereign interest in maintaining the integrity of the United States' borders, enforcing the immigration laws, and ensuring that immigration cases can be adjudicated swiftly. The United States and the public, by contrast, would plainly be harmed by any halting of the important rule at issue in this case. The Court should therefore deny a preliminary injunction.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. Congress has empowered the Attorney General and Secretary of Homeland Security to decide who may be admitted to this country as a refugee. 8 U.S.C. §§ 1101(a)(42), 1158, 1225. As a general matter, aliens have a right to apply for asylum. "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival ...), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b), which governs expedited removal of aliens]." *Id.* § 1158(a)(1). But a grant of asylum is entirely discretionary. Asylum "*may* [be] grant[ed] to an alien who has applied," *id.* § 1158(b)(1)(A) (emphasis added), if the alien satisfies certain standards and is not subject to an application or eligibility bar, *id.* § 1158(a)(2), (b)(1)(B), (b)(2). As part of this discretion, "[t]he Attorney General [and Secretary] may by

regulation establish additional limitations and conditions, consistent with this section [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). Separate from the discretionary authority to grant asylum, the United States has a mandatory duty to provide two forms of protection from removal: withholding of removal (when an alien faces a probability of persecution on a protected ground in another country) and protection under the Convention Against Torture (CAT) (when an alien faces a probability of torture in another country). *See* 8 U.S.C. § 1231(b)(3)(A) (withholding); 8 C.F.R. § 1208.16(c) (CAT).

<u>Joint Rule</u>. On July 16, 2019, the Attorney General and Acting Secretary issued a joint interim final rule providing (with limited exceptions) that "an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum." 84 Fed. Reg. at 33,830. The Attorney General and Acting Secretary invoked their authority to establish "additional limitations … under which an alien shall be ineligible for asylum" (8 U.S.C. § 1158(b)(2)(C)), and to impose "limitations on the consideration of an application for asylum" (*id.* § 1158(d)(5)(B)). *See* 84 Fed. Reg. at 33,830-31. The rule provides that aliens who are ineligible for asylum may still receive protections from removal if they establish a reasonable fear of persecution or torture. *Id.* at 33,834, 33,837-38.

The rule seeks to discourage "asylum claims raised by those apprehended at the southern border [that] are ultimately determined to be without merit" and that impose a "strain on the nation's immigration system," "undermine[ ] many of the humanitarian purposes of asylum," have "exacerbated the humanitarian crisis of human smuggling," and "affect[ ] the United States' ongoing diplomatic negotiations with foreign countries." 84 Fed. Reg. at 33,831. It does so by "de-

prioritizing the applications of individuals who could have obtained protection in another country" and "ensur[ing] that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly." *Id.* "[C]urrently more than 900,000 cases are pending before immigration courts," *id.*, many tens of thousands of which involve asylum claims that will not be granted. AR21, 121. The rule combats that serious systemic strain by "reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief." *Id.* The rule thus "mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture." *Id.* "Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category." *Id.*

The rule was issued as an interim final rule, effective immediately during the comment period under the good-cause and foreign-affairs exceptions to the notice-and-comment and effective-date requirements of the APA. *See id.* at 33,840-41.

The CAIR lawsuit. The day the rule was published, two organizations that provide legal and social services to immigrants and refugees filed the *CAIR* lawsuit in this Court seeking immediate injunctive relief. Plaintiffs alleged that the rule unlawfully "strip[s] asylum eligibility" from many aliens. *CAIR* Compl. ¶ 7. Plaintiffs alleged that they must "diver[t] ... their human and financial resources" to, among other things, "create more complicated new resources and procedures to assist clients with their claims," *id.* ¶¶ 110, 115, 135, 136, and that the rule could mean fewer cases and fewer "volunteers at law firms," which will lead to "fewer ... donations," *id.*

¶¶ 130, 142. After a hearing on Plaintiffs' motion for a temporary restraining order, this Court found that Plaintiffs had not met the "high standard" required to award relief. *See Capital Area Immigrants' Rights Coal.*, 2019 WL 3436501, at *1. The Court noted that additional expenditures could not suffice to establish irreparable harm, and that the "most salient" claim was that the organizations would be able to reach fewer people. *Id*. The Court expressed "skepticism" that could warrant emergency relief, however, distinguishing this from other cases where irreparable harm was established. *See id at* *2. The Court held that Plaintiffs had not provided data on "how many of their clients will be newly eligible under the Interim Rule; how many intake interviews or credible fear interviews will take place over the next few weeks; and ultimately, how many potential clients they will be unable to reach in that time frame." *Id*. The Court also offered preliminary thoughts on the other relevant factors, noting its skepticism that Plaintiffs would be able to show that the rule exceeded the Attorney General's authority under section 1158(b)(2)(C), and that it also had strong doubts about Plaintiffs' claim under the TVPRA, noting that migrants respond to immigration policy. *Id*. at 4.

Subsequently, Plaintiffs filed an amended complaint, adding nine individual Plaintiffs—J.M.M., D.L.R., Z.B.M., Y.G.C., M.Y.R.B., K.M.V.M., W.M.R.O., C.C.R.O., and N.G.R.L., and an additional organization—Human Rights First. Am. Compl., ECF 37. Plaintiffs bring four APA claims, a constitutional claim, a mandamus claim, and a "declaratory judgement" claim. *See generally id*. *First*, they claim that the rule conflicts with the asylum statute, 8 U.S.C. § 1158, and so is contrary to law. *CAIR* Am. Compl. ¶¶ 224-31; *see* 5 U.S.C. § 706. Plaintiffs principally contend that the rule conflicts with Immigration and Nationality Act (INA) provisions that: (1) render ineligible for asylum aliens who "may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened," 8 U.S.C.

7

§ 1158(a)(2)(A); and (2) prohibit granting asylum to an alien who "was firmly resettled in another country prior to arriving in the United States," *id.* § 1158(b)(2)(A)(iv), *CAIR* Am. Compl. ¶¶ 226. *Second*, Plaintiffs claim that the rule is arbitrary and capricious because it is unsupported by evidence. *CAIR* Am. Compl. ¶¶ 232-240. *Third*, they contend it violates the APA because it was improperly issued without notice and an opportunity to comment and was published less than 30 days before its effective date. *CAIR* Am. Compl. ¶¶ 241-247; *see* 5 U.S.C. § 553(b), (c), (d). *Fourth*, Plaintiffs allege that the rule violates the due-process rights of "Individual Plaintiffs and the other putative class members in the United States," although the case has no class-action component. *CAIR* Am. Compl. ¶¶ 248-255; *see* 5 U.S.C. § 706(2)(A). *Fifth,* they allege a violation of the TVPRA. *CAIR* Am. Compl. ¶¶ 256-263. They also bring a mandamus claim and a declaratory judgment claim. *CAIR* Am. Compl. ¶¶ 264-275. Plaintiffs move for a preliminary injunction—based on their APA and TVPRA, but not due-process, claims—preventing the rule from taking effect. *See generally CAIR* Mot., ECF 41-1.

The East Bay lawsuit. Another case, *East Bay v. Barr*, case no. 19-cv-4073-JST (N.D. Cal.), also challenges the rule. Plaintiffs in that case are four organizations that provide services to aliens. On July 24, 2019, the same day this Court announced its decision denying the TRO in the *CAIR* case, the Northern District of California heard argument on a motion to enjoin the rule and issued a TRO enjoining enforcement of the rule nationwide, which was subsequently converted into a preliminary injunction. *See East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019). First, the court concluded that plaintiffs raised "serious questions" regarding the government's invocation of the good-cause and foreign-affairs exceptions to notice-and-comment procedures. *East Bay*, 385 F. Supp. 3d at 950-51. Second, the court concluded that the rule likely conflicted with the INA, specifically, with the statutory bars to asylum for aliens "who may be

removed to a 'safe third country'" and aliens who were "firmly resettled in another country prior to arriving in the United States." *Id*. at 930. Finally, the court concluded that the rule was likely arbitrary and capricious because the government had neither shown that asylum was "sufficiently available" in third countries nor explained why "the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country." *Id.* at 953.

The court ordered a nationwide injunction despite this Court's earlier refusal to award any preliminary relief (nationwide or otherwise) against the rule, see *Capital Area Immigrants' Rights Coalition*, 2019 WL 3436501. The government filed a notice of appeal and moved for a stay pending appeal, which the court denied. The government renewed its motion for a stay pending appeal in the Ninth Circuit. A motions panel denied the motion for a stay "insofar as the injunction applies within the Ninth Circuit, but granted the motion for a stay outside of the Ninth Circuit, because the nationwide scope of the injunction is not supported by the record as it stands." *East Bay Sanctuary Covenant*, 2019 WL 3850928, at *1.The Ninth Circuit, reviewing the denial of the stay for an abuse of discretion, stated that the government had not made a "strong showing" and that the good-cause exception "'should be interpreted narrowly'" and the foreign-affairs exception "requires showing that ordinary public noticing would 'provoke definitely undesirable international consequences.'" *Id*. (citation omitted). In light of that conclusion, the Ninth Circuit expressly declined to reach the district court's alternative determinations that the rule exceeded the government's statutory authority and that the rule was arbitrary and capricious. *See id.* at n.3. On August 26, 2019, the government applied for an emergency stay of that injunction in the Supreme Court. *Barr v. East Bay Sanctuary Covenant*, Supreme Court case no. 19A230.

