## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPITAL AREA IMMIGRANTS' RIGHTS
COALITION, *et al.*,

               Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

               Defendants.

Civil Action No. 1:19-cv-02117-TJK

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................1

   I.    The Court Has Jurisdiction ...................................................................2

       A.    The Organizational Plaintiffs Are Properly Before The Court ..............................2

       B.    The Individual Plaintiffs Are Properly Before The Court ......................................2

   II.    Plaintiffs Are Likely To Prevail On The Merits ..................................................10

       A.    The Rule Was Issued In Violation Of The APA's Procedural Requirements .......................................................10

           1.    *The Rule does not satisfy the good cause exception* ..................................10

           2.    *The Rule does not satisfy the foreign affairs exception* ...........................11

       B.    The Rule Violates 8 U.S.C. § 1158 And The TVPRA. .........................................13

       C.    The Rule Is Arbitrary And Capricious ..................................................16

   III.    The Rule Inflicts Irreparable Harm On Plaintiffs ..........................................20

   IV.    The Balance Of Equities And The Public Interest Favor Injunctive Relief ..................22

   V.    Nationwide Relief Is Appropriate ..................................................23

CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

Abbott Labs. v. Gardner,
    387 U.S. 136 (1967)......................................................................................................9

Air All. Houston v. EPA,
    906 F.3d 1049 (D.C. Cir. 2018)................................................................................15

Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States,
    751 F.2d 1239 (Fed. Cir. 1985)................................................................................12

Bal v. Sessions,
    292 F. Supp. 3d 604 (E.D. Pa. 2017) .........................................................................9

Butte County v. Hogen,
    613 F.3d 190 (D.C. Cir. 2010) .........................................................................19, 20

Califano v. Yamasaki,
    442 U.S. 682 (1979)..................................................................................................25

Capital Area Immigrants' Rights Coal. v. Trump,
    No. 1:19-cv-2117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019).......................22

Christensen v. Harris County,
    529 U.S. 576 (2000)..................................................................................................15

City of New York v. Permanent Mission of India to United Nations,
    618 F.3d 172 (2d Cir. 2010)......................................................................................12

Earthlink, Inc. v. FCC,
    462 F.3d 1 (D.C. Cir. 2006)......................................................................................17

East Bay Sanctuary Covenant v. Barr,
    -- F.3d --, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) .........................................10

East Bay Sanctuary Covenant v. Barr,
    385 F. Supp. 3d 922 (N.D. Cal. 2019) ........................................................... passim

East Bay Sanctuary Covenant v. Trump,
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ....................................................................25

East Bay Sanctuary Covenant v. Trump,
    354 F. Supp. 3d 1085 (2018) ...................................................................................23

*East Bay Sanctuary Covenant v. Trump*,
909 F.3d 1219 (9th Cir. 2018) ........................................................13, 23

*Energy Future Coal. v. EPA*,
793 F.3d 141 (D.C. Cir. 2015) ..................................................................10

*Farmworker Justice Fund, Inc. v. Brock*,
811 F.2d 613 (D.C. Cir. 1987), *vacated as moot* 817 F.2d 890 ...............15

*Fook Hong Mak v. INS*,
435 F.2d 728 (2d Cir. 1970) ....................................................................16

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ..................................................................................7

*Galvan v. Levine*,
490 F.2d 1255 (2d Cir. 1973) ..................................................................24

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ..................................................................................15

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018), *appeal filed*, No. 19-5013 (D.C. Cir. Jan. 30, 2019) ..................................................................................................21

*Grace v. Whitaker*,
No. 18-1853, 2019 WL 329572 (D.D.C. Jan. 25, 2019)....................21, 22

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)............................................................23, 25

*Humane Soc'y of the U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) ................................................................23

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)..................................................................................25

*INS v. St. Cyr*,
533 U.S. 289 (2001)....................................................................................4

*In re Ping Xiao*,
2015 WL 4503966 (BIA Jan. 9, 2015) ......................................................8

*In re Pula*,
19 I. & N. Dec. 467 (BIA 1987) ..............................................................16

Page(s)

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,*
 319 F. Supp. 3d 491 (D.D.C. 2018) ........................................22

*J.E.F.M. v. Lynch,*
 837 F.3d 1026 (9th Cir. 2016) .........................................3, 7

*Jean v. Nelson,*
 711 F.2d 1455 (11th Cir. 1983) ........................................12

*Jennings v. Rodriguez,*
 138 S. Ct. 830 (2018) ...............................................5, 6, 7

*Landon v. Plascencia,*
 459 U.S. 21 (1982) ...................................................22

*Lincoln v. Vigil,*
 508 U.S. 182 (1993) ..................................................15

*Lopez v. Davis,*
 531 U.S. 230 (2001) ..................................................16

*Martinez v. Napolitano,*
 704 F.3d 620 (9th Cir. 2012) ...........................................4

*McNary v. Haitian Refugee Ctr., Inc.,*
 498 U.S. 479 (1991) ...................................................7

*Mobil Oil Corp. v. Dep't of Energy,*
 728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ..........................11

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.,*
 463 U.S. 29 (1983) .......................................... *passim*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
 440 F.3d 459 (D.C. Cir. 2010) .........................................10

*Nat'l Mining Ass'n v. Babbitt,*
 172 F.3d 906 (D.C. Cir. 1999) .........................................17

*Nielsen v. Preap,*
 139 S. Ct. 954 (2019) ..................................................6

*Nken v. Holder,*
 556 U.S. 418 (2009) ..................................................22

*North Carolina v. Covington*,
  137 S. Ct. 1624 (2017) ........................................................24

*O.A. v. Trump*,
  Nos. 18-2718 & 18-2838, 2019 WL 3536334 (D.D.C. Aug. 2, 2019) ........................... *passim*

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
  139 S. Ct. 1881 (2019) .......................................................14

*Pereira v. Sessions*,
  138 S. Ct. 2105 (2018) .........................................................5

*Purepac Pharm. Co. v. Thompson*,
  238 F. Supp. 2d 191 (D.D.C. 2002) ..........................................23

*Qureshi v. Holder*,
  663 F.3d 778 (5th Cir. 2011) ...................................................9

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ..................................................12

*Ramirez v. U.S. Immigration & Customs Enf't*,
  310 F. Supp. 3d 7 (D.D.C 2018) .............................................22

*Raoof v. Sullivan*,
  315 F. Supp. 3d 34 (D.D.C. 2018) ...........................................12

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................23

*Rochester Tel. Corp. v. United States*,
  307 U.S. 125 (1939) .............................................................9

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ...........................................10, 11

*Tenn. Gas Pipeline Co. v. FERC*,
  969 F.2d 1141 (D.C. Cir. 1992) ..........................................10, 11

*Teva Pharm. USA, Inc. v. Sebelius*,
  595 F.3d 1303 (D.C. Cir. 2010) ................................................9

