**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 1:19-cv-02117-TJK |

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Plaintiffs

submit the following statement of material facts as to which there are no genuine disputes.[1]

**ASYLUM SEEKERS AT THE SOUTHERN BORDER**

1.      Individuals who arrive at the southern border seeking asylum in the United

States frequently hail from El Salvador, Guatemala, and Honduras, often referred to collectively

as the "Northern Triangle."  Administrative Record (hereinafter "AR") 289.

2.      The Northern Triangle is undergoing "unprecedented level[s] of violence," with

43.5% of migrants from those countries reporting that a family member died of violence in the

last two years.  AR290, 293-294.

3.      While in Mexico, "refugees and migrants face acute risks of kidnapping,

disappearance, sexual assault, trafficking, and other grave harms."  AR703.  They are "targeted

---

[1] Plaintiffs further incorporate by reference the Statement of Material Facts Not in Genuine Dispute filed by the plaintiffs in the related case of *I.A., et al. v. Barr, et al.*, Civil Action No. 1:19-cv-02530-TJK.

due to their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons." *Id.*; *see also* Supp. Decl. of Michelle Garza Pareja (hereinafter "Garza Pareja Supp. Decl.") ¶ 7, Dkt. 41-3; Cubas Supp. Decl. ¶ 9, Dkt. 41-2.

4.      Approximately 68% of refugees and migrants crossing Mexico are exposed to violence, and almost one-third of refugee and migrant women are sexually assaulted.  AR290, 703.  Some of these individuals "have been trafficked into forced labor, while women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and night clubs that cater to police, military, and other forces."  AR703.

5.      Migrants travelling through Mexico also "are often easy prey" for the same gangs that many fled in the Northern Triangle, AR292, or suffer violence and other abuses at the hands of Mexican officials.  AR290, AR292, AR703.

6.      Crimes against migrants are often committed with impunity in Mexico.  AR290, AR703, AR759, AR775.  Between 2014 and 2016, 99% of the 5,284 crimes against migrants in Chiapas, Oaxaca, Tabasco, Sonora, and Coahulia remained either uninvestigated or unresolved. AR775.

7.      When they attempt to seek asylum protections in Mexico, migrants often lack access to information about available asylum procedures and are not informed of their rights to seek asylum in Mexican detention facilities.  AR533, AR703, AR708, AR772.

8.      Mexico "lack[s] an effective appeal process to correct wrongful denials of protection."  AR703.

9.      Mexico's asylum agency is "[b]uckling under surging asylum applications and the lowest budget in years."  AR699; *see also* AR534, AR700, AR703; Garza Pareja Supp. Decl.

¶ 8; Decl. of Sharon McBride (hereinafter "McBride Decl.") ¶ 11, Dkt. 41-4; Cubas Supp. Decl. ¶ 10.

10.     Mexico stopped processing asylum applications in 2017 and only reopened its asylum system in 2018 after a successful lawsuit by the Mexican Commission for the Defense and Projection of Human Rights.  AR703.

11.     Rates of success on asylum applications in Mexico are exceedingly low.  AR773 (citing report finding that 11% of adult asylum applicants from the Northern Triangle were granted asylum or complementary protection in Mexico in 2017); *see also* Cubas Supp. Decl. ¶ 10.

12.     Mexico also repeatedly deported individuals seeking asylum to countries in which they face a threat of persecution, in violation of the principle of non-*refoulement*.  AR306, AR708, AR717.

13.     While transiting through Guatemala, migrants remain susceptible to high risks of the same violence and criminal activity that they fled in other countries, particularly to the extent that gang affiliations cross national borders in the region.  Garza Pareja Supp. Decl. ¶ 10; Cubas Supp. Decl. ¶ 12.

14.     According to the U.S. State Department, the Office of the United Nations High Commissioner for Refugees ("UNHCR") "reported that identification and referral mechanisms for potential asylum seekers" in Guatemala "were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status."  U.S. Department of State, Guatemala 2015 Human Rights Report, https://bit.ly/2mmFiQ6.

15.     The number of migrants apprehended at the southern border has steadily declined since May 2019, including between July and August, while the Rule was enjoined

nationwide. *See* CBP, U.S. Border Patrol Southwest Border Apprehensions FY 2019, https://bit.ly/2mnbZsp. The number of border apprehensions from May 2019 to August 2019 dropped by more than half from 144,255 total apprehensions in May to 64,006 in August. *Id.*

## THE RULE

16.     On July 16, 2019, Defendants issued the interim final rule challenged in this lawsuit, entitled *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (the "Rule").

