# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 1:19-cv-02117-TJK |
| I.A., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 1:19-cv-02530-TJK |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs file this Notice of Supplemental Authority to bring to the Court's attention the Ninth Circuit's recent decision in *East Bay Sanctuary Covenant v. Trump*, Nos. 18-17274 & 18-17436 (9th Cir. Feb. 28, 2020) (Attachment A), which invalidated a bar on asylum eligibility for any person who entered the southern border of the United States outside a port of entry.

Although this case concerns a different bar to asylum than the one at issue in *East Bay*, the Ninth Circuit's reasoning in *East Bay* is applicable to several aspects of the government's arguments here. Most notably, the Ninth Circuit held that the government did not properly

invoke either the good-cause or foreign affairs exceptions to the APA's notice-and-comment requirement, based on rationales and evidence that closely track those offered in this case. *Id.* at 49-53. It explained that the same newspaper article the government cited here to support the good-cause exception was "not sufficient to demonstrate that the delay caused by notice-and-comment or the grace period might do harm to life, property, or public safety." *Id.* at 50-51. And the court found that the government "has not made a 'sufficient showing' that 'the public rulemaking provisions should provoke definitely undesirable international consequences,'" to invoke the foreign affairs exception. *Id.* at 53. Additionally, the Ninth Circuit rejected the government's objections to jurisdiction and organizational standing, which are nearly identical to the government's arguments in this case. *See East Bay* slip op. at 23-35.

Dated: March 5, 2020

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Manoj Govindaiah
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant
Center for Education and Legal Services, Inc.*

Adina Appelbaum (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@caircoalition.com

*Counsel for Plaintiff Capital Area
Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt
Mohan Warusha Hennadige
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

*Counsel for CAIR Coalition Plaintiffs*

Katrina Eiland*
Cody Wofsy*
Julie Veroff*
Morgan Russell*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800


*Attorneys for I.A. Plaintiffs*
*Admitted pro hac vice*

  /s/ Lee Gelernt
Lee Gelernt*
Omar Jadwat*
Daniel Galindo*
Celso J. Perez (D.C. Bar No. 1034959)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Charles George Roth
Keren Hart Zwick
Gianna Borroto
NATIONAL IMMIGRANT JUSTICE
CENTER
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1370

**ATTACHMENT A**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT; AL OTRO LADO; INNOVATION LAW LAB; CENTRAL AMERICAN RESOURCE CENTER, | No. 18-17274 |
| | 18-17436 |
| *Plaintiffs-Appellees,* | D.C. No. |
| | 4:18-cv-06810- |
| | JST |
| v. | |
| DONALD J. TRUMP, President of the United States; WILLIAM P. BARR, Attorney General; JAMES MCHENRY, Director, Executive Office for Immigration Review (EOIR); CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security; KENNETH T. CUCCINELLI, Acting Director, U.S. Citizenship and Immigration Services; MARK A. MORGAN, Acting Commissioner, U.S. Customs and Border Protection; MATTHEW T. ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, | OPINION |
| *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted October 1, 2019
San Francisco, California

Filed February 28, 2020

Before:  Ferdinand F. Fernandez, William A. Fletcher,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Fernandez

# SUMMARY[*]

## Immigration / Preliminary Injunctions

The panel affirmed the district court's grant of a temporary restraining order and a subsequent grant of a preliminary injunction enjoining enforcement of a rule and presidential proclamation that, together, strip asylum eligibility from every migrant who crosses into the United States along the southern border of Mexico between designated ports of entry.

In November 2018, the Department of Justice and Department of Homeland Security adopted an interim final rule ("the Rule") that makes migrants who enter the United States in violation of a "a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico" categorically ineligible for asylum.   The same day, President Trump issued a presidential proclamation ("the Proclamation") that suspends the entry of all migrants along the southern border of the United States for ninety days, except for any migrant who enters at a port of entry and properly presents for inspection.

Legal services organizations that represent asylum-seekers ("the Organizations") sued to prevent enforcement of the Rule.   The district court entered a temporary restraining order enjoining the Rule, concluding that it irreconcilably conflicted with the Immigration and Nationality Act ("INA").   The government appealed and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sought an immediate stay in this court of the district court's order pending appeal.  In a published order, a motions panel of this court denied the government's request for a stay, and the government's application for a stay from the Supreme Court was also denied.   The district court issued an injunction barring enforcement of the Rule, the government appealed, and this court consolidated the two appeals.

First, the panel held that—given the preliminary stage of the appellate process at which the motions panel issued its order—the motions panel's decision did not bind the present panel.  The panel explained that, under the law-of-the-case doctrine, courts—at their own discretion—will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case.  The panel noted, however, that the court sometimes exercises its discretion to reconsider issues within the same case and that merits panels tend not to extend the doctrine to a prior motions panel's decision in the same case. Further, the panel explained that a decision by a motions panel is a probabilistic endeavor, doctrinally distinct from the question considered by the later merits panel and issued without oral argument on limited briefing. Addressing the court's recent statement, in *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015), that "a motions panel's published opinion binds future panels the same as does a merits panel's published opinion," the panel concluded that the language was dicta.

The panel also noted that its holding was consistent with the court's general rules governing law of the circuit, which provide that the first panel to consider an issue sets the law for all inferior courts and future panels of the court. Specifically, the panel explained that tentative conclusions that are not law of the case do not bind later panels in the same case as law of the circuit, and that any other rule would

paradoxically provide that a merits panel would be bound by a motions panel's opinion—because it is law of the circuit—and not bound by the same opinion—because it is not law of the case.

Next, the panel re-evaluated the government's challenge to the court's jurisdiction. First, the panel held that the Organizations had established organizational standing by showing that their ability to perform services had been impaired by the Rule. Second, the panel rejected the government's argument that the court should avoid interfering with the Rule on the ground that the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the government's political departments largely immune from judicial control. The panel explained it was responsible for reviewing whether the government has overstepped its delegated authority under the INA and encroached upon Congress's legislative prerogative. Third, the panel rejected the government's argument that three statutory provisions, 8 U.S.C. §§ 1252(e)(3), 1252(a)(5), and 1252(b)(9), divested this court of jurisdiction. The panel explained that none of these provisions have any bearing on the Rule because they govern judicial review of removal orders or challenges inextricably linked with actions taken to remove migrants from the country. The panel also concluded that the Organizations continued to fall within the zones of interests of the INA.

The panel next addressed the Organizations' likelihood of success on the merits of their claims, under the Administrative Procedure Act ("APA"). Applying the framework established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the panel held that the Rule conflicts with the INA's section on asylum, which begins by stating that an undocumented migrant may apply

for asylum when she is "physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival . . . )[.]"  8 U.S.C. § 1158(a)(1). The panel explained that, because the Rule requires migrants to enter the United States at ports of entry to preserve their eligibility for asylum, it is effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in § 1158(a).

The panel further concluded that, even if the text of section 1158(a) were ambiguous, the Rule fails at the second step of *Chevron* because it is an arbitrary and capricious interpretation of that statutory provision.    The panel explained that the BIA and this court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief, but that the method of entry should be carefully evaluated in light of the harsh consequences that may befall an alien.    Thus, the panel concluded that, given the Rule's effect of conditioning asylum eligibility on a factor that has long been understood as worth little if any weight in adjudicating whether a migrant should be granted asylum, it is an arbitrary and capricious interpretation of § 1158(a).

The panel also concluded that the Rule is unreasonable in light of the United States's treaty obligations under the 1951 United Nations Convention Relating to the Status of Refugees ("1951 Convention") and the 1967 United Nations Protocol Relating to the Status of Refugees. Specifically, the panel concluded that the Rule runs afoul of three codified rules: 1) the right to seek asylum; 2) the prohibition against penalties for irregular entry; and 3) principles of non-refoulement,  which  prohibit  signatories  to  the  1951

Convention from returning a refugee to the frontiers of territories where his life or freedom would be threatened.

The panel briefly addressed the procedural arguments raised by the parties regarding whether the Rule was invalid because it was issued without public notice and comment or complying with the thirty-day grace period required by the APA. The panel concluded that the Rule likely does not properly fall under the good-cause exception or the foreign-affairs exception to these procedural requirements.

Next, the panel concluded that the Organizations had demonstrated a sufficient likelihood of irreparable injury to warrant injunctive relief, explaining that the Organizations had shown that they will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction.

The panel next concluded that the public interest weights sharply in the Organizations' favor, noting that: 1) the public interest is served by compliance with the APA; 2) the public has an interest in ensuring that this country does not deliver aliens into the hands of their persecutors; 3) the public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat; and 4) while the government and the public have an interest in the efficient administration of the immigration laws at the border, this factor was not entitled to much weight because the Organizations had established that the Rule is invalid.

Finally, addressing the scope of the remedy, the panel concluded that the district court did not abuse its discretion in issuing an injunction preventing any action to implement the Rule. The panel noted that the Organizations do not limit their potential clients to refugees who enter only at the Mexican border with California and Arizona, and that the

government had not proposed an alternative form of the injunction that accounts for the scope of the Organizations' harms, but applies only within the Ninth Circuit. The panel also noted that two other factors supported the scope of the district court's injunction: 1) when a regulation is found unlawful, the typical result is to vacate and remand, not to attempt to fashion a valid regulation from the remnants of the old rule; and 2) there is an important need for uniformity in immigration policy—which supports the authority of district courts to enjoin unlawful policies on a universal basis.

Concurring, Judge Fernandez wrote that he concurred in the majority opinion because, and for the most part only because, he believes that this panel is bound by the motions panel's published decision in this case. Judge Fernandez wrote that the panel is bound by the law of the circuit, which binds all courts within a particular circuit, including the court of appeals itself, and remains binding unless overruled by the court sitting en banc, or by the Supreme Court. Further, Judge Fernandez wrote that, insofar as factual differences might allow precedent to be distinguished on a principled basis, in this case, the situation before this panel was in every material way the same as that before the motions panel. Judge Fernandez also stated that, in *Lair v. Bullock*, this court held that a motions panel's published opinion binds future panels the same as does a merits panel's published opinion, disagreeing with the majority's characterization of this language as dicta. Judge Fernandez also concluded that the law of the case doctrine binds this panel, noting that he did not perceive any of the exceptions to the doctrine to be involved here.

Applying those doctrines, Judge Fernandez concluded that: 1) the Organizations have standing; 2) the

Organizations are likely to succeed on the substantive merits; 3) the motions panel's decisions on harm and balance of hardship are also binding; and 4) the scope of the injunction is not overly broad.

---

## COUNSEL

Scott Grant Stewart (argued), Deputy Assistant Attorney General; Francesca Genova and T. Benton York, Trial Attorneys; Erez Reuveni, Assistant Director; William C. Peachey, Director; August E. Flentje, Special Counsel; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Lee P. Gelernt (argued), Judy Rabinovitz, Omar C. Jadwat, Anand Balakrishnan, Daniel Galindo, and Celso Perez, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York; Jennifer Chang Newell, Cody Wofsy, Spencer Amdur, and Julie Veroff, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Mary Bauer, Southern Poverty Law Center, Charlottesville, Virginia; Gracie Willis, Southern Poverty Law Center, Decatur, Georgia; Baher Azmy, Angelo Guisado, and Ghita Schwarz, Center for Constitutional Rights, New York, New York; Christine P. Sun and Vasudha Talla, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; for Plaintiffs-Appellees.

