**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAPITAL AREA IMMIGRANTS' RIGHTS COALITION**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, *in his official capacity as President of the United States*, *et al.*, <br><br> Defendants. | No. 1:19-cv-02117-TJK |
| **I.A.**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **WILLIAM BARR**, *Attorney General of the United States, in his official capacity*, *et al.*, <br><br> Defendants. | No. 1:19-cv-02530-TJK |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
BY *AMICUS CURIAE* IMMIGRATION REFORM LAW INSTITUTE**</u>

CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

LAWRENCE J. JOSEPH
Law Office of Lawrence J. Joseph
1250 Connecticut Ave. NW, Suite 700-1A
Washington, DC 20036
(202) 355-9452
ljoseph@larryjoseph.com

*Counsel for Immigration Reform Law Institute*

## TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Table of Authorities ................................................................................................ iii

Identity and Interest of *Amicus Curiae* .................................................................. 1

Introduction .............................................................................................................. 1

Statement of Facts .................................................................................................... 2

Argument .................................................................................................................. 2

I.     This Court lacks jurisdiction to grant Plaintiffs' requested relief. ..................... 2

     A.     The institutional Plaintiffs lack an Article III case or controversy. ......................... 2

          1.     The institutional Plaintiffs lack a legally protected interest in the relief that they seek. ................................................................ 3

          2.     The institutional Plaintiffs' diverted-resources injuries are inadequate under binding precedent. ............................................. 5

          3.     The institutional Plaintiffs lack third-party standing for future clients. ................................................................................... 8

     B.     Sovereign immunity bars this action. ................................................. 8

II.     Plaintiffs lack a viable action on the merits. ..................................................... 10

     A.     The IFR's promulgation did not violate the APA's procedural requirements. ..................................................................................... 10

     B.     The IFR complies with the INA ........................................................ 10

          1.     A categorical bar to *granting* asylum is not inconsistent with a mandatory right to *apply* for asylum. ..................................... 11

          2.     This Court should reject Plaintiffs' argument that §1158's statutory bars preclude any regulatory bars as a repeal by implication of the Executive's discretion with respect to asylum. ......................................................................................... 11

     C.     Plaintiffs' theory would undermine the essential flexibility that the APA and the INA provide to address emergencies and foreign-affairs functions. ............................................................................... 13

III.     The other *Winter* factors weigh against interim relief. ................................... 15

     A.     Plaintiffs will not suffer irreparable harm. ....................................... 15

     B.     The balance of equities favors the Government. ................................ 16

     C.     The public interest favors the Government. ....................................... 16

Conclusion .............................................................................................................. 17

## TABLE OF AUTHORITIES

### CASES

*Action Alliance of Senior Citizens v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ........................................................................7

*Allen v. Wright*,
    468 U.S. 737 (1984) .........................................................................................3

*Altria Group, Inc. v. Good*,
    555 U.S. 70 (2008) .........................................................................................13

*Am. Immigration Lawyers Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) .....................................................................8

*Arizona v. United States*,
    567 U.S. 387 (2012) ...............................................................................10, 14

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534 (1986) .........................................................................................2

*Benson v. Schofield*,
    236 F.2d 719 (D.C. Cir. 1956) .......................................................................5

*Burford v. Sun Oil Co.*,
    319 U.S. 315 (1943) .................................................................................16-17

*Chevron U.S.A., Inc. v. NRDC*,
    467 U.S. 837 (1984) .......................................................................................14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .........................................................................................5

*Cooper Indus., Inc. v. Aviall Serv., Inc.*,
    543 U.S. 157 (2004) .........................................................................................7

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) ...................................................................16

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) .........................................................................................9

*Diamond v. Charles*,
    476 U.S. 54 (1986) .........................................................................................4

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*,
    729 F.App'x 287 (5th Cir. 2018) ...................................................................6

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) .......................................................................3

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .........................................................................................8

*Flast v. Cohen*,
    392 U.S. 83 (1968)..................................................................................4

*Fourco Glass Co. v. Transmirra Products Corp.*,
    353 U.S. 222 (1957)..............................................................................12

*Gladstone, Realtors v. Bellwood*,
    441 U.S. 91 (1979)..................................................................................6

\*   *Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................5-8

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017) .................................................................1

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982)...............................................................................2

*Keller v. City of Fremont*,
    719 F.3d 931 (8th Cir. 2013) .................................................................1

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972).............................................................................15

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)...............................................................................2

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)...............................................................................8

*Lane v. Pena*,
    518 U.S. 187 (1996)...............................................................................9

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)...............................................................................4

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................................3

*Mathews v. Diaz*,
    426 U.S. 67 (1976)...............................................................................15

*McConnell v. FEC*,
    540 U.S. 93 (2003)..............................................................................4-5

*Miller v. Albright*,
    523 U.S. 420 (1998)...............................................................................8

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).............................................................................15

\*   *Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996)...............................................................6

*Muskrat v. United States*,
    219 U.S. 346 (1911)...............................................................................2

*Nader v. Saxbe,*
497 F.2d 676 (D.C. Cir. 1974) .................................................................................4

\* *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
551 U.S. 644 (2007) ......................................................................................12

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,*
290 F.3d 578 (3d Cir. 2002) .....................................................................16

*Pennsylvania v. New Jersey,*
426 U.S. 660 (1976) .........................................................................................5

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture,*
797 F.3d 1087 (D.C. Cir. 2015) .........................................................5, 8

*Sea-Land Serv., Inc. v. Alaska R.R.,*
659 F.2d 243 (D.C. Cir. 1982) .............................................................9

*Second City Music, Inc. v. City of Chicago,*
333 F.3d 846 (7th Cir. 2003) ...............................................................16

*Shays v. FEC,*
414 F.3d 76 (D.C. Cir. 2005) ...............................................................5

*Sierra Club v. Morton,*
405 U.S. 727 (1972) ...............................................................................3, 6

*South Central Bell Tel. Co. v. Alabama,*
526 U.S. 160 (1999) .............................................................................7