The I.A. lawsuit. Shortly after the Ninth Circuit narrowed the injunction in *East Bay*,

counsel in that case, on behalf of new plaintiffs—eight individuals and one organization—filed suit in this Court, again seeking a nationwide injunction. *I.A.* Compl., ECF 3. That same day, the *I.A.* Plaintiffs moved for a preliminary injunction. *I.A.* Mot., ECF 6. Plaintiffs bring very similar but not identical claims for relief as the *CAIR* Plaintiffs. *First*, they allege the rule violates the INA because the rule is contrary to the asylum law provisions, including 8 U.S.C. §§ 1158(a)(1), 1158(a)(2)(A), 1158(b)(2)(A)(vi), 1158(b)(2)(C), 1158(d)(5)(B), and 1225(b). *See I.A.* Compl., ¶¶ 121-124. *Second* and *third*, they allege the rule violates the APA's notice and comment provisions, *id.* ¶¶ 125-128. *Fourth*, they claim that the rule is arbitrary and capricious under the APA because it is unsupported by evidence, *id.* ¶¶ 129-130. *Fifth*, they claim that the rule violates the TVPRA because it "upends" the non-adversarial system through which unaccompanied alien children can apply for asylum. ¶¶ 131-135.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must satisfy each requirement, and the D.C. Circuit has suggested that "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," and that the Court may not apply the "sliding scale approach." *Nat'l Ass'n for Fixed Annuities v. Perez*, 219 F. Supp. 3d 10, 13 (D.D.C. 2016). Regardless of "whether the sliding scale approach applies," if Plaintiffs do not show "a substantial likelihood" of jurisdiction or demonstrate that they are "likely to suffer an irreparable injury, the Court must deny the motion." *California Ass'n of Private Postsecondary Sch. v. DeVos*, No. 17-

999, 2018 WL 5017749, at *4 (D.D.C. Oct. 16, 2018). And any claims of injury on which standing will be premised "must be evaluated under the heightened standard for evaluating a motion for summary judgment in determining whether or not to grant the motion for preliminary injunction." *Elec. Privacy Info. Ctr. v. United States Dep't of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019).

## ARGUMENT

The Court should deny the motions for a preliminary injunction. The organizational Plaintiffs lack standing and are not within the INA's zone of interests. The individual Plaintiffs who are in removal proceedings must raise their claims in those removal proceedings, and those Plaintiffs who are not in removal proceedings may not seek preliminary relief, nor relief that is broader than necessary to redress their individual injury. Even if Plaintiffs could surmount these jurisdictional hurdles, their claims lack merit, the equities are against them, and their requested relief is far too broad in any event.

### I.    Plaintiffs Lack Article III Standing And Are Not Within the Zone of Interests.

Standing. The Plaintiff organizations have not suffered a cognizable injury necessary to establish Article III standing. To satisfy the "'irreducible constitutional minimum' of standing" under Article III, the party invoking federal jurisdiction must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560). Where, as here, an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).

11

The organizational Plaintiffs seek to establish standing based on an alleged interference with their missions, under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See CAIR* Am. Compl. ¶¶ 174-223; *I.A.* Compl. ¶ 119-120. Organizations may have standing in some situations where their core activities are impaired, as recognized in *Havens*. But, notably, *Havens* arose under a private right of action under the Fair Housing Act, not the generalized challenges that Plaintiffs pursue here where Congress made plain its interest in channeling review to those directly affected—aliens. *See Spokeo*, 136 S. Ct. at 1549 ("Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'"). Congress's aim to allow private enforcement of statutory prohibitions against discriminatory housing practices thus drove the Court's standing analysis. *See Havens*, 455 U.S. at 373-74. And even in the fair-housing context, an organization alleging standing under *Havens* must establish that it would have suffered some other injury if it had not diverted resources to counteracting the problem, because otherwise the diversion of resources is a purely self-inflicted injury. *See Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). Here, however, the INA confers no "legally cognizable interests," *Spokeo*, 136 S. Ct. at 1549, on advocacy organizations, but it does the opposite by channeling review of aliens' immigration-related claims into removal proceedings (in administrative proceedings and then federal courts of appeals), 8 U.S.C. § 1252(a)(5), (b)(9), and no organizational Plaintiff has alleged that it is being forced to divert resources to avoid *other* cognizable injuries.

Further, a person "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-07 (D.C. Cir. 1987) (applying principle to immigration context). An organization similarly has "no judicially

cognizable interest in procuring enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). And a person generally lacks standing to challenge the government's provision (or denial) of benefits to a third party. *E.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006); *cf. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788 (1980) (discussing "[t]he simple distinction between government action that directly affects a citizen's legal rights" and "action that is directed against a third party and affects the citizen only indirectly or incidentally").

These principles are particularly important in the immigration context. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quotation marks omitted). It has emphasized that "[t]he obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into" the field of immigration. *Plyler v. Doe*, 457 U.S. 202, 225 (1982). Decisions involving immigration "may implicate our relations with foreign powers" and also must account for "changing political and economic circumstances." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Because of the need for "flexibility in [immigration] policy choices," such choices are typically "more appropriate to either the Legislature or the Executive than to the Judiciary." *Id.*; *see also New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (immigration enforcement decisions "patently involve policy judgments about resource allocation and enforcement methods [that] fall squarely within a substantive area clearly committed by the Constitution to the political branches").

Even if *Havens* applies, the D.C. Circuit has interpreted *Havens* to impose a two-part test for determining "whether an organization's injury is concrete and demonstrable or merely a setback to its abstract social interests." *PETA v. United States Dep't of Agric.*, 797 F.3d 1087, 1094

(D.C. Cir. 2015). First the Court asks "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). "If the answer is yes, [it] then ask[s] whether the plaintiff used its resources to counteract that injury." *Id.* Here, the organizational Plaintiffs do not satisfy these requirements.

To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union (NTEU) v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Standing exists only when "the action challenged ... [is] at loggerheads with the stated mission of the plaintiff." *Id.* at 1429; *see also PETA*, 797 F.3d at 1095; *cf. PETA*, 797 F.3d at 1100-01 (Millett, J., dubitante) (criticizing expansive readings of *Havens* and noting that the case involved "direct, concrete, and immediate injury" to the organization's services based on a "specific legal right"). Plaintiff CAIR, for example states its mission as "serv[ing] as many migrants lawfully seeking asylum as possible." *CAIR* Am. Compl. ¶ 178. And Plaintiff RAICES states its mission as "promot[ing] justice by providing free and low-cost legal services to underserved migrant children, families, and refugees in Texas. *CAIR* Am. Compl. ¶ 198. But nothing in the rule prevents them from continuing to represent asylum-seeking clients. Although the legal landscape may have partially changed because of the rule, the organizations can still provide legal services.

Even if there were an adequate conflict with those organizations' missions, they have failed to demonstrate that they meet the second requirement. Plaintiffs claim that they will suffer harm as a result of the rule, because they will not be able to serve as many clients and they will suffer corresponding financial harm. *See CAIR* Am. Compl. ¶¶ 174-223; *I.A.* Compl. ¶ 119-120. But these concerns are speculative and self-inflicted. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

14

416 (2013) (no standing where plaintiffs' costly measures to avoid government surveillance they believed reasonably likely were "self-inflicted"). Thus, Plaintiffs' claim that they are likely to suffer financially—because, perhaps, it will have fewer clients and less funding—is insufficient to confer standing. And any desire to prevent the removal of potential future clients provides no basis for standing, as Plaintiffs have no "judicially cognizable interest" in preventing the government from enforcing the law against third parties. *See Linda R.S.*, 410 U.S. at 619; *see PETA*, 797 F.3d at 1099 (Millett, J., dubitante) (criticizing "precedents [that] now hold that the required Article III injury need not be what the defendant has done to the plaintiff; it can also be what the defendant has not done to a third party"). Moreover, Plaintiffs have no judicially cognizable basis to challenge a change in the law simply because it may affect future clients and then may in turn derivatively affect Plaintiffs' own decisions about how to allocate their own resources. *See Arpaio v. Obama*, 797 F.3d 11, 15 (D.C. Cir. 2015) (rejecting standing from the "[p]rojected increases ... in the county's policing burden and jail population" which "rest on chains of supposition and contradict acknowledged realities").

Plaintiffs also say that they must adapt to the new requirements by spending more time on their clients' cases, adjusting staffing, and analyzing the new policy and revising new training and orientation materials. *CAIR* Am. Compl. ¶¶ 207, *I.A.* Mot. 37. But if such "injuries" could confer standing, then any legal services or advocacy organization could sue in federal court whenever there is a change in the law, simply by alleging that the organization must get up to speed on the impact of the change. Such impacts on legal representation do not satisfy Article III. Indeed, D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also Nat'l Taxpayers*

*Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

Finally, Plaintiffs claim that they have been harmed because the lack of notice-and-comment procedures did not allow them to inform the government of the alleged harms that would result from the rule. *CAIR* Am. Compl. ¶¶ 196, 216, 223, *I.A.* Compl. ¶ 120. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *cf. Am. Ass'n for Homecare v. Leavitt*, No. 08-cv-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) ("injury cannot stand on procedural violation alone without showing another actual injury"). Moreover, the agencies expressly requested further comment, curing the very purported injury Plaintiffs allege. Indeed, some of the Plaintiffs have now commented, *see* ECF 41-4, ¶ 25, and that others have chosen not to is a conscious choice that cannot rise to the level of cognizable injury. And even were such an injury sufficient, it would supply Article III standing for only for their notice and comment claim.

<u>Zone of Interests</u>. The organizational Plaintiffs' claims are also outside the zone of interests of the statutes they invoke. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing

must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Plaintiffs invoke no such interest here.

Nothing in the INA and its asylum provisions even arguably suggests that the statute protects the interests of nonprofit organizations that provide assistance to asylum seekers. The asylum provisions neither regulate the organizational Plaintiffs' conduct nor create any benefits for which these organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at aliens, not the organizations advocating for them. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).[1]

That reasoning fully applies here. Plaintiff organizations are not applying for asylum; they seek to help others do so. Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources." *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). Because Plaintiffs are simply bystanders to the statutory scheme, the (alleged) effects on their resources are outside the statutory zone of interests. *See*

---

[1] While the Ninth Circuit recently held otherwise in *East Bay Sanctuary Covenant*, 909 F.3d at 1243-44, it did not consider *FAIR*, 93 F.3d at 903, which held that persons were outside the zone of interests of the INA provisions that they challenged even though they were within the zone of interests of another statutory provision, and the case is still being litigated. Regardless, *East Bay* conflicts with controlling D.C. Circuit authority.

*Legalization Assistance Project*, 510 U.S. at 1305 ("The fact that the INS regulation may affect the way an organization allocates its resources … does not give standing to an entity which is not within the zone of interests the statute meant to protect.").