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .............................................................8

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ................................................................24

*Trump v. Int'l Refugee Assistance Project,*
137 S. Ct. 2080 (2017) ................................................................24

*U.S. Army Corp. of Eng'rs v. Hawkes Co.,*
136 S. Ct. 1807 (2016) ..............................................................8, 9

*Util. Air Regulatory Grp. v. EPA,*
573 U.S. 302 (2014) ....................................................................14

*Yassini v. Crosland,*
618 F.2d 1356 (9th Cir. 1980) ....................................................13

**STATUTES:**

5 U.S.C. § 553(a)(1) ........................................................................12

5 U.S.C. § 706(2) ............................................................................24

8 U.S.C. § 1158 ................................................................13, 14, 15

8 U.S.C. § 1158(a)(2)(B) ................................................................14

8 U.S.C. § 1158(a)(2)(E) ................................................................15

8 U.S.C. § 1158(b)(2)(C) ................................................................14

8 U.S.C. § 1158(b)(3)(C) ..................................................................6

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................5

8 U.S.C. § 1229(a) ........................................................................4, 5

8 U.S.C. § 1252 ............................................................................2, 8

8 U.S.C. § 1252(a)(1) ....................................................................3, 4

8 U.S.C. § 1252(a)(5) ....................................................................3, 4

8 U.S.C. § 1252(b) ............................................................................3

8 U.S.C. § 1252(b)(1) ........................................................................3

8 U.S.C. § 1252(b)(4)(A) ..................................................................7

**Page(s)**

8 U.S.C. § 1252(b)(4)(B) ...................................................................7

8 U.S.C. § 1252(b)(4)(C) ...................................................................7

8 U.S.C. § 1252(b)(4)(D) ...................................................................7

8 U.S.C. § 1252(b)(9) ................................................................ *passim*

8 U.S.C. § 1252(d) .........................................................................3, 4

8 U.S.C. § 1252(e)(3) .......................................................................24

8 U.S.C. § 1252(e)(3)(A) ..................................................................24

28 U.S.C. § 2349(a) ............................................................................3

R**EGULATIONS:**

8 C.F.R. § 208.2 .................................................................................6

8 C.F.R. § 208.3 .................................................................................6

8 C.F.R. § 208.4 .................................................................................6

8 C.F.R. § 208.30(f) ......................................................................5, 6

8 C.F.R. § 212.5 .................................................................................6

8 C.F.R. § 1239.1(a) ..........................................................................4

*Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) ..................................................................................... *passim*

R**ULE:**

Fed. R. Civ. P. 23(b)(2)....................................................................24

# INTRODUCTION

Plaintiffs opened their prior brief by noting everything that has changed since this Court's TRO ruling one month ago: two judicial decisions finding the Rule likely unlawful; the amendment of Plaintiffs' complaint to add individual asylum-seekers; and a stay ruling that subjects Plaintiffs to the threat of imminent and grave harm. Mem. of Points and Authorities in Support of Pls.' Mot. for Prelim. Inj. (hereinafter "Mem.") at 1-2, Dkt. 41-1. Plaintiffs also gave close consideration to this Court's analysis of their claims at the TRO stage, and substantially developed their arguments in light of this Court's "preliminary thoughts," Tr. of Oral Ruling at 12:21-22, and with the benefit of time and further analysis.

Defendants have responded to all of these important developments by changing—almost nothing. With the exception of one new section on jurisdiction, *see* Consol. Opp. to Pls.' Mots. for Prelim. Inj. (hereinafter "Opp.") at 19-28, Dkt. 43, Defendants' opposition brief is a near-verbatim copy of the brief they filed at the TRO stage. Defendants barely attempt to respond to the arguments actually contained in Plaintiffs' brief, account for the insights of five judges, or even acknowledge that several of their arguments have already been rejected. *See id.* at 11-19 (repeating the standing and zone-of-interests arguments this Court rejected); *id.* at 40 (trumpeting "the *East Bay* court's agreement with the government's conclusion" on good cause when both the district court and the Ninth Circuit have rejected that conclusion). Defendants' jurisdictional argument, meanwhile, is merely a rehash of the argument Judge Moss extensively considered and rejected in *O.A. v. Trump*, Nos. 18-2718 & 18-2838, 2019 WL 3536334 (D.D.C. Aug. 2, 2019).

Defendants cannot keep running the same play and hope for the same result. The sole basis this Court gave for denying a TRO has disappeared. Tr. of Oral Ruling at 9:16-17. And a

close analysis of the merits should yield the same conclusion drawn by every judge that has thus far reached those questions: The Rule is likely unlawful. The Court should grant the Motion and protect Plaintiffs from the great and certain harm this Rule will inflict.

## I. The Court Has Jurisdiction.

### A. The Organizational Plaintiffs Are Properly Before The Court.

Defendants open by repeating the arguments they made at the TRO stage for why the organizational Plaintiffs allegedly lack standing and fall outside the zone of interests. *Compare* Opp. 11-19, *with* Mem. of Points and Authorities in Opp. to the Mot. for TRO (hereinafter "TRO Opp.") at 9-18, Dkt. 20. This Court has already rejected those arguments, Tr. of Oral Ruling at 4:17-5:8, and Defendants do not attempt to address any of the flaws this Court or Plaintiffs identified. *See* Reply in Support of Pls.' Mot. for TRO and Prelim. Inj. (hereinafter "TRO Reply") at 2-8, Dkt. 22. This Court accordingly continues to have jurisdiction over the organizational Plaintiffs' claims.

### B. The Individual Plaintiffs Are Properly Before The Court.

As to the individual Plaintiffs, Defendants do not dispute that these asylum-seekers have Article III standing and fall within the zone of interests of the asylum statute. *See* Mem. 8. Nonetheless, Defendants contend that this Court lacks jurisdiction over their claims because (1) "the provisions of [8 U.S.C. § 1252] strip district courts of jurisdiction" over their claims, Opp. 21-23; (2) Plaintiffs are not challenging a "final agency action," *id.* at 24-25; and (3) Plaintiffs' claims are unripe, *id.* at 24. Each of these arguments is meritless.

1. In *O.A*, Judge Moss explained in detail why Defendants' arguments concerning the scope of section 1252—to which Defendants "devote[d] the lion's share of their briefing" in *O.A.*—are inconsistent with the statute's text, structure, and precedent. 2019 WL 3536334, at

*8-19. Defendants repeat the same arguments here in briefer form, but nothing casts any doubt on Judge Moss's considered analysis.