17.     Under the Rule's amendments to 8 C.F.R. §§ 208.13, 1208.13, an individual who "enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside of the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum." 84 Fed. Reg. at 33,843.

18.     The Rule applies unless an affected individual can show that she falls into one of three narrow exceptions: (1) she applied for protection from persecution or torture in at least one third country and received a final judgment of denial; (2) she satisfies the definition of a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11; or (3) the only third countries through which she transited to the United States were, at the time, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment ("CAT"). 84 Fed. Reg. at 33,843.

19.     Mexico, the only country adjoining the southern border of the United States, is a party to the Refugee Convention, the Protocol, and the CAT. AR540, AT707, AR771. Because

all migrants at the southern land border of the United States have transited through Mexico, the Rule's third exception will never apply.  *See* Rule, 84 Fed. Reg. at 33840.

20.     The Rule applies to noncitizens pursuing asylum affirmatively and defensively. Rule, 84 Fed. Reg, at 33,843-33,844.

21.     The Rule's amendments to 8 C.F.R. § 208.30(e)(5)(ii) confirm that individuals subject to this revised policy will face a higher burden to avoid removal: "If the alien is found to be an alien described in § 208.13(c), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum," and proceed to place the individual into full removal proceedings under Section 240 of the INA for consideration of her claims for withholding of removal under Section 241(b)(3) of the INA or for protection under the CAT.  84 Fed. Reg. at 33,843-33,844.

22.     Either alternative form of relief (withholding of removal or protection pursuant to the CAT) requires the individual to establish a more burdensome "reasonable fear of persecution or torture," rather than a credible fear, subject to limited review under the same "reasonable fear" standard by an immigration judge.   84 Fed. Reg. at 33,843-33,844 (amending 8 C.F.R. § 208.30(e)(5)(ii)).

23.     The Rule went into effect upon publication even though the APA requires an agency to allow a period of public notice and comment, as well as a thirty-day waiting period, before implementing a proposed regulation, *see* 5 U.S.C. § 553(b), (c), (d).

24.     To explain why they did not follow these ordinary rulemaking procedures, Defendants claimed that "good cause" existed to bypass them pursuant to 5 U.S.C. § 553(b)(B). The Rule's announcement contends that any delay in implementation would lead to "a surge in migrants hoping to enter the country before the rule becomes effective," which in turn "would

jeopardize the lives and welfare of aliens who surge to the border" and "be destabilizing to the region, as well as to the U.S. immigration system."  84 Fed. Reg. at 33,841.

25.     The only supporting evidence of such a "surge" cited in the Rule itself is a newspaper article claiming that the "rollback" of the Administration's policy of "separating parents from their children" led some human smugglers to "tell potential customers [that] the Americans do not jail parents who bring children—and to hurry up before they might start doing so again."  84 Fed. Reg. at 33,841; AR439.

26.     Defendants also claimed that the Rule involves a "foreign affairs function of the United States" under 5 U.S.C. § 553(a)(1), because it affects "[t]he flow of aliens across the southern border, unlawfully or without appropriate travel documents," 84 Feg. Reg. at 33,841.

27.     The deadline for written or electronic comments regarding the Rule was August 15, 2019.  84 Fed. Reg. at 33,830.

### NAMED PLAINTIFFS

#### *J.M.M.*

28.     Plaintiff J.M.M. is a young woman from El Salvador seeking asylum in the United States.  J.M.M. Decl. ¶¶ 1, 3, Dkt. 31-3.

29.     J.M.M. fled El Salvador in May 2018, and Mexico in July 2019, after years of threats, beatings, extortion, and sexual assault by members of the MS-13 gang.  *Id.* ¶¶ 3-5, 7-8. J.M.M. did not report the extortion, threats, or violence to the police because they are associated with MS-13, and she has witnessed the police refuse to arrest gang members.  *Id.* ¶ 6.

30.     J.M.M. fled to Mexico from El Salvador in May 2018.  *Id.* ¶ 7.  Members of the gang found her in Mexico in the summer of 2019, beat her, and stated that they would find her wherever she was hiding.  *Id.* ¶¶ 7-8.  J.M.M. then fled Mexico for the United States.  *Id.*

31.     J.M.M. entered the United States without inspection on July 16, 2019 and was quickly detained by U.S. immigration officials.  *Id.* ¶ 8.