Lawrence J. Joseph, Washington, D.C.; Christopher J. Hajec, Director of Litigation, Immigration Reform Law

Institute, Washington, D.C.; for Amicus Curiae Immigration Reform Law Institute.

Patrick W. Pearsall, Karthik P. Reddy, and Vaishalee V. Yeldandi, Jenner & Block LLP, Washington, D.C.; Alice Farmer, Office of the United Nations High Commissioner for Refugees, Washington, D.C.; for Amicus Curiae Office of the United Nations High Commissioner for Refugees.

Richard D. Bernstein, Washington, D.C.; Richard Mancino, Willkie Farr & Gallagher LLP, New York, New York; for Amici Curiae Peter Keisler, Stuart Gerson, Carter Phillips, John Bellinger III, Samuel Witten, Ray Lahood, Brackett Denniston, Stanley Twardy, and Richard Bernstein.

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Alex Gazikas, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Peter S. Margulies, Bristol, Rhode Island; Shoba Sivaprasad Wadhia, University Park, Pennsylvania; for Amici Curiae Professors of Immigration Law.

Margaret L. Carter, Dmitiri D. Portnoi, and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Barbara J. Parker, City Attorney; Maria Bee, Erin Bernstein, Malia McPherson, Zarah Rahman, and Suzanne Dershowitz; Office of the City Attorney Oakland, California; Edward N. Siskel, Corporation Counsel, City of Chicago Department of Law, Chicago, Illinois; Zachary W. Carter, Corporation Counsel, New York City Law Department, New York, New York; for Amici Curiae 21 Counties, Cities, and Local Officials.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Christine Chuang,

Supervising Deputy Attorney General; Shubhra Shivpuri and James F. Zahradka II, Deputy Attorneys General; Office of the Attorney General, Oakland, California; Philip J. Weiser, Attorney General, Denver, Colorado; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Karl A. Racine, Attorney General, Washington, D.C.; Clare E. Connors, Attorney General, Honolulu, Hawaii; Kwame Raoul, Attorney General, Chicago, Illinois; Tom Miller, Attorney General, Des Moines, Iowa; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General, Carson City, Nevada; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan, Jr., Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Olympia, Washington; for Amici Curiae California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington.

**OPINION**

PAEZ, Circuit Judge:

Forty years ago, Congress recognized that refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States. It mandated equity in its treatment of all refugees, however they arrived.**[1]**

This principle is embedded in the Refugee Act of 1980, which established an asylum procedure available to any migrant, "irrespective of such alien's status," and irrespective of whether the migrant arrived "at a land border or port of entry." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Today's Immigration and Nationality Act ("INA") preserves that principle. It states that a migrant who arrives in the United States—"whether or not at a designated port of arrival"—may apply for asylum. *See* 8 U.S.C. § 1158(a).

In November 2018, the Departments of Justice and Homeland Security jointly adopted an interim final rule ("the Rule") which, coupled with a presidential proclamation issued the same day ("the Proclamation"), strips asylum eligibility from every migrant who crosses into the United States between designated ports of entry. In this appeal, we consider whether, among other matters, the Rule unlawfully conflicts with the text and congressional purpose of the INA. We conclude that it does.

---

**[1]** *See* 125 Cong. Rec. 35,813–14 (1979) (statement of Rep. Holtzman).

## I.

The Rule announces a new bar to asylum eligibility. It makes migrants who enter the United States in violation of "a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico" categorically ineligible for asylum. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,952 (Nov. 9, 2018) (codified at 8 C.F.R. §§ 208.13, 208.30). Migrants who are ineligible for asylum under the Rule will also automatically receive negative credible-fear determinations in expedited-removal proceedings. *See id.* at 55,935, 55,952. Typically, a migrant in expedited-removal proceedings who demonstrates a "credible fear" of persecution must be allowed to present her asylum claim before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(v). A migrant who enters the United States in contravention of a proclamation will instead need to demonstrate a "reasonable fear" of persecution or torture—which is more difficult than establishing a credible fear of persecution—to obtain other forms of relief. *See* 83 Fed. Reg. at 55,936, 55,952; *see also* 8 C.F.R. § 208.31(c); 8 U.S.C. § 1225(b)(1)(B)(v).

The same day the Departments of Justice ("DHS") and Homeland Security ("DHS") adopted the Rule, President Trump issued the Proclamation. The Proclamation suspends the entry of all migrants along the southern border of the United States for ninety days, except for any migrant who "enters the United States at a port of entry and properly presents for inspection." *See* Presidential Proclamation No. 9,822, Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018).

Individually, the Rule and Proclamation have little effect. The Proclamation does not have the force of law, and the Rule only effectuates proclamations. But together, the Rule and Proclamation make asylum entirely unavailable to migrants who enter the country between ports of entry. The magnitude of the Rule's effect is staggering: its most direct consequence falls on "the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry [who] then assert a credible fear in expedited-removal proceedings." 83 Fed. Reg. at 55,948. These migrants would typically proceed to an asylum hearing before an immigration judge but will now be unable to do so because they have entered the country at a place other than a port of entry.

The day the Proclamation and Rule issued, four legal services organizations that represent current and future asylum-seekers sued to prevent enforcement of the Rule. East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center of Los Angeles (collectively, "the Organizations") argued that the Rule was likely unlawful because it was issued without public notice and comment or complying with the thirty-day grace period required by the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 553(b)–(d). The Organizations also argued that the Rule conflicts with the plain text of the INA and is arbitrary and capricious because it constitutes a severe departure from the Board of Immigration Appeals's and the Ninth Circuit's interpretation of asylum practices in the United States.

The district court agreed that the Rule "irreconcilably conflicts with the INA and the expressed intent of Congress" and entered a temporary restraining order enjoining the Rule's enforcement and ordering the government "to return

to the pre-Rule practices for processing asylum applications." *See E. Bay Sanctuary Covenant v. Trump* (*EBSC I*), 349 F. Supp. 3d 838, 844, 868–69 (N.D. Cal. 2018). Eight days after the court's order, the government filed an appeal and an emergency motion in the district court to stay the temporary restraining order pending appeal. The court denied the stay motion three days later.

The following day, the government sought an immediate stay in our court of the district court's order pending appeal. In a lengthy published order, a motions panel of this court denied the government's request to stay enforcement of the court's order. *See E. Bay Sanctuary Covenant v. Trump* (*EBSC II*)*,* 932 F.3d 742, 755, 762 (9th Cir. 2018). Although temporary restraining orders are typically not appealable, the panel concluded that appellate jurisdiction existed under 28 U.S.C. § 1292(a)(1) because the temporary restraining order was effective for thirty days, well beyond the fourteen-day limit imposed by Federal Rule of Civil Procedure 65(b). *Id.* at 762–63. The government's application for a stay from the Supreme Court was also denied. *See Trump v. E. Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018).

While the government's stay application was pending before the Supreme Court, the Organizations filed a motion for a preliminary injunction in the district court. The arguments presented during the second round of litigation were "nearly identical" to those made during the first. *See E. Bay Sanctuary Covenant v. Trump* (*EBSC III*), 354 F. Supp. 3d 1094, 1102 (N.D. Cal. 2018). Relying heavily on the motions panel's published order, the district court again issued an injunction barring enforcement of the Rule. *See id.* at 1121.

The government again appeals, arguing that the district court erred when it entered the injunction or that the

injunction should at least be narrowed.  We consolidated the government's appeal from the temporary restraining order with the appeal from the preliminary injunction.**[2]**  For the reasons explained below, we agree with the district court that the Rule is inconsistent with the INA, and we affirm the district court's orders granting preliminary injunctive relief.

## II.

We first consider the effect of the motions panel's order on the present panel's decision.  How strictly the order binds this court depends on whether it is law of the case, law of the circuit, or both.

Law of the circuit is stare decisis, by another name.  The doctrine requires that we "stand by yesterday's decisions"—even when doing so "means sticking to some wrong decisions." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015).  Published decisions of this court become law of the circuit, which is binding authority that we and district courts must follow until overruled. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).  Controlling, overruling authority includes only intervening statutes or Supreme Court opinions that create "clearly

---

**[2]** Although the Proclamation expired by its terms in February 2019, the President issued a new Proclamation, which did not substantially change the terms of the original Proclamation and extended its effect for an additional ninety days.  When that Proclamation expired in May, the President again re-issued it and extended the effect of the initial Proclamation "for an additional 90 days beyond the date when the United States obtains relief from the preliminary injunction of the interim final rule[.]"  *See* Presidential Proclamation No. 9,880, Addressing Mass Migration Through the Southern Border of the United States, 84 Fed. Reg. 21,229, 21,229 (May 8, 2019).

irreconcilable" conflicts with our caselaw. *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc).

Under the law-of-the-case doctrine, instead, courts—at their own discretion—"will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez*, 677 F.3d at 389 n.4; *see also United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986). The doctrine encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case. *See Am. Civil Liberties Union v. F.C.C.*, 523 F.2d 1344, 1346 (9th Cir. 1975).

We do sometimes exercise our discretion to reconsider issues within the same case. Most often, we recognize exceptions to the law-of-the-case doctrine where the prior decision is "clearly erroneous" and enforcing it would create "manifest injustice"; intervening, controlling authority encourages reconsideration; or substantially different evidence is produced at a later merits trial. *See In Re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996). This list is narrow but nonexhaustive. The legal context of the prior decision also affects whether and to what extent it may be treated as law of the case. We generally do not, for example, apply the doctrine to administrative proceedings because agencies are sometimes vested with explicit authority to reconsider their own decisions. *See, e.g., Silva-Pereira v. Lynch*, 827 F.3d 1176, 1190 (9th Cir. 2016). Our review of district court orders denying or granting preliminary-injunction requests also does not typically become law of the case; the record before a later panel may materially differ from the record before the first panel, such that the first panel's decision eventually provides "little guidance as to the appropriate disposition on the merits."

*Sports Form, Inc. v. United Press Intern., Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).

Merits panels also tend not to extend the doctrine to a prior motions panel's decision in the same case. *See, e.g., United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005) (explaining that a prior motions panel's denial of a motion to dismiss did not "preclude [the panel] from reaching a contrary decision"); *In re Castro*, 919 F.2d 107, 108 (9th Cir. 1990) (per curiam) (holding that a motions panel's denial of a dispositive motion without an opinion was not binding on a later merits panel); *Stifel, Nicolaus & Co., Inc. v. Woolsey & Co., Inc.*, 81 F.3d 1540, 1543–44 (10th Cir. 1996) (concluding that the law-of-the-case doctrine did not prevent the panel from reconsidering a motions panel's application of res judicata to a relevant state-court decision). A later merits panel should not "lightly overturn a decision made by a motions panel," but "we do not apply the law of the case doctrine as strictly in that instance as we do when a second merits panel is asked to reconsider a decision reached by the first merits panel on an earlier appeal." *Houser*, 804 F.2d at 568.