*Steel Co. v. Citizens for a Better Env't.,*
523 U.S. 83 (1998) ............................................................................2

*Trump v. Hawaii,*
138 S.Ct. 2392 (2018) ..............................................................10-11, 14-15

*United States v. Mendoza,*
464 U.S. 154 (1984) ...........................................................................7

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ...........................................................................14

*United States v. Sherwood,*
312 U.S. 584 (1941) ...........................................................................9

*Univ. Med. Ctr. of Southern Nevada v. Shalala,*
173 F.3d 438 (D.C. Cir. 1999) ......................................................3

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
454 U.S. 464 (1982) ..........................................................................3

\* *Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) .......................................................................4-6

*Warth v. Seldin,*
422 U.S. 490 (1975) ..........................................................................6

*Washington v. Reno,*
   35 F.3d 1093 (6th Cir. 1994) ...............................................................16

*Waters v. Churchill,*
   511 U.S. 661 (1994) ...............................................................................7

*Winter v. Natural Resources Defense Council, Inc.,*
   555 U.S. 7 (2008) .........................................................................2, 15-16

*Yakus v. United States,*
   321 U.S. 414 (1944) ..............................................................................17

## **STATUTES**

U.S. Const. art. III ...................................................................2-6, 8, 15

U.S. Const. art. III, §2 ....................................................................3

Administrative Procedure Act,
   5 U.S.C. §§551-706 ................................................2, 9-10, 13-14

5 U.S.C. §553(a)(1).................................................................10, 14

5 U.S.C. §553(b)(B)................................................................10, 14

5 U.S.C. §553(d)(3) ...............................................................10, 14

* 5 U.S.C. §701(a)(1)................................................................9-10

5 U.S.C. §702.............................................................................9

* 5 U.S.C. §703.......................................................................9-10

5 U.S.C. §704.......................................................................9-10

Congressional Review Act,
   5 U.S.C. §§801-808 ...............................................................13

Immigration and Naturalization Act,
   8 U.S.C. §§1101-1537 .......................................1, 6-11, 13-15

8 U.S.C. §1158.................................................................10-12

8 U.S.C. §1158(a)(1)..............................................................11

* 8 U.S.C. §1158(c)(2)(A)........................................................11

8 U.S.C. §1158(c)(2)(A)(ii).....................................................11

* 8 U.S.C. §1158(c)(2)(B) ....................................................10-11

* 8 U.S.C. §1158(c)(2)(C)........................................................11

8 U.S.C. §1252(e)(3)..............................................................9

Pub. L. No. 94-574, §1,
   90 Stat. 2721 (1976)..............................................................9

* Refugee Act of 1980, Pub. L. No. 96-212, §201(b),
   94 Stat. 102, 105 .................................................................12

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996) ..................................................12

Pub. L. No. 104-208, Div. C, §604,
    110 Stat. 3009, 3009-690 to 3009-694 (1996) ...................................................12

* 8 U.S.C. §1158 (1994) .........................................................................................................12

## RULES AND REGULATIONS

Local Rule 7(o)(5)..........................................................................................................1

Fed. R. App. P. 29(a)(4)(E) ............................................................................................1

Asylum Eligibility and Procedural Modifications,
    84 Fed. Reg. 33,829 (2019) ...................................................................................1, 10, 13

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Immigration Law Reform Institute ("IRLI") seeks the Court's leave to file this brief for the reasons set forth in the accompanying motion for leave to file.[1] IRLI is a not for profit 501(c)(3) public interest law firm incorporated in the District of Columbia. IRLI is dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens and legal permanent residents, and to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus* briefs in important immigration cases, including *Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013), and *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017). For more than twenty years, the Board of Immigration Appeals has solicited *amicus* briefs drafted by IRLI staff from IRLI's parent organization, the Federation for American Immigration Reform, because the Board considers IRLI an expert in immigration law. For these reasons, IRLI has a direct interest in the issues here.

## INTRODUCTION

In two related — but not consolidated — actions, several individual asylum seekers and immigrant advocacy groups (collectively, "Plaintiffs") have sued various federal Executive offices and officers (collectively, the "Government") to challenge the promulgation and enforcement of an interim final rule, Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (2019) (hereinafter, the "IFR"), which concerns aliens seeking asylum status in the United States after transiting through a third country without seeking asylum there. Plaintiffs challenge not only the substantive merits under the Immigration and Naturalization Act, 8 U.S.C. §§1101-1537 ("INA"),

---

[1]     Consistent with FED. R. APP. P. 29(a)(4)(E) and Local Rule 7(o)(5), counsel for movant and *amicus curiae* authored the motion and brief in whole, and no counsel for a party authored the motion or brief in whole or in part, nor did any person or entity, other than the movant/*amicus* and his counsel, make a monetary contribution to preparation or submission of the motion or brief.

but also the use of an interim final rule, without notice-and-comment rulemaking under the

Administrative Procedure Act, 5 U.S.C. §§551-706 ("APA"). Plaintiffs move for a preliminary

injunction, which requires meeting the four-factor test of *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 20 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to
> succeed on the merits, that he is likely to suffer irreparable harm in the absence
> of preliminary relief, that the balance of equities tips in his favor, and that an
> injunction is in the public interest.

*Id.* Since Plaintiffs meet none of these factors, the Court should deny interim relief.

## STATEMENT OF FACTS

*Amicus* adopts the facts as stated by the Government. Gov't Memo. at 1-10 (ECF #043)

(No. 1:19-cv-02117-TJK). In arguing these cases, however, *Amicus* does not rely on the specific

facts concerning each Plaintiff.

## ARGUMENT

**I.     THIS COURT LACKS JURISDICTION TO GRANT PLAINTIFFS' REQUESTED
RELIEF.**

Federal courts are courts of limited jurisdiction. *Bender v. Williamsport Area Sch. Dist.*,

475 U.S. 534, 541 (1986). "It is to be presumed that a cause lies outside this limited jurisdiction,

and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*

*v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The parties cannot confer jurisdiction

by consent or waiver, *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S.