The procedural nature of some of the organizational Plaintiffs' claims makes no difference. A plaintiff asserting a violation of the APA's notice-and-comment requirements must show that the underlying concrete Article III injury comes within the zone of interests protected by the underlying substantive statute upon which the claim is based—here, the INA. *See Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014). Plaintiffs have not done so.

Moreover, as discussed further in the following section, the INA specifies the manner and scope of judicial review in connection with removal proceedings, *see* 8 U.S.C. § 1252, and only the affected alien may seek that review, and only in petitions for review with the courts of appeals following completion of those proceedings. *Id.* § 1252(a)(5), (b)(9); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). The same Congress that sought to channel all claims an *alien* could bring into administrative proceedings and then petitions for review in the courts of appeal would not have separately authorized suits by organizations. *Arroyo v. U.S. DHS.*, No. SACV19815JGBSHKX, 2019 WL 2912848, at *7 (C.D. Cal. June 20, 2019) (explaining that Congress sought to end the "wave of litigation brought by organizations and classes of individuals not in removal proceedings to preemptively challenge the enforcement of certain immigration statutes"). That specification precludes review at the behest of third parties, including Plaintiff organizations here. *Block*, 467 U.S. at 344-45, 349-51; *see* 5 U.S.C. § 701(a)(1). And Congress similarly made clear that no party other than the United States could litigate such claims in the district courts by withdrawing jurisdiction for such causes of action that had previously existed. Until Congress amended the INA to include the claim-channeling provisions of § 1252, a separate

18

provision, 8 U.S.C. § 1329, provided an affirmative basis for jurisdiction in federal district courts for suits filed by any alien or organization challenging implementation of the immigration laws. *See, e.g.*, *Bains v. Schiltgen*, No. C 97-2573 SI, 1998 WL 204977, at *3 (N.D. Cal. Apr. 21, 1998) (describing statute's prior version). But Congress amended section 1329 in 1996, "making clear that district court jurisdiction founded on the immigration statute is confined to actions brought by the government." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999). This provision makes clear that under the INA, organizational plaintiffs like those here lack any cognizable cause of action within the relevant statute's zone of interests.

## II.    The Individual Aliens' Claims Provide No Basis For An Injunction.

As explained below, the Court has jurisdiction over only two individual Plaintiffs' claims, and even for them the Court has only the limited jurisdiction afforded by section 1252(e)(3). This means that, if the Court agrees with Plaintiffs on the merits, it can only order relief as to those two individuals—and it may not award preliminary relief. The remaining individual plaintiffs also may not seek this relief, as district court jurisdiction is precluded over their claims because they must raise their claims in their individual removal proceedings.

Expedited Removal Plaintiffs. Two of the individual Plaintiffs—I.A and E.B—are subject to expedited removal but have not yet had credible fear screenings because they are currently being criminally prosecuted (and thus not yet had the rule applied to them). *See* Declarations of Jorge L. Chapa, Exhibits (Ex.) A & B (all exhibits filed under seal). Because they are subject to expedited removal, the only vehicle available to them to challenge anything related to the expedited removal process is through section 1252(e)(3). Title 8 U.S.C. § 1252(e)(3) provides the sole basis for jurisdiction for such a challenge, but prohibits the entry of a preliminary injunction like the one Plaintiffs seek, *see* §§ 1252(a)(2)(A), (e). Under that provision, the court has jurisdiction over

"challenges to the validity of the system," but only if Plaintiffs are subject to "orders under section 1225(b)(1)." 8 U.S.C. §§ 1252(e) (title), (e)(3)(A). Here, no Plaintiffs have been ordered removed under expedited removal pursuant to section 1225(b), thus Plaintiffs have no determinations to challenge.

To the extent the rule is applied to them in expedited removal, it is only through 8 C.F.R. §§ 208.30(e)(5)(iii), 1208.30(g)(1)(ii), which provides that the bar implemented by the rule applies in credible fear screenings. Thus, while a plaintiff in expedited removal (with a final order of expedited removal) could challenge a new regulation such as 8 C.F.R. §§ 208.30(e)(5)(iii), 1208.30(g)(1)(ii), even if jurisdiction lies under this provision, the scope of review is limited. Section 1252(e)(1) provides that "no court may—(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." As to section 1252(e)(3), the sole remedy authorized is a "determination[]" on the *merits* of "whether [section 1225(b)], or any regulation issued to implement such section, is constitutional" or "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." Section 1252(e)(3) explicitly does not provide for any *interim* relief premised on such a determination. Instead, the only authority for such interim relief is found at section 1252(f), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions part IV of this subchapter [*i.e.* 8 U.S.C. §§ 1221-32] other than with respect to the *application of such*

*provisions to an individual alien against whom proceedings under such part have been initiated*."
(Emphasis added).

The proposed injunction runs afoul of this prohibition because it would enjoin the rule as applied to aliens nationwide, rather than individually to a certain alien who was determined to warrant relief. *See* § 1252(e)(3), (f)(1). But just as Congress authorized litigation "by, and only by, aliens against whom the new procedures had been applied," *AILA*, 199 F.3d at 1360, it also only authorized preliminary relief as to "alien[s] against whom proceedings under *such part* have been initiated," meaning aliens who are subject to expedited removal proceedings. 8 U.S.C. § 1252(f)(1). Accordingly, the Court lacks authority to issue preliminary injunctive relief as to aliens in expedited removal proceedings.

Plaintiffs in Section 1229a Removal Proceedings. As to the individual alien Plaintiffs who are in removal proceedings under section 1229a, they must raise their claims through their administrative immigration proceedings, before seeking review in an Article III court. As mentioned above, the provisions of section 1252 strip district courts of jurisdiction over claims that arise from removal proceedings, the forum in which Plaintiffs' asylum claims are properly heard, and channel such claims through an administrative adjudication process for ultimate review by federal courts of appeal. *See* 8 U.S.C. §§ 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals in accordance with this section *shall be the sole and exclusive means* for judicial review of an order of removal ... .") (emphasis added); *id.* § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States ... shall be available only in judicial review of a final order under this section" and no district court "shall have jurisdiction ... to review such an order or such questions

of law or fact."); *J.E.F.M*, 837 F.3d 1031 ("*[A]ny* issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the [administrative] process ... ."). That includes "policies-and-practices challenges," *id.* at 1032, arising from any "action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *See J.E.F.M.*, 837 F.3d at 1032. These provisions and this history demonstrate that Congress intended to enact a scheme whereby judicial review of rules such as this is channeled through an individual alien's removal proceedings and administrative appeal. "When a claim by an alien, however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the ultimate order of removal, it is prohibited by section 1252(a)(5)." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012).

At present, none of the individual Plaintiffs in the *CAIR* matter is subject to expedited removal any longer. They have all either been issued NTAs or have received positive credible fear determinations from an asylum officer or Immigration Judge, and will thus have the opportunity to present their asylum claims in immigration court under section 1229a. According to the Amended Complaint, Plaintiff Y.G.C. was issued an NTA on July 31, 2019. *CAIR* Am. Compl. ¶ 39, *see also* Ex. C. Plaintiff Z.B.M. was issued an NTA on July 29, 2019, *see also* Ex. D. *Id*. ¶ 33. Plaintiffs N.G.R.L., W.M.R.O. and C.C.R.O. were all issued NTAs. *Id*. ¶¶ 59, 63, *see also* Exs. E, F, G. Even if any Plaintiff has not yet been served with an NTA, he or she has been found to have a credible fear of persecution, such that he or she is no longer subject to expedited removal and will be served with an NTA in due course. *See id.* ¶ 46 (J.M.M., same), ¶ 26 (D.L.R., same, *see also* Ex. H), ¶ 46 (M.Y.R.B., same), ¶ 53 (K.M.V.M., same, *see also* Ex. I).

In the *I.A.* case, the majority of the individual Plaintiffs have also been issued NTAs referring them to removal proceedings pursuant to section 1229a, and are thus no longer subject to expedited removal. *See I.A.* Compl. ¶ 18 (L.C. received positive reasonable fear determination and was referred to removal proceedings, *see also* Ex. J[2]); ¶ 20 (L.A. received credible fear interview, *see also* Ex. K). *See also* Ex. L (indicating M.X. was issued an NTA), Ex. M (indicating A.L.G. was issued an NTA), Ex. N (indicating A.G. was issued an NTA), Ex O (indicating N.B. was issued an NTA). The other two Plaintiffs—I.A. and E.B.—are discussed above.

Here, Plaintiffs in removal proceedings attempt to challenge a rule that governs whether they may receive relief from removal in the form of the discretionary grant of asylum. That rule plainly governs the "procedure and substance of an agency determination that is inextricably linked to the ultimate order of removal." *Martinez*, 704 F.3d at 623; *see Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality) (suggesting § 1252(b)(9) would bar claims "challenging any part of the process by which [aliens'] removability will be determined"). It makes no difference that some NTAs have not yet been "filed" with the immigration courts, such that proceedings "commenced" pursuant to 8 C.F.R. § 1239.1(a). The point is that those proceedings are pending, and once pending, Plaintiffs must raise their claims through the administrative process. *See* 8 U.S.C. § 1252(b)(9). But more importantly, the reason these Plaintiffs have been issued NTAs is because they have been found to have a positive credible or reasonable fear, and thus are no longer in expedited removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). "If an alien ... is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act." 8 C.F.R. § 208.30(f); *see also* § 208.13(c)(3).

---

[2] The NTA indicates she received a positive credible fear determination.

Accordingly, once Plaintiffs are found to have a credible fear such that they are no longer subject to expedited removal proceedings the sole and exclusive forum for each Plaintiff's claims is his or her removal proceedings. *Accord Bal v. Sessions*, 292 F. Supp. 3d 604, 606-08 & n.35 (E.D. Penn. 2017) (service of NTA, after APA challenge to asylum decision was filed with the district court and summary judgment motions were pending, deprived the court of jurisdiction because a final agency action no longer existed); *see also Ansaldo v. United States*, No. 16-cv-328-CMA, 2018 WL 1084144, at *2-3 (D. Colo. Feb. 28, 2018) (collecting cases); *Randall v. Meese*, 854 F.2d 472, 477-78, 481-82 (D.C. Cir. 1988) (deportation proceedings initiated after lawsuit filed meant further agency proceedings were ongoing and initial agency action was not ripe for judicial review).