Section 1252 "channel[s] judicial review over final orders of removal to the courts of appeals" in two basic ways. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). First, section 1252(a)(1) provides that "[j]udicial review of a final order of removal" may be obtained only through a petition for review filed in a court of appeals. 8 U.S.C. § 1252(a)(1); *see* 28 U.S.C. § 2349(a). Section 1252(a)(5) reaffirms that requirement, stating that "a petition for review filed with an appropriate court of appeals" is "the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." 8 U.S.C. § 1252(a)(5); *see also id.* § 1252(d) (limiting when "[a] court may review a final order of removal").

Second, section 1252(b) lists a series of "requirements" that apply "[w]ith respect to review of an order of removal under subsection (a)(1)." *Id.* § 1252(b)(1). One of those requirements is set forth in section 1252(b)(9), which states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

*Id.* § 1252(b)(9). Although this language is broad, it has "built-in limits." *J.E.F.M.*, 837 F.3d at 1032. By its terms, section 1252(b)(9) applies only "[w]ith respect to review of an order of removal under subsection (a)(1)," and only to questions of law or fact that "aris[e] from" an "action taken or proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(1), (9).

Plaintiffs' claims fall outside the scope of each of these jurisdiction-channeling provisions. *First*, no "order of removal" has been entered against Plaintiffs. Their claims thus fall outside the scope of sections 1252(a)(1), 1252(a)(5), and 1252(d). *See id.* § 1252(a)(1)

(channeling "[j]udicial review *of a final order of removal*" (emphasis added)); *id.* § 1252(a)(5)

(channeling "judicial review of *an order of removal entered or issued under any provision of this chapter*" (emphasis added)); *id.* § 1252(d) (limiting when "[a] court may review *a final order of removal*" (emphasis added)).[1]  For much the same reason, they also fall outside the scope of section 1252(b)(9).  As the Supreme Court explained in *INS v. St. Cyr*, section 1252(b)(9) applies only "[w]ith respect to review of an order of removal under subsection (a)(1)," and so does not restrict judicial review of an order "*not* subject to judicial review under § 1252(a)(1)."  533 U.S. 289, 313 (2001).  Thus, as Justice Scalia put the point in dissent, under the Supreme Court's interpretation, "subsection (b)(9) [is] given effect only *within* the review of removal orders that takes place under subsection (a)(1)."  *Id.* at 332 (Scalia, J., dissenting).  Because no such order has been issued here, section 1252(b)(9) is inapplicable.[2]

*Second*, there has been no "action taken or proceeding brought to remove" any of the individual Plaintiffs.  8 U.S.C. § 1252(b)(9).  Removal proceedings are "brought" by the issuance of a notice to appear (NTA).  *See id.* § 1229(a) (providing that removal proceedings are "[i]nitiat[ed]" by issuance of a "notice to appear"); 8 C.F.R. § 1239.1(a) ("Every removal proceeding . . . is commenced by the filing of a notice to appear with the immigration court.").

---

[1] Defendants repeatedly cite *Martinez v. Napolitano*, 704 F.3d 620 (9th Cir. 2012), but that case held only that "8 U.S.C. § 1252(a)(5) prohibits [APA] claims that indirectly challenge a removal order," such as by "seeking a writ of mandamus" to overturn an order of removal.  *Id.* at 622-623.  That holding has no application where, as here, no removal order has been issued.

[2] Justice Scalia expressed concern that the Court's interpretation of section 1252(b)(9) in *St. Cyr* rendered that statute "meaningless."  533 U.S. at 332 (Scalia, J., dissenting).  That concern was overstated.  Under the *St. Cyr* Court's interpretation, section 1252(b)(9) ensures that aliens not only raise their challenges to removal orders in petitions for review, but that they include in their petitions for review "*all* questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien."  8 U.S.C. § 1252(b)(9) (emphasis added).  In any event, section 1252 includes several redundancies befitting a so-called zipper statute, including the redundancy between section 1252(a)(1) and section 1252(a)(5).  *See O.A.*, 2019 WL 3536334, at *10-11 (explaining that section 1252(a)(5) "merely reaffirms" what is provided by section 1252(a)(1)).

But, as Defendants concede, several Plaintiffs have not been issued NTAs. Opp. 22-23.[3] Likewise, although the government has served the remaining Plaintiffs with documents styled as NTAs, those documents lack a date or time for an immigration hearing. *See* Opp. Ex. C at 1 (Y.G.C.); Opp. Ex. D at 1 (Z.B.M.); Opp. Ex. E at 1 (N.G.R.L.); Opp. Ex. F at 1 (W.M.R.O.); Opp. Ex. G at 1 (C.C.R.O.). The Supreme Court held in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), that "[a] notice that does not inform a noncitizen when and where to appear for removal proceedings is not a 'notice to appear under section 1229(a).'" *Id.* at 2110. The government therefore has not "brought" "proceedings" against any of the Plaintiffs.

Nor has the government taken "action . . . to remove" any of the Plaintiffs. 8 U.S.C. § 1252(b)(9). The government has simply reviewed each Plaintiff's asylum claim, found that they stated a credible fear of persecution or are unaccompanied minors, and "detained" them or permitted them to remain in the country pending full adjudication of their asylum applications. *See* Am. Compl. ¶¶ 13-67. In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Court stated that "[i]t is questionable whether" individuals in this posture—that is, "aliens who are detained under 8 U.S.C. § 1225(b)(1)(B)(ii) for consideration of their asylum applications"—have been subjected to any "'action[s] taken . . . to remove [them] from the United States.'" *Id.* at 840 & n.2 (quoting 8 U.S.C. § 1252(b)(9)). That doubt was warranted. Section 1225(b)(1)(B)(ii) expressly states that, when an alien is found to have "a credible fear of persecution . . . , the alien shall be detained *for further consideration of the application for asylum*," not for the purpose of removal. 8 U.S.C. § 1225(b)(1)(B)(ii); *see* 8 C.F.R. § 208.30(f) (same); *see also id.* § 212.5

---

[3] Defendants claim that proceedings "are pending" against these aliens. Opp. 23. It is unclear in what metaphysical sense Defendants claim this to be true; these proceedings are no more "pending" than a motion sitting on a litigant's hard drive or in a litigant's imagination is pending. In any event, the relevant question is whether the proceedings have been "brought," and they plainly have not.

(permitting asylum-seekers awaiting a hearing to be paroled into the United States).[4] The individual Plaintiffs are thus being "detained" or permitted to remain in the country "for further consideration of their application[s] for asylum," not "to remove" them.

*Third*, even if the government had somehow taken actions or brought proceedings to remove the Plaintiffs, the "questions of law and fact" that Plaintiffs raise did not "aris[e] from" any such actions or proceedings. 8 U.S.C. § 1252(b)(9). Plaintiffs are challenging a rule that imposes a categorical restriction on asylum eligibility both inside and outside of removal proceedings. *See* 8 C.F.R. §§ 208.2-208.4 (describing process of filing affirmative asylum applications outside of removal proceedings). Plaintiffs' claims came into being when that rule was issued; or, at the latest, when Plaintiffs entered the country and became subject to the Rule. Their claims will remain live even if the government never takes removal-related actions against them. Plaintiffs' claims thus " 'arise from' the challenged rulemaking," not " 'from [removal] proceedings' " or " 'the [removal] process.' " *O.A.*, 2019 WL 3536334, at *14 (quoting *Jennings*, 138 S. Ct. at 854 (Thomas, J., concurring in part and concurring in the judgment)).