32.     On July 22, 2019, J.M.M. underwent a credible fear interview by an asylum officer and received a negative determination.  *Id.* ¶ 9.

33.     On July 30, 2019, an immigration judge reversed the negative credible fear determination.  *Id.*

34.     On or after July 30, 2019, J.M.M. was served with a document styled as a NTA that lacked a date or time for a hearing.

35.     After August 16, 2019, J.M.M.'s initial hearing was set for October 16, 2019.

### *D.L.R.*

36.     Plaintiff D.L.R. is a young woman from Cuba seeking asylum in the United States.  D.L.R. Decl. ¶¶ 1, 3, Dkt. 31-4.

37.     D.L.R. fled Cuba in June 2019 after being persecuted by the Cuban government for her opposition to communism.  *Id.* ¶¶ 3-9.  This year, D.L.R. was arrested for her refusal to vote in a constitutional election, and again for refusing to participate in communist meetings.  *Id.* ¶¶ 10-11.  A few weeks later the latter arrest, the police assaulted D.L.R.  *Id.* ¶ 12.

38.     D.L.R. traveled through Nicaragua, Honduras, Guatemala, and Mexico before entering the United States.  *Id.* ¶ 13.

39.     D.L.R. presented at a United States port of entry on July 17, 2019 and requested asylum.  *Id.*

40.     On July 21, 2019, D.L.R. underwent a credible fear interview by an asylum officer and received a negative determination.  *Id.* ¶ 14.

41.     On July 30, 2019, an immigration judge reversed the negative credible fear determination. *Id.*

42.     On or after July 30, 2019, D.L.R. was served with a document styled as a NTA that lacked a date or time for a hearing.

43.     On or around August 16, 2019, D.L.R.'s initial hearing was set for September 23, 2019.  D.L.R. currently is scheduled for a hearing on October 30, 2019.

### *Z.B.M.*

44.     Plaintiff Z.B.M. is a young woman from Angola seeking asylum in the United States. Z.B.M. Decl. ¶¶ 1, 4,  Dkt. 31-5.

45.     Z.B.M. fled Angola in February 2019 after men kidnapped, beat, and threatened her because of her religion and her membership in the Bakongo tribe.  *Id.* ¶¶ 3, 5-11.  Z.B.M.'s attackers threatened to kill her if she did not flee the country within 24 hours.  *Id.* ¶ 10.

46.     The day after being attacked, Z.B.M. fled to Ecuador and then crossed through Columbia, Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and Mexico before reaching the United States.  *Id.* ¶ 13.  On her journey, Z.B.M. was robbed and saw people be killed or injured.  *Id.*

47.     Z.B.M. entered the United States without inspection on July 16, 2019 and was quickly detained by U.S. immigration officials.  *Id.* ¶ 15.

48.     On July 21, 2019, Z.B.M. underwent a credible fear interview by an asylum officer and received a negative determination.  *Id.* ¶ 16.

49.     On July 26, 2019, an immigration judge reversed the negative credible fear determination.  *Id.* ¶ 17.

50.     On or after July 26, 2019, Z.B.M. was served with a document styled as a NTA that lacked a date or time for a hearing.

51.     After August 16, 2019, Z.B.M.'s initial hearing was set for October 16, 2019.

### *Y.G.C.*

52.     Plaintiff Y.G.C. is a young woman from Guatemala seeking asylum in the United States. Y.G.C. Decl. ¶¶ 1, 3, Dkt. 31-6.

53.     Beginning in May 2019, a man whom Y.G.C. believes is a gang member began threatening and extorting her.  *Id.* ¶¶ 4-6.  Y.G.C. attempted to file a criminal complaint against the man threatening her, but police officers told Y.G.C. that they could not help her.  *Id.* ¶ 7.

54.     After receiving continued threats from the same individual, Y.G.C. fled Guatemala in June 2019.  *Id.* ¶¶ 8-9.

55.     Y.G.C. traveled through Mexico and entered the United States without inspection on July 16, 2019, and was quickly detained by U.S. immigration officials.  *Id.* ¶ 10.

56.     On July 21, 2019, Y.G.C. underwent a credible fear interview by an asylum officer and received a negative determination.  *Id.* ¶ 11.