Our caselaw interpreting the relationship between motions and merits panels' opinions has not always been clear. Citing to *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003), we recently stated that "a motions panel's published opinion binds future panels the same as does a merits panel's published opinion." *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015). But this observation was not germane to the eventual resolution of *Lair*; the panel noted that the effect of the motions panel's decision was not necessary to its holding, *see id.*, and it was not reached after "reasoned consideration," so its law-of-the-case discussion is dicta and

not binding on subsequent cases.  *See United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019).

*Gammie* encouraged a "pragmatic" approach to "an evolving body of common law."  335 F.3d at 899–900.  Our own practice has frequently indicated that we have not, and do not, follow the summary language in *Lair*: merits panels of this court frequently depart from published decisions issued by motions panels in the same case.  *See, e.g., Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886–87 (9th Cir. 2007) (vacating a stay of a preliminary injunction issued in an opinion by a motions panel); *Golden Gate Rest. Ass'n v. City and Cty. of San Francisco*, 546 F.3d 639, 643–61 (9th Cir. 2008) (reaching the merits of an appeal without reliance on a previous motions panel's order entering a stay of a district court judgment pending appeal); *see also Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 873 (9th Cir. 2008), *rev'd on other grounds by* 562 U.S. 134 (re-reviewing the merits of the case and generally treating a motions panel's opinion as nonbinding); *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 518 (9th Cir. 2019) (Fletcher, J., concurring in the judgment) (stating that a later merits panel may, "with the benefit of full briefing and regularly scheduled oral argument," depart from the legal conclusions reached by the motions panel).  At least four other circuits have agreed that later panels may review the merits of a case "uninhibited" by a motions panel's earlier decision in the same case.  *Stifel, Nicolaus & Co., Inc.*, 81 F.3d at 1544 (10th Cir. 1996); *see also Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 311 n.26 (5th Cir. 1998); *Vann v. Citicorp Sav. of Illinois*, 891 F.2d 1507, 1509 n.2 (11th Cir. 1990).    Two others have held that jurisdictional determinations by motions panels do not bind later merits panels.  *See Council Tree Commc'ns, Inc. v.*

*F.C.C.*, 503 F.3d 284, 291–92 (3d Cir. 2007); *United States v. Henderson*, 536 F.3d 776, 778 (7th Cir. 2008).

There are good policy and practical reasons for departing from *Lair*'s dicta. Motions panels' orders are generally issued without oral argument, on limited timelines, and in reliance on limited briefing. *See* Fed. R. App. P. 27(e) (motions are decided without oral argument unless the court orders otherwise); *compare also* Rule 27(a)(3)–(4) (responses to motions and replies to responses must be filed within ten days of service of the motion) *and* 27(d)(2) (motions or responses to motions are limited to 5,200 words; replies are limited to 2,600 words) *with* Ninth Circuit Rule 3-3 (in preliminary injunction appeal, opening brief must be filed within 28 days of notice of appeal; response must be filed 28 days thereafter; reply may be filed 21 days thereafter) *and* Ninth Circuit Rule 32-1 (opening and response briefs limited to 14,000 words). The record before a motions panel, much like the record before a district court deciding a preliminary injunction, is often incomplete. *Cf. Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). Constrained by timing demands, motions panels' decisions are often issued without opinions and explanations. *See, e.g., Haggard v. Curry*, 631 F.3d 931, 933 n.1 (9th Cir. 2010) (per curiam). A panel operating with the benefit of a complete record and additional time to consider the merits of the case may "conclude that the motions decision was improvident and should be reconsidered." *Houser*, 804 F.2d at 568 (citing *E.E.O.C. v. Neches Butane Prod. Co.*, 704 F.2d 144, 147 (5th Cir. 1983)).

Reconsideration of a motions panel's decision by a merits panel also "differs in a significant way" from reconsideration of a merits panel's decision. *Id.* A party that receives an unfavorable decision by a merits panel will have the opportunity to file a petition for panel rehearing, rehearing en banc, or petition for certiorari. Motions for reconsideration or modification of a motions panel's order are "discouraged," "disfavored by the court[,] and rarely granted." Ninth Circuit Rule 27-1 advisory committee note. For this reason, motions panel decisions are "rarely subjected" to a thorough reconsideration process; "[f]ull review of a motions panel decision will more likely occur only after the merits panel has acted." *Houser*, 804 F.2d at 568. Unilaterally binding later merits panels to the preliminary decisions made by motions panels prevents litigants from fully vindicating their appellate rights.**[3]**

These concerns are particularly heightened here, where the motions panel considered whether to grant the government's request for a stay of the district court's preliminary injunction. The decision whether to grant a

---

**[3]** Our holding is consistent with our general rules governing law of the circuit. "[T]he first panel to consider an issue sets the law . . . for all the inferior courts in the circuit" and "future panels of the court of appeals," *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001), but motions panels' conclusions do not "set the law" for later merits panels *in the same case*, *see, e.g., Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case."). Tentative conclusions that are not law of the case do not bind later panels in the same case as law of the circuit. Any other rule would paradoxically require that a merits panel treat a motions panel's published decision that does not constitute law of the case as binding. A merits panel cannot be simultaneously bound by the motions panel's opinion—because it is law of the circuit—and not bound by the opinion—because it is not law of the case.

stay—much like the decision whether to grant a preliminary injunction—is a "probabilistic" endeavor. *Sierra Club v. Trump*, 929 F.3d 670, 688 (9th Cir. 2019). We discuss the merits of a stay request in "likelihood terms," and exercise a "restrained approach to assessing the merits." *Id.* (quotations omitted). Such a predictive analysis should not, and does not, forever bind the merits of the parties' claims. This sort of "pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)).

Notably, when acting on the government's stay motion in this case, the motions panel acknowledged the preliminary nature of the stay proceedings. The panel issued a lengthy opinion with detailed analysis, but repeatedly "stress[ed]" that the case was still "at a very preliminary stage of the proceedings," and expected that "[f]urther development of the record as the case progresses may alter [their] conclusions." *EBSC II*, 932 F.3d at 780. The panel also left open various mixed questions of law and fact for a later court—pointing out, for example, that if "facts develop in the district court that cast doubt on the Organizations' standing, the district court is, of course, free to revisit this question," *id.* at 763 n.6, and reiterating that its conclusions were reached "at [the current] stage of the proceedings," *see id.* at 763, 767, 778, 779.

The question before us now is also doctrinally distinct from the question considered by the motions panel. A stay does have "some functional overlap with an injunction, particularly a preliminary one"; both "can have the practical effect of preventing some action before the legality of that action has been conclusively determined." *Nken*, 556 U.S.

at 428.   But, as we have noted, "there are important differences between a preliminary injunction and a stay pending review." *Leiva-Perez*, 640 F.3d at 966 (citing *Nken*, 556 U.S. at 425–30).   A stay "operates upon the judicial proceeding itself," while a preliminary injunction "direct[s] an actor's conduct."   *Nken*, 556 U.S. at 428, 429.   In the government's appeal, we are charged with determining whether the district court abused its discretion in granting the preliminary injunction, *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); the motions panel, instead, considered whether the government raised serious questions relating to the propriety of the district court's preliminary injunction and whether the government would likely prevail on appeal, *see Leiva-Perez*, 640 F.3d at 965–66.   The question presented to the motions panel is an additional step removed from the underlying merits of the district court's preliminary injunction.   We exercise restraint in assessing the merits of either question, *see Sierra Club*, 929 F.3d at 688, but particularly so when considering the "extraordinary request" to stay a preliminary injunction granted by a district court.   *Barr v. E. Bay Sanctuary Covenant*, No. 19A230, 2019 WL 4292781, at *1 (Sept. 11, 2019) (Sotomayor, J., dissenting from grant of a stay).

Given the preliminary stage of the appellate process at which the motions panel issued the order denying the government's stay motion and the panel's stated reservations, we treat the motions panel's decision as persuasive, but not binding.

## III.

We next re-evaluate the government's challenge to our jurisdiction.   The government argues, as it did previously before the district court and before the motions panel, that the Organizations lack Article III standing because they have

not suffered a cognizable injury and are outside the zone of interests protected by the INA.  The government also renews three arguments before this court: (1) the Organizations lack a "legally protected interest in maintaining their current organizational structure or in the [R]ule's application to third parties," Op. Br. of Gov't at 29,**[4]** (2) the "immigration context" of the Rule counsels against judicial intrusion, and (3) various portions of the INA divest this court of jurisdiction to entertain this appeal.   We address each argument in turn.

**A.**

The Article III standing inquiry serves a single purpose: to maintain the limited role of courts by ensuring they protect against only concrete, non-speculative injuries. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 583 (1992).  Parties must have a "personal stake in the outcome" sufficient to ensure the court that, absent judicial review, they will suffer or have suffered some direct injury. *See id.*

Organizations can assert standing on behalf of their own members, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000), or in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  To determine whether organizational standing requirements have been satisfied, we "conduct the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?'"    *Havens*, 455 U.S. at 378–79.    The Organizations therefore have the burden of demonstrating

---

**[4]** We refer to the government's opening brief as "Op. Br. of Gov't," and to the government's reply brief as "Reply Br. of Gov't."

that (1) they have suffered an injury-in-fact, meaning an injury that is "concrete and particularized" and "actual and imminent," (2) the alleged injury is "fairly traceable" to the defendants' conduct, and (3) it is "more than speculative" that the injury is judicially redressable. *Lujan*, 504 U.S. at 560–61.

In *Havens*, the Supreme Court held that a fair housing organization had standing under the Fair Housing Act where the defendants' allegedly racial steering practices had frustrated the organization's ability to assist equal access to housing, and it had to devote "significant resources" to identify and counteract those practices. 455 U.S. at 379. Because the defendants' practices had "perceptibly impaired" the organization's ability to provide its services, the Court explained, "there can be no question that the organization has suffered injury in fact." *Id.*

We have read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). Of course, organizations cannot "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all," but they can show they "would have suffered some other injury" had they "not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *see also, e.g., El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 745, 748 (9th Cir. 1991).

We agree with the motions panel and the district court that the Organizations have established that the Rule has

"perceptibly impaired" their ability to perform the services they were formed to provide. *EBSC II*, 932 F.3d at 765. This is sufficient for organizational standing. *See Combs*, 285 F.3d at 904–05.

The Organizations share the same mission of assisting migrants seeking asylum. "[B]ecause the Rule significantly discourages a large number of [asylum-seekers] from seeking asylum given their ineligibility," the Rule frustrates their mission. *EBSC II*, 932 F.3d at 766. The Rule has also caused the Organizations to divert their already limited resources in response to the collateral obstacles it introduces for asylum-seekers. East Bay Sanctuary Covenant ("EBSC") and Innovation Law Lab ("ILL"), for example, are located near Berkeley, California, and in Oregon, respectively, and because most asylum-seekers who enter at a designated port of entry will "remain detained in detention facilities near the border hundreds of miles away," *EBSC III*, 354 F. Supp. 3d at 1109 (internal quotation marks omitted), those organizations "cannot represent asylum seekers." Decl. of Michael Smith at ¶ 6. Unaccompanied minors are now often unable to seek asylum alone, and "[s]ince the new rule was announced, Al Otro Lado [("AOL")] has been overwhelmed with children who traveled to the southern border of the United States to apply for asylum but now cannot do so." Supp. Decl. of Erika Pinheiro at ¶¶ 4, 15. Caring for the often nonlegal needs of these unaccompanied children is not part of AOL's core mission and is "causing a near complete diversion of [AOL's] resources." *Id.* ¶ 16. It has "expended significant resources to send staff to the border as it attempts to shift its programs." *EBSC III*, 354 F. Supp. 3d at 1109.