694, 702 (1982), and federal courts instead have the obligation to assure themselves of jurisdiction

before reaching the merits. *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998). As

explained below, these actions suffer from several jurisdictional defects.

### A.     The institutional Plaintiffs lack an Article III case or controversy.

Under Article III, federal courts cannot issue advisory opinions, *Muskrat v. United States*,

219 U.S. 346, 356-57 (1911), but must instead focus on the cases or controversies presented by affected parties before the court. U.S. CONST. art. III, §2. "'All of the doctrines that cluster about Article III — not only standing but mootness, ripeness, political question, and the like — relate in part, and in different though overlapping ways, to … the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" *Allen v. Wright,* 468 U.S. 737, 750 (1984) (*quoting Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178-79 (D.C. Cir. 1983) (Bork, J., concurring)). The institutional Plaintiffs' claims fail under several overlapping strands of Article III doctrine. Although this Court need not evaluate the institutional Plaintiffs' standing if the individual Plaintiffs have standing for a claim, this Court would need a plaintiff with both standing and a waiver of sovereign immunity to grant interim — or any — relief.

### 1. The institutional Plaintiffs lack a legally protected interest in the relief that they seek.

A plaintiff can, of course, premise its standing on non-economic injuries, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 486 (1982), such as a "change in the aesthetics and ecology of [an] area," *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972), or the denial of information. *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) ("*EPIC*"). But the threshold requirement for "the irreducible constitutional minimum of standing" remains: did the plaintiff suffer an "injury in fact" through "an invasion of a *legally protected interest* which is … concrete and particularized" to that plaintiff? *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added); *EPIC*, 878 F.3d at 380; *cf. Univ. Med. Ctr. of Southern Nevada v. Shalala*, 173 F.3d 438, 441 (D.C. Cir. 1999) ("alleged illegality without an injury-in-fact does not satisfy standing requirements"). To be sure, the requirement for particularized injury typically poses the biggest problem for plaintiffs — for example, *Valley Forge Christian College*, *Morton*, and *EPIC*,

*supra*, all turned on the lack of a particularized injury — but the requirement for a legally protected interest is even more basic.

As the Supreme Court recently explained in rejecting standing for *qui tam* relators based on their financial stake in a False Claims Act penalty, not all *interests* are *legally protected* interests:

> There is no doubt, of course, that as to this portion of the recovery — the bounty he will receive if the suit is successful — a *qui tam* relator has a concrete private interest in the outcome of the suit. But the same might be said of someone who has placed a wager upon the outcome. *An interest unrelated to injury in fact is insufficient to give a plaintiff standing*. The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right. A *qui tam* relator has suffered no such invasion[.]

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73 (2000) (emphasis added, interior quotation marks, citations, and alterations omitted); *accord McConnell v. FEC*, 540 U.S. 93, 226-27 (2003) ("political 'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources" so "[t]his claim of injury … is, therefore, not to a legally cognizable right") (interior quotation marks and alterations omitted). Thus, even harm to a pecuniary interest does not *necessarily* qualify as an injury in fact. Rather, "Art. III standing requires an injury with a nexus to the substantive character of the statute or regulation at issue." *Diamond v. Charles*, 476 U.S. 54, 70 (1986).[2] As the D.C. Circuit has

---

[2] After rejecting standing based on an interest in a *qui tam* bounty, *Stevens* held that *qui tam* relators have standing on an assignee theory (*i.e.*, the government has an Article III case or controversy and assigns a portion of it to the *qui tam* relator). *Stevens*, 529 U.S. at 771-73. Outside of taxpayer-standing cases that implicate the Establishment Clause, the nexus test of *Flast v. Cohen*, 392 U.S. 83 (1968), typically arises in cases challenging a failure to prosecute. *See, e.g.*, *Nader v. Saxbe*, 497 F.2d 676, 680-82 (D.C. Cir. 1974); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18 (1973) ("in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks"). Even without the *Flast* nexus test, Article III nonetheless requires that the claimed interest qualify as a "legally protected right." *Stevens*, 529 U.S. at 772-73.

explained, an "asserted injury [must] implicate[ a] 'legally cognizable right' … to show invasion of [a] legally protected interest, as required for standing." *Shays v. FEC*, 414 F.3d 76, 88 (D.C. Cir. 2005). Plaintiffs have no such claim here. Accordingly, Plaintiffs have not suffered an injury in fact under the statutes at issue here.[3]

### 2.   The institutional Plaintiffs' diverted-resources injuries are inadequate under binding precedent.

The institutional Plaintiffs attempt to assert organizational standing based on their diverted resources under decisions like *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA*"). But "[m]ere loss of income in consequence of the action of Government or economic disadvantage, by itself, constitutes *damnum absque injuria* which does not confer standing." *Benson v. Schofield*, 236 F.2d 719, 722 (D.C. Cir. 1956).

Because Plaintiffs' diverted-resources injury is entirely self-inflicted, moreover, *amicus* IRLI respectfully submits that it would not suffice for Article III, even if the underlying injury were legally protected. *See* Section I.A.1, *supra*. This type of diverted-resources standing derives from *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372-73 (1982); as Judge Millett explained in her *PETA* dissent, "[t]he problem is not *Havens*[; the] problem is what our precedent has done with *Havens*." 797 F.3d at 1100-01 (Millett, J., *dubitante*). Under the unique statutory and factual situation in *Havens*, a housing-rights organization's diverted resources provided it standing, but in most other settings such diverted resources are mere self-inflicted injuries. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976). If mere spending could manufacture standing, any private advocacy group could establish standing

---

[3]     Although analogous to the prudential zone-of-interests test, *Stevens*, *Shays*, and *McConnell* make clear that the need for a *legally protected interest* is an element of the threshold inquiry under Article III of the Constitution, not a merely prudential inquiry that a party could waive.

against any government action. But that clearly is not the law. *Morton,* 405 U.S. at 739 (organizations lack standing to defend "abstract social interests"). To avoid overstepping its constitutional authority, this Court must reconsider the diverted-resources rationale for Article III standing.