Indeed, it is well-settled that where, as here, agency action remains pending, notwithstanding parallel federal district court proceedings, those federal proceedings are not ripe for adjudication, and should be dismissed without prejudice pending resolution of the administrative procedures. *See Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 59 (1993) ("[T]he promulgation of the challenged regulations did not itself give each CSS and LULAC class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him."); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) (controversy concerning regulation not ripe for APA review until regulation is applied to plaintiff by concrete action). Second, even where proceedings might otherwise be ripe, once NTAs are issued, 8 U.S.C. § 1252(d) requires Plaintiffs to raise their claims in their removal proceedings. That provision provides that an alien subject to section 1229a removal proceedings must "exhaust[] all administrative remedies available to the alien as of right," *id*. § 1252(d), which includes the removal proceeding itself. *See Xiao v. Barr*, 979 F.2d 151, 153 (9th Cir. 1992) ("[E]ven when an alien is not, strictly speaking, seeking to attack a final order of

exclusion, judicial review is precluded if the alien has failed to avail himself of all administrative remedies, one of which is the exclusion hearing itself."); *Howell v. INS*, 72 F.3d 288, 290, 293 (2d Cir. 1995) (service of document initiating deportation proceedings after plaintiff filed suit in district court, notwithstanding that the document was only *filed* with immigration court after district court dismissed the case, required that alien exhaust administrative remedies). And section 1252(d) is a *jurisdictional* provision, meaning that once removal proceedings are initiated, an alien's failure to raise his claims in those proceedings cannot be excused. *See Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) ("§ 1252(d)(1) mandates exhaustion" and is "jurisdiction[al]") (collecting cases).

And even if the Court otherwise had jurisdiction, the fact that removal proceedings are ongoing means that Plaintiffs lack a cognizable cause of action under the APA. Under the APA, Plaintiff must "allege that [their] injury stems from a final agency action for which there is no other adequate remedy." *Jama v. DHS*, 760 F.3d 490, 495 (6th Cir. 2014) (citations omitted) (applying final-agency-action test to plaintiffs in removal proceedings); 5 U.S.C. § 704. "The core question for determining finality [is] whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). An agency action is not final and is thus unreviewable under the APA if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939). That is true here, where these Plaintiffs will have their asylum claims considered and resolved by an immigration judge, and if necessary, ultimately in the courts of appeal.

Plaintiffs cite to *O.A. v. Trump*, 2019 WL 3556334 (D.D.C. August 2, 2019), in support of their contention that this Court has jurisdiction to hear their claims. *See I.A.* Mot. 11, *CAIR* Mot.

25

18. *O.A.* found that sections 1252(a)(5) and (b)(9) did not deprive the court of jurisdiction to entertain the plaintiffs' APA challenges to a rule and presidential proclamation related to asylum eligibility. That ruling disregarded all of the authority just discussed requiring that challenges be brought in immigration proceedings, and should not be followed.

First, *O.A.* relied primarily on a supposed distinction between a facial APA challenge to a rule and an as-applied challenge to that rule tied to their not-yet-entered removal orders. But that is a false distinction, as challenges to removal orders include any challenge to statutes or regulations applied to aliens *in those proceedings*. *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483-85 (1999) (explaining that section 1252(b)(9) channels review of all "decisions and actions leading up to or *consequent upon final orders of deportation*") (emphasis added). "[R]eview of a final removal order is the only *mechanism* for reviewing" such claims. *J.E.F.M.*, 837 F.3d at 1034 (emphasis added). Indeed, *O.A.* was wrong to suggest that facial claims that a rule violates notice-and-comment procedures or is arbitrary and capricious cannot be raised in removal proceedings—such claims are. *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 432 (2d Cir. 2008) (reviewing claim that agency failed to follow notice-and-comment procedures in a petition for review of removal proceedings). And the Hobbs Act, which governs circuit court review of removal orders, clearly envisions such challenges. *See Judulang v. Holder,* 132 S. Ct. 476, 483 & n.7 (2011) (reviewing non-statutory policy adopted by the Board under the APA's arbitrary-and-capricious standard).

That is no different than any other administrative review context in which facial challenges to statute or regulations are routinely channeled through administrative proceedings *before* review in a federal court. *See, e.g.*, *AFGE, AFL-CIO v. Trump* (D.C. Cir. 2019) (channeling facial challenge to executive orders regarding labor relations through Federal Service Labor-

Management Relations Statute scheme, which provided for administrative review followed by review in the courts of appeal, and therefore district court lacked jurisdiction); *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 639 (D.C. Cir. 2013) (district court lacks jurisdiction to review APA challenge to Air Force uniform regulations to the administrative process and noting that "a party [may not] avoid the [channeling mechanism] because it provides only an 'inconvenient' remedy"); *see also Jarkesy v. S.E.C.*, 803 F.3d 9 (D.C. Cir. 2015) (facial constitutional challenge to the Securities and Exchange Commission courts must be channeled through those courts, even though those courts lacked authority adjudicate constitutional challenges to their existence, followed by review in the court of appeals).

Second, *O.A.* was wrong to be concerned about whether plaintiffs can develop a record for review in the courts of appeals. *O.A.*, 2019 WL 3556334 at 15. As the Supreme Court explained in *Elgin*, the courts of appeal are able to obtain a record in those cases if and where it is required. *Elgin*, 567 U.S. at 19. The record can be developed by the immigration court, *see* 8 U.S.C. § 1229a(b)(1), or if needed by a district court at the behest of a reviewing court of appeals. *See* 28 U.S.C. § 2347(b)(3). Any hypothetical concern about the possible absence of a record therefore provides no justification for disregarding the review scheme established by Congress.[3]

For the same reason, O.A.'s reliance on *McNary v. Haitian Refugee Ctr.*, 489 U.S. 479 (1991) is also misplaced—in that case, the Court evaluated a different statutory scheme that did not broadly channel review, as Congress did in section 1252(b)(9). 498 U.S. at 492, 494-97 (noting that statute at issue limited review to administrative record and that Congress "easily could have used broader statutory language" if it had "intended the limited review provisions [at issue] to

---

[3] The court in *O.A.* also relied on detention cases such as *Jennings* and *Nelson v. Preap*, 139 S. Ct. 954 (2019) *O.A.*, 2019 WL 3556334 *12. But *Jennings* and *Preap* both involved challenges to *detention*—and, unlike here, were not "challenging any part of the *process* by which their removability will be determined." *Jennings*, 138 S. Ct. at 841(emphasis added) (explaining that "[u]nder these circumstances, § 1252(b)(9) does not present a jurisdictional bar").

encompass challenges to INS procedures and practices"). Indeed, in enacting section 1252(b)(9), Congress expressly used the language identified by *McNary* as properly channeling into an administrative review scheme. *Compare McNary*, 498 U.S. at 492 *with* section 1252(b)(9). Furthermore, *O.A.* reliance on *McNary* is flawed on its own terms, as *McNary* involved a collateral "pattern-and-practice" challenge, and here, Plaintiffs' eligibility for asylum is not a collateral challenge—it is the very core of what the immigration court, Board of Immigration Appeals, and circuit courts will adjudicate.

Because the Court lacks jurisdiction over all of the individual Plaintiffs claims save for I.A. and E.B., it lacks any jurisdiction to enter any injunctive relief on behalf of anyone but those two Plaintiffs.

## III.    The Government is Likely to Succeed on the Merits.

### A.  The Rule Is Consistent With The INA.

Plaintiffs' lead argument is that the rule violates the INA by denying eligibility for asylum to certain aliens. *See CAIR* Mot. 20-24; *I.A.* Mot. 13-22. That argument fails.

The asylum statute makes it clear that asylum is always a matter of executive "discretion" and never a matter of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987); *see* 8 U.S.C. § 1158(b)(1)(A) (providing that asylum "*may* be granted" to an eligible alien). The asylum statute also makes it clear that the Executive may exercise its discretion through categorical rules, not just through case-by-case adjudication. It provides that the Executive may establish categorical "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, so long as those additional limitations and conditions are "consistent with [section 1158]." *Id*. § 1158(b)(2)(C).

The rule here is well within those discretionary grants of authority over asylum. To start, the rule is consistent with the discretionary nature of asylum and the authority to adopt new eligibility bars. In the rule, the Department heads determined, in the exercise of discretion, that aliens who fail to apply for protection in at least one third country through which they transited, subject to some exceptions, should not be granted the discretionary benefit of asylum, because they are not refugees with nowhere else to turn. 84 Fed. Reg. at 33,839. The broad delegation of authority to establish additional eligibility bars requires only that regulatory asylum-eligibility bars be "consistent with" section 1158. 8 U.S.C. § 1158(b)(2)(C). That describes the rule here. The rule bars asylum *eligibility* for aliens who fail to seek asylum at the first available opportunity, and instead wait to reach their preferred destination of the United States, rendering doubtful the validity and urgency of the alien's claim. Nothing in section 1158 precludes such a rule. This rule further is consistent with Board of Immigration Appeals precedent recognizing that an alien's attempts to seek asylum in a third country are relevant to the discretionary determination whether to grant him asylum. *See Matter of Pula*, 19 I. & N. Dec. 467, 473-74 (BIA 1987) (adverse factors supporting denial of asylum include "whether the alien passed through other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States"); *see also Kalubi v. Aschroft*, 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country"). The rule does adopt a categorical bar rather than a case-by-case approach. But that too is consistent with the asylum statute. If the Attorney General and the Acting Secretary may take account of that factor in individual cases, settled principles of administrative law dictate that they may do so categorically as well. *See Lopez v. Davis*, 531 U.S.

230, 243-44 (2001); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (upholding INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

Plaintiffs make several arguments that the new eligibility bar "is flatly inconsistent with" the asylum statute, *I.A.* Mot. 12-22, *CAIR* Mot. 20-24, but each of their arguments lacks merit.