The conclusion is reinforced by the Court's recent decisions rejecting an "expansive" construction of section 1252(b)(9). *Jennings*, 138 S. Ct. at 840. In *Jennings* and again in *Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019), the Court held that section 1252(b)(9) covers, at most, three categories of claims: challenges to (1) "an order of removal," (2) "the decision to detain [aliens] in the first place or to seek removal," or (3) "part of the process by which [aliens'] removability will be determined." *Jennings*, 138 S. Ct. at 841; *see Preap*, 139 S. Ct. at 962 (same). Plaintiffs do not challenge an order of removal. *See supra* pp. 2-4. They do not challenge the decision to

---

[4] The statute provides an even less adversarial process for unaccompanied minors, stating that "[a]n asylum officer"—not an immigration judge with removal authority—"shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child." 8 U.S.C. § 1158(b)(3)(C).

detain them or to seek removal. And the Rule's limit on asylum eligibility does not govern "the procedure by which [Plaintiffs'] removability will be determined"; rather, it governs the availability of a discretionary immigration benefit, which can be obtained both inside and outside of removal proceedings, and which does not determine whether aliens have a right to remain in the country. *O.A.*, 2019 WL 3536334, at \*12, \*14; *cf. J.E.F.M.*, 837 F.3d at 1029 (finding claims challenging denial of counsel in removal proceedings within the scope of section 1252(b)(9)). Plaintiffs' claims thus fall beyond the outermost bounds of what section 1252(b)(9) might cover.

*Finally*, the structure of the statute and background reviewability principles confirm that Congress did not intend to "cram[ ] judicial review" of Plaintiffs' claims "into the review of final removal orders." *Jennings*, 138 S. Ct. at 840. Section 1252(b) provides both that the record on review of an order of removal " 'shall' consist of '*only* . . . the administrative record *on which the order of removal is based*' "—not the administrative record underlying the rule itself—and that courts shall treat an immigration judge's removal decision as "conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(A)-(D)). Channeling review of APA claims through this process would "leave no room for the courts of appeals to evaluate the lawfulness of the Rule under APA standards." *O.A.*, 2019 WL 3536334, at \*15; *see McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 493-494 (1991) (deeming jurisdiction-channeling provision inapplicable to APA claim where the statute established an "abuse-of-discretion standard" and limiting courts to reviewing the "record created during the . . . administrative review process").

Furthermore, courts "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.' " *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)

(quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-213 (1994)). All of those considerations point against limiting judicial review here. A plaintiff might not be able to obtain judicial review of the Rule after undergoing removal proceedings if, for instance, he was denied asylum but granted a different (but less generous) form of relief, such as withholding of removal. *O.A.*, 2019 WL 3536334, at *16 (citing cases denying review under section 1252 in this circumstance). Plaintiffs' claims are "wholly collateral" to the INA's review provisions, which are concerned with challenges to removal decisions, not to general asylum eligibility rules. *Id.* And Plaintiffs' claims are outside the expertise of immigration judges and the Board of Immigration Appeals, which do not even have the *authority* to review the legality of the Rule. *See In re Ping Xiao*, 2015 WL 4503966, at *3 (BIA Jan. 9, 2015) ("The Board is without authority to rule on the validity of the regulations promulgated by the Attorney General."). It is deeply implausible that Congress intended these claims to be raised through section 1252's provisions—and the plain text of the statute makes clear that it did not.

2. There is also "no merit to Defendants' contention . . . that Plaintiffs fail to satisfy the final-agency-action requirement of the APA." *O.A.*, 2019 WL 3536334, at *13 n.8; *see* Opp. 24-25. Plaintiffs challenge a regulation that is expressly denominated "an interim final rule." *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829, 33,829 (July 16, 2019). That Rule (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) determines the "rights or obligations" of tens of thousands of asylum-seekers, including Plaintiffs—several of whom had the Rule applied against them before it was enjoined. *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

Defendants suggest that this explicitly "final rule" is really non-final because "it 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency

of future administrative action.' " Opp. 25 (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). That standard, plucked from a pre-APA case, is not the law. Under the Court's modern precedent, a rule is "final[ ]" and "immediately reviewable" if it " 'give[s] notice of how the [agency] interpret[s]' the relevant statute," even it " 'would have effect only if and when a particular action [i]s brought.' " *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-150 (1967)).[5]

3. The individual Plaintiffs' claims are also ripe. "The ripeness inquiry probes the fitness for review of the legal issue presented, along with (in at least some cases), 'the hardship to the parties of withholding court consideration.' " *Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010). Plaintiffs' claims check all of the boxes for "fitness": They are "purely legal"; delay would not "afford additional 'concrete[ness]' "; and the challenged Rule is "final." *Id.* at 1308-09. Because Defendants have not identified any "significant agency or judicial interests militating in favor of delay," Plaintiffs need not show the delay would cause them "hardship." *Id.* at 1310. But denying Plaintiffs the benefits of asylum for months or years—during which time they would be under constant threat of removal and would not enjoy the numerous benefits asylum affords—constitutes "hardship" by any standard.[6]

---

[5] Defendants analogize this case to instances in which aliens challenged decisions made by asylum officers and immigration judges in the midst of their removal proceedings. Opp. 24-25. But those decisions were non-final because the aliens were challenging "an intermediate step in a multi-stage administrative process." *Bal v. Sessions*, 292 F. Supp. 3d 604, 607 (E.D. Pa. 2017) (quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)). This case is nothing like that. Plaintiffs are challenging a final rule issued by the Attorney General and the Secretary of Homeland Security, which is neither intermediate nor "tentative." *Hawkes*, 136 S. Ct. at 1813.

[6] Defendants claim that Plaintiffs' claims are unripe because "agency action remains pending." Opp. 24. Putting aside that no action of any kind is pending for several Plaintiffs, however, the actions Defendants refer to are individual removal proceedings, which would in no way render Plaintiffs' claim more fit for judicial review. "If a suit presents a purely legal question of whether [an agency's] final action violates [a statute], it is unnecessary to wait for [the agency's]

## II.    Plaintiffs Are Likely To Prevail On The Merits.

### A.    The Rule Was Issued In Violation Of The APA's Procedural Requirements.

#### 1.    *The Rule does not satisfy the good cause exception.*

Defendants do not dispute the standard of review for the good cause exception:  A court must review the legal basis for the good cause determination *de novo*, while reviewing the "factual basis" for the agency's prediction to ensure it has adequate "record support" and is "reasonable."  Mem. 11 (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706-707 (D.C. Cir. 2014); *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144-45 (D.C. Cir. 1992)). Defendants also do not dispute that the Rule's theory of good cause relies on two steps: first, that immediate issuance of the Rule would cause a "surge to the border"; and, second, that this surge would endanger aliens and destabilize the region and the immigration system.  Mem. 11.  The only question, then, is whether this two-step prediction satisfies the "meticulous and demanding" standard the APA imposes.  *Sorenson*, 755 F.3d at 706.  Defendants fail to make that showing.