57.     On July 29, 2019, an immigration judge reversed the negative credible fear determination. Am. Compl. ¶ 38.

58.     On or after July 29, 2019, Y.G.C. was served with a document styled as a NTA that lacked a date or time for a hearing.

59.     On or after August 16, 2019, Y.G.C.'s initial hearing was set for September 23, 2019.  Y.G.C. currently is scheduled for a hearing on October 30, 2019.

*M.Y.R.B.*

60.     Plaintiff M.Y.R.B. is a young woman from Guatemala seeking asylum in the United States for herself and her minor son.  M.Y.R.B. Decl. ¶¶ 1, 4, Dkt. 31-7.

61.     M.Y.R.B. and her son fled Guatemala in July 2019, because she was threatened and extorted by the Barrio 18 gang and was persecuted for being an indigenous woman.  *Id.* ¶ 5.

62.     M.Y.R.B. did not report the threats and extortion to the police, because Barrio 18 gang members told her they would kill her if she went to the police.  *Id.* ¶ 8.

63.     M.Y.R.B. also faced racial discrimination in Guatemala due to her indigenous background.  *Id.* ¶¶ 11-12.  That discrimination repeatedly escalated to physical violence against her.  *Id.* ¶ 13.

64.     M.Y.R.B. did not apply for asylum in Mexico, because her journey through that country to the United States was dangerous.  *Id.* ¶ 15.  Once, M.Y.R.B. and others were extorted by the police.  *Id.*  Another time, a man sexually assaulted her and threatened to beat her family if she reported the assault.  *Id.*

65.     M.Y.R.B. entered the United States without inspection on July 17, 2019 and was quickly detained by U.S. immigration officials.  *Id.* ¶ 16.

66.     On July 23, 2019, M.Y.R.B. underwent a credible fear interview by an asylum officer on behalf of herself and her son and received a positive determination.  *Id.* ¶ 17.

67.     On or after July 23, 2019, M.Y.R.B. was served with a document styled as a NTA that lacked a date or time for a hearing.

68.     After August 16, 2019, M.Y.R.B.'s initial hearing was set for October 23, 2019.

### *K.M.V.M.*

69.    Plaintiff K.M.V.M. is a young woman from Honduras seeking asylum in the United States for herself and her minor daughter.  K.M.V.M. Decl. ¶¶ 1, 4, Dkt. 31-8.

70.    K.M.V.M. and her daughter fled Honduras in June 2019 after being repeatedly threatened by gang members in her hometown.  *Id.* ¶¶ 2-12.  K.M.V.M., her parents, and her daughter had moved to another town in Honduras but heard that the gang was still looking for them there.  *Id.* ¶ 13.  They alerted the police, who agreed that they were in danger but told them there was nothing the police could do to protect them.  *Id.* ¶ 14.

71.    K.M.V.M. then fled with her daughter to the United States.  *Id.* ¶¶ 15-16.  She traveled through Guatemala and Mexico, but did not stop there due to her belief that the gang could reach her in either of those countries.  *Id.* ¶¶ 16-17.

72.    K.M.V.M. and her daughter entered the United States on July 17, 2019 and were quickly detained by U.S. immigration officials.  *Id.* ¶ 18.

73.    On July 24, 2019, K.M.V.M. underwent a credible fear interview of behalf of herself and her daughter.  *Id.* ¶ 19.  She received a negative credible fear determination.  *Id.* ¶ 20.

74.    On August 5, 2019, an immigration judge reversed the negative credible fear determination.  *Id.*

75.    On or after August 5, 2019, K.M.V.M. was served with a document styled as a NTA that lacked a date or time for a hearing.

76.    After August 16, 2019, K.M.V.M.'s initial hearing was set for October 1, 2019.

*W.M.R.O. and C.C.R.O.*

77.      Plaintiffs W.M.R.O. and C.C.R.O. are unaccompanied minors from Honduras seeking asylum in the United States. W.M.R.O. Decl. ¶¶ 1, 4, Dkt. 31-9; C.C.R.O. Decl. ¶¶ 1, 4, Dkt. 31-10.

78.      W.M.R.O. and C.C.R.O. are twin siblings who fled Honduras in June 2019 after two men in their community threatened to kill them and their family members because their brother is gay.  W.M.R.O. Decl. ¶¶ 3, 5-6; C.C.R.O. ¶¶ 9, 13.