The funding on which the Organizations critically depend is also jeopardized by the Rule. EBSC only "rarely"

represents people in removal proceedings. Decl. of Michael Smith at ¶ 8. Because 80 percent of its clients have entered without stopping at a port of entry in the past, EBSC stands to "lose a significant amount of business and suffer a concomitant loss of funding" if these individuals are deemed categorically ineligible for asylum. *EBSC III*, 354 F. Supp. 3d at 1109 (citing *EBSC II*, 932 F.3d at 767). AOL and CARECEN explain that the Rule decreases the funding they stand to receive from the California Department of Social Services. AOL often represents detained immigrants in their bond proceedings, and "[s]ince the [R]ule went into effect," AOL has "not received a single referral for a bond case, as persons who enter without inspection are ostensibly being put into 'Withholding-only' proceedings and no longer initially eligible for bond." Supp. Decl. of Erika Pinheiro at ¶ 22. CARECEN receives from the Department a flat amount of funding per client it assists, and because more of its clients are being put into more time- and resource-intensive withholding proceedings, it will assist less clients and receive less funding. Decl. of Daniel Sharp at ¶ 7.

Each organization would have lost clients seeking refuge in the United States had it not diverted resources toward counteracting the effect of the Rule. *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088. The Organizations are not required to demonstrate some threshold magnitude of their injuries;[5] one less client that

_____

[5] The government notes that "East Bay Sanctuary Covenant has only 'around 35 clients who have entered without inspection and [who] expect to file for affirmative asylum in the upcoming months,'" while, "[b]y comparison, the 'current backlog of asylum cases exceeds 200,000' and more than 200,000 inadmissible aliens present themselves for inspection at ports of entry annually (even without the additional incentive to do so that the Rule will create)." Op. Br. of Gov't at 27 n.4.

they may have had but-for the Rule's issuance is enough. In other words, plaintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief.

The government advances three additional justiciability arguments. First, the government argues that the Organizations have "no legally protected interest in maintaining their current organizational structure or in the Rule's application to third parties, which the motions panel did not consider in its analysis." Op. Br. of Gov't at 28. This position misunderstands the injury-in-fact inquiry and conflates organizational standing with third-party standing, which the Organizations have conceded is not at issue.**[6]** An injury-in-fact is "an invasion of a legally protected interest," *see Lujan*, 504 U.S. at 560, but this means an interest that is only concrete and particularized and actual or imminent—

---

The comparative magnitude of the harms alleged by the parties, however, is not relevant for standing purposes; "a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury."); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

**[6]** Many of the cases cited by the government in support of this proposition do not concern organizational standing under Article III. In *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), the Court addressed whether nursing home residents have a right to an administrative hearing before a state or federal agency hearing before the agency revokes the home's authority to provide them with nursing care at government expense. *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006), *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), and *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883 (1984) all describe limitations on third-party, not organizational, standing.

*not* an interest protected by statute. This distinction prevents Article III standing requirements from collapsing into the merits of a plaintiff's claim; "a petitioner's 'legally protected interest' need not be a statutorily created interest," *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013), and a plaintiff can have standing despite losing on the merits. *See also In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .")).

More recent Supreme Court opinions have described injury-in-fact as "a judicially cognizable interest"—implying that "an interest can support standing even if it is not protected by law . . . so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention." *In re Special Grand Jury 89-2*, 450 F.3d at 1172 (citing *Bennett v. Spear*, 520 U.S. 154, 167 (1997)); *see also, e.g., Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013). Whether the Organizations have a sufficient statutory or otherwise legal basis for their claims is irrelevant at this threshold stage.

The government next argues that we should avoid interfering with DOJ's and DHS's decision to adopt the Rule because "[t]he Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *See* Op. Br. of Gov't at 30 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

We do not conduct independent policy analyses of executive decisions. But we do "police the separation of

powers in litigation involving the executive[.]"    *In re Cheney*, 334 F.3d 1096, 1106 (D.C. Cir. 2003), *vacated and remanded on other grounds*, 542 U.S. 367 (2004).  For this reason, there is a strong presumption favoring judicial review of administrative action, *see Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 670 (1986); non-reviewability is an exception that must be clearly evidenced in the statute, *see Barlow v. Collins*, 397 U.S. 159, 166–67 (1970).  Without such review, "statutes would in effect be blank checks drawn to the credit of some administrative officer or board."  *Bowen*, 476 U.S. at 671 (citing S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).    Efficient agency administration always requires some authority and responsibility to resolve questions left unanswered by Congress.  It does not include the "power to revise clear statutory terms."**[7]**  *Utility Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014).

We are therefore responsible for reviewing whether the government has overstepped its delegated authority under the INA and encroached upon Congress's legislative prerogative.  *See* 5 U.S.C. § 706(2)(A).

Finally, the government argues that three provisions of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), 8 U.S.C. §§ 1252(e)(3),

---

**[7]** The irony of the government's position is that section 1158(b)(2)(C)—the INA rule-making delegation upon which it relies—is based on a congressional mandate that was intended, at least in part, to curtail "unfettered executive discretion" and assure *Congress's* "proper and substantial role in refugee admissions, given [its] plenary power over immigration." 125 Cong. Rec. 35,814–15 (1979) (statement of Rep. Holtzman) (emphasis added). "[I]f there is a separation-of-powers concern here, it is between the President and Congress." *EBSC II*, 932 F.3d at 774.

1252(a)(5), and 1252(b)(9), divest this court of jurisdiction to entertain this appeal.  These statutes, in the government's view, require the Organizations to bring their claims in individual-removal proceedings or in the District Court for the District of Columbia.

Section 1252(e)(3) authorizes a limited court review of expedited-removal proceedings.  The statute requires that judicial review of such administrative decisions be initiated in the District Court for the District of Columbia, and limits review to "determinations of (i) whether such section, or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation . . . is not consistent with applicable provisions of this subchapter or is otherwise in violation of law."**8**  Section 1252(e)(3), in short, limits jurisdiction over challenges to regulations implementing expedited-removal orders.  *See Barajas-Alvarado*, 655 F.3d at 1086 n.10.

Section 1252(a)(5) operates in conjunction with section 1252(e).  It limits review of expedited-removal orders to habeas review under 1252(e) and further restricts any appellate habeas review to considering only whether the migrant is lawfully in the country.  *See id.* at 1082; 8 U.S.C. § 1252(e)(2).  Section 1252(b)(9) also applies only to removal orders, but instead channels "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United

---

**8** Migrants can be placed in expedited removal proceedings when they arrive at ports of entry without documents, misrepresent their identities, or present fraudulent documents.  *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011).  Undocumented migrants who receive removal orders but indicate an intention to apply for asylum or a fear of persecution may still be considered for asylum.  *See id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)).

States[,]" to the courts of appeals.  8 U.S.C. § 1252(b)(9);
*see also I.N.S. v. St. Cyr*, 533 U.S. 289, 313 (2001).

In the APA context, these provisions prohibit "a claim
by an alien, however it is framed, [that] challenges the
procedure and substance of an agency determination that is
'inextricably linked' to the order of removal[.]" *Martinez v.
Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012). "[C]laims
that are independent of or collateral to the removal process"
are not actions taken to "remove an alien from the United
States." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir.
2016); 8 U.S.C. § 1252(b)(9).  The purpose of these claim-
channeling provisions is to "limit all aliens to one bite of the
apple with regard to challenging an order of removal."
*Martinez*, 704 F.3d at 622.

None of these provisions have any bearing on the Rule.
Sections 1252(a)(5), (b)(9), and (e)(3) govern judicial
review of removal orders or challenges inextricably linked
with actions taken to remove migrants from the country. The
Rule "governs *eligibility* for asylum and *screening
procedures* for aliens subject to a presidential proclamation
or order restricting entry[.]"    83 Fed. Reg. at 55,934
(emphasis added). Bars to asylum eligibility may eventually
be relevant to removal proceedings, but they are not
"regulation[s] . . . to implement [removal orders]" or
otherwise entirely linked with removal orders.**[9]**    8 U.S.C.

---

**[9]** In another, strikingly similar context, the government appears to
agree with this interpretation of section 1252(e)(3). Before the District
Court for the District of Columbia, the government argued that section
1252(e)(3) divested the court of jurisdiction to hear an APA challenge to
an immigration decision issued by the Attorney General. *See Grace v.
Whitaker*, 344 F. Supp. 3d 96, 105 (D.D.C. 2018). The Attorney
General's decision, and a policy memorandum that adopted the standards
in the decision, invoked the expedited-removal statute and required that

§ 1252(e)(3); *see also Martinez*, 704 F.3d at 623; *O.A. v. Trump*, 404 F. Supp. 3d 109, 141 (D.D.C. 2019) ("§ 1252(e)(3) is about challenges to expedited removal orders and the implementation of the expedited removal provisions that Congress enacted in IIRIRA."). This is consistent with the purposes of these jurisdictional limitations: allowing collateral APA challenges to an asylum-eligibility rule does not undermine Congress's desire to "limit all aliens to one bite of the apple with regard to challenging" their removal orders. *See Martinez*, 704 F.3d at 622.

At best, the law governing asylum is collateral to the process of removal. Migrants in the country who file affirmatively for asylum, or who are otherwise lawfully in the country—such as those who have a valid visa, maintain Temporary Protected Status, or are given parole, for example—can apply and be eligible for asylum and never encounter any of the statutory provisions governing removal. *See* 8 C.F.R. § 208.4(a)(5)(iv). Other subsections of the INA explicitly *grant* this court jurisdiction to review denials of individual asylum applications, further reinforcing that the jurisdiction-stripping provisions cited by the government were not intended to apply at all to challenges to asylum eligibility rules. *See* 8 U.S.C. §§ 1252(a)(2)(B)(ii), (a)(2)(D); *see also Morales v. Gonzales*, 478 F.3d 972, 978–79 (9th Cir. 2007).

---

"claims based on membership in a putative particular social group defined by the members' vulnerability to harm . . . will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution." *Id.* at 110. The government there argued that the policy memorandum and the Attorney General's decision did not "implement" section 1225(b) because it "was a decision about *petitions for asylum* under section 1158." *Id.* at 115–16 (emphasis added).

We again hold that the Organizations' claims are justiciable and they have otherwise satisfied the Article III standing requirements.