Relying on *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 102-09 (1979), *Havens* held that the Fair Housing Act at issue there extends "standing under §812 … to the full limits of Art. III," so that "courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section," 455 U.S. at 372, thereby collapsing the standing inquiry into the question of whether the alleged injuries met the Article III minimum of injury in fact. *Id.* The typical organizational plaintiff and typical statute lack several critical criteria from *Havens*.

First, the *Havens* organization had a statutory right (backed by a statutory cause of action) to truthful information that the defendants denied to it. Because "Congress may create a statutory right[,] … the alleged deprivation of [those rights] can confer standing." *Warth v. Seldin,* 422 U.S. 490, 514 (1975). Under a typical statute, a typical organizational plaintiff has no claim to any rights related to its own voluntarily diverted resources. So too under the INA.

Second, and related to the first issue, the injury that an organizational plaintiff claims must align with the other components of its standing, *Stevens*, 529 U.S. at 772; *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996); *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F.App'x 287, 299 (5th Cir. 2018) (collecting cases), including the allegedly cognizable right. In *Havens,* the statutorily protected right to truthful housing information aligned with the alleged injury (costs to counteract false information, in violation of the statute). By contrast, under a typical statute, there will be no rights even *remotely* related to a third-party organization's spending.

Third, the *Havens* statute eliminated prudential standing, so the zone-of-interest test did not apply. When a plaintiff — whether individual or organizational — sues under a statute that does not eliminate prudential standing, that plaintiff cannot bypass the zone-of-interest test or other prudential limits on standing.[4] Typically, it would be fanciful to suggest that a statute has private, third-party spending in its zone of interests.

Non-mutual estoppel does not apply to the federal government, *United States v. Mendoza,* 464 U.S. 154, 162 (1984), and *stare decisis* cannot be applied so conclusively that, in effect, it operates as preclusion against non-parties to the prior litigation. *South Central Bell Tel. Co. v. Alabama,* 526 U.S. 160, 167-68 (1999). While Judge Millett acknowledged problematic precedent under *Havens*, those "cases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality); *Cooper Indus., Inc. v. Aviall Serv., Inc.,* 543 U.S. 157, 170 (2004). *Amicus* IRLI respectfully submits that this Court has a constitutional obligation to consider diverted-resource standing, without considering either issue preclusion or preclusive resort to *stare decisis* from decisions that did not expressly consider the issues that the Government and *amicus* IRLI raise.

Even if this Court choses not to re-examine diverted-sources standing under *Havens* and its Circuit progeny, it would be enough under binding Circuit precedent to find that *Havens* does not bar application of the zone-of-interests test outside the Fair Housing Act, *Action Alliance*, 789 F.2d at 939, and immigration advocacy groups do not meet that test for the INA. *See* Gov't Memo. at 17 (citing *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C.

---

[4]    For example, applying *Havens* to diverted resources in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986) (R.B. Ginsburg, J.), then-Judge Ginsburg correctly recognized the need to ask whether those diverted resources fell within the zone of interests of the Age Discrimination Act. 789 F.2d at 939. There was no such inquiry here or in most diverted-resource decisions.

Cir. 1996)). Accordingly, the institutional Plaintiffs cannot asset diverted-resource standing under *Havens* and *PETA*.

### 3.      The institutional Plaintiffs lack third-party standing for future clients.

The institutional Plaintiffs lack third-party standing to assert the rights of absent asylum seekers whom the institutional Plaintiffs hope to meet someday and represent. While some relationships might support third-party standing, the same is simply not true of all hypothetical relationships, including those between the institutional Plaintiffs and any asylum seekers whom the institutional Plaintiffs might meet in the *future*: an *"existing* attorney-client relationship is, of course, quite distinct from the *hypothetical* attorney-client relationship posited here.*" Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) (emphasis in original). Future asylum-seeking aliens do not have regular, ongoing relationships with the institutional Plaintiffs analogous to *existing* attorney-client relationships.

Before *Kowalski* was decided in 2004, "the general state of third party standing law" was "not entirely clear," *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000), and "in need of what may charitably be called clarification." *Miller v. Albright*, 523 U.S. 420, 455 n.1 (1998) (Scalia, J., concurring). After *Kowalski* was decided in 2004, however, hypothetical future relationships can no longer support third-party standing. Thus, the institutional Plaintiffs lack third-party standing to assert future clients' rights. The institutional Plaintiffs' implicit invocation of third-party standing fails under *Kowalski*.

### B.      Sovereign immunity bars this action.

In addition to the lack of Article III jurisdiction, these actions also fall outside the scope of the APA's waiver of sovereign immunity and thus are subject to an independent jurisdictional bar. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature"). As the Government explains, the INA precludes third-party judicial review by groups like the

institutional plaintiffs, channels review to administrative removal proceedings for all but two of the individual Plaintiffs, and bars interim relief for those two individual Plaintiffs entitled to review under 8 U.S.C. §1252(e)(3). *See* Gov't Memo. at 19-28. Collectively, these three bars to judicial review preclude, narrow, or channel all the review that Plaintiffs seek and deny this Court the authority to issue interim relief here.

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," without regard to any perceived unfairness, inefficiency, or inequity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). The scope of such waivers, moreover, is strictly construed in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Here, Plaintiffs lack a waiver of sovereign immunity for an APA action.

In the 1976 APA amendments to 5 U.S.C. §702,[5] Congress "*eliminat[ed]* the sovereign immunity defense in *all equitable actions* for specific relief against a Federal agency or officer acting in an official capacity." *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1982) (quoting S. REP. NO. 996, 94th Cong., 2d Sess. 8 (1976); H.R. REP. NO. 1656, 94th Cong., 2d Sess. 9 (1976), 1976 U.S. Code Cong. & Admin. News 6121, 6129) (R.B. Ginsburg, J.). But that waiver has several restrictions that preclude review *in these actions*.