*First*, Plaintiffs contend that the rule conflicts with the firm-resettlement bar to asylum eligibility, 8 U.S.C. § 1158(b)(2)(A)(vi), because it precludes asylum relief in the United States in circumstances that fall short of a permanent offer of residence in third country. *I.A.* Mot. 13-17; *CAIR* Mot. 22-23.

Plaintiffs are incorrect. Plaintiffs argue that the rule "turns Congress's choice on its head, as it *bars* asylum precisely where the statutes *preserves* it," *I.A.* Mot. 15, but this misunderstands both the nature of asylum and the scope of the statutory bars to relief. The firm-resettlement bar prohibits the Executive from granting asylum to an alien who "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi). That provision merely *prohibits* the Executive from granting asylum to a particular category of aliens. It does not *require* that the Executive preserve eligibility for asylum or grant such relief to aliens outside that category. It is therefore consistent with the Executive's imposition of an additional restriction upon the grant of asylum.

Moreover, the third-country-transit bar addresses a different set of aliens than the firm-resettlement bar—those who could have applied (but did not apply) for protection in a third country. The firm-resettlement bar in section 1158(B)(2)(A)(vi), by contrast, renders ineligible for asylum any alien who "was firmly resettled in another country prior to arriving in the United States." It applies to aliens who, "prior to arrival in the United States, ... entered into another

country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15. The two bars are thus concerned with different circumstances, different classes of aliens, and different actions (or inactions). There is no inconsistency between barring both classes from asylum eligibility. Properly characterized, the rule here promotes aims that are in fact complementary to the firm-resettlement bar—it prioritizes applicants "with nowhere else to turn." *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA 2013). The logic of the firm-resettlement bar is that if someone was offered permanent status in a third country, there is categorically no need to afford them asylum in the United States. Similarly, the logic of the third-country-transit bar is that if someone could have applied for and obtained protection in a third country but failed to do so, there is categorically no need to afford them asylum in the United States. Those harmonized, reinforcing judgments reflect that the new bar is just the sort of "condition" or "limitation" that Congress authorized the Department heads to adopt.[4]

*Second*, Plaintiffs contend that the rule is "inconsistent with the one other very narrow circumstance in which Congress permitted the denial of asylum based on the protections available in a third country: the safe third country provision." *I.A.* Mot. 17; *see CAIR* Mot. 22-23. The safe third country provision, 8 U.SC. § 1158(a)(2)(A), bars an alien from applying for asylum if her or she may be removed to a safe third country under a bilateral or multilateral agreement, and in which he or she "would have access to a full and fair procedure for determining a claim to asylum or equivalent protection." Because the United States has no safe third country agreement with Mexico and other countries through which migrants transit to reach the United States, Plaintiffs claim, the rule is an improper attempt to "accomplish indirectly what [the government] could not

---

[4] Plaintiffs also contend that Congress rejected a similar transit bar in 1995, when it enacted the firm resettlement bar. *I.A.* Mot. 16 (citing H.R. 2182, 104th Cong. (1995)). But the rejected amendment pertained to an alien's ability to *apply* for asylum if the Secretary of State designated certain countries as "providing asylum or safe haven to refugees. *See* H.R. 2182, §§ 1(a), 2. The failed amendment does not refer to transit issues at all, but in fact is a precursor to what became the safe-third country bar that was ultimately enacted, which the rule is consistent with.

do directly" and "circumvent Congress's carefully drawn requirements for a safe-third country agreement." *I.A.* Mot. 18.

Plaintiffs are mistaken. As with the firm-resettlement bar, the safe third country provision *denies* the right to apply for asylum to a particular category of aliens. But it does not mandate that all aliens who fall outside that category should retain eligibility for or be granted asylum. It is therefore consistent with the Executive's imposition of an additional restriction upon the grant of asylum.

And, again like the firm-resettlement bar, there are distinctions between the rule and the safe-third country provision. Section 1158(a)(2)(A) categorically bars applications for asylum "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened on account" of a protected ground. The safe-third country bar is potent and unyielding: it prohibits an alien from even *applying* for asylum. But nothing in section 1158(a)(2)(A)'s asylum-*application* bar forecloses the Department heads from taking into account, in considering the applicant's *eligibility* for relief, the applicant's failure to seek potential relief in a third country while in transit to the United States—particularly when that transit was undertaken to flee a different country for the purported purposes of finding a safe country. Further, the safe-third country provision offers a potential mechanism for categorically sending away all would-be asylum applicants to a third country to apply for relief, *see* 8 U.S.C. § 1158(a)(2)(A), *see Asylum Claims Made By Aliens Arriving From Canada at Land Border Ports-of-Entry*, 69 Fed. Reg. 69,490, 69,490 (Nov. 29, 2004). This rule is significantly different, providing for a more tailored determination of whether an alien passed through a country where he could have, but did not, apply

32

for relief. Further, this rule preserves withholding of removal for aliens who demonstrate that they have a reasonable fear of persecution. *See* 84 Fed. Reg. at 33,830, 33,831.

An additional distinction between the present rule and the types of agreements permissible under the safe-third country provision is that, under the United States' safe-third country agreement with Canada, for example, a potential asylee traveling through Canada would be barred from applying for asylum in the United States *even if* that applicant had applied for asylum in Canada and had his or her claim *rejected. See Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries*, U.S.—Can., Dec. 5, 2002, State Dept. 05-35, Article 5; *see also* 69 Fed. Reg. at 69,480 Not so under this rule. Here, the rule bars eligibility *only if* an alien failed to *seek* potential relief in at least one third country while in transit to the southern border. If that claim is denied in that country, then, unlike aliens subject to the safe-third country agreement with Canada, an alien is not subject to the new eligibility bar and can still obtain asylum in the United States. 84 Fed. Reg. at 33,831. That agreement makes it so that an alien may apply for asylum only in the first of the two countries he steps foot in; this new rule, by contrast, provides no such one-country limit and instead just requires certain aliens to have exhausted at least one other potential avenue to relief before being eligible for relief in the United States. *Id.* at 33,839.

Finally, as noted above, the failure to seek such relief in a country where there is a colorable claim that relief could have been obtained has long been recognized as an adverse dsicretionary factor supporting the denial of asylum. *See Pula*, 19 I. & N. Dec. at 473-74. And denying asylum on this ground is consistent with the purpose of the safe-third country bar, which is "to prevent forum-shopping by asylum seekers, and to promote the orderly handling of asylum claims." *United States v. Malenge*, 294 F. App'x 642, 645 (2d Cir. 2008). Thus, far from conflicting with section

1158(a)(2)(A), the rule complements it, reaching a different class of aliens whom the agencies have concluded may be "forum-shopping ... after transiting through one or more third countries where they could have sought protection, but did not," 84 Fed. Reg. at 33,384, while—unlike the safe-third country bar—permitting those aliens to apply for asylum if they first apply in another country. *See* AR 121, 770.

There is a repeated, erroneous suggestion running through Plaintiffs' lead arguments: that section 1158's asylum bars regarding third countries somehow occupy the field for how an alien's relationship with a third county can bear on eligibility to be granted asylum.[5] *See I.A.* Mot. 15-16, 17-18, 19; *CAIR* Mot. 22-24. For example, Plaintiffs suggest that the rule exceeds the agencies' authority because it does not parrot section 1158(a)(2)(A) in full, asserting that that provision contains distinct elements and that the rule does not comply in full with those criteria. *I.A.* Mot. 17-18; *CAIR* Mot. 22-24. And they assert that the rule "rewrite[s]" section 1158(b)(2)(A)(vi) for similar reasons, because the rule does not implement identical criteria or safeguards as the firm-resettlement bar. *CAIR* Mot. 22; *I.A.* Mot. 15-17. These suggestions are baseless. As already noted, there is no conflict between the rule and these provisions—the rule complements them, reaching a different class of aliens who the agencies have concluded may be "forum-shopping ... after transiting through one or more third countries where they could have sought protection, but did not," 84 Fed. Reg. at 33,384. But more importantly, in section 1158 Congress simply made clear, in the safe-third country provision and firm-resettlement bar, that two particular third-country

---

[5] CAIR Plaintiffs argue that the government and this Court erred in construing their argument as one sounding in "preemption." *CAIR* Mot. 21. They argue that the "[t]he theory is not that Congress has preempted a category of Executive action; it is that the Executive cannot use a residual authority to override the limits Congress has placed on exceptions to asylum eligibility." *Ibid.* Their argument, according to Plaintiffs, rests "on the elementary principle that when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Ibid.* (internal quotation marks and citation omitted). This is only a different framing of the preemption argument, as it contends that once Congress acted regarding third country transit bars, any other form of third country transit bar is impermissible. *See ibid.* In any event, however characterized, Plaintiffs' argument fails for the many reasons given above.

actions or relationships are *definite* bars. Congress nowhere said that those express bars are the only permitted bars concerning an alien's relationship with a third country. Far from it: section 1158(b)(2)(C) authorizes the Executive to adopt further categorical "*additional* limitations" on asylum eligibility that are "consistent" with the rest of section 1158—including those that promote the logic and purposes of those statutory bars. In contrast to many other regulatory statutes, here Congress expressly specified the creation of additional extra-statutory limitations on asylum eligibility, which need not be identical to prior bars that section 1158 codifies explicitly, even if they complement them. *See, e.g.*, *Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012) ("[f]raud in the application is not mentioned explicitly [in the statute], but is one of the 'additional limitations ...under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation"). Plaintiffs' contrary reading would "disabl[e] the Attorney General from adopting [a] further limitation[]" that the statute "clearly empowers him" to adopt. *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017).