As to the first step, Defendants simply repeat their prediction of a surge, without identifying any new record basis for that prediction or addressing the flaws Plaintiffs identified in the record documents Defendants previously cited.  Opp. 39-40; *see* Mem. 12-14.  Defendants claim that "the *East Bay* court[ ] agree[d] with the government's conclusion" that the record adequately supports their prediction.  Opp. 40.  To the contrary, both Judge Tigar and the Ninth Circuit *rejected* the government's invocation of the good cause exception here.  *East Bay Sanctuary Covenant v. Barr*, -- F.3d --, 2019 WL 3850928, at *1 (9th Cir. Aug. 16, 2019); *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 950-951 (N.D. Cal. 2019).

---

legal conclusion to be applied in order to determine its legality."  *Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015) (citation and internal quotation marks omitted); *see Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464-465 (D.C. Cir. 2010) (same).

Implicitly acknowledging the dearth of record support for their prediction, Defendants say they "cannot provide evidence for actions that have not occurred in response to a rule that has yet to be promulgated." Opp. 40. But the D.C. Circuit held—in response to a remarkably similar theory that announcement of a rule would lead to a "rush" of violators—that an agency "must" provide a substantial "factual basis" and "cite . . . examples" to support its prediction. *Tenn. Gas Pipeline*, 969 F.2d at 1144-45. The D.C. Circuit also distinguished Defendants' principal case, *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477 (Temp. Emer. Ct. App. 1983), explaining that it dealt with "special circumstances" in which it was "well recognized that prices can be changed rapidly to accommodate shifts in regulatory policy." *Tenn. Gas Pipeline*, 969 F.2d at 1146. There is no similar evidence that migration patterns change rapidly in response to changes in immigration policy—a telling lacuna, given the government's wealth of experience and even greater wealth of data concerning changes to the immigration laws.

As to the second step, Defendants do not offer even a perfunctory response to the flaws in their argument. *See* Mem. 15-17. They do not attempt to defend the demonstrably false proposition that migrants are safer in Mexico or the Northern Triangle than transiting to the United States. *Id.* at 16. They do not identify any record support showing that a "surge" would "be destabilizing to the region." 84 Fed. Reg. at 33,841. And they do not explain how administrative and fiscal costs for the U.S. immigration system would entail the sort of "imminent[ ] threat[ ] [to] life or physical property" necessary to invoke the good cause exception. *Sorenson*, 755 F.3d at 706.

### 2. The Rule does not satisfy the foreign affairs exception.

Defendants' foreign affairs argument is equally weak. Defendants devote most of their argument to reciting the ways in which the Rule allegedly "*implicates* the foreign policy and

11

national security interests of the United States." Opp. 41-42 (emphasis added) (quoting 84 Fed. Reg. at 33,841-42). As every court to consider the question has agreed, that is not sufficient to satisfy the foreign affairs exception. Mem. 18 (citing cases). Rather, the rule must "*involv*[*e*]" a "foreign affairs *function* of the United States." 5 U.S.C. § 553(a)(1) (emphases added).

The rule plainly falls outside the "paradigm case" for invoking this exception: It does not carry out a "diplomatic function[ ]" or execute a treaty. *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010); *see, e.g.*, *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (D.D.C. 2018). Defendants accordingly must point to "evidence of undesirable international consequences that would result if rulemaking were employed." *E.g. Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983); *see* Mem. 18-19. Defendants claim that *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), and *American Association of Exporters & Importers-Textile & Apparel Group v. United States*, 751 F.2d 1239 (Fed. Cir. 1985), employed a less exacting standard. Opp. 43. Not so. In *Rajah*, the Second Circuit required the agency to identify "definitely undesirable international consequences that would follow from notice and comment rulemaking." 544 F.3d at 437. Likewise, in *American Association of Exporters and Importers*, the Federal Circuit found the exception satisfied because delaying implementation would have "provoke[d] definitely undesirable international consequences" *and* because the rule "derive[d] in part from the President's foreign affairs power." 751 F.2d at 1249.

Here, the government has made no similar showing of harm. In their brief, Defendants identify a single international-relations harm that would allegedly flow from immediate publication of the rule: that it would ostensibly "overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration that the negotiations seek to decrease, undermining the United States' negotiations with Mexico." Opp. 44. As an initial

matter, this is simply a repackaging of the government's "surge" rationale, which is fatally infirm for the reasons given above. *See supra* pp. 10-11. Furthermore, this rationale for invoking the foreign affairs exception is found nowhere in the Rule itself. *See* 84 Fed. Reg. at 33,842. And it positively contradicts the rationale Defendants' counsel gave at argument. *See* Tr. of TRO Hr'g at 99:19-100:25 (claiming the rule "puts pressure on our . . . international partner[s]").

Even putting all that to one side, Defendants still do not explain how a temporary increase in migration would affect negotiations with Mexico concerning a long-term immigration agreement. That connection is anything but self-evident. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252-53 (9th Cir. 2018) (expressing confusion over similar rationale). The foreign affairs exception requires more than this *ipse dixit*. *See Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (per curiam) (crediting foreign affairs concerns identified in "affidavits of the Attorney General and Deputy Secretary of State"); *East Bay*, 909 F.3d at 1253.

## B.     The Rule Violates 8 U.S.C. § 1158 And The TVPRA.

The Rule also "fundamentally conflicts with the [approach] Congress took in enacting mandatory bars based on a safe option to resettle or pursue other relief in a third country." *East Bay*, 385 F. Supp. 3d at 945.

Defendants' reading of section 1158 boils down to this: The safe-third-country and firm-resettlement bars only "prohibit[ ]" a grant of asylum to a particular class of aliens, but do not "require" that those outside of the class be allowed to seek asylum. Thus, any new limitation that does not *expand* asylum to those prohibited by statute from obtaining it is necessarily "consistent with" those provisions. In other words, section 1158 only sets a floor by making certain aliens ineligible for asylum, and as such any additional condition imposed upon those aliens is necessarily "consistent with" section 1158. That reading of the statute is untenable.