79.      W.M.R.O. and C.C.R.O. traveled through Guatemala and Mexico en route to the United States.  W.M.R.O. Decl. ¶ 8; C.C.R.O. ¶ 11.

80.      W.M.R.O and C.C.R.O. entered the United States without inspection on July 16, 2019 and were quickly detained by U.S. immigration officials.  W.M.R.O. Decl. ¶ 10; C.C.R.O. ¶ 13.

81.      After July 16, 2019, W.M.R.O. and C.C.R.O. were served with documents styled as NTAs that lacked a date or time for a hearing.

82.      After August 16, 2019, W.M.R.O. and C.C.R.O.'s initial hearings were set for December 4, 2019.

*N.G.R.L.*

83.      Plaintiff N.G.R.L. is an unaccompanied minor from Honduras seeking asylum in the United States.  N.G.R.L. Decl. ¶¶ 1, 4, Dkt. 31-11.

84.      N.G.R.L. fled Honduras in May 2019 after being raped and threatened by her stepfather.  *Id.* ¶¶ 3, 5.

85.     N.G.R.L. traveled through Guatemala and Mexico en route to the United States. *Id.* ¶ 8.  N.G.R.L. remained in Mexico for approximately one month but did not feel safe there. *Id.*

86.     On July 24, 2019, N.G.R.L. presented at a port of entry in the United States and was detained by U.S. immigration officials.  *Id.* ¶ 9.

87.     After July 24, 2019, N.G.R.L. was served with a document styled as a NTA that lacked a date or time for a hearing.

88.     After August 16, 2019, N.G.R.L.'s initial hearing was set for December 12, 2019.

### *CAIR Coalition*

89.     Plaintiff Capital Area Immigrants' Rights Coalition ("CAIR Coalition") is a 501(c)(3) nonprofit legal services and advocacy organization with its principal place of business in the District of Columbia.  Decl. of Claudia Cubas (hereinafter "Cubas Decl.") ¶ 3, Dkt. 3-3. CAIR Coalition provides direct legal services to migrant men, women, and children at risk of detention and deportation in the Washington, DC metropolitan area and beyond, including with respect to credible fear interviews in the course of removal procedures, asylum applications, and adversarial proceedings in immigration courts.  *Id.* ¶¶ 4-7.

90.     A substantial proportion of CAIR Coalition's clients are seeking asylum, and many—including approximately 95% of child clients—have transited third countries en route to the United States without first applying for asylum or analogous protection in those countries. Cubas Supp. Decl. ¶ 6.

91.     If the Rule is implemented, CAIR Coalition will be unable to fulfill its mission to serve as many detained immigrants lawfully seeking asylum as possible.  Cubas Decl. ¶ 14; Cubas Supp. Decl. ¶ 3.

92.     Helping as many clients as possible to obtain the particular statutory benefits of asylum—such as derivative eligibility for family members, employment authorization, access to public benefits, legal permanent resident status adjustment, a path to citizenship, and the ability to travel abroad—is a key component of CAIR Coalition's mission, which is not accomplished merely by providing different legal services or attempting to help clients obtain alternative forms of relief from removal.  Cubas Supp. Decl. ¶ 4.

93.     It is a "virtual certainty" that more of CAIR Coalition's clients will be deported under the Rule, given the greater difficulty of obtaining withholding of removal or CAT relief under the "reasonable fear" standard.  *Id.* ¶ 5.

94.     CAIR Coalition estimates that it will be able to serve 50% fewer asylum-seekers under the Rule, due to the increased per-client resources that will be required to help individuals prepare for interviews and removal proceedings.  Cubas Supp. Decl. ¶ 19; Cubas Decl. ¶¶ 24-26, 31-34.

95.     CAIR Coalition also will be required to expend and divert additional resources to preparing guidance materials on the Rule and establishing new procedures for processing claims. Cubas Decl. ¶¶ 15-23.  The Asylum Rule will reduce the number of individuals CAIR Coalition can assist, curtail its other activities, and jeopardize its already tight budget.  *Id.* ¶¶ 15-16, 20, 24, 25-26, 29-30, 34, 37-39.

### *RAICES*

96.     Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a 501(c)(3) nonprofit legal services and advocacy organization operating in Texas.  Decl. of Michelle Garza Pareja (hereinafter "Garza Pareja Decl.") ¶¶ 3-4, Dkt. 3-2.