**B.**

We generally also require that plaintiffs fall within the "zone of interests" protected by the statute in question to bring their claims in federal court. *Lexmark Int'l, Inc., v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014). The breadth of the zone-of-interests test varies, depending on the provisions of law at issue. *Id*. Under the APA, the test is not "especially demanding." *Id*. at 130 (quotations and citations omitted). The zone-of-interests analysis forecloses suit "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id*. (quotations and citations omitted).

The Organizations bring their claims under the APA, but because the APA provides a cause of action only to those "suffering legal wrong because of agency action . . . within the meaning of a relevant statute," 5 U.S.C. § 702, the relevant zone of interest is that of the INA. *EBSC II*, 932 F.3d at 767–68. And the relevant purpose is not that of the entire INA; it is "by reference to the particular provision of law upon on which the plaintiff relies." *Bennett*, 520 U.S. at 175–76.

In our review, we are "not limited to considering the [specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress' overall purposes" in enacting the statute. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987); *see also EBSC II*, 932 F.3d at 768. This inquiry is intended only to help clarify

the act's *scope*—not determine whether Congress *intended* a cause of action to arise for the plaintiff in question. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) ("We do not require any indication of congressional purpose to benefit the would-be plaintiff.") (internal quotation marks omitted).

The Organizations' claims continue to fall within the zone of interests of the INA and of the regulatory amendments implemented by the Rule. The Rule, much like the scope of section 1158(b) of the INA, shapes asylum eligibility requirements for migrants. The Organizations' purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services. *EBSC III*, 354 F. Supp. 3d at 1108–10. This is sufficient for the Court's lenient APA test: at the very least, the Organizations' interests are "marginally related to" and "arguably within" the scope of the statute. *See Patchak*, 567 U.S. at 224, 225.

## IV.

We turn to the merits of the preliminary injunction[10] entered by the district court.     A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *All. for the Wild Rockies*, 632 F.3d at 1131 (citing

---

[10] The terms of the temporary restraining order entered by the district court in *EBSC I* technically differ from the terms of the preliminary injunction entered by the court in *EBSC III*, but the difference has no practical effect: both injunctions prevent enforcement of the Rule and are identical in scope.     Therefore, we review them together.

*Winter v. National Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the government is a party, the last two factors (equities and public interest) merge. *Nken*, 556 U.S. at 435. These factors are evaluated on a sliding scale. *All. for the Wild Rockies*, 632 F.3d. at 1131–34.

We review for abuse of discretion the district court's grant of a preliminary injunction. *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). District courts abuse their discretion when they rely on an erroneous legal standard or clearly erroneous finding of fact. *Id*. (internal quotations omitted).

## A.

The likelihood of the Organizations' success on the merits depends on the substantive and procedural validity of the Rule. *See EBSC III*, 354 F. Supp. 3d at 1111–12. They must establish a likelihood that the Rule is either substantively or procedurally invalid. *See EBSC II*, 932 F.3d at 770. Because the record on appeal is now "fully developed," and the substantive validity of the Rule "rest[s] primarily on interpretations of law, not the resolution of factual issues, we may consider the merits of the case and enter a final judgment to the extent appropriate." *Beno v. Shalala*, 30 F.3d 1057, 1063 (9th Cir. 1994) (internal quotation marks omitted).

## 1.

The APA requires that we "hold unlawful and set aside agency action, findings, and conclusions found to be . . . an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Presidential action is not ordinarily "agency action," and is typically unreviewable under the APA. *Franklin v. Massachusetts*, 505 U.S. 788,

796 (1992).  But the Proclamation and Rule together create an "operative rule of decision" for asylum eligibility that is reviewable by this court. *EBSC II*, 932 F.3d at 770; *see also City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (holding that executive orders with "specific statutory foundation[s]" that do not expressly preclude judicial review are treated as agency action and reviewed under the APA); *Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties.").

To determine whether the Rule is "not in accordance with law," we apply the framework established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  Under *Chevron*, we first consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  Federal courts are "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

**a.**

We consider, then, whether the Rule conflicts with Congress's intent.  The only section of the INA implicated by the Rule is section 1158 ("Asylum").  That section begins by stating that an undocumented migrant may apply for asylum when she is "physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival . . . )[.]"  8 U.S.C. § 1158(a)(1). DOJ   and   DHS   adopted   the   Rule   under   section

1158(b)(2)(C)'s grant of authority to the Attorney General to "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum[.]"**11**

We agree with the district court that the Rule is "not in accordance with law."   5 U.S.C. § 706(2)(A).   Section 1158(a) provides that migrants arriving anywhere along the United States's borders may apply for asylum.  The Rule requires migrants to enter the United States at ports of entry to preserve their eligibility for asylum.  It is effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in section 1158(a).  As the district court stated, "[i]t would be hard to imagine a more direct conflict" than the one presented here.  *EBSC III*, 354 F. Supp. 3d at 1112.

The government argues that the structure of section 1158 mandates a different result.  Critical to the government's argument is that section 1158 splits asylum applications (§ 1158(a)) and eligibility (§ 1158(b)) into two different subsections; therefore, the government explains, Congress intended to allow DOJ to promulgate limitations on asylum eligibility without regard to the procedures and authorizations governing asylum applications.  The text in section 1158(a) requires only that migrants arriving between

---

**11** A separate subsection of section 1158, 1158(d)(5)(B), grants the Attorney General authority to impose "conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter."   As the motions panel observed, had the Rule explicitly conditioned *applications* for asylum (instead of *eligibility* for asylum) on arriving at a designated point of entry, the Rule would be "quite obviously, 'not in accordance with law,'" *EBSC II*, 932 F.3d at 770 (quoting  5 U.S.C. § 706(2)(A)), because 1158(a) directs migrants to "apply for asylum" in accordance with section 1158.

ports of entry be permitted to "apply for *asylum*," and the Rule does not prevent migrants from submitting futile asylum applications. (emphasis added).

This argument is unconvincing. We avoid absurd results when interpreting statutes. *Rowland v. Cal. Men's Colony, Unit II Men's Adv. Council*, 506 U.S. 194, 200–01 (1993). Explicitly authorizing a refugee to file an asylum application *because* he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity. The consequences of denial at the application or eligibility stage are, to a refugee, the same. *See EBSC II*, 932 F.3d at 771. Had Congress intended to allow DOJ and DHS to override this provision, it could have said so in its delegation of authority to the Attorney General or in the statutory provisions governing asylum applications. And Congress signaled its desire that any eligibility limitations be consistent with application requirements; limitations promulgated under the eligibility subsection of the statute must be "consistent with this *section*"—meaning the entirety of section 1158—not just consistent with this *subsection*.

The other categorical bars to asylum in section 1158(b) of the INA do not meaningfully inform our reading of the statute and the Rule. *See EBSC II*, 932 F.3d at 771 n.12. The INA contains various provisions making ineligible asylum applicants who committed a serious, nonpolitical crime outside the United States prior to arrival (8 U.S.C. § 1158(b)(2)(A)(iii)), assisted or otherwise participated in the persecution of another person (8 U.S.C. § 1158(b)(2)(A)(i)), or were firmly resettled in another country prior to arriving in the United States (8 U.S.C. § 1158(b)(2)(A)(vi)), among other things. The government again suggests that the existence of these eligibility bars in

the INA demonstrates that Congress intended certain categories of migrants to be permitted to apply for asylum even though they are categorically ineligible. A migrant who was firmly resettled in another country, for example, is still free to complete an asylum application, even though she will be barred from seeking asylum under section 1158(b)(2)(A)(vi).

But—unlike the eligibility bar effected by the Rule—the statutory asylum bars in the INA do not separately conflict with explicit text in section 1158(a). There is no provision in section 1158(a), for example, that affirmatively requires that migrants who were firmly resettled in another country be permitted to apply for asylum. The Rule creates the only bar to eligibility under section 1158(b) that directly conflicts with language in section 1158(a). The statutory eligibility bars noted above do not suggest Congress intended that migrants who are subject to them be permitted to apply for asylum. *See also EBSC II*, 932 F.3d at 772 ("'[t]o say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter.'") (quoting *EBSC I*, 349 F. Supp. 3d at 857). The district court correctly concluded that the Rule is substantively invalid because it conflicts with the plain congressional intent instilled in 8 U.S.C. § 1158(a), and is therefore "not in accordance with law," 5 U.S.C. § 706(2)(A).

**b.**

But even if the text of section 1158(a) were ambiguous, the Rule fails at the second step of *Chevron* because it is an arbitrary and capricious interpretation of that statutory provision. If the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Campos-Hernandez*, 889 F.3d at 568 (quoting

*Chevron*, 467 U.S. at 843).  Under this standard, we must give effect to an agency's reasonable interpretation of a statute, unless the interpretation is inconsistent with clearly expressed congressional intent.  *See United States v. Fulton,* 475 U.S. 657, 666–67 (1986).

The Board of Immigration Appeals ("BIA") and this court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief. *EBSC II*, 932 F.3d at 772.  More than thirty years ago, the BIA stated that "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor" to adjudicating asylum applications under section 1158(a), but "it should not be considered in such a way that the practical effect is to deny relief in virtually all cases."**[12]**  *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987), *superseded in part by statute on other grounds as stated in Andriasian v. I.N.S.*, 180 F.3d 1033, 1043–44 (9th Cir. 1999); *see also EBSC II*, 932 F.3d at 772.  The court explained that it would instead evaluate "the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution," rather than deny asylum outright because of a single procedural flaw in the migrant's application. *Matter of Pula*, 19 I. & N. Dec. at 473–74.

Especially where a migrant may be eligible only for asylum and cannot establish the more stringent criteria for

---

**[12]** The BIA in *Pula* interpreted section 1158(a) before it was amended to include the particular phrase at issue ("whether or not at a designated port of arrival").  At the time, the relevant sentence stated "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum[.]"  8 U.S.C. § 1158(a) (1980).

withholding-of-removal, the discretionary factors—
including method of entry—should be "carefully evaluated
in light of the unusually harsh consequences which may
befall an alien[.]" *Id.* at 474. Indeed, "the danger of
persecution should generally outweigh all but the most
egregious of adverse factors." *Id.*

We have supported the BIA's understanding of section
1158(a). The most vulnerable refugees are perhaps those
fleeing across the border through the point physically closest
to them. That a refugee crosses a land border instead of a
port-of-entry says little about the ultimate merits of her
asylum application; "if illegal manner of flight and entry
were enough independently to support a denial of asylum,
. . . virtually no persecuted refugee would obtain asylum."
*EBSC II*, 932 F.3d at 773 (quoting *Huang v. I.N.S.*, 436 F.3d
89, 100 (2d Cir. 2006)). Given the Rule's effect of
conditioning asylum eligibility on a factor that has long been
understood as "worth little if any weight," *see Mamouzian v.
Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004), in
adjudicating whether a migrant should be granted asylum, it
is an arbitrary and capricious interpretation of section
1158(a).