Specifically, the APA excludes review for "statutes [that] preclude judicial review" and those that provide "special statutory review." 5 U.S.C. §§701(a)(1), 703. In addition, the waiver of immunity extends only to actions made reviewable by statute and final actions for which there is no other adequate remedy in court. 5 U.S.C. §704. Both because these are either precluded outright or channeled to special INA review and because — for most individual Plaintiffs — the

---

[5]     PUB. L. NO. 94-574, § 1, 90 Stat. 2721 (1976).

new rule does not represent final agency action, *see* Gov't Memo. at 19-28, these actions fall outside the APA's waiver of sovereign immunity. *See* 5 U.S.C. §§701(a)(1), 703, 704. Accordingly, this Court should deny interim relief on sovereign immunity grounds.

## II.   PLAINTIFFS LACK A VIABLE ACTION ON THE MERITS.

Assuming *arguendo* that this Court reaches the merits, this Court should reject Plaintiffs' claims on both the procedural and substantive merits.

### A.   <u>The IFR's promulgation did not violate the APA's procedural requirements.</u>

The Government issued its interim final rule to address not only a public-safety and humanitarian emergency, but also issues of national security and foreign relations. 84 Fed. Reg. at 33,840-42. These grave and weighty concerns easily meet the APA's exceptions for notice-and-comment rulemaking and for suspending the 30-day grace period for a rule's taking effect. 5 U.S.C. §553(a)(1), (b)(B), (d)(3). The Supreme Court has found it imperative that the United States speak with one national voice — not 50 states' voices or 88 district courts' voices — on issues, such as immigration, that touch foreign relations. *Arizona v. United States*, 567 U.S. 387, 395 (2012). Given the APA's foreign-affairs exception, 5 U.S.C. §553(a)(1), the 88 federal district courts do not have authority, *vis-à-vis* APA procedural issues, to interfere in these aspects of sovereignty, which the Constitution commits to the political branches. *Trump v. Hawaii*, 138 S.Ct. 2392, 2419 (2018). The APA poses no procedural barrier to the IFR.

### B.   <u>The IFR complies with the INA.</u>

The IFR's substantive validity hinges on whether the Government's proposed additional criteria for denying asylum qualify as "consistent with this section." 8 U.S.C. §1158(c)(2)(B). This Court should reject Plaintiffs' alleged inconsistencies with §1158.

1.    **A categorical bar to _granting_ asylum is not inconsistent with a mandatory right to _apply_ for asylum.**

A categorical prohibition on the _granting_ of asylum is fully consistent with the mandatory right to _apply_ for asylum. _Compare_ 8 U.S.C. §1158(a)(1) (right to apply for asylum) _with id._ §1158(c)(2)(A)-(C) (exceptions to subsection (b)(1)'s permissive grant of asylum). For example, an alien "who arrives in the United States … whether or not at a designated port of arrival" has an unfettered right to _apply_ for asylum, 8 U.S.C. §1158(a)(1), but immigration officials lack the authority to _grant_ that application if the alien in question has been convicted of certain crimes. _Id._ §1158(c)(2)(A)(ii). The INA does not create a right to obtain the discretionary grant of asylum merely by giving aliens the right to _apply_ for asylum. The Supreme Court recognized that the INA makes a similar distinction between obtaining a visa to enter the United States and being deemed admissible to enter the United States. _Hawaii_, 138 S.Ct. at 2414 ("plaintiffs' interpretation … ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA"). Neither the INA nor the Constitution prohibits allowing applications that are doomed to fail.

2.    **This Court should reject Plaintiffs' argument that §1158's statutory bars preclude any regulatory bars as a repeal by implication of the Executive's discretion with respect to asylum.**

Plaintiffs argue that §1158's express statutory bars to asylum (_e.g._, an alien's being "firmly resettled in another country prior to arriving in the United States") preclude the Government's adopting additional regulatory bars because the regulatory bars would not qualify as "consistent with this section." _See_ 8 U.S.C. §1158(c)(2)(B). Nothing in the 1996 enactment[6] of the relevant

---

[6]    The contested provisions of current §1158 were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act, PUB. L. NO. 104-208, Div. C, 110 Stat. 3009-546 (1996). _See_ PUB. L. NO. 104-208, Div. C, §604, 110 Stat. 3009, 3009-690 to 3009-694 (1996).

provisions of §1158 announced that Congress intended to repeal the Executive's pre-existing

discretion with respect to *denying* asylum. *See* Refugee Act of 1980, Pub. L. No. 96-212, §201(b),

94 Stat. 102, 105. Specifically, the relevant pre-1996 part of §1158 provided as follows:

> The Attorney General shall establish a procedure for an alien physically present
> in the United States or at a land border or port of entry, irrespective of such
> alien's status, to apply for asylum, and the alien may be granted asylum in the
> discretion of the Attorney General if the Attorney General determines that such
> alien is a refugee within the meaning of section 101(a)(42)(A).

*Id.* (former §1158(a)).[7] While it would plainly be inconsistent with §1158 to *contradict* the

categorical bars that Congress enacted, *supplementing* those categorical bars by regulation is not

linguistically inconsistent with §1158. Given that the Executive had broad discretion to deny

asylum to any category of aliens before 1996, reading the 1996 amendment to implicitly narrow

the discretion in areas where the 1996 amendments were silent amounts to a repeal by implication,

which this Court should reject.

Repeals by implication are disfavored, *Nat'l Ass'n of Home Builders v. Defenders of*

*Wildlife,* 551 U.S. 644, 662 (2007) ("*NAHB*"), and require "clear and manifest" intent of a

congressional intent to repeal the prior authority:

> While a later enacted statute … can sometimes operate to amend or even repeal
> an earlier statutory provision …, repeals by implication are not favored and will
> not be presumed unless the intention of the legislature to repeal is clear and
> manifest.