*Third*, Plaintiffs contend that, because aliens transiting Mexico to enter the southern border must travel through third countries in which they could apply for asylum, the rule contravenes section 1158(a)(1)'s prescription that aliens may apply for asylum "whether or not at a designated port of arrival." *I.A.* Mot. 19. Plaintiffs maintain that "Congress recognized that many asylum seekers would transit through another country before reaching the United States." *Id.* This argument fails as well. The rule does not bar aliens from applying for asylum. It simply makes it so that an alien is not *eligible* for asylum if he transits a third country without seeking relief that he could have sought in that country. Plaintiffs also argue that, "[i]n guaranteeing that entering the United States at or between ports of arrival could not be a basis for categorically denying asylum, Congress also guaranteed that merely transiting through another country to reach the United States

could not be a categorical barrier either." *I.A.* Mot. 19-20. But section 1158(a)(1) does not say anything that would bar the Executive from considering the relevance of what happens before someone reaches the southern border. Indeed, as noted, the asylum statute expressly recognizes the relevance of an alien's transit through third countries. *See* 8 U.S.C. § 1158(a)(2)(A) (safe-third country provision); *id.* § 1158(b)(2)(A)(vi) (firm-resettlement bar); *see also Pula*, 19 I. & N. Dec. at 473-74. And Congress did not purport to limit the Executive in implementing other bars, given section 1158(b)(2)(C), *see R-S-C-*, 869 F.3d at 1187, so there is no basis to view Congress as intending section 1158(a)(1) to bar agencies from taking into account, when assessing asylum eligibility, considerations such as those embodied in this rule. And, in any event, contrary to Plaintiffs' suggestion, the rule does not punish "merely transiting." *I.A.* Mot. 20. Rather, it renders aliens ineligible for asylum if they pass through a country but fail to apply for asylum there, thereby "rais[ing] questions about the validity and urgency of the alien's claim." 84 Fed. Reg. at 33,839.

*Finally*, Plaintiffs contend that the rule is inconsistent with international law, citing guidance and recent statements from the United Nations High Commissioner for Refugees. *See I.A.* Mot. 17, 18-19. But neither the 1951 United Nations Convention Relating to the Status of Refugees nor the 1967 United Nations Protocol Relating to the Status of Refugees is self-executing and so do not have "the force of law in American courts." *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009); *see Medellin v. Texas*, 552 U.S. 491, 522 (2008) ("Congress knows how to accord domestic effect to international obligations [in a non-self-executing treaty] when it desires such a result"). Accordingly, it is an open question whether the *Charming Betsy* canon on which Plaintiffs rely has any application at all in these circumstances. *See*, *e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting the open question); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d

872, 879 (D.C. Cir. 2006) (Kavanaugh, J. concurring) ("the canon against construing an ambiguous statute to abrogate a treaty ... should not apply in cases involving non-self-executing treaties").

Regardless, nothing in the rule puts the United States at odds with any international obligations. Plaintiffs are correct that neither instrument "*require[s]* refugees to apply for protection in the first country where it could have been sought, or that refugees be returned to a country they crossed in transit." *I.A.* Mot. 17. But that gets Plaintiffs nothing. Neither instrument *prohibits* a rule like the one at issue here. And nothing in the rule is contrary to the United States' obligations under these instruments: the United State has implemented its non-refoulement obligations by providing withholding of removal, 8 U.S.C. § 1231(b)(3)(A), and CAT protection, 8 C.F.R. §§ 1208.16(c)-1208.18. *See Cardoza-Fonseca*, 480 U.S at 429. The rule leaves those protections in place. Moreover, the Convention and its Protocol contemplate the permissibility of formal safe-third-country agreements, meaning that the availability of relief in a third country may be a factor that a State Party can take into account in assessing asylum eligibility. *See* Article 31(1) (states "shall not impose penalties, on account of their illegal entry or presence, on refugees who, *coming directly from a territory where their life or freedom was threatened* ... enter or are present in their territory without authorization") (emphasis added). So, for aliens fleeing harm who transit through third countries, the Convention and Protocol allow the use of conditions and limitations on those aliens' eligibility for relief.

**B.  The Rule Does Not Conflict With the TVPRA.**

Plaintiffs also challenge the rule under the TVPRA, claiming that it strips unaccompanied alien children of their right to present their case before a USCIS officer and requires them to present their claims to an immigration judge in an adversarial proceeding. *CAIR* Mot. n.6; *I.A.* Mot. 31-33. But there is no general mandate in the INA that every rule must treat unaccompanied

children differently, and such children are subject to the same eligibility criteria as other aliens. Section 1158(b)(2)(A)'s eligibility bars make no exception for unaccompanied alien children, and so there is no reason to believe that an eligibility bar promulgated under section 1158(b)(2)(C) must make special dispensation for such individuals. In other words, unaccompanied alien children, like all other aliens, have no statutory right to be eligible for or granted asylum. And the rule is consistent with 8 U.S.C. § 1158(b)(3)(C), as unaccompanied alien children who retain asylum eligibility will still have their claims heard initially by the asylum officer, as that provision directs.

### C.  The Rule Satisfies the APA's Procedural Requirements.

Plaintiffs contend that the rule was unlawfully issued without notice and an opportunity for comment. But the APA provides exceptions to its notice-and-comment and publication requirements when either "the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), (d)(3), or the rule "involve[s] ... [a] foreign affairs function of the United States," *id.* § 553(a)(1). The rule here fits within both exceptions and is consistent with similar interim rules affecting the border.

Good Cause. The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare." *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983). Significant public-safety harms provide good cause to make rule changes without pre-promulgation notice and comment. *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (delay may increase "threat[s] to public safety"); *see Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004) (relying on *Hawaii Helicopter*). This standard is met where "an

announcement of a proposed rule creates an incentive for those affected to act prior to a final administrative determination." *East Bay*, 909 F.3d at 1253; *see East Bay*, 354 F. Supp. 3d at 1115.

Consistent with these principles, the Departments recognized that pre-promulgation notice and comment or a delayed effective date "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect" by encouraging a "surge in migrants." 84 Fed. Reg. at 33,841; *e.g.*, AR438-48, 664. Their "experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border." 84 Fed. Reg. at 33,841 (citing *East Bay*, 354 F. Supp. 3d at 1115); *e.g.*, AR438-48, 676. The Departments described the "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 84 Fed. Reg. at 33,841; *e.g.* AR682. Further, the Departments determined that "an additional surge of aliens ... would be destabilizing to the region, as well as to the U.S. immigration system." 84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 45, 119, 208-20, 679. They specified the factors that contribute to the "massive increase in aliens arriving at the southern border who assert a fear of persecution [that] is overwhelming our immigration system." 84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 37-44, 45, 119, 121, 192, 208-20, 222-30, 241-63, 634, 679, 768-70. They stressed that the "concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events." 84 Fed. Reg. at 33,841; *e.g.*, AR438-48, 540-54, 664, 682. The Departments therefore lawfully concluded that "[a] large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis." 84 Fed. Reg. at 33,841. The promulgation of the rule without

notice and comment "is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx," and "[a]n extended notice-and-comment rulemaking process would be impracticable and self-defeating" for those reasons.[6] 84 Fed. Reg. at 33,841; AR119, 208, 434-56, 664, 676, 682; *see East Bay*, 909 F.3d at 1253; *East Bay*, 54 F. Supp. 3d at 1115 (noting that the Departments' evidence on border surges "supports the inference that smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy" and in turn precipitate changes in immigration patterns, warranting the application of the good-cause exception). The rule addresses the current crisis, which was not caused by its own choices in promulgating the rule.

Plaintiffs argue that the government's conclusion that a delayed effective date may cause a surge of migrants is "imagined" and that it offers "frail support," notwithstanding the *East Bay* court's agreement with the government's conclusion. *I.A.* Mot. 18; *see East Bay*, 54 F. Supp. 3d at 1115. Under Plaintiffs' argument, the federal government could never rely on the good-cause exception by making predictive judgments about how people will rationally act based on past behavior. Yet the court in *East Bay* found good cause on a similar showing. *See East Bay*, 354 F. Supp. 3d at 1115; AR439 ("Americans do not jail parents who bring children—and to hurry up before they might start doing so again."). That was appropriate: the government obviously cannot provide evidence for actions that have not occurred in response to a rule that has yet to be promulgated, and courts are ill-equipped to second-guess the Executive Branch's prospective judgment.[7] *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government,

---

[6] The Departments did not invoke the "impracticability" exception to notice and comment—concerning the "threat of impending fiscal peril"—that is discussed in *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). Therefore, Plaintiffs' discussion of it is inapposite.

[7] Plaintiffs' claim that a surge is self-inflicted from the promulgation of the rule means that a good-cause exception based on the promulgation of a rule could never be justified. That cannot be the case—and, even accepting Plaintiffs' terms, the Departments documented the current border crisis that is the impetus for the rule as they have in the prior

when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusion."). In an APA case, the Court's review of the merits must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Plaintiffs' attempt to substitute its own record and views for that of the Departments is thus inappropriate.[8]

<u>Foreign Affairs.</u> The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). "A rule of law that would inhibit the flexibility of the political branches [in matters of foreign affairs] should be adopted with only the greatest caution." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

The Departments properly invoked this exception. First, the "flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States." 84 Fed. Reg. at 33,841; *e.g.*, AR676, 698. The Departments found that the "rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States ... and the urgent need to address the current humanitarian and security crises along the southern land border between the United States and Mexico." 84 Fed. Reg. at 33,842; AR537, 635-37. The Departments concluded that the "negotiations would be disrupted" by the

---

rules that Plaintiffs cite. 84 Fed. Reg. at 33,841; *e.g.*, AR21-22, 37-44, 45, 119, 121, 192, 208-20, 222-30, 241-63, 634, 679, 768-70.