First, as already explained, the statute *already requires* that any new limitation be "*additional*." 8 U.S.C. § 1158(b)(2)(C) (emphasis added). Any regulation that purported to make a class of aliens eligible for asylum who are expressly made ineligible for asylum by the statute would not be an "*additional*" limitation. Thus, Defendants have once again given the phrase "consistent with" no work to do, in violation of the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (internal quotation marks omitted).

Second, Defendants' interpretation would give rise to unwarrantable results. For instance, under 8 U.S.C. § 1158(a)(2)(B), an alien must apply for asylum "within 1 year after the date of the alien's arrival in the United States." If Defendants are right about the scope of their power, they could rewrite that provision through regulation to say that an alien must apply within 30 days of arrival. After all, the deadline provision only "*denies* the right to apply to asylum to a particular category of aliens," but "does not mandate that all aliens who fall outside that category should retain eligibility for or be granted asylum." Opp. 32. Thus, per Defendants' own theory, replacing one year with one month would be perfectly "consistent with the Executive's imposition of an additional restriction." *Id.* That cannot be right: "It is hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 326 (2014). And it is a basic axiom of both interpretation and the separation of powers that an agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Id.*

Consider another example: Under 8 U.S.C. § 1158(a)(2)(E), the safe-third-country provision expressly does not apply to "an unaccompanied alien child." If Defendants are right about their reading of the statute, they could simply pass a regulation saying that unaccompanied

minor children are subject to the safe-third-country bar. In their view, such a regulation would merely be adding an additional limitation to the floor set by Congress. That, of course, would eviscerate the phrase "consistent with." *Cf. O.A.*, 2019 WL 3536334, at \*26 ("[A] regulation making all sixteen-year-olds 'ineligible' to obtain a driver's license is not, by any logic, *consistent with* a statute providing that any sixteen-year-old may 'apply' for a driver's license."). But that is where Defendants' interpretation leads. The "carefully described limits on the Attorney General's authority" in section 1158 cannot be reduced to "mere suggestions" in this manner. *Gonzales v. Oregon*, 546 U.S. 243, 260-261 (2006); *Christensen v. Harris County*, 529 U.S. 576, 583 (2000) ("[W]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."). Indeed, it is notable that, despite repeated invitations, Defendants have not yet identified a single "additional limitation" on asylum that they could impose that would not be "consistent with" section 1158.

Defendants also advert to the fact that the ultimate grant of asylum is discretionary. But the conferral of discretion is not a license to violate the law. It goes without saying that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion . . . by putting restrictions in the operative statutes." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In other words, "agency discretion is defined by and circumscribed by law." *Farmworker Justice Fund, Inc. v. Brock*, 811 F.2d 613, 622 (D.C. Cir. 1987), *vacated as moot* 817 F.2d 890. Thus, whatever discretion is given to the Attorney General in the asylum process, "if any incongruity exists between the terms of the statute and a regulation, the statutory text prevails—not vice versa." *O.A.*, 2019 WL 3536334, at \*27; *see Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) (rejecting an interpretation of a general authority that "would deprive the more specific authority of virtually all effect").

Defendants also seek support in the fact that the BIA has "recogniz[ed] that an alien's attempts to seek asylum in a third country are relevant to the discretionary determination whether to grant him asylum." Opp. 29 (citing *In re Pula*, 19 I. & N. Dec. 467, 473-474 (BIA 1987)). First of all, *Pula* does not suggest that this one factor should be dispositive; indeed, *Pula* highlights several other factors that might explain an alien's decision not to apply for asylum in a third country, like the fact that an "alien has relatives legally in the United States or other personal ties to this country" or the fact that the third country might not actually be a "safe haven." 19 I. & N. Dec. at 474. In any event, "there is a vast difference between considering how the alien entered the United States as one, among many, factors in the exercise of a discretionary authority, and a categorical rule that disqualifies any alien who enters across the southern border outside a designated port of entry." *O.A.*, 2019 WL 3536334, at *27.[7]

### C.  The Rule Is Arbitrary And Capricious.

The Rule is rooted in premises that are contradicted by the record, and entirely neglects a crucial aspect of the problem it purports to address. It therefore violates the APA and must be set aside. *East Bay*, 385 F. Supp. 3d at 951-957.

Under the APA's arbitrary-and-capricious standard of review, courts must ensure that the agency "examine[d] the relevant data and [can] articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Defendants attempt to stack the standard-of-review deck,

---

[7] The cases that Defendants cite (at Opp. 29-30) do not suggest otherwise: In none of these cases was there a contention that a categorical rule would conflict with other categorical rules that Congress had enacted, nor were there specific textual limits requiring the agency to exercise its rulemaking authority in a manner "consistent with this section." *See Lopez v. Davis*, 531 U.S. 230, 243-244 (2001); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970).

arguing that the agencies' "predictive judgments . . . are entitled to particularly deferential review" and "need not rest on pure factual determinations." Opp. 44 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). But Defendants omit the key proviso in that quotation: "as long as [the predictive judgments] *are reasonable*." *Earthlink*, 462 F.3d at 12 (emphasis added). The Court thus owes the Rule the same amount of deference it owes every other rule, which is to say that it cannot stand if it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And the Rule cannot survive that standard.

1. Defendants offer no satisfying defense of the inference at the core of the Rule: That failure to seek asylum in a third country indicates that an alien lacks a meritorious asylum claim. *See* Mem. 25-26. Defendants claim that they "made a permissible policy choice" by choosing a "bright-line rule." *Id*. But bright-line rules are not self-justifying; the rationale supporting the bright-line rule is precisely what must be probed under the APA. Otherwise, categorical regulations would be exempt from APA scrutiny, which of course would turn basic administrative law principles on their head. *See Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999) (a rule that is "irrationally overbroad" is "arbitrary and capricious"). And here, Defendants simply fail to provide evidence supporting the key inference animating the bright-line rule: that choosing "not to seek protection at the earliest possible opportunity" signals a lack of an "urgent or genuine need for asylum." 84 Fed. Reg. at 33,831, 33,839.

2. As to the Rule's second key shortcoming—its failure to offer any evidence for why a migrant traversing Mexico or Guatemala could have obtained protection there (Mem. 26-30)—Defendants offer a mish-mash of contradictions and *post hoc* rationalizations. Defendants repeat

the Rule's reliance on adherence to certain treaties as a proxy for a functional asylum system (Opp. 48-49), but fail to address the mountain of evidence in the record belying that claim (Mem. 26-30). *See East Bay*, 385 F. Supp. 3d at 952 (membership in treaties does not make asylum system adequate). Defendants cannot wish that evidence away by ignoring it.