97.     A substantial proportion of RAICES's clients are seeking asylum, and the vast majority have transited third countries en route to the United States without first applying for asylum or analogous protection in those countries.  Garza Pareja Supp. Decl. ¶ 5.

98.     If implemented, the Rule will frustrate RAICES's mission to serve as many asylum seekers as possible to access the unique benefits of asylum and exercise their protections against removal under the law.  Garza Pareja Supp. Decl. ¶¶ 4, 19.

99.     Helping as many clients as possible to obtain the particular statutory benefits of asylum—such as derivative eligibility for family members, employment authorization, access to public benefits, legal permanent resident status adjustment, a path to citizenship, and the ability to travel abroad—is a key component of RAICES's mission, which is not accomplished merely by providing different legal services or attempting to help clients obtain alternative forms of relief from removal.  Garza Pareja Supp. Decl. ¶ 3.

100.    It is a "virtual certainty" that more of RAICES's clients will be deported under the Rule, given the greater difficulty of obtaining withholding of removal or CAT relief under the "reasonable fear" standard.  *Id.* ¶¶ 4, 19.

101.    RAICES estimates that it will be able to serve less than half as many total asylum-seekers under the Rule, due to the increased per-client resources that will be required to help individuals prepare for interviews and removal proceedings.  *Id.* ¶ 19.

102.    The Rule also will require RAICES to create costly new procedures to assist individuals in complying with the Rule and divert resources from its numerous other programs.  Garza Pareja Decl. ¶¶ 7, 9-12, 15, 18-21, 26-27, 31-37.  The organization's Family Detention Services, for example, would need to "radically change its entire program" under the Rule, by

shifting intake resources, creating new intake and credible-fear interview preparation processes, and reallocating staff.  *Id.* ¶¶ 9-22.

103.    Most of the Individual Plaintiffs in this case—J.M.M., D.L.R., Y.G.C., Z.B.M., C.C.R.O., W.M.R.O., and N.G.R.L.—received legal services from RAICES.

### *Human Rights First*

104.    Plaintiff Human Rights First ("HRF") is a nonpartisan 501(c)(3) nonprofit international human rights organization with offices in New York, New York; Houston, Texas; Los Angeles, California; and the District of Columbia.  McBride Decl. ¶ 3.  HRF operates one of the largest programs for pro bono legal representation of asylum seekers in the nation.  *Id.* ¶ 5.

105.     Asylum applications represent a vital component of HRF's organizational mission and account for much of the services that the organization provides.  *Id.* ¶ 6.  Many of HRF's clients have transited third countries en route to the United States without first applying for asylum or analogous protection in those countries.  *Id.* ¶ 9.

106.    The Rule will irreparably frustrate HRF's mission to represent asylum seekers and advocate for meaningful access to the asylum system.  *Id.* ¶ 13.  Because Defendants will summarily remove asylum seekers before they reach the interior of the United States, where HRF's offices are located, HRF will likely face a "drastic reduction" in its client base.  *Id.*

107.    The Rule also will impair HRF's volunteer staffing and financial health and significantly divert staff and financial resources.  *Id.* ¶¶ 14-16, 19-24, 32.

108.    The higher "reasonable fear" standard imposed by the Rule will force HRF to spend significantly more time preparing each impacted client for the various steps of their immigration proceedings.  *Id.* ¶¶ 17-18.  In turn, the organization will be able to assist fewer clients.  *Id.* ¶¶ 17, 32.

109.    Due to the absence of notice and comment procedures prior to the Rule's issuance, CAIR Coalition, RAICES, and HRF were deprived of the ability to inform Defendants of the substantial harms—both to the organizations and to their clients—that the Rule would create.  Cubas Decl. ¶ 40; Garza Pareja Decl. ¶ 38; McBride Decl. ¶ 25.

110.    All three organizations would have filed comments regarding the Rule, had that opportunity been provided.  Cubas Decl. ¶ 40; Garza Pareja Decl. ¶ 38; McBride Decl. ¶ 25.

Dated: September 30, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Manoj Govindaiah (D.D.C. Bar ID TX0145)
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78201
Telephone: (210) 787-3745
Facsimile: (210) 787-3745
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.com

* *Motion for admission forthcoming*

*Counsel for Plaintiff Capital Area Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt
Mohan Warusha Hennadige
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>                  Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                  Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

September 30, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick
Justin W. Bernick
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com