The Attorney General's interpretation of section 1158(a)
is also unreasonable, as the motions panel and district court
discussed, in light of the United States's treaty obligations.
*See EBSC II*, 932 F.3d at 772–73; *EBSC III*, 354 F. Supp. 3d
at 1112–13. The United States agreed to comply with
Articles 2 through 34 of the 1951 United Nations
Convention Relating to the Status of Refugees ("1951
Convention") and the 1967 United Nations Protocol
Relating to the Status of Refugees ("1967 Protocol") in
1968. H.R. Rep. 96-781 (Conf. Rep.), at 19–20 (1980), *as
reprinted in* 1980 U.S.C.C.A.N. 160, 160–62; *see also I.N.S.*

*v. Cardoza-Fonseca*, 480 U.S. 421, 429, 436–37 (1987). To streamline the United States's refugee procedures and implement the country's new treaty commitments, Congress passed the Refugee Act of 1980, which amended the INA and created the country's first codified rules governing asylum. S. Rep. No. 96-256, at 1 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 141, 141–42, 144; H.R. Doc. No. 96-608, at 17–18 (1979); *see also Negusie v. Holder*, 555 U.S. 511, 535–36 (2009).

As the United Nations High Commissioner of Refugees ("UNHCR") explains,[13] the Rule runs afoul of three of these codified rules: the right to seek asylum, the prohibition against penalties for irregular entry, and the principle of non-refoulement embodied in Article 31(1) of the 1951 Convention.  Neither the 1967 Protocol nor the 1951 Convention require countries to accept refugees, but they do ensure that refugees at each signatory's borders have legal and political rights and protections. *See* Cong. Research Serv. S522-10, Review of U.S. Refugee Resettlement Programs and Policies 15–16 (1980).

The definition of "refugee" used in the 1951 Convention is "virtually identical" to the one adopted by Congress in the INA. *Cardoza-Fonseca*, 480 U.S. at 437.  Under both the

---

[13] The arguments presented by the United Nations in its amicus brief on how the 1951 Convention and 1967 Protocol should be construed are not binding on this court. *See Cardoza-Fonseca*, 480 U.S. at 439 n.22. But they do "provide[] significant guidance in construing the [1967] Protocol, to which Congress sought to conform[,]" and are "useful in giving content to the obligations that the Protocol establishes." *Id; see also Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007) ("We view the UNHCR Handbook as persuasive authority in interpreting the scope of refugee status under domestic asylum law.") (internal quotation marks and citation omitted).

INA and the 1951 Convention, refugees are all individuals who—because of a "well-founded fear of being persecuted for reasons of race, religion, nationality, membership in a particular social group or political opinion"—are "unable," or, because of such fear, "unwilling to return" to their home countries. *See* 8 U.S.C. § 1101(a)(42); 1951 Convention, Art. 1(A)(2). Once individuals meet the statutory definition of a "refugee," they may be granted asylum under the INA. *See* 8 U.S.C. § 1158(b)(1)(A).

Both the INA and the 1951 Convention acknowledge that individuals may be stripped of their refugee status even when they meet the other eligibility criteria for asylum. The refugee provisions of the 1951 Convention "shall not apply" to "any person with respect to whom there are serious reasons for considering" that such a person has committed a crime against peace, a war crime, a crime against humanity, a non-political crime outside of the country of refuge, prior to their admission as a refugee, or has been "guilty of acts contrary to the purposes and principles of the United Nations." 1951 Convention, Art. 1(F)(a)–(c). The statutory bars for eligibility in the INA are similarly severe. Individuals who are otherwise refugees may not apply for asylum if the Attorney General determines that they "ordered, incited, assisted, or otherwise participated" in the persecution of another, based on a trait protected by the INA; "constitute[] a danger to the community of the United States"; committed a "serious nonpolitical crime" outside the country; are a "danger to the security" of the country; have engaged in terrorist activities; or were "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(i)–(vi).

The exceptions listed in the 1951 Convention "require individualized assessments and 'must be [interpreted]

restrictive[ly]." Br. for UNHCR as Amicus Curiae at 14 n.6 (quoting Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 149 (Geneva, 1979)). So too the categorical bars on eligibility in the INA are interpreted with lenience toward migrants to avoid infringing on the commitments set forth in the 1951 Convention and 1967 Protocol. *See, e.g., Ali v. Ashcroft*, 394 F.3d 780, 790 (9th Cir. 2005) (A "narrow interpretation of the firm resettlement bar would limit asylum to refugees from nations contiguous to the United States or to those wealthy enough to afford to fly here in search of refuge. The international obligation our nation agreed to share when we enacted the Refugee Convention into law knows no such limits."); *Cardoza-Fonseca*, 480 U.S. at 449.

The asylum bars in the INA and in the 1951 Convention appear to serve either the safety of those already in the United States or, in the case of the firm-resettlement bar, the safety of refugees. The Rule ensures neither. Even a broad interpretation of these eligibility bars does not naturally encompass a refugee's method of entry. Illegal entry is not ordinarily considered a "serious crime." *See Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968) (stating that the statute criminalizing entry into the United States "is not based on any common law crime, but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens" and "is a typical mala prohibita offense"). Nor does a migrant's method of entry per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another.

And the Rule surely does not suggest that the migrant has received protection in a third country. Many migrants enter

between ports of entry out of necessity: they "cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim." Br. for UNHCR as Amicus Curiae at 15 (citing *Memorandum by the Secretary-General*, Ad Hoc Comm. on Statelessness, Status of Refugees & Stateless Persons, at Annex Art. 24, cmt. ¶ 2, U.N. Doc. E/AC.32/2 (Jan. 3, 1950); UNHCR Executive Committee Conclusion No. 58 (XL) ¶ (i) (Oct. 13, 1989)). This was well recognized when the Refugee Act of 1980 was drafted. *See* Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Prior to the passage of the Act, migrants who arrived at a port of entry were "given an opportunity to have their [asylum] applications heard in a hearing before an immigration judge," but refugees arriving "at a land border of the United States [we]re not given this right." *Refugee Act of 1979: Hearing on H.R. 2816 before the Subcomm. on Immigration, Refugees, and Int'l Law of the Comm. on the Judiciary*, 96th Cong. 190 (1979) (testimony of David Carliner, American Civil Liberties Union). In its attempt to streamline the country's refugee and asylum laws, Congress was urged to consider that "persons who seek any benefits under [the INA] should be entitled to a uniform procedure." *Id.* Congress heeded this consideration during the drafting of the Refugee Act, eventually describing it as "establish[ing] a more uniform basis for the provision of assistance to refugees, and [] other purposes." Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). The Rule defies this desire for uniformity and denies refuge to those crossing a land border. The effects of the Rule contravene the United States's commitments in the 1951 Convention.

Article 31(1) of the 1951 Convention also explains that signatories "shall not impose penalties" on account of refugees' "illegal entry or presence," 1951 Convention

Art 31(1).        Notwithstanding     the    government's
interpretations otherwise, "deportation is an integral part—
indeed, sometimes the most important part—of the penalty
that may be imposed" on migrants who are found guilty of
specified crimes, or for other reasons are barred from
seeking asylum.**[14]** *See Padilla v. Kentucky*, 559 U.S. 356,
364 (2010) (footnote omitted).    The Rule imposes an
additional penalty on refugees because of their "illegal
entry" by risking the deportation of migrants who enter the
country at a land border. 1951 Convention Art. 31(1).

And by categorically denying refugees an opportunity to
seek asylum only because of their method of entry, the Rule
is also in tension with the United States's commitment to
avoid refouling individuals to countries where their lives are
threatened. Article 31(1) of the 1951 Convention prohibits
signatories from "expel[ling] or return[ing] ('refouler') a
refugee in any manner whatsoever to the frontiers of
territories where his life or freedom would be threatened[.]"
The INA's withholding-of-removal, 8 U.S.C. § 1231(b)(1),
and Convention Against Torture ("CAT") protections,
8 C.F.R. § 1208.16–18, are not as great as those conferred
by the INA's asylum provisions. The evidentiary standard
that applicants must meet for either withholding-of-removal
or CAT relief is higher than the evidentiary standard for
asylum. *See, e.g., Ling Huang v. Holder*, 744 F.3d 1149,
1152 (9th Cir. 2014).    Applicants for withholding-of-
removal and CAT relief must establish a "clear probability"
that they would be persecuted or tortured, respectively, if
they were removed to their home countries. *See Korablina
v. I.N.S.*, 158 F.3d 1038, 1045–46 (9th Cir. 1998); *Wakkary*

---

**[14]** The UNHCR's view is that "penalties" in Article 31(1)
"encompasses civil or administrative penalties as well as criminal ones."
Br. for UNHCR as Amicus Curiae at 20.

*v. Holder*, 558 F.3d 1049, 1053 (9th Cir. 2009). A "clear probability" of persecution or torture means that it is "more likely than not" that applicants will be persecuted upon their removal. *I.N.S. v. Stevic*, 467 U.S. 407, 424, 429–30 (1984).

Applicants for asylum instead must demonstrate only that they are "unable or unwilling" to return to their home countries "because of persecution or a well-founded fear of persecution[.]" 8 U.S.C. § 1101(a)(42)(A). "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place"; it would only be "too apparent," for example, for a refugee to have a "well-founded fear of being persecuted" where "every tenth adult male person is either put to death or sent to some remote labor camp" in the applicant's home country. *Cardoza-Fonseca*, 480 U.S. at 431 (citing 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966)). The Rule, then, risks the removal of individuals with meritorious asylum claims who cannot petition for withholding of removal or CAT relief. By doing so, it is inconsistent with our treaty commitment to non-refoulement.

The Rule is "arbitrary, capricious, or manifestly contrary to the statute," *Chevron,* 467 U.S. at 844, both because it is contrary to plain congressional intent, and because it is an arbitrary and capricious interpretation of section 1158(a). Even if we agreed that the text of section 1158(a) is ambiguous, the Rule flouts this court's and the BIA's discretionary, individualized treatment of refugees' methods of entry, and infringes upon treaty commitments we have stood by for over fifty years.

**2.**

Because we conclude that the Rule is substantively invalid, we only briefly address the procedural arguments raised by the parties. The APA requires public notice and comment and a thirty-day grace period before a proposed rule takes effect. 5 U.S.C. § 553(b)–(d). The notice-and-comment requirements are exempted when "there is involved a military or foreign affairs function of the United States[,]" *id*. § 553(a), or when "the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest." *Id*. § 553(b)(B). The thirty-day lag in publication can be waived where "good cause [is] found."**15**   *Id*. § 553(d)(3).

The Rule was issued without notice and comment or the grace period. The government argues that the Rule was properly issued because it falls under either the good-cause or the foreign-affairs exceptions to these procedural requirements.

**a.**

Proper invocation of the good-cause exception is "sensitive to the totality of the factors at play." *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010). The

---

**15** "Different policies" underlie the good-cause exception for the thirty-day grace period and the good-cause exception for the notice-and-comment requirement, and "they can be invoked for different reasons." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992). Notice-and-comment requirements are intended to ensure public participation in rulemaking, and the thirty-day waiting period is "intended to give affected parties time to adjust their behavior before the final rule takes effect." *Id*.

exception is a "high bar" because it is "essentially an emergency procedure." *Id*. at 1164, 1165. The government must make a sufficient showing that "'delay would do real harm' to life, property, or public safety," *EBSC II*, 932 F.3d at 777 (quoting *Valverde*, 628 F.3d at 1164–65), or that "some exigency" interferes with its ability to carry out its mission. *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003).