*Id.* (interior quotation marks and alterations omitted).[8] In the related context of federal preemption,

---

[7]     The pre-1996 version of §1158, 8 U.S.C. §1158 (1994), is attached hereto as exhibit A.

[8]     Although *NAHB* involved one statute impliedly repealing another statute, the same
principle applies to instances where one version of a statute amends the prior version of the same
statute: "no changes of law or policy are to be presumed from changes of language in the revision
unless an intent to make such changes is clearly expressed." *Fourco Glass Co. v. Transmirra*
*Products Corp.,* 353 U.S. 222, 227 (1957).

the same clear-and-manifest standard is presumptively not met if the statute is linguistically open to a non-preemptive reading: "When the text of [a statute] is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors'" unsettling the canon. *Altria Group, Inc. v. Good,* 555 U.S. 70, 77 (2008) (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)). Here, too, this Court should reject Plaintiffs' attempt to graft onto a congressional bar to some asylees a congressional intent to preclude the Executive's authority — in the discretion that Congress delegated to the Executive — to adopt regulatory bars when the Executive finds them appropriate. If Congress disagrees with the Executive's actions, Congress can amend the statute or even reject the regulation. *See* 5 U.S.C. §§801-808 (Congressional Review Act). This Court should not attempt to displace the political branches in setting immigration policy.

### C.     Plaintiffs' theory would undermine the essential flexibility that the APA and the INA provide to address emergencies and foreign-affairs functions.

It would suffice to deny a preliminary injunction if Plaintiffs' APA and INA claims lack merit. *See* Sections II.A-II.B, *supra. Amicus* IRLI respectfully submits that this Court should also consider the "flip-side" of how *granting* a preliminary injunction would injure the very flexibility that the APA and the INA provide the Government.

Before addressing the legal issues of APA and INA flexibility, *amicus* IRLI respectfully submits that the Government has correctly recognized a real emergency. Aliens are crossing the southern border at unprecedented levels, far exceeding the ability of the immigration system to process them in an orderly manner. Most asylum claims are deemed to lack merit, and many valid claims could continue under the IFR. In addition to the public-safety and humanitarian concerns about harm to both federal enforcement officers and the illegal border crossers themselves, removing the magnetic pull of near-automatic parole into the United States while awaiting the orderly processing of baseless asylum claims injures *bona fide* asylum seekers, whose claims are

slowed by the mass of baseless claims.

The APA provides all federal agencies broad discretion to set policy in the interstitial areas that their enabling statutes do not address specifically. *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 844 (1984). Furthermore, in the specific context of emergencies, the APA goes further in loosening the otherwise-applicable requirements for notice-and-comment rulemaking. 5 U.S.C. §553(b)(B), 553(d)(3). Finally, "to the extent that there is involved … a … foreign affairs function of the United States," the APA provides still more flexibility by outright exempting federal agencies from those rulemaking requirements. *Id.* §553(a)(1). This Court should not ignore — or trammel upon — the flexibility that the APA gives the Government to address the humanitarian and public-safety emergencies here or to interfere with the Government's negotiations with Mexico over illegal aliens crossing through Mexico to the United States.

In addition to the general flexibility that the APA provides, the INA provides even more flexibility to the political branches to address immigration:

> Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. … It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a *field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program.*

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543-44 (1950) (internal quotation marks omitted, emphasis added); *Arizona*, 567 U.S. at 396 ("principal feature of the removal system is the broad discretion exercised by immigration officials"); *Hawaii*, 138 S.Ct. at 2420 (even under the Constitution, courts should avoid "inhibit[ing] the flexibility of the President to respond to changing world conditions") (interior quotation marks omitted). Significantly, we deal here not with a constitutional limit but with perceived statutory limits.

Finally, the "exclusion of aliens is a fundamental act of sovereignty by the political

branches." *Hawaii*, 138 S.Ct. at 2407 (interior quotation marks omitted). Because "decisions in these matters may implicate our relations with foreign powers" and implicate "changing political and economic circumstances," these "decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Thus, the Government's flexibility here — while clearly present in the INA itself — also arises from the nature of sovereignty and the separation of powers: "In accord with ancient principles of the international law of nation-states, … the power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers — a power to be exercised exclusively by the political branches of government.'" *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (citations, internal alterations, and quotation marks omitted). This Court should not attempt to set federal immigration policy.

## III.   THE OTHER *WINTER* FACTORS WEIGH AGAINST INTERIM RELIEF.

Although the unlikelihood that Plaintiffs will prevail is enough to deny interim relief, the other three *Winter* factors also counsel against interim relief.

### A.   <u>Plaintiffs will not suffer irreparable harm.</u>

Immigrant advocacy groups and economic migrants (that is, those seeking to immigrate to the United States because the standard of living is higher here than in their home countries) have abused the asylum process by making false claims of persecution or other baseless asylum claims in order to gain entry into this country, only to disappear into the country without appearing at future hearings. Injuries that qualify as sufficiently immediate under Article III can nonetheless fail to qualify under the higher bar for irreparable harm. *Monsanto Co. v. Geertson Seed Farms*,

561 U.S. 139, 149-50, 162 (2010).[9] Similarly, this Court should discount the allegedly irreparable harm from this action when the individual Plaintiffs have an adequate remedy in their removal proceedings. *See* Section I.B, *supra*. Finally, because these aliens did not apply for asylum in the countries through which they transited to get here, this Court can draw an inference that their allegedly irreparable harm is not as significant as they claim.

## B.   The balance of equities favors the Government.

The balance of equities tips in the Government's favor for two reasons. First, the Government's advantage on the substantive merits tips the equities in its favor. *See* Section II, *supra*. Second, Plaintiffs' interest — if even cognizable and within this Court's jurisdiction, *see* Sections I, *supra* — undercuts their ability to assert a countervailing form of irreparable harm. *See* Section III.A, *supra*. Consequently, the balance of equities tips decidedly in the Government's favor. Moreover, as the Government explains, the crush of economic migrants asserting insincere claims of persecution in their asylum claims drown immigrants with bona fide asylum claims in delay caused by the economic migrants.