[8] Plaintiffs disingenuously claim no evidence of a surge in *East Bay* ever materialized. *I.A.* Mot. 26. Of course, the rule was enjoined almost immediately and has not been just "temporarily enjoined" but rather remains enjoined, so no surge directly tied to the rule could arise. *Id.* But certainly aliens continue to surge across the border in ever greater numbers, as the rule at issue here, 84 Fed. Reg. at 33,838, and the record, AR119, demonstrate.

surge of migrants who would attempt to enter the United States in response to the rule: the rule's delayed effective date would "provok[e] a disturbance in domestic politics in Mexico and the Northern Triangle countries, and erod[e] the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners." *Id.* Moreover, a delay in effectiveness would prompt the undesirable consequence of an increase in the number of migrants who could have sought assistance in foreign countries at the "U.S. border, which has little present capacity to provide assistance." 84 Fed. Reg. at 33,842; AR208-20, 222-30, 558-59, 679. "Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place" to slow the "enormous flow of aliens through these countries to the southern U.S. border," thereby "facilitat[ing] the likelihood of success" in the United States' ongoing negotiations with Mexico "regarding regional and bilateral approaches to asylum," and supporting the President's foreign-policy aims. 84 Fed. Reg. at 33,842; *e.g.*, AR231-32, 676, 698. Indeed, just recently, the United States, relying on another immigration initiative—the "Migrant Protection Protocols" (MPP)—successfully negotiated a partial agreement with Mexico concerning asylum seekers whereby MPP would be implemented "across its entire Southern Border" and "Mexico will take unprecedented steps to increase enforcement to curb irregular migration, to include the deployment of its National Guard throughout Mexico" and take "decisive action to dismantle human smuggling and trafficking organizations as well as their illicit financial and transportation networks." AR24, *see* AR45-50, 138-39, 231-32 533-57, 635-37, 676, 698. The two countries will "continue their discussions on the terms of additional understandings to address irregular migrant flows and asylum issues." 84 Fed. Reg. at 33,842.

  An immigration initiative like the rule here—which promotes the interlocking goals of

securing the border and promoting negotiations with other countries—is thus "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249; *see Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018) (affirming Department of State's invocation of the foreign-affairs exception to promulgate a rule governing the "exchange visitor program" without notice and comment because it "relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department"). The Executive Branch's choice—to require aliens seeking asylum here to first seek protection in countries that offer asylum and thus stem the transit through countries with which the United States is negotiating—is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini*, 618 F.2d at 1361. Indeed, this is a more straightforward case than *Yassini*, which involved Iranians *already in the United States* who were required to leave. *Id.* This case involves only aliens transiting countries with whom the United States is negotiating.

Plaintiffs argue that the rule does not show notice and comment "will provoke definitely undesirable international consequences." CAIR Mot. 21. The statute requires no such showing. The exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm. 5 U.S.C. § 553(a)(1); *see Rajah*, 544 F.3d at 437 (there is "no requirement" that agency state a finding of undesirable international consequences, particularly "when the consequences are seemingly as evident" as they are here). Indeed, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *East Bay*, 909 F.3d at 1252. And even if a showing that harm will follow "immediate

*publication* of the Rule, instead of *announcement*," were required, it is present here: the Executive has shown that a delay in publishing the rule would overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration that the negotiations seek to decrease, undermining the United States' negotiations with Mexico. 84 Fed. Reg. at 33,842; *Yassini*, 618 F.2d at 1360 ("prompt response" required to embassy takeover). The rule satisfies the foreign-affairs exception.

### D. The Rule Is Not Arbitrary and Capricious.

Plaintiffs also argue that the new rule is arbitrary and capricious in violation of the APA. *CAIR* Mot. 24-30; *I.A.* Mot. 28-31. This claim also lacks merit.

To begin, arbitrary-and-capricious review is "limited," *EarthLink, Inc. v. FCC*, 462 F.3d 1, 9 (D.C. Cir. 2006), and courts may not substitute their "judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Inc. Co.*, 463 U.S. 29, 43 (1983). "'An agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential* review'" and "need not rest on 'pure factual determinations.'" *EarthLink, Inc.*, 462 F.3d at 213 (quoting *In re Core Commc'ns, Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006) & *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981)) (emphasis in original). An agency thus "does not engage in arbitrary and capricious decision-making by making 'predictive judgment[s]' or even by relying on '[i]ncomplete data.'" *New York v. NRC*, 824 F.3d 1012, 1022 (D.C. Cir. 2016); *see Sacora v. Thomas*, 628 F.3d 1059, 1068-69 (9th Cir. 2010) (it is "reasonable for the [agency] to rely on its expertise" to arrive at its conclusions, even if those conclusions are not supported with "empirical research."). The agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle*, 463 U.S. at 43, and Plaintiffs cannot demonstrate a likelihood of success by relying on non-record materials.

*See, e.g.*, *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013). In cases like this one, which does not concern a statutory gap but rather the express grant of authority to prescribe rules and standards, the agency's "judgment [is owed] more than mere deference of weight," and courts give the agency interpretation controlling weigh unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Lindeen v. Securities and Exchange Commission*, 825 F.3d 646, 656 (D.C. Cir. 2016); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1177 (9th Cir. 2019) (in such circumstances "agency's promulgations are entitled to more than mere deference or weight; rather, they are entitled to legislative effect").

The rule here was promulgated to serve multiple importance policy objectives. First, the rule helps "alleviate the strain on the U.S. immigration system" by "prioritizing" the applicants with "nowhere else to turn" and thus who "need [asylum] most," while deprioritizing" other applicants. 84 Fed. Reg. at 33,831, 33,839-40. Second, the rule helps curtail "meritless asylum claims" by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity." 84 Fed. Reg. at 33,831, 33,839. Third, the rule helps protect children by reducing the incentive for families leaving Central America to make the "long and arduous" journey to the United States. 84 Fed. Reg. at 33,838. Fourth, the rule helps "curtail the humanitarian crises created by human smugglers" by "reducing a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief." 84 Fed. Reg. at 33,840. Finally, the rule "will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle Countries" regarding the flow of aliens from those countries. 84 Fed. Reg. at 33,840.

The rule is reasonably related to all these objectives. As the rule concludes, aliens with non-meritorious asylum claims will have less incentive to seek entry to the United States, and thus less incentive to rely on "human smuggling" and suffer "its tragic effects," if they cannot take advantage of a lengthy delay in adjudicating that claim to live and work in this country. 84 Fed. Reg. at 33,840; *see* A.R. 109-10, 664, 676, 682. This relieves stress on the adjudicatory authorities of both DHS and DOJ, and on border enforcement given fewer incentives to illegally seek entry. *See* 84 Fed. Reg. at 33,831, 33,840-41; AR 21-22, 37-45, 109-10, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70. Likewise, by ensuring that the adjudicators are able to focus on the claims of aliens who have not been able to obtain relief in a third country, the rule focuses on the class of aliens who have no other country to turn to, making it easier for adjudicators to fulfill the humanitarian nature of asylum. *See generally id.*; *accord Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011) (the "core regulatory purpose of asylum ... is not to provide [aliens] with a broader choice of safe homelands, but rather, to protect refugees with nowhere else to turn"). And by declining to consider asylum claims by aliens who transit Mexico and Northern Triangle countries without seeking relief, the government is in a better position to negotiate a formal and lasting resolution to the "humanitarian and security crises along the southern" border with those same countries. 84 Fed. Reg. at 33,831, 33,842, A.R. 231-32. This shifts the onus to consider such claims to other countries within that region that are able to provide fair adjudications of requests for asylum, while pointing towards an eventual burden-sharing framework of the kind that already governs consideration of asylum claims made by many aliens on the northern border with Canada. A.R. 138-39, 231-32, 537, 635-36.

Plaintiffs fail to raise any challenge to the actual policy justifications advanced by the Departments in support of the rule. And the only other district court to opine on the rule thus far

recognized that "the Rule's intent is to incentivize putative refugees to seek relief at the first opportunity," and that "[t]he agency's explanation as to how this exhaustion requirement serves its stated aims is adequate." *East Bay*, 385 F. Supp. 3d at 957.

Rather than attack the policy justifications for the rule, Plaintiffs repeatedly seek to cast doubt on the government's judgments underlying the rule. Plaintiffs argue that the rule "is built on the premise that individuals who transit through third countries but do not seek asylum there generally lack meritorious asylum claims." *CAIR* Mot. 25 (citing 84 Fed. Reg. at 33,839); *see I.A.* Mot. 28-29. Rather than lacking meritorious claims, Plaintiffs argue, the failure to apply for asylum in Mexico or a Northern Triangle country may be the result of valid concerns about violence and dangers to refugees in those countries. *CAIR* Mot. 25-26; *I.A.* Mot. 28-29. Plaintiffs' objection to the rule is unsound. In the rule, the Departments acknowledged that "[a]n alien's decision not to apply for protection at the first available opportunity *raises questions* about the validity and urgency of the alien's claim and *may mean* that the claim is *less likely* to be successful." 84 Fed. Reg. at 33,839 (emphasis added). The Departments decided, however, to address an alien's failure to seek protection in a third country by adopting a "categorical asylum bar," not just by treating that failure as "just one of many factors" to be considered in the course of adjudicating the alien's asylum claim. 84 Fed. Reg. at 33,839 n.8.

The Departments made a permissible policy choice. Agencies must often choose between implementing a policy through a bright-line rule or, instead, through a flexible standard. *See generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989). And the asylum statute explicitly invites the use of bright-line rules by authorizing the adoption of new categorical bars to asylum. *See* 8 U.S.C. § 1158(b)(2)(C). In this case, the Departments chose to adopt a categorical rule, in part because only a categorical rule would achieve the Departments'

central objective of reducing the strain created by "the increased numbers ... of asylum claims in recent years." 84 Fed. Reg. at 33,839 n.8. Moreover, only a categorical rule would "reduc[e] a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief." 84 Fed. Reg. at 33,840.

To be sure, the Departments' selection of a categorical rule means that some meritorious asylum claims will not be granted in the United States, but will instead be channeled to other countries' asylum systems. It does not follow, however, that the Departments' policy choice was arbitrary and capricious. After all, "[a]ll generalizations ... are to some degree invalid, and hence every rule of law has a few corners that do not quite fit." Scalia, *Rule of Law*, 56 U. Chi. L. Rev. at 1177. And the Departments' policy choice to channel some meritorious asylum claims to other countries was particularly reasonable here, given that the asylum statute's purpose is not "to grant asylum to everyone who wishes to mov[e] to the United States," *Singh v. INS*, 134 F.3d 962, 972 (9th Cir. 1998), given that the United States' asylum system currently faces a crushing burden, and given that the U.N. High Commissioner for Refugees has endorsed "efforts to share and allocate the burden of review of refugee and asylum claims" among multiple countries, 84 Fed. Reg. at 33,840 (citation omitted).