Defendants also claim that the Rule depends not on a migrant's ability to *actually* seek protection elsewhere, but on their mere *attempt* to seek protection elsewhere. According to Defendants, "the particular details of the asylum system in Mexico or other third countries" is irrelevant to attempting to seek asylum there, because failing to try itself "strongly suggests that the alien's claim lacks urgency and merit." Opp. 49. That is plainly untrue. *See* Mem. 24-30. One good reason a migrant might think twice before seeking asylum in Mexico is that there is a high chance of *refoulement*. *See* AR306; AR708; AR717. In any event, the argument that the health of Mexico's asylum system is irrelevant contradicts the stated reasoning of the Rule, and thus represents an impermissible "*post hoc* rationalization[ ]." *State Farm*, 463 U.S. at 50.[8] The Rule explicitly relied on Mexico's "robust protection regime" (84 Fed. Reg. at 33,835), on its "functioning asylum system" (*id*. at 33,838), and on the fact that migrants "could have obtained protection" there (*id*. at 33,831). Defendants cannot now—after Plaintiffs pointed out the Mexican asylum system's shortcomings (Mem. 25-30)—claim that those shortcomings actually do not matter at all. *See State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

---

[8] Indeed, even Defendants' defense of the Rule in this Court betrays the importance of other countries' asylum systems. *See* Opp. 46 (the Rule "ensure[s] that the adjudicators are able to focus on the claims of aliens who have not been able to obtain relief in a third country"); *id*. ("This shifts the onus to consider such claims to other countries within that region that are able to provide fair adjudications of requests for asylum"); *id*. at 49 ("[T]he Departments weighed the totality of that evidence and determined that it established sufficient capacity in Mexico to address the claims of transiting aliens.").

Defendants fall back on the claim that "Mexico is improving its asylum system." Opp. 49. But (1) the Rule was premised on a *currently* "functioning asylum system," 84 Fed. Reg. at 33,831, so this is yet another *post hoc* rationalization; and (2) the record casts doubt on this assertion. *See, e.g.*, AR306 (cataloguing deficiencies with Mexican asylum system).

Defendants also argue that this Court "cannot second-guess" the agencies' determination that there is "sufficient capacity in Mexico to address the claims of transiting aliens." Opp. 49. But this Court's role is not to pass judgment on Mexico's asylum system directly; rather, it must determine whether the "*agency* . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 103 (emphasis added and internal quotation marks omitted). Here the agencies failed woefully in that task: They have "offered an explanation for its decision that runs counter to the evidence" before them. *Id*.; *see* Mem. 25-29.

Finally, Defendants fail to respond to Plaintiffs' concerns about Guatemala's asylum system (or lack thereof). *See* Mem. 29-30. An agency may not "ignore evidence contradicting its position" in this manner. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

3. The Rule is also arbitrary and capricious because it fails to exempt unaccompanied children. *See* Mem. 30. Defendants have no response, other than to claim that they were not required to craft such an exemption. Opp. 49. "Regardless of whether there is any true statutory conflict," the TVRPA "demonstrates that such children are an important aspect of the problem . . . when it comes to administering the asylum scheme." *East Bay*, 385 F. Supp. 3d at 956 (internal quotation marks omitted). Defendants contend that a footnote in the Rule reveals that they did consider the problem. Opp. 49-50. But, as the *East Bay* court explained, "the agencies did not expressly consider whether the Rule's rationale applies with full force to those children"; "why it is rational to assume that an unaccompanied minor's failure to apply has the same

probative value on the merits as an adult's"; and "whether placing unaccompanied minors in the more rigorous reasonable fear screening process . . . creates a significantly greater risks that even those alternative claims will be decided wrongly." *East Bay*, 385 F. Supp. 3d at 956-957.

4. Defendants next contend that the Rule will reduce migrants' incentives to seek entry into the United States, thereby reducing human smuggling and "reliev[ing] stress on the adjudicatory authorities." Opp. 46. But the citations marshalled by Defendants do not connect a change in asylum rules with lower numbers of migrants seeking entry to the United States. *See, e.g.*, AR676 (new asylum rules "aren't even likely to stop people arriving at the US-Mexico border"). This data reveals either a lack of a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43, or a decision to "ignore evidence contradicting its position," *Hogen*, 613 F.3d at 194. Either way, the Rule is arbitrary and capricious.

5. Finally, Defendants argue that this Rule will put the United States "in a better position to negotiate a formal and lasting resolution" with Mexico and Northern Triangle countries. Opp. 46. But nothing in the record suggests that the agencies here "consider[ed] an important aspect of the problem"—how these countries will react to the arrival of thousands of migrants on their doorsteps. *State Farm*, 463 U.S. at 43.

## III. The Rule Inflicts Irreparable Harm On Plaintiffs.

Plaintiffs will suffer irreparable harm if the Rule remains in force outside the Ninth Circuit. After reciting the relevant standard—injury that is "unrecoverable," "both certain and great," and "actual and not theoretical," Opp. 51—Defendants offer no argument that the individual Plaintiffs fail to meet it. For good reason: the Rule demands that all of the individual Plaintiffs be "found ineligible for asylum." 84 Fed. Reg. at 33,843. Indeed, many of the individual Plaintiffs had the Rule applied against them before it was enjoined, and were issued

negative credible fear determinations as a result. *See* Mem. 4-6. If the Rule remains in effect during the pendency of this litigation, all of these individuals once again will be categorically denied asylum and likely deported to dangerous countries of origin in as little as a few months. *See* Cubas Supp. Decl. ¶ 15, Garza Pareja Supp. Decl. ¶ 16. That risk is "certain and great" and creates a cognizable irreparable harm. *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018) ("No one seriously questions that plaintiffs face substantial harm if returned to their countries of origin."), *appeal filed*, No. 19-5013 (D.C. Cir. Jan. 30, 2019).[9]

Defendants' attempts to minimize the organizational Plaintiffs' irreparable harms fare no better. Defendants suggest that the organizational Plaintiffs merely "have harms that are speculations about their funding and the need to plan for the new rules," Opp. 51, but they plainly have pointed to a greater variety of irreparable injuries, *see* Mem. 34-36. Key among them is the Rule's irreparable harm to their missions to assist as many asylum-seekers as possible to obtain the unique statutory benefits of asylum. *See* Cubas Decl. ¶¶ 4, 8-9, 14, 39; Cubas Supp. Decl. ¶¶ 3, 4; Garza Pareja Decl. ¶¶ 4, 7-8, 33-37; Garza Pareja Supp. Decl. ¶ 3; McBride Decl. ¶¶ 13, 21, 32. Indeed, the "vast majority" of the Organizations' clients are now subject to the Rule, Cubas Supp. Decl. ¶¶ 4, 6-7; Garza Pareja Supp. Decl. ¶ 5; McBride Decl. ¶ 21, and the resource-shifting that the Rule requires will cut the number of clients that they can serve by half, Cubas Supp. Decl.¶ 19, Garza Pareja Supp. Decl. ¶ 19. *See also* McBride Decl. ¶ 17. This Court previously described such injury as the organizational Plaintiffs' "most salient

---

[9] The individual Plaintiffs' harm remains irreparable whether or not they are eligible for protection under the Convention Against Torture or withholding of removal. *See* Opp. 51. Both alternative forms of relief are substantially more difficult to obtain and confer fewer benefits— including less protection from removal—than asylum. *See* Am. Compl. ¶¶ 93-97 & n.4, ¶ 183.

claim of irreparable harm." *Capital Area Immigrants' Rights Coal. v. Trump*, No. 1:19-cv-2117-TJK, 2019 WL 3436501, at *2 (D.D.C. July 24, 2019). Defendants do not even address it.