In support of its reliance on the exception, the government now cites a *Washington Post* article indicating that when the United States stopped its policy of separating migrant parents from their children, smugglers told asylum-seekers that "the Americans do not jail parents who bring children—and to hurry up before they might start doing so again." *See* Nick Miroff and Carolyn Van Houten, The Border is Tougher to Cross Than Ever. But There's Still One Way into America, Wash. Post (Oct. 24, 2018). The district court concluded that the article "at least supports the inference" that the Rule might result in similar changes in immigration policy, and held that the government had "identified a 'rational connection between the facts found and the choice made' to promulgate the interim Rule on an emergency basis." *EBSC III*, 354 F. Supp. 3d at 1115 (quoting *Valverde*, 628 F.3d at 1168).

A citation to this single article is not sufficient to demonstrate that the delay caused by notice-and-comment or the grace period might do harm to life, property, or public safety. *See EBSC II*, 932 F.3d at 777. The government's reasoning continues to be largely speculative, *see id.* at 778; no evidence has been offered to suggest that any of its predictions are rationally likely to be true. The article does not directly relate to the Rule, the consequences of the Rule, or anything related to asylum eligibility.

Even if it did, that "the very announcement of [the] proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare," Reply Br. of Gov't at 21, is likely often, or even always true. The lag period before any regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception. Because the government has failed to demonstrate the existence of an exigency justifying good cause, we hold that the Rule likely does not properly fall under the good cause exception.

**b.**

For the foreign affairs exception to apply, "the public rulemaking provisions should provoke definitely undesirable international consequences." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Otherwise, the exception "would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Id*. Use of the exception is generally permissible where the international consequences of the rule-making requirements are obvious or thoroughly explained. We have rejected its use where the government has failed to substantiate its reliance on the exception or explain the detrimental effects of compliance with the APA's requirements. *See EBSC II*, 932 F.3d at 776–77.

The government cites to four documents in support of its renewed argument that the foreign-affairs exception is justified: a Memorandum of Understanding ("MOU") between DHS and the Mexican government, the *Washington*

*Post* article, credible-fear origin data published by the Executive Office of Immigration Review ("EOIR"), and a speech by President Trump.  The four documents appear to demonstrate that the Rule and Proclamation are related to ongoing changes in the national immigration landscape, but still fail to establish that adhering to notice and comment and a thirty-day grace period will "provoke definitely undesirable international consequences." *Yassini*, 618 F.3d at 1360 n.4.

We agree with the government that the cited MOU does broadly "show[] that [immigration] negotiations have happened in the past," Op. Br. of Gov't at 49, but this is insufficient to demonstrate that notice and comment will provoke undesirable international consequences.  Indeed, the MOU's substance seems to undermine the "broader diplomatic program involving sensitive and ongoing negotiations with Mexico."  Op. Br. of Gov't at 47 (internal quotations omitted).  Article 3 of the MOU states that "[l]ocal repatriation agreements should conform to mutually established criteria and principles for the repatriation of Mexican nationals being repatriated from the United States to Mexico."  The unilateral repatriation of Mexican nationals set forth by the Rule—without requesting public participation—undermines these terms.

The cited *Washington Post* page discusses an increase in the proportion of families that seek asylum and the EOIR data lists the country of origin of credible-fear cases and summarizes the number of people that attempt to enter the United States with an asylum application, the number of cases completed in 2018, and the outcome of credible fear cases. It is unclear how these data "reflect[] motivations for crossing the border illegally," Op. Br. of Gov't at 49, and even less clear how they demonstrate the consequences of

requesting public notice-and-comment on foreign policy. And the speech by President Trump, as the district court noted, discusses the *domestic* consequences of foreign immigration, not the foreign policy consequences of immigration into the United States. *See EBSC III*, 354 F. Supp. 3d at 1114. The speech—like the MOU, the article, and the EOIR data—does not suggest that the APA's rulemaking provisions might trigger or even shape immediate consequences in foreign affairs.

The evidence relied on by the government here is largely the same as the evidence previously before the motions panel and the district court. While we remain "sensitive to the fact that the President has access to information not available to the public, and . . . [are] cautious about demanding confidential information," the connection between negotiations with Mexico and the immediate implementation of the Rule is still "not apparent." *EBSC II,* 932 F.3d at 776. Broadly citing to the Rule's immigration context is insufficient to invoke the foreign-affairs exception. *See Yassini*, 618 F.2d at 1360 n.4.   The government has not made a "sufficient showing" that "the public rulemaking provisions should provoke definitely undesirable international consequences."   *Id.*; *see also Evans*, 316 F.3d at 912.

In sum, we agree with the motions panel that the government has not established that DOJ and DHS properly invoked the foreign-affairs exception to the notice-and-comment requirement and thirty-day grace period.

**B.**

We next consider whether the Organizations have established that, in the absence of a preliminary injunction, they are likely to suffer irreparable harm. *See Arizona*

*Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *Id*. For this reason, economic harm is not generally considered irreparable. But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Intangible injuries may also qualify as irreparable harm, because such injuries "generally lack an adequate legal remedy." *Brewer*, 757 F.3d at 1068.

We agree with the district court that the Organizations have established that they will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction enjoining enforcement of the Rule. *EBSC II*, 932 F.3d at 767. Both constitute irreparable injuries: the first is an intangible injury, and the second is economic harm for which the Organizations have no vehicle for recovery.

The Rule has already prompted the Organizations to change their core missions. Since the Rule issued, ILL has placed programmatic expansions on hold and has "had to lessen its caseload[.]" Supp. Decl. of Stephen W. Manning at ¶ 14. CARECEN notes that it will "divert significant resources," including "staff time and organizational resources" to respond to the Rule. Decl. of Daniel Sharp at ¶¶ 11–13. EBSC has had to "divert resources away from its core programs to address the new policy." Decl. of Michael Smith at ¶ 15. And, as discussed in Part III, *supra*, the Organizations each stand to lose funding because of their core changes in mission.

Importantly, the Organizations also filed suit the same day that the Rule and the first proclamation issued; while not

dispositive, this suggests urgency and impending irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985). We agree with the district court that the Organizations have demonstrated a sufficient likelihood of irreparable injury to warrant injunctive relief. *EBSC III*, 354 F. Supp. 3d at 1116.

## C.

The government next argues that the harms it will suffer because of the preliminary injunction—namely, the harm caused by the injunction "undermin[ing] the Executive Branch's constitutional and statutory authority to secure the Nation's borders," and the "entry of illegal aliens"— outweigh the benefit to the public and the Organizations conferred by the injunction. Op. Br. of Gov't at 51–52. Relevant equitable factors include the value of complying with the APA, the public interest in preventing the deaths and wrongful removal of asylum-seekers, preserving congressional intent, and promoting the efficient administration of our immigration laws at the border.

First, "[t]he public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581. Indeed, it "does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *Id*. at 581–82. The Organizations and various Amici informed the district court that they would have submitted comments explaining why the Rule disrupts their organizational missions and fails to meet its intended purpose, had they had the opportunity. The APA's requirements reflect "a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations." *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984) (citing *Phil. Citizens in Action v. Schweiker*, 669 F.2d 877, 881 (9th Cir. 1982)). The

government's failure to comply with the APA—particularly given the strength of the Organizations' procedural attack on the Rule—weighs in favor of granting injunctive relief.

Second, the public has an interest in "ensuring that we do not deliver aliens into the hands of their persecutors," *Leiva-Perez*, 640 F.3d at 971, and "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," *Nken*, 556 U.S. at 436. The Rule will likely result in some migrants being wrongfully denied refugee status in this country. For migrants affected by the Rule, withholding of removal and CAT protection are the only forms of relief available. As discussed, these forms of relief demand a higher burden of proof than an asylum claim. At the initial screening interview with an asylum officer, an applicant seeking asylum need only present a "credible fear" of persecution, while an applicant seeking withholding of removal of CAT protection must demonstrate the higher "reasonable fear" of persecution or torture.

The government's opening brief notes that 17 percent of the 34,158 migrants whose cases were completed in 2018 received asylum. *See* Op. Br. of Gov't at 52. Assuming the number of migrants remains constant, if even just 25 percent of asylum-seekers with meritorious claims are denied asylum because of their method of entry, over 1,000 people will either be returned to home countries where they face "persecution based on 'race, religion, nationality, membership in a political social group, or political opinion,'" *EBSC III*, 354 F. Supp. 3d at 1117 n.15 (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)), or forced to proceed on limited-relief claims that demand more stringent showings. If the rate of migration and the rate of migrants claiming fear during the expedited removal process

continues to increase, *see* 84 Fed. Reg. at 21,229, the scale of this wrongful removal will only worsen.

Third, the public has an interest in ensuring that the "statutes enacted by [their] representatives are not imperiled by executive fiat." *EBSC II*, 932 F.3d at 779 (internal quotation marks omitted). The INA, and the United States's signatory status to the 1951 Convention, "reflect the balance Congress struck between the public interests in rendering aliens who enter illegally inadmissible and subject to criminal and civil penalties, and . . . preserving their ability to seek asylum." *EBSC III*, 354 F. Supp. 3d at 1117–18 (citations omitted). The Rule and Proclamation disrupt that balance by overriding plain congressional intent.

Finally, the government and the public have an interest in the "efficient administration of the immigration laws at the border." *EBSC II*, 932 F.3d at 779 (internal quotation marks omitted). This interest is "weighty." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). "[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Id.* The government has a compelling interest in ensuring that injunctions—such as the one granted here—do not undermine separation of powers by blocking the Executive's lawful ability to regulate immigration and rely on its rulemaking to aid diplomacy.

The role of the judiciary in reviewing such policies is narrow. It is merely to ensure that executive procedures do not violate principles of due process or "displace congressional choices of policy." *Id.* at 35. This executive deference, then, is closely linked with our determination on the substantive validity of the Rule. Essentially, the weight we ascribe to this factor depends on the extent to which we agree that the Rule overrides plain congressional intent.

Because the Organizations have established that the Rule is invalid, we do not place much weight on this factor. As the motions panel noted: "[t]here surely are enforcement measures that the President and the Attorney General can take to ameliorate the [immigration] crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws." *EBSC II*, 932 F.3d at 774.

In sum, we agree with the district court that there is a significant basis for concluding that the public interest weighs "sharply" in the Organizations' favor. *See EBSC III*, 354 F. Supp. 3d at 1111.

**V.**

Finally, we turn to the remedy entered by the district court: an injunction preventing enforcement of the Rule. The injunction enjoins the part of the Rule that removes asylum eligibility from migrants who fail to follow a presidential proclamation. *EBSC III*, 354 F. Supp. 3d at 1121. It does not enjoin the credible-fear amendments, but "they have no independent effect," so they are effectively enjoined as well. *Id*. at 1121 n.22. We conclude that the district court did not abuse its discretion in enjoining enforcement of the Rule.

Injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *Univ. of Cal. v. U.S. Dep't of Homeland Sec*., 908 F.3d 476, 511 (9th Cir. 2018) (internal quotations omitted). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown," but there is "no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169–1170 (9th Cir. 1987). The

equitable relief granted by the district court is acceptable where it is "necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71.  District courts have "considerable discretion" in crafting suitable equitable relief; correspondingly, appellate review is "narrow." *Lamb-Weston, Inc. v. McCain Foods, Ltd*., 941 F.2d 970, 974 (9th Cir. 1991).

As discussed, the harms caused to the Organizations as a result of the Rule include a (1) loss of funding and (2) disruption of organizational purpose.   Adequate equitable relief must remedy both harms. *Bresgal*, 843 F.2d at 1170–71. Both harms are due, in part, to the Rule's likely consequence of preventing asylum-seekers with meritorious claims from entering the country along our southern border and successfully obtaining asylum.   The stymied flow of refugees will result in less funding for the Organizations, and a shift (sometimes wholesale) in their organizational missions.

The Organizations do not limit their potential clients to refugees that enter the United States only at the California-Mexico or Arizona-Mexico border; they represent "asylum seekers" broadly.   Unlike the plaintiffs in *California v. Azar*—individual states seeking affirmation of an injunction that applied past their borders—the Organizations here "do not operate in a fashion that permits neat geographic boundaries." *EBSC III*, 354 F. Supp. 3d at 1120–21; *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (The "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.").   An injunction that, for example, limits the application of the Rule to California, would not address the harm that one of the Organizations suffers from losing clients entering through the Texas-Mexico border.   One

fewer asylum client, regardless of where the client entered the United States, results in a frustration of purpose (by preventing the organization from continuing to aid asylum applicants who seek relief), and a loss of funding (by decreasing the money it receives for completed cases).

The government suggests that plaintiffs "identify actual aliens in the United States who would otherwise be subject to the Rule," Op. Br. of Gov't at 57, but this suggestion fails to redress the scope of the Organizations' harms. Part of the harm the Organizations have alleged is the difficulty posed by the Rule in helping them reach migrants who will cross the border; their missions are not limited to helping individuals currently present in the United States. Even if their missions were so limited, asking the Organizations to seek and list every person in the country they might help in the coming months is infeasible and impracticable. The "Government has not proposed a workable alternative form of the [injunction] that accounts" for the harm at issue but "nevertheless appl[ies] only within the [] borders" of the Ninth Circuit. *Washington v. Trump,* 847 F.3d 1151, 1167 (9th Cir. 2017); *see also EBSC II*, 932 F.3d at 779; *EBSC III*, 354 F. Supp. 3d at 1121.

Two other factors support the district court's decision to enjoin Defendants from taking any action to implement the Rule.  First, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Univ. of Cal.*, 908 F.3d at 511 (internal quotation marks omitted).   Singular equitable relief is "commonplace" in APA cases, and is often "necessary to provide the plaintiffs" with "complete redress." *Id.* at 512. Our "typical response is to vacate the rule and remand to the agency"; we "ordinarily do not

attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989). Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an "entire" regulatory program. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990).

Second, as the district court noted, there is an important "need for uniformity in immigration policy." *Id.* at 511; *see also EBSC III*, 354 F. Supp. 3d at 1120–21. We previously have recognized that the "Constitution requires a *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Univ. of Cal.*, 908 F.3d at 511 (quoting *United States v. Texas*, 809 F.3d 134, 187–88 (5th Cir. 2014) (emphases in original)). The INA itself "was designed to implement a uniform federal policy, and the meaning of concepts important to its application are not to be determined according to the law of the forum, but rather require[] a uniform federal definition." *Kahn v. I.N.S.*, 36 F.3d 1412, 1414 (9th Cir. 1994) (internal quotation marks omitted). Different interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action in response to the United States's changing immigration requirements.   For these reasons, in immigration cases, we "consistently recognize[] the authority of district courts to enjoin unlawful policies on a universal basis." *EBSC II*, 932 F.3d at 779 (citing *Univ. of Cal.*, 908 F.3d at 511).

The government again "raises no grounds on which to distinguish this case from our uncontroverted line of

precedent." *Id.* Given the context of this case and the harm
the district court sought to address, we find no error or abuse
of discretion in the terms or scope of the preliminary
injunction.

## **VI.**

For the reasons discussed, the district court's orders
granting preliminary injunctions are **AFFIRMED**.

FERNANDEZ, Circuit Judge, concurring in the result:

I concur in the majority opinion because, and for the
most part only because, I believe that we are bound by the
published decision in *East Bay Sanctuary Covenant v.
Trump* (*East Bay I*), 932 F.3d 742 (9th Cir. 2018).

More specifically, we are bound by both the law of the
circuit and the law of the case. Of course, the rules that
animate the former doctrine are not the same as those that
animate the latter. *See Gonzalez v. Arizona*, 677 F.3d 383,
389 n.4 (9th Cir. 2012) (en banc).

As we have said: "Circuit law . . . binds all courts within
a particular circuit, including the court of appeals itself.
Thus, the first panel to consider an issue sets the law not only
for all the inferior courts in the circuit, but also future panels
of the court of appeals." *Hart v. Massanari*, 266 F.3d 1155,
1171 (9th Cir. 2001). Moreover: "Once a panel resolves an
issue in a precedential opinion, the matter is deemed
resolved, unless overruled by the court itself sitting en banc,
or by the Supreme Court." *Id.* (footnote omitted). Published
opinions are precedential. *See id.* at 1177; *see also
Gonzalez*, 667 F.3d at 389 n.4. That remains true, even if

some later panel is satisfied that "arguments have been characterized differently or more persuasively by a new litigant,"[1] or even if a later panel is convinced that the earlier decision was "incorrectly decided" and "needs reexamination."[2]  And those rules are not mere formalities to be nodded to and avoided.  Rather, "[i]nsofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis." *Hart*, 266 F.3d at 1172.  In this case, there are no material differences—in fact, the situation before this panel is in every material way the same as that before the motions panel.  Furthermore, there is no doubt that motions panels can publish their opinions,[3] even though they do not generally do so.[4]  Once published, there is no difference between motions panel opinions and other opinions; all are entitled to be considered with the same principles of deference by ensuing panels.  Thus, any hesitation about whether they should be precedential must necessarily come before the panel decides to publish, not after.  As we held in *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015):

> Lair contended at oral argument that a motions panel's decision cannot bind a merits panel, and as a result we are not bound by the motions panel's analysis in this case.  Not so.

---

[1] *United States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).

[2] *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018).

[3] *See* 9th Cir. Gen. Order 6.3(g)(3)(ii); *see also id.* at 6.4(b).

[4] *See Haggard v. Curry*, 631 F.3d 931, 933 n.1 (9th Cir. 2010) (per curiam).

> We have held that motions panels can issue
> published decisions. . . . [W]e are bound by
> a prior three-judge panel's published
> opinions, and a motions panel's published
> opinion binds future panels the same as does
> a merits panel's published opinion.

*Id.* at 747 (citations omitted).**5**   Therefore, the legal
determinations in *East Bay I* are the law of the circuit.

We have explained the law of the case doctrine as "a
jurisprudential doctrine under which an appellate court does
not reconsider matters resolved on a prior appeal." *Jeffries
v. Wood*, 114 F.3d 1484, 1488–89 (9th Cir. 1997) (en banc),
*overruled on other grounds by Gonzalez*, 677 F.3d at 389
n.4.   While we do have discretion to decline application of
the doctrine, "[t]he prior decision should be followed unless:
(1) the decision is clearly erroneous and its enforcement
would work a manifest injustice, (2) intervening controlling
authority    makes    reconsideration    appropriate,    or
(3) substantially different evidence was adduced at a
subsequent trial." *Id.* at 1489 (internal quotation marks and

---

**5** The majority opines that in this respect *Lair*'s holding is dicta. Not
so. The court's first basis for rejecting Lair's contention was the basis
just quoted. Its second basis was then set forth. *Id.* It gave both of those
alternatives weight and attention. *See Woods v. Interstate Realty Co.*,
337 U.S. 535, 537, 69 S. Ct. 1235, 1237, 93 L. Ed. 1524 (1949) (holding
"where a decision rests on two or more grounds, none can be relegated
to the category of *obiter dictum*."); *see also United States v. Vidal-
Mendoza,* 705 F.3d 1012, 1016 n.5 (9th Cir. 2013); *Guadalupe-Cruz v.
INS*, 240 F.3d 1209, 1211 & n.5 (9th Cir.), *corrected*, 250 F.3d 1271 (9th
Cir. 2001).

footnote omitted).**6**  We have also indicated that, in general, "our decisions at the preliminary injunction phase do not constitute the law of the case,"**7** but that is principally because the matter is at the preliminary injunction stage and a further development of the factual record as the case progresses to its conclusion may well require a change in the result.**8**  Even so, decisions "on pure issues of law . . . are binding." *Ranchers Cattlemen*, 499 F.3d at 1114. Of course, the case at hand has not progressed beyond the preliminary injunction stage. It is still at that stage, and the factual record has not significantly changed between the record at the time of the decision regarding the stay motion and the current record.  Therefore, as I see it, absent one of the listed exceptions, which I do not perceive to be involved here, the law of the case doctrine would also direct that we are bound by much of the motions panel's decision in *East Bay I*.

Applying those doctrines:

---

**6** The majority seems to add a fourth exception, that is, motions panel decisions never constitute the law of the case. That would be strange if those decisions can constitute the law of the circuit, which they can. Moreover, the case primarily cited for that proposition did not indicate it was dealing with a published motions panel decision or one that set forth its reasoning. *See United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005). It also dealt with the unique area of jurisdiction. *See id.*

**7** *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007); see also *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1074, 1076 n.5 (9th Cir. 2015); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).

**8** *See Ctr. for Biological Diversity*, 706 F.3d at 1090.

(1) The Organizations have standing. *East Bay I*, 932 F.3d at 765–69.

(2) The Organizations are likely to succeed on the substantive merits. *See id.* at 770–74. As to procedural validity regarding adoption of the regulation, the motions panel decision that the foreign affairs exception to the notice and comment procedures does not apply is binding. *Id.* at 775–77. In addition, while the motions panel decision regarding the good cause exceptions is not fully binding, what it did determine was that the information then brought to the attention of the panel and the district court did not suffice. *Id.* at 777–78. In light of that, I agree with the majority that merely adding the twenty-five-word sentence from a Washington Post article was insufficient to justify changing the motions panel result.

(3) The decisions made by the motions panel regarding harm to the Organizations and balance of hardships are also binding decisions regarding the propriety of the preliminary injunction. *Id.* at 767, 778–79.

(4) The scope of the injunction is not overly broad. *Id.* at 779–80.

Thus, I respectfully concur in the result of the majority opinion.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     Defendants. | Civil Action No. 1:19-cv-02117-TJK |
| I.A., *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>WILLIAM BARR, in his official capacity as Attorney General of the United States, *et al.*,<br><br>     Defendants. | Civil Action No. 1:19-cv-02530-TJK |

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on March 5, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated: March 5, 2020

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick
Justin W. Bernick
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com