## C.   The public interest favors the Government.

The last *Winter* criterion is the public interest. Where the parties dispute the lawfulness of government programs, this last criterion collapses into the merits. *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). If the Court agrees with the Government on the merits, the public interest will tilt decidedly toward the Government: "It is in the public interest that federal courts

---

[9]   This is especially true for self-inflicted injuries like diverted resources. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury"); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("injury … may be discounted by the fact that [a party] brought that injury upon itself"); *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002). To the extent that the institutional Plaintiffs lack standing, *see* Section I.A, *supra*, so they lack irreparable harm as well.

of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.,* 319 U.S. 315, 318 (1943). In public-injury cases, equitable relief that affects competing public interests "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff" because courts also consider adverse effects on the public interest. *Yakus v. United States*, 321 U.S. 414, 440 (1944). This Court should not attempt to set asylum policy for the Nation.

## **CONCLUSION**

For the foregoing reasons and those cited by the Government, this Court should deny the motions for a preliminary injunction.

Dated: August 29, 2019                    Respectfully submitted,

/s/ Lawrence J. Joseph
_____
Christopher J. Hajec                  Lawrence J. Joseph, D.C. Bar No. 464777
Immigration Reform Law Institute      1250 Connecticut Av NW Suite 700-1A
25 Massachusetts Ave. NW, Suite 335   Washington, DC 20036
Washington, DC 20001                  Telephone: (202) 355-9452
Telephone: (202) 232-5590             Facsimile: (202) 318-2254
chajec@irli.org                       ljoseph@larryjoseph.com

*Counsel for Immigration Reform Law Institute*

Exhibit A
8 U.S.C. §1158 (1994)

Presidential Determination No. 90–2, Oct. 6, 1989, 54 F.R. 43035.

Presidential Determination No. 89–15, June 19, 1989, 54 F.R. 31493.

Presidential Determination No. 89–2, Oct. 5, 1988, 53 F.R. 45249.

Presidential Determination No. 88–16, May 20, 1988, 53 F.R. 21405.

Presidential Determination No. 88–01, Oct. 5, 1987, 52 F.R. 42073.

Presidential Determination No. 87–1, Oct. 17, 1986, 51 F.R. 39637.

Presidential Determination No. 83–2, Oct. 11, 1982, 47 F.R. 46483.

Presidential Determination No. 82–1, Oct. 10, 1981, 46 F.R. 55233.

Presidential Determination No. 80–28, Sept. 30, 1980, 45 F.R. 68365.

Ex. Ord. No. 12208. Consultations on the Admission of Refugees

Ex. Ord. No. 12208, Apr. 15, 1980, 45 F.R. 25789, as amended by Ex. Ord. No. 12608, Sept. 9, 1987, 52 F.R. 34617, provided:

By the authority vested in me as President by the Constitution and laws of the United States of America, including the Refugee Act of 1980 (P.L. 96–212; 8 U.S.C. 1101 note), the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), and Section 301 of Title 3 of the United States Code, it is hereby ordered as follows:

1–101. Exclusive of the functions otherwise delegated, or reserved to the President, by this Order, there are hereby delegated the following functions:

(a) To the Secretary of State and the Attorney General, or either of them, the functions of initiating and carrying out appropriate consultations with members of the Committees on the Judiciary of the Senate and of the House of Representatives for purposes of Sections 101(a)(42)(B) and 207(a), (b), (d), and (e) of the Immigration and Nationality Act, as amended (8 U.S.C. 1101(a)(42)(B) and 1157(a), (b), (d), and (e)).

(b) To the United States Coordinator for Refugee Affairs, the functions of reporting and carrying on periodic discussions under section 207(d)(1) of the Immigration and Nationality Act, as amended [8 U.S.C. 1157(d)(1)].

1–102. (a) The functions vested in the United States Coordinator for Refugee Affairs by Section 1–101(b) of this Order shall be carried out in consultation with the Secretary of State, the Attorney General, and the Secretary of Health and Human Services.

(b) The United States Coordinator shall notify the Committees on the Judiciary of the Senate and of the House of Representatives that the Secretary of State and the Attorney General, or either of them, wish to consult for the purposes of Section 207(a), (b), or (d) of the Immigration and Nationality Act, as amended [8 U.S.C. 1157(a), (b), or (d)]. The United States Coordinator for Refugee Affairs shall, in accord with his responsibilities under Section 301 of the Refugee Act of 1980 (8 U.S.C. 1525), prepare for those Committees the information required by 207(e) of the Immigration and Nationality Act, as amended.

1–103. There are reserved to the President the following functions under the Immigration and Nationality Act, as amended [8 U.S.C. 1101 et seq.].

(a) To specify special circumstances for purposes of qualifying persons as refugees under Section 101(a)(42)(B) [8 U.S.C. 1101(a)(42)(B)].

(b) To make determinations under Sections 207(a)(1), 207(a)(2), 207(a)(3) and 207(b) [8 U.S.C. 1157(a)(1) to (3) and (b)].

(c) To fix the number of refugees to be admitted under Section 207(b).

1–104. Except to the extent inconsistent with this Order, all actions previously taken pursuant to any function delegated or assigned by this Order shall be deemed to have been taken and authorized by this Order.

Section Referred to in Other Sections

This section is referred to in sections 1101, 1151, 1159, 1181, 1182, 1324b, 1522 of this title; title 7 section 2015; title 22 section 4703; title 42 sections 602, 615, 1382j, 1436a.

§ 1158. Asylum procedure

(a) Establishment by Attorney General; coverage

The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

(b) Termination of asylum by Attorney General; criteria

Asylum granted under subsection (a) of this section may be terminated if the Attorney General, pursuant to such regulations as the Attorney General may prescribe, determines that the alien is no longer a refugee within the meaning of section 1101(a)(42)(A) of this title owing to a change in circumstances in the alien's country of nationality or, in the case of an alien having no nationality, in the country in which the alien last habitually resided.