Plaintiffs also argue that the rule is arbitrary and capricious because it asserts that a refugee "could have obtained protection" in Mexico or a Northern Triangle country without "offer[ing]" any "evidence-based explanations for why that is the case." *CAIR* Mot. 26, 27; *see I.A.* Mot. 29. In essence, Plaintiffs argue that the rule is flawed by assuming asylum in one of the likely countries of transit is a feasible alternative to relief in the United States. That conclusion, too, is incorrect. First, the rule makes it clear that the third-country transit bar is inapplicable where "[t]he only

countries through which the alien transited" are not parties to certain international treaties and thus do not have any obligation under those treaties to provide protection from persecution and torture. 84 Fed. Reg. at 33,843. Second, the rule's rationales do not depend on the particular details of the asylum system in Mexico or other third countries. Regardless of the ease or difficulty of obtaining asylum in those countries, the very fact that an alien has not even *tried* to obtain asylum there strongly suggests that the alien's claim lacks urgency and merit. Third, in all events, the record establishes that Mexico is improving its asylum system, often in conjunction with international partners. *See* A.R. 306, 534, 639. Other evidence does indicate concerns regarding access to that system and the treatment of aliens, *see East Bay*, 385 F. Supp. 3d at 953-55, but the Departments weighed the totality of that evidence and determined that it established sufficient capacity in Mexico to address the claims of transiting aliens. 84 Fed. Reg. at 33,839-40. Once the agencies made that finding, courts cannot second-guess it: "it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." *Munaf*, 553 at 700-01. Plaintiffs effectively ask that this court "pass judgment on" Mexico's legal system, a particularly improper request that would "undermine" our "Government's ability to speak with one voice in this area." *Id.* at 702-03.

Finally, Plaintiffs argue that the rule "is arbitrary and capricious because it fails to exempt unaccompanied children ... from its coverage." *CAIR* Mot. 30; *see I.A.* Mot. 31-33. But no statute requires such an exemption. When unaccompanied children are to be treated differently than adults, the INA says so. *See*, *e.g.*, 8 U.S.C. § 1158(b)(3)(C). And, in fact, unaccompanied children are *not* exempt from any other eligibility bar to asylum. *See generally* 8 U.S.C. § 1158(b)(2)(A). In any event, the Departments did consider the specific issues posed by unaccompanied children.

*See* 84 Fed. Reg. at 33,839 n.7. They just determined that no exception was warranted. That was not arbitrary and capricious.

In the end, Plaintiffs' claims are nothing more than disagreement with the judgment of the agencies. But this Court may not "second-guess[] the" Departments "weighing of risks and benefits." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019); *New York*, 824 F.3d at 1022 ("a challenge to the agency's assumptions must be more than an effort by [a party] to substitute its own analysis for the agency's"). The rule is supported by reasonable justifications rooted in the government's "expertise and experience," *EarthLink, Inc.*, 462 F.3d at 213 (quoting *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001)), and passes muster under the extraordinarily deferential review applicable to such rules, *Lindeen*, 825 F.3d at 656; *see Time Warner*, 240 F.3d at 1133 ("we must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency.").

## III.   The Equitable Factors Weigh Against a Preliminary Injunction.

A preliminary injunction would irreparably harm the United States and the public. It is always in the public interest to protect the country's borders and enforce its immigration laws, and the requested injunction would frustrate the federal government's "law enforcement and public safety interests," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), and the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders, *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). *See also Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Here, the Executive Branch has identified a crisis at the southern border—of thousands of aliens entering our country, overwhelming the immigration system, incentivizing human trafficking, and risking their lives—and has taken targeted measures to address that crisis. *See* 84 Fed. Reg. at 33,831 (noting an "increase of more than 100,000 cases (or a greater than 13

percent increase in the number of pending cases) since the start of FY 2019" and recognizing that between FY 2015 and FY 2019 there has been a "nearly 125 percent" increase in pending cases even with "double the number of immigration judges as in 2010"); AR21-22, 37-45, 109-10, 119, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70. The requested injunction would undermine a coordinated effort by the Executive Branch to curtail that surge. Plaintiffs do not acknowledge the extraordinary strain on our asylum system inflicted by those who have no valid claim for asylum at all. The public interest is served by encouraging aliens to apply for asylum in the first country in which they may take refuge, rather than picking among preferred destinations. *See Tchitchui*, 657 F.3d at 137.

Against this, "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). The "failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "The D.C. Circuit has set a high standard for irreparable injury. The injury must be unrecoverable; it must be both certain and great; [and] it must be actual and not theoretical." *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, No 17-cv-999, 2018 WL 5017749, at *6 (D.D.C. Oct. 16, 2018).

Plaintiffs should not receive a nationwide injunction when aliens ineligible for asylum lose only a discretionary benefit to which they are never entitled—and they remain eligible for mandatory protections from removal. *See* 84 Fed. Reg. at 33,834. Plaintiff organizations have harms that are speculations about their funding and the need to plan for the new rules. *See, e.g.*, *CAIR* Am. Compl. ¶¶ 181-191; I.A. Compl. ¶ 119. Even these alleged harms ring hollow since expending resources is not irreparable injury. *See, e.g.*, *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006).[9] And the loss of an opportunity to comment is not sufficient. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiffs suggest otherwise, but they fail to acknowledge law in this Circuit that provides that a putative procedural violation does not produce irreparable injury because the violation has already occurred and can "be remedied by a decision on the merits" (by requiring the agency to re-do the decision using the proper procedures). *See Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012). Thus, "irreparable injury cannot stand on procedural violation alone." *Am. Ass'n for Homecare v. Leavitt*, 2008 WL 2580217, *5 (D.D.C. June 30, 2008). And even if credited, those administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). Furthermore, at least some of the Plaintiffs have now submitted comments. *See* McBride Declaration, ECF 41-4 ¶ 25.

## IV.   Any Preliminary Relief Must Be Sharply Limited.

Even if Plaintiffs were entitled to any relief, it would need to be strictly limited.

First, to the extent that Plaintiffs could be deemed to challenge any aspect of the rule as applied to expedited removals, the Court "lacks the authority" to issue any such preliminary relief. *East Bay*, 354 F. Supp. 3d at 1118; *see* 8 U.S.C. §§ 1252(e)(1), (3), (f)(1), as explained above.

Second, as a general rule, courts lack the authority to enter universal injunctions—*i.e.*, injunctions that preclude the enforcement of a law or rule against any person, rather than against

---

[9] Plaintiffs cite *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), for the proposition that expending resources satisfies irreparable harm because there "can be no do over and no redress." *Id.* at 74. That case involved registering voters in time for an election, and so does not stand for that broader proposition.

only the plaintiffs. Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934. Because "standing is not dispensed in gross," "a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-353 (2006) (citations omitted). A plaintiff may have standing to challenge the application of the rule to the plaintiff himself, but ordinarily lacks standing to challenge its application to unrelated third parties. Quite apart from Article III, bedrock rules of equity require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). That principle applies with even greater force to a preliminary injunction, which is an equitable tool designed merely to preserve the status quo during litigation. *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Moreover, the equitable jurisdiction of federal courts is grounded in historical practice, *see Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999), yet nationwide injunctions are a modern invention, *see Hawaii*, 138 S. Ct. at 2425-2429 (Thomas, J., concurring in the judgment).

Universal injunctions create practical problems for the federal courts and federal litigants. They "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring). They also allow courts and parties to circumvent Federal Rule of Civil Procedure 23, which sets out the prerequisites for certifying a class and for granting relief to such a class. And they create an inequitable "one-way ratchet" under which a loss by the government precludes enforcement of the challenged rule everywhere, but a victory by the government does not preclude other plaintiffs

from "run[ning] off to the 93 other districts for more bits at the apple." *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in the judgment and dissenting in part), *reh'g en banc granted*, Order of June 4, 2018, *reh'g en banc vacated as moot*, Order of Aug. 10, 2018.[10]

Finally, this is not the only case challenging this rule, and this Court's ruling should respect that. *See East Bay Sanctuary Covenant v. Barr*, No. 19- 4073 (N.D. Cal.). If this Court issues any relief, it should not preempt the Northern District of California and Ninth Circuit's ability to continue to consider the issue under the relevant law of the Ninth Circuit while the case is on appeal there. *See also United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("[a]llowing only one final adjudication would" "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue" and "deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.").

For all these reasons, should the Court believe Plaintiffs otherwise carry their burden of demonstrating entitlement to a preliminary injunction, any relief must be limited to the actual Plaintiffs in this case over which the court has subject matter jurisdiction, and limited to those individual aliens or bona fide clients of the Plaintiff organizations that those Plaintiffs affirmatively identify for the Court.

## CONCLUSION

For these reasons, the Court should deny the motions for preliminary injunctions.

---

[10] Contrary to the stay panel's decision in *East Bay*, 909 F.3d at 1255-56, immigration law is not a special context that warrants different consideration—especially where, as here, the farther plaintiffs are from being actually affected by a rule, the less likely they could assert a successful nationwide "harm": an individual plaintiff, who is actually affected by the rule, could receive a complete remedy by an individualized injunction, while under Plaintiffs' theory of Article III, an organizational plaintiff, less personally affected, could receive a far more encompassing remedy. A limit to nationwide injunctions ensures that the courts resolve actual cases and controversies rather than entering into disputes that are constitutionally delegated to the other two branches of government

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

*s/Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-4458
Email: Lauren.C.Bingham@usdoj.gov

PATRICK GLEN
Senior Litigation Counsel

Dated: August 28, 2019            *Attorneys for Defendants*

# EXHIBIT A
## Under Seal

# EXHIBIT B
## Under Seal

# EXHIBIT C
## Under Seal

# EXHIBIT D
## Under Seal

# EXHIBIT E
## Under Seal

# EXHIBIT F
## Under Seal

# EXHIBIT G
## Under Seal

# EXHIBIT H
## Under Seal

# EXHIBIT I
## Under Seal

# EXHIBIT J
## Under Seal

# EXHIBIT K
## Under Seal

# EXHIBIT L
## Under Seal

# EXHIBIT M
## Under Seal

# EXHIBIT N
## Under Seal

# EXHIBIT O
## Under Seal