## IV. The Balance Of Equities And The Public Interest Favor Injunctive Relief.

Defendants spend a single paragraph arguing that the public interest and the balance of equities favor the government, because the Rule ostensibly represents a "targeted measure[ ]" to curtail a "surge" in illegal immigration at the southern border. Opp. 50-51. Setting aside whether the Rule reflects a meaningfully tailored response to the migration influx Defendants identify, this argument mischaracterizes the relevant interests at stake. The public interest in "enforc[ing] [the] immigration laws," Opp. 50, favors Plaintiffs, not Defendants. *See, e.g.*, *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate."). There also is an immense "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see Landon v. Plascencia*, 459 U.S. 21, 34 (1982) (recognizing "weighty" interests of migrants who "stand[ ] to lose the right 'to stay and live and work in this land of freedom'" (citation omitted)); *Grace v. Whitaker*, No. 18-1853, 2019 WL 329572, at *4 (D.D.C. Jan. 25, 2019) (considering public interest in preventing harm to non-party migrants "who allege credible fears of domestic or gang-related violence").

Moreover, an injunction would merely maintain the *status quo*—"the last uncontested status which preceded the pending controversy"—pending resolution of Plaintiffs' claims. *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,* 319 F. Supp. 3d 491, 498 (D.D.C. 2018). Defendants contend that the government is burdened by a "strain on our asylum system inflicted by those who have no valid claim for asylum at all," Opp. 51, but administrative

"strain" does not permit the Executive to upend Congress's asylum scheme, regardless of the "validity" of applications.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015) (Government "cannot suffer harm from an injunction that merely ends an unlawful practice" (internal quotation marks omitted)); *Grace*, 2019 WL 329572, at *5 (recognizing citizens' interests in "ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat" (quoting *East Bay*, 909 F.3d at 1255)).

## V.     Nationwide Injunctive Relief Is Appropriate.

A nationwide injunction is warranted.[10]  The Rule is contrary to the INA, the TVPRA and the APA; Circuit precedent therefore requires that the Rule be "vacated—not that [its] application to the individual petitioners is proscribed."  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see, e.g.*, *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("Normally when an Agency clearly violates the APA we would vacate its action."); *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 211 n.28 (D.D.C. 2002) ("[A] nationwide injunction invalidating an agency rule of broad applicability is appropriate even where a single plaintiff has challenged the legality of the rule.").  Defendants argue that courts "lack the authority to enter universal injunctions," Opp. 52, but that is contrary not just to the law of this Circuit but the practice of the Supreme Court: The Court, after all, left in place a nationwide injunction enjoining Defendants' previous asylum rule, and did not disturb the geographic reach of the Ninth Circuit's decision in the travel ban cases (although it did restrict

---

[10] Defendants suggest that *any* injunctive relief would be inappropriate, "to the extent that Plaintiffs could be deemed to challenge any aspect of the rule as applied to expedited removals." Opp. 52 (citing 8 U.S.C. § 1252(e)(1), (3), (f)(1)).  But the cited provisions merely channel certain claims related to removal orders or removal proceedings into particular courts, and do not "immunize the primary asylum eligibility portions of the Rule from judicial review." *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1085, 1118 (2018); *see supra* pp. 2-8.

the people who could benefit from it). *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).

Moreover, Defendants' stated concerns with nationwide injunctions are not borne out in practice. It is simply not the case that universal injunctions "prevent[ ] legal questions from percolating through the federal courts." Opp. 53 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring)). As this case confirms, parallel requests for preliminary injunctive relief and even summary judgment against nationwide policies have been litigated— sometimes yielding divergent decisions—across multiple federal courts. *See* Mem. 39 n.9.[11] Nor are Plaintiffs seeking to "circumvent" the class-action requirements of Federal Rule of Civil Procedure 23(b)(2). As Judge Friendly explained, in suits seeking a "prohibitory" injunction against the government, the "class action designation is largely a formality," because either way the "judgment run[s] to the benefit not only of the named plaintiffs but of all others similarly situated." *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973). And given the APA's directive that agency action simply be "set aside," 5 U.S.C. § 706(2), it is "unclear that class certification will serve any significant purpose," *O.A.*, 2019 WL 3536334, at *2.

Moreover, in drawing the scope of any equitable relief, the Court must consider "what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017). Defendants suggest that "any relief must be limited to the actual Plaintiffs in this case over which the court has subject matter jurisdiction, and limited to those individual aliens or bona fide clients of the Plaintiff

---

[11] Defendants' stated concern that multiple courts have an opportunity to "continue to consider the issue," Opp. 54, rings particularly hollow given their repeated invocation of 8 U.S.C. § 1252(e)(3), and their insistence that jurisdiction is limited to this Court. *Id.* § 1252(e)(3)(A).

organizations that those Plaintiffs affirmatively identify for the Court." Opp. 54.[12] But such relief would not be commensurate with the "extent of the violation established" by the Rule. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also, e.g.*, *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991) (a regulation that is "without statutory authority" is "facially invalid"). Nor is it clear what Defendants mean by "bona fide," or how that standard should be administered. *See East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 866 n.21 (N.D. Cal. 2018) (questioning how an injunction limited to organizational Plaintiffs "would work in practice, for example, whether the clients of the Plaintiff firms would have special rights that other immigrants would not have"). The Rule is unlawful root and branch, and Defendants' proposed injunction would leave unprotected thousands of migrants subject to it merely because they happen not to be bona fide clients of the organizational Plaintiffs. *See Harmon*, 878 F.2d at 495 & n.21 ("[t]raditional administrative law principles" counsel against the proposition that "named plaintiffs alone should be protected by the injunction").

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' opening brief, Plaintiffs' Motion for Preliminary Injunction should be granted.

---

[12] Notwithstanding the Ninth Circuit's stay decision in *East Bay*, Defendants make no request that this Court limit any injunction based on geography and offer no response to Plaintiffs' account of the substantial confusion the Ninth Circuit's approach has engendered. Mem. 39-40.

Dated: September 3, 2019

Manoj Govindaiah
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.com

* *Motion for admission forthcoming*

*Counsel for Plaintiff Capital Area Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West* (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* *Motion for admission pending*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>                 Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                 Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

September 3, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick
Justin W. Bernick
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com