(c) Status of spouse or child of alien granted asylum

A spouse or child (as defined in section 1101(b)(1)(A), (B), (C), (D), or (E) of this title) of an alien who is granted asylum under subsection (a) of this section may, if not otherwise eligible for asylum under such subsection, be granted the same status as the alien if accompanying, or following to join, such alien.

(d) Aliens convicted of aggravated felony

An alien who has been convicted of an aggravated felony, notwithstanding subsection (a) of this section, may not apply for or be granted asylum.

(e) Employment authorization

An applicant for asylum is not entitled to employment authorization except as may be provided by regulation in the discretion of the Attorney General.

(June 27, 1952, ch. 477, title II, ch. 1, § 208, as added Mar. 17, 1980, Pub. L. 96–212, title II, § 201(b), 94 Stat. 105; amended Nov. 29, 1990, Pub. L. 101–649, title V, § 515(a)(1), 104 Stat. 5053; Sept. 13, 1994, Pub. L. 103–322, title XIII, § 130005(b), 108 Stat. 2028.)

Amendments

1994—Subsec. (e). Pub. L. 103–322 added subsec. (e).

1990—Subsec. (d). Pub. L. 101–649 added subsec. (d).

Effective Date of 1990 Amendment

Section 515(b) of Pub. L. 101–649, as amended by Pub. L. 102–232, title III, § 306(a)(13), Dec. 12, 1991, 105 Stat. 1752, provided that:

"(1) The amendment made by subsection (a)(1) [amending this section] shall apply to convictions entered before, on, or after the date of the enactment of this Act [Nov. 29, 1990] and to applications for asylum made on or after such date.

"(2) The amendment made by subsection (a)(2) [amending section 1253 of this title] shall apply to convictions entered before, on, or after the date of the enactment of this Act [Nov. 29, 1990] and to applications for withholding of deportation made on or after such date."

### EFFECTIVE DATE

Section effective Mar. 17, 1980, and applicable to fiscal years beginning with the fiscal year beginning Oct. 1, 1979, see section 204 of Pub. L. 96-212, set out as an Effective Date of 1980 Amendment note under section 1101 of this title.

### EXPEDITIOUS DEPORTATION FOR DENIED ASYLUM APPLICANTS

Section 130005 of Pub. L. 103-322 provided:
"(a) IN GENERAL.—The Attorney General may provide for the expeditious adjudication of asylum claims and the expeditious deportation of asylum applicants whose applications have been finally denied, unless the applicant remains in an otherwise valid nonimmigrant status.
"(b) EMPLOYMENT AUTHORIZATION.—[Amended this section.]
"(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—
"(1) $64,000,000 for fiscal year 1995;
"(2) $90,000,000 for fiscal year 1996;
"(3) $93,000,000 for fiscal year 1997; and
"(4) $91,000,000 for fiscal year 1998."

### TIME FOR ESTABLISHMENT OF ASYLUM PROCEDURE BY ATTORNEY GENERAL

Section 204(d)(2) of Pub. L. 96-212 provided that: "The Attorney General shall establish the asylum procedure referred to in section 208(a) of the Immigration and Nationality Act (as added by section 201(b) of this title) [subsec. (a) of this section] not later than June 1, 1980."

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1324b of this title; title 7 section 2015; title 22 section 4703; title 42 sections 602, 615, 1436a.

## § 1159. Adjustment of status of refugees

**(a) Criteria and procedures applicable for admission as immigrant; effect of adjustment**

(1) Any alien who has been admitted to the United States under section 1157 of this title—
    (A) whose admission has not been terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe,
    (B) who has been physically present in the United States for at least one year, and
    (C) who has not acquired permanent resident status,

shall, at the end of such year period, return or be returned to the custody of the Service for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1226, and 1227 of this title.

(2) Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before a special inquiry officer to be admissible (except as otherwise provided under subsection (c) of this section) as an immigrant under this chapter at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this chapter, be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States.

**(b) Maximum number of adjustments; recordkeeping**

Not more than 10,000 of the refugee admissions authorized under section 1157(a) of this title in any fiscal year may be made available by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—
    (1) applies for such adjustment,
    (2) has been physically present in the United States for at least one year after being granted asylum,
    (3) continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,
    (4) is not firmly resettled in any foreign country, and
    (5) is admissible (except as otherwise provided under subsection (c) of this section) as an immigrant under this chapter at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

**(c) Applicability of other Federal statutory requirements**

The provisions of paragraphs (4), (5), and (7)(A) of section 1182(a) of this title shall not be applicable to any alien seeking adjustment of status under this section, and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(June 27, 1952, ch. 477, title II, ch. 1, § 209, as added Mar. 17, 1980, Pub. L. 96-212, title II, § 201(b), 94 Stat. 105; amended Nov. 29, 1990, Pub. L. 101-649, title I, § 104(a)(1), title VI, § 603(a)(4), 104 Stat. 4985, 5082; Dec. 12, 1991, Pub. L. 102-232, title III, § 307(l)(1), 105 Stat. 1756.)

### AMENDMENTS

1991—Subsec. (c). Pub. L. 102-232 substituted "subparagraph (A)" for "subparagraphs (A)".
1990—Subsec. (b). Pub. L. 101-649, § 104(a)(1), substituted "10,000" for "five thousand".
    Subsec. (c). Pub. L. 101-649, § 603(a)(4), substituted "(4), (5), and (7)(A)" for "(14), (15), (20), (21), (25), and (32)" and "(other than paragraph (2)(C) or subparagraphs (A), (B), (C), or (E) of paragraph (3))" for "(other than paragraph (27), (29), or (33) and other than so much of paragraph (23) as relates to trafficking in narcotics)".

### EFFECTIVE DATE OF 1991 AMENDMENT

Section 307(l) of Pub. L. 102-232 provided that the amendment made by that section is effective as if included in section 603(a) of the Immigration Act of 1990, Pub. L. 